# EXHIBIT A

This is a sealed pleading and it is subject to the Order Under 11 U.S.C. §§ 102(1)(A), 105(a), 107, 108(a)(2), and 546(a) and Fed. R. Bankr. P. 7004, 9006(c), and 9018 (i) Authorizing Debtors to Enter into Stipulations Tolling Statute of Limitations with Respect to Certain Claims, (ii) Authorizing Procedures to Identify Causes of Action that Should be Preserved, and (iii) Establishing Procedures for Certain Adversary Proceedings Including Those Commenced by Debtors Under 11 U.S.C. § 541, 544, 545, 547, 548 or 553, dated August 16, 2007.

TOGUT, SEGAL & SEGAL LLP
Conflicts Counsel for Delphi Corporation, *et al.*,
Debtors and Debtors in Possession
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000
Neil Berger (NB-3599)
Scott E. Ratner (SER-0015)

Delphi Legal Information Hotline:
Toll Free: (800) 718-5305
International: (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------- x
                                            :
In re:                                      :   Chapter 11
                                            :   Case No. 05-44481 [RDD]
DELPHI CORPORATION, *et al.*,               :
                                            :   Jointly Administered
---------------------------------------------------------- x
                                            :
DELPHI CORPORATION, *et al.*,               :   Adv. Pro. No. 07-_____ [RDD]
                                            :
                            Plaintiffs,     :
                                            :
        - against -                         :
                                            :
EDS, EDS CORP., ELECTRONIC DATA             :
SYSTEMS, ELECTRONIC DATA SYSTEMS            :
CORP., ELECTRONIC DATA SYSTEMS DE,          :
ELECTRONIC DATA SYSTEMS LTD. and            :
EDS CANADA INC.,                            :
                                            :
                            Defendants.     :
                                            :
---------------------------------------------------------- x


### COMPLAINT TO AVOID AND RECOVER
### TRANSFERS PURSUANT TO 11 U.S.C. §§ 547 AND 550

Delphi Corporation ("Delphi") and the other above-captioned debtors and debtors in possession, the plaintiffs herein (together, the "Plaintiffs"),[1] by their conflicts counsel, Togut, Segal & Segal LLP, as and for their complaint ("Complaint") against the above-captioned Defendants (defined below), allege the following on knowledge as to themselves and their own acts and otherwise upon information and belief:

## INTRODUCTION

1.     On October 8, 2005 (the "Initial Filing Date"), Delphi and certain of its subsidiaries (the "Initial Filers") each filed voluntary petitions in this Court for reorganization relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). On October 14, 2005, three additional U.S. subsidiaries of Delphi (together with the Initial Filers, the "Debtors") filed voluntary petitions in this Court for reorganization relief under Chapter 11 of the Bankruptcy Code.

2.     The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

## JURISDICTION, VENUE AND PARTIES

3.     Plaintiffs bring this adversary proceeding (the "Adversary Proceeding") pursuant to, *inter alia*, sections 547 and 550 of the Bankruptcy Code and Rules 3007 and 7001(1) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") for an Order and Judgment of this Court against EDS, EDS Corp., Electronic Data Systems, Electronic Data Systems Corp., Electronic Data Systems DE, Electronic Data Systems Ltd. and EDS Canada Inc. (together, "Defendants") to direct the return of

---

[1]     The term "Plaintiffs" shall mean all of the Debtors in the above-captioned chapter 11 cases.

certain avoidable transfers (the "Transfers") that were made by Plaintiffs to Defendants as more fully and particularly identified in Exhibit "1" annexed hereto.

4.     This Adversary Proceeding is a "core" proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (F) and (O).

5.     Jurisdiction exists in this Court pursuant to 28 U.S.C. § 1334.

6.     Venue of this Adversary Proceeding is proper in this Court pursuant to 28 U.S.C. § 1409(a).

7.     Upon information and belief, Defendants were creditors of one or more of the Plaintiffs prior to the filing of Plaintiffs' chapter 11 cases.

8.     Plaintiffs retain the right to enforce, sue on, settle or compromise all causes of action including, without limitation, claims under and pursuant to sections 502(d), 544, 547, 548 and 550 of the Bankruptcy Code.

### CLAIMS FOR RELIEF

#### FIRST CAUSE OF ACTION
#### (Avoidance and Recovery of Preferential Transfers)

9.     Plaintiffs repeat, reallege and incorporate by reference all of the allegations contained in paragraphs 1 through 8 of this Complaint as though set forth at length herein.

10.    On or within ninety (90) days prior to the Initial Filing Date, Plaintiffs made, or caused to be made, the Transfers to Defendants.

11.    The Transfers constitute transfers of interests in Plaintiffs' property.

12.    Plaintiffs made, or caused to be made, the Transfers to, or for the benefit of Defendants.

13.     Plaintiffs made, or caused to be made, the Transfers for, or on account of, antecedent debt(s) owed to Defendants prior to the dates on which the Transfers were made (the "Debt").

14.     Pursuant to Bankruptcy Code section 547(f), for purposes of this Adversary Proceeding, Plaintiffs are presumed to have been insolvent at the time that the Transfers were made.

15.     The Transfers enabled Defendants to receive more than they would have received if: (i) this case was administered under chapter 7 of the Bankruptcy Code; (ii) the Transfers had not been made; and (iii) Defendants had received payment of the Debt to the extent provided by the Bankruptcy Code.

16.     Based upon the foregoing, the Transfers constitute avoidable preferential transfers pursuant to section 547(b) of the Bankruptcy Code and pursuant to section 550(a) of the Bankruptcy Code, an Order should be entered granting judgment in favor of Plaintiffs: (i) avoiding the Transfers pursuant to Bankruptcy Code section 547(b); (ii) against Defendants in an amount not less than the amount of the Transfers, plus interest from the date hereof and the costs and expenses of this action including, without limitation, attorneys' fees; and (iii) directing Defendants to turnover and pay such sum to Plaintiffs pursuant to Bankruptcy Code section 550(a).

**WHEREFORE**, Plaintiffs respectfully request entry of judgment on their Complaint as follows:

a.     On Plaintiffs' First Cause of Action, in favor of Plaintiffs and against Defendants in an amount not less than the amount of the Transfers, plus interest from the date hereof until full payment is made to Plaintiffs, together with the costs and expenses of this action, including, without limitation, attorneys' fees, and directing

Defendants to turnover such sum to Plaintiffs pursuant to Bankruptcy Code sections 547(b) and 550(a); and

        b.     Granting such other and further relief as this Court may deem just and proper.

DATED:  New York, New York
           September 26, 2007

                                      DELPHI CORPORATION, *et al.*,
                                      Debtors, Debtors in Possession and Plaintiffs,
                                      By their Conflicts Counsel,
                                      TOGUT, SEGAL & SEGAL, LLP
                                      By:

                                      /s/ Neil Berger
                                      NEIL BERGER (NB-3599)
                                      SCOTT E. RATNER (SER-0015)
                                      Members of the Firm
                                      One Penn Plaza, Suite 3335
                                      New York, New York  10119
                                      (212) 594-5000

## EXHIBIT "1"

## DELPHI CORPORATION, *et al.*
### v.
## EDS, *et al.*

| Transfer Date | Transfer Amount | Transfer Type |
|:---:|:---:|:---:|
| 10/1/2005 | $75,446.60 | EFT |
| 10/3/2005 | $4,118,332.15 | WIRE |
| 10/4/2005 | $25,000.00 | CHECK |
| 10/4/2005 | $433,434.36 | EFT |
| 10/4/2005 | $94,499.67 | EFT |
| 10/6/2005 | $4,999,999.95 | WIRE |
| 7/11/2005 | $333,333.34 | WIRE |
| 8/1/2005 | $90,002.15 | EFT |
| 8/18/2005 | $9,196.76 | CHECK |
| 8/19/2005 | $4,599,622.53 | WIRE |
| 8/2/2005 | $3,586,662.99 | WIRE |
| 8/2/2005 | $314,589.49 | EFT |
| 8/24/2005 | $76,000.00 | EFT |
| 8/26/2005 | $333,333.33 | WIRE |
| 8/3/2005 | $333,333.33 | WIRE |
| 8/30/2005 | $333,333.33 | WIRE |
| 8/8/2005 | $5,666,666.61 | WIRE |
| 9/1/2005 | $88,563.59 | EFT |
| 9/15/2005 | $956.52 | CHECK |
| 9/2/2005 | $382,595.00 | EFT |
| 9/21/2005 | $4,118,332.15 | WIRE |
| 9/21/2005 | $4,411.68 | EFT |
| 9/22/2005 | $270.31 | CHECK |
| 9/7/2005 | $5,333,333.28 | WIRE |
| 9/7/2005 | $333,333.33 | WIRE |
| 9/9/2005 | $4,599,622.53 | WIRE |

**TOTAL:**             $40,284,204.98

# EXHIBIT B

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                               :

In re                             :     Chapter 11
                               :

DELPHI CORPORATION, et al.,     :     Case No. 05-44481 (RDD)
                               :

                  Debtors.    :     (Jointly Administered)
                               :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ORDER UNDER 11 U.S.C. § 363(b) AND FED. R. BANKR.
P. 6004 AUTHORIZING DEBTORS TO ENTER INTO
INFORMATION TECHNOLOGY INFRASTRUCTURE
OUTSOURCING AGREEMENTS

("IT INFRASTRUCTURE OUTSOURCING ORDER")

           Upon the motion, dated September 29, 2006 (the "Motion"), of Delphi

Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-

in-possession in the above-captioned cases (collectively, the "Debtors"), for an order (the

"Order") under 11 U.S.C. § 363(b) and Fed. R. Bankr. P. 6004 authorizing, but not

directing, the Debtors to enter into various information technology infrastructure

outsourcing agreements; and upon the record of the hearing held on the Motion; and this

Court having determined that the relief requested in the Motion is in the best interests of

the Debtors, their estates, their creditors, and other parties-in-interest; and it appearing

that proper and adequate notice of the Motion has been given and that no other or further

notice is necessary; and after due deliberation thereon, and sufficient cause appearing

therefor, it is hereby

           ORDERED, ADJUDGED, AND DECREED THAT:

           1.        The Motion is GRANTED.

2.     The Debtors are authorized, but not directed, to enter into and fully perform under (a) an agreement with Electronics Data Systems Corporation and EDS Information Services, LLC (together, "EDS") which provides for the outsourcing of global desktops, service desk, and hosting mainframe systems (the "EDS Agreement"), and (b) an agreement with Hewlett Packard Company ("HP") which provides for the outsourcing of hosting server systems (together with the EDS Agreement, the "IT Infrastructure Outsourcing Agreements"), including making all payments due to EDS and HP under the IT Infrastructure Outsourcing Agreements.

3.     The Debtors are authorized, but not directed, to execute and deliver, and perform under, consummate, and implement all additional instruments and documents as may be reasonably necessary or desirable to implement and perform under the IT Infrastructure Outsourcing Agreements.

4.     To the extent that Delphi makes a payment under the IT Infrastructure Outsourcing Agreements in respect of the liability of an affiliate Debtor, Delphi shall have an allowed claim under section 503 of the Bankruptcy Code against the affiliate Debtor for the amount of such payment.

5.     This Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this Order.

6.    The requirement under Rule 9013-1(b) of the Local Bankruptcy
Rules for the United States Bankruptcy Court for the Southern District of New York for
the service and filing of a separate memorandum of law is deemed satisfied by the
Motion.

Dated:    New York, New York
          October 19, 2006


                              /s/Robert D. Drain
                              UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT C

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

   - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                              :
        In re                  :    Chapter 11
                              :
DELPHI CORPORATION, et al.,    :    Case No. 05-44481 (RDD)
                              :
                              :    (Jointly Administered)
            Debtors.        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

DEBTORS' SECOND OMNIBUS OBJECTION (PROCEDURAL) PURSUANT TO
11 U.S.C. § 502(b) AND FED. R. BANKR. P. 3007 TO CERTAIN (I) EQUITY CLAIMS,
(II) CLAIMS DUPLICATIVE OF CONSOLIDATED TRUSTEE OR AGENT CLAIMS,
AND (III) DUPLICATE AND AMENDED CLAIMS

("SECOND OMNIBUS CLAIMS OBJECTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates (the "Affiliate Debtors"), debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this Second Omnibus Objection Pursuant To 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 3007 To Certain (i) Equity Claims, (ii) Claims Duplicative Of Consolidated Trustee Or Agent Claims, And (iii) Duplicate And Amended Claims On Procedural Grounds (the "Second Omnibus Claims Objection"), and respectfully represent as follows:

Background

A.      The Chapter 11 Filings

1.      On October 8 and 14, 2005, Delphi and certain of its U.S. subsidiaries and affiliates filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. This Court entered orders directing the joint administration of the Debtor's chapter 11 cases.

2.      No trustee or examiner has been appointed in the Debtors' cases. On October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors. On April 28, 2006, the U.S. Trustee appointed an official committee of equity holders.

3.      This Court has jurisdiction over this objection pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

4.     The statutory predicates for the relief requested herein are section 502(b) of the Bankruptcy Code and Rule 3007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

B.     Current Business Operations Of The Debtors

5.     As of December 31, 2005, Delphi and its subsidiaries and affiliates (collectively, the "Company") had global 2005 net sales of approximately $26.9 billion and global assets of approximately $17.0 billion.[1]  At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues, and the thirteenth largest public company business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are not chapter 11 debtors and continue their business operations without supervision from the Bankruptcy Court.

6.     The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology.  The Company supplies products to nearly every major global automotive original equipment manufacturer.

7.     Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of General Motors Corporation ("GM").  Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM.  In

---

[1]     The aggregated financial data used in this objection generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates.

connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications. Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

C.      Events Leading To The Chapter 11 Filing

8.      In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income. Every year thereafter, however, with the exception of 2002, the Company has suffered losses. In calendar year 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[2] Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of approximately $2.4 billion on net sales of $26.9 billion.

9.      The Debtors believe that the Company's financial performance has deteriorated because of (a) increasingly unsustainable U.S. legacy liabilities and operational restrictions driven by collectively bargained agreements, including restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which have the effect of creating largely fixed labor costs, (b) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (c) increasing commodity prices.

10.     In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product

---

[2]      Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004. The Company's net operating loss in calendar year 2004 was $482 million.

portfolio, operational issues, and forward-looking revenue requirements.  Because discussions

with its major unions and GM had not progressed sufficiently by the end of the third quarter of

2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete the

Debtors' transformation plan and preserve value for its stakeholders.

D.     The Debtors' Transformation Plan

11.     On March 31, 2006, the Company outlined the key tenets of its

transformation plan.  The Company believes that this plan will enable it to return to stable,

profitable business operations and allow the Debtors to emerge from these chapter 11 cases in

the first half of 2007.  To complete their restructuring process, the Debtors must focus on five

key areas.  First, Delphi must modify its labor agreements to create a competitive arena in which

to conduct business.  Second, the Debtors must conclude their negotiations with GM to finalize

GM's financial support for the Debtors' legacy and labor costs and to ascertain GM's business

commitment to the Company.  Third, the Debtors must streamline their product portfolio to

capitalize on their world-class technology and market strengths and make the necessary

manufacturing alignment with their new focus.  Fourth, the Debtors must transform their salaried

workforce to ensure that the Company's organizational and cost structure is competitive and

aligned with its product portfolio and manufacturing footprint.  Finally, the Debtors must devise

a workable solution to their current pension situation.

12.     Upon the conclusion of the reorganization process, the Debtors expect to

emerge as a stronger, more financially sound business with viable U.S. operations that are well-

positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal all of

its resources to continue to deliver high-quality products to its customers globally.  Additionally,

the Company will preserve and continue the strategic growth of its non-U.S. operations and

maintain its prominence as the world's premier auto supplier.

E.      Bar Date, Proofs Of Claim, And Omnibus Claims Objections

13.     On April 12, 2006, this Court entered an Order Under 11 U.S.C. §§ 107(b), 501, 502, And 1111(a) And Fed R. Bankr. P. 1009, 2002(a)(7), 3003(c)(3), And 5005(a) Establishing Bar Dates For Filing Proofs Of Claim And Approving Form And Manner Of Notice Thereof (Docket No. 3206) (the "Bar Date Order").  Among other things, the Bar Date Order established July 31, 2006 (the "Bar Date") as the last date for all persons and entities holding or wishing to assert "Claims," as such term is defined in 11 U.S.C. § 101(5), against a Debtor (collectively, the "Claimants") to file a proof of claim form with respect to each such Claim.

14.     On or prior to April 20, 2006, Kurtzman Carson Consultants, LLC, the claims and noticing agent in these cases (the "Claims Agent"), provided notice of the Bar Date by mailing a notice of bar date approved by this Court (the "Bar Date Notice"), together with a proof of claim form, to (a) the persons or entities set forth in the Debtors' Schedules of Assets and Liabilities and Statements of Financial Affairs (the "Schedules and Statements") filed with this Court on January 20, 2006 (and subsequently amended on February 1, 2006 and April 18, 2006) and (b) the persons and entities included in the notice database compiled by the Debtors, but not listed on any of the Schedules and Statements.  In total, the Debtors provided Bar Date Notices to more than 500,000 persons and entities.

15.     In addition, the Debtors published the Bar Date Notice in the New York Times (National Edition), the Wall Street Journal (National, European, and Asian Editions), USA Today (Worldwide Edition), the Automotive News (National Edition), and in local editions of the following: the Adrian Daily Telegram, the Arizona Daily Star, the Buffalo News, the Chicago Sun Times, the Clinton News, the Columbia Dispatch, the Daily Leader, Dayton Daily News, the Detroit Free Press, the El Paso Times, the Fitzgerald Herald Leader, the Flint Journal, the Gadsden Times, the Grand Rapids Press, the Greenville News, the Indianapolis Star, the

6

Kansas City Star, the Kokomo Tribune, the Lansing State Journal, the Laurel Leader, the Los Angeles Daily News, the Milwaukee Journal Sentinel, the Mobile Beacon, the Mobile Register, the Oakland Press, the Olathe Daily News, the Rochester Democrat and Chronicle, the Saginaw News, the Sandusky, the Tribune Chronicle, the Tulsa World, the Tuscaloosa News, and the Vindicator, and electronically through posting on the Delphi Legal Information Website, www.delphidocket.com, on or before April 24, 2006.

16.     Approximately 16,000 proofs of claim (the "Proofs of Claim") have been timely filed against the Debtors in these cases.  On September 19, 2006, the Debtors filed the First Omnibus Objection Pursuant To 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 3007 To Certain (i) Duplicate And Amended Claims And (ii) Equity Claims ("First Omnibus Claims Objection"). In the First Omnibus Claims Objection, the Debtors objected to approximately 3,500 claims.  On October 24, 2006, the Court entered an order disallowing and expunging (a) certain Claims because they were duplicative of other Claims or had been amended or superseded by later filed Claims and (b) certain Claims because they were filed by holders of Delphi common stock solely on account of their stock holdings.  In this Second Omnibus Claims Objection, the Debtors are objecting to 2,853 claims.[3]

Relief Requested

17.     By this Objection, the Debtors seek entry of an order pursuant to 11 U.S.C. § 502(b) and Bankruptcy Rule 3007 disallowing and expunging (a) those Claims set forth on

---

[3]     Consistent with the notice provided to claimants with respect to the First Omnibus Claims Objection and approved by this Court in the order entered with respect thereto, the Debtors will provide each Claimant whose Proof of Claim is subject to an objection pursuant to this Second Omnibus Claims Objection with a personalized Notice Of Objection To Claim which specifically identifies the Claimant's Proof of Claim that is subject to an objection and the basis for such objection.  A form of Notice Of Objection To Claim is attached hereto as Exhibit A.  Claimants will receive a copy of this Second Omnibus Claims Objection without Exhibits B-1, B-2, C, and D hereto.  Claimants will nonetheless be able to review such exhibits free of charge by accessing the Debtors' Legal Information Website (www.delphidocket.com).

Exhibit B-1 attached hereto because they were filed by holders of Delphi common stock solely on account of their stock holdings, (b) those Claims set forth on Exhibit B-2 attached hereto because they were filed by holders of Delphi common stock solely on account of their stock holdings or, in the alternative, were untimely pursuant to the Bar Date Order, (c) those Claims set forth on Exhibit C attached hereto because (i) they were filed by individual noteholders or trust preferred security holders and are duplicative of the consolidated proof of claim filed on their behalf by Wilmington Trust Company ("Wilmington Trust") or Law Debenture Trust Company of New York ("Law Debenture," together with Wilmington Trust, "Trustees"), as appropriate, or (ii) they were filed by individual lenders under the prepetition credit facility and are duplicative of the liabilities in the master proof of claim filed by JPMorgan Chase Bank, N.A. ("JPMorgan" or "Agent") on behalf of itself and each of the prepetition secured lenders, and (d) those Claims set forth on Exhibit D attached hereto because they are duplicative of other Claims or have been amended or superseded by later filed Claims.

A.    Equity Claims

18.    During the Debtors' review of the Proofs of Claim, the Debtors determined that certain of the Proofs of Claim filed against the Debtors in fact represent proofs of interest that were filed on behalf of persons or entities holding Delphi common stock (the "Equity Claims").  The Debtors caused the Claims Agent to serve notice of the Bar Date on holders of Delphi common stock to ensure that holders of stock who desired to assert claims against any of the Debtors that were not based solely upon their ownership of Delphi common stock would be afforded the opportunity to file claims in these chapter 11 cases.

19.    The ownership of Delphi common stock constitutes an equity interest in Delphi, but does not constitute a "claim" against Delphi's estate as such term is defined in section 101(5) of the Bankruptcy Code.  Furthermore, as set forth in the Bar Date Notice that was

approved by this Court, creditors and equityholders were notified that they were not required to file proofs of claim based exclusively on ownership interests in Delphi common stock.[4]

20.     In addition, certain of the Equity Claims were received by the Debtors after the Bar Date ("Untimely Equity Claims").  With respect to those Untimely Equity Claims, the Debtors also object to such Claims on the basis that they were not timely filed pursuant to the Bar Date Order.[5]

21.     Attached hereto as <u>Exhibit B-1</u> is a list of the Equity Claims that the Debtors have identified as solely representing proofs of interest.  The Debtors therefore seek to have reclassified from Claims to interests and disallowed and expunged.  To the extent that any of the individuals or entities that filed the Equity Claims listed on <u>Exhibit B-1</u> hold valid equity interests in Delphi as of the applicable record date, the requested reclassification of their Proofs

---

[4]     The Bar Date Order provides, in relevant part:

> Proofs of Claim are not required, at this time, to be filed by any Person or Entity asserting a Claim of any of the types set forth below:
>
> *     *     *
>
> (h)  Any holder of equity securities of, or other interests in, the Debtors solely with respect to such holder's ownership interest in or possession of such equity securities, or other interest; <u>provided, however</u>, that any such holder which wishes to assert a Claim against any of the Debtors <u>that is not based solely upon its ownership of the Debtors' securities</u>, including, but not limited to, Claims for damages or recision based on the purchase or sale of such securities, must file a proof of claim on or prior to the General Bar Date in respect of such Claim.

Bar Date Order ¶5 (emphasis added).

[5]     The Bar Date Order provides:

> Any Person or Entity which is required to file a Proof of Claim in these chapter 11 cases but that fails to do so in a timely manner on or before the applicable Bar Date shall be forever barred, estopped, and enjoined from (a) asserting any Claim against the Debtors that such Person or Entity has that (i) is in an amount that exceeds the amount, if any, that is set forth in the Schedules as undisputed, non-contingent, and unliquidated or (ii) is of a different nature or in a different classification than as set forth in the Schedules (any such Claim referred to as an "Unscheduled Claim") and (b) voting upon, or receiving distributions under, any plan or plans of reorganization in these chapter 11 cases in respect of an Unscheduled Claim, and the Debtors and their property shall be forever discharged from any and all indebtedness or liability with respect to such Unscheduled Claim.

Bar Date Order ¶ 11.

of Claim and disallowance of their Claims will not impair any entitlements they may ultimately have under a plan of reorganization with respect to such equity interests.  Attached hereto as Exhibit B-2 is a list of Untimely Equity Claims which the Debtors have identified as solely representing proofs of interest and therefore seek to have reclassified from Claims to interests and disallowed and expunged.  In addition, the Debtors seek to have such Untimely Equity Claims disallowed and expunged as Claims that were not timely filed pursuant to the Bar Date Order.[6]

22.     Accordingly, the Debtors (a) object to the Equity Claims, (b) object to the Untimely Equity Claims, and (c) seek entry of an order disallowing and expunging both the Equity Claims and Untimely Equity Claims in their entirety.

B.     Claims Duplicative Of Consolidated Trustee Or Agent Claims

23.     During the Debtors' review of the Proofs of Claim, the Debtors determined that certain of the Proofs of Claim filed by certain claimants against the Debtors in fact assert duplicate Claims for a single liability.

24.     Wilmington Trust is the successor indenture trustee under a 1999 Indenture Agreement ("1999 Indenture") for a series of senior unsecured securities that were due in 2006, 2009, 2013, and 2029.  Pursuant to Section 6.02 of the 1999 Indenture, Wilmington Trust is authorized to file a proof of claim on behalf of all holders of notes.[7]  On August 2, 2006,

---

[6]     None of the Untimely Equity Claims listed on Exhibit B-2 hereto was included as part of the Motion For Order Under Fed. R. Bankr. P. 3003(c)(3) And 9006(b)(1) Deeming Certain Proofs Of Claim Timely Filed, dated September 29, 2006 (Docket No. 5238).

[7]     1999 Indenture provides, in relevant part:

In case there shall be pending proceedings for the bankruptcy or for the reorganization of the Corporation or any other obligor upon Securities of any series under Title 11 of the United States Code or any other applicable law, or in case a receiver or trustee shall have been appointed for the property of the Corporation or such other obligor, or in case of any other judicial proceedings relative to the Corporation

*(cont'd)*

Wilmington Trust filed with this Court a consolidated Proof of Claim on behalf of the noteholders in the amount of $2,044,593,402.77 plus amounts presently unliquidated (Claim No. 10271) (the "Wilmington Trust Trustee Claim").

25. Law Debenture is the successor indenture trustee and property trustee under an October 2003 and a November 2003 Indenture Agreement for junior subordinated notes due 2033 and adjustable rate junior subordinated notes due 2033. On April 17, 2006, Law Debenture filed with this Court a consolidated Proof of Claim on behalf of individual holders in the amount of $420,083,457.18 (Claim No. 2660) (the "Law Debenture Trustee Claim").

26. Certain individual holders filed Proofs of Claim asserting liabilities also asserted by either the Wilmington Trust Trustee Claim or the Law Debenture Trustee Claim (the "Individual Holder Claims"). Because the Trustees also filed consolidated Proofs of Claim on behalf of their respective holders, the Individual Holder Claims are duplicative. Furthermore, as set forth in the Bar Date Notice that was approved by this Court, individual holders were notified that they were not required to file proofs of claim based exclusively on the issuance of Delphi

---

*(cont'd from previous page)*

or such other obligor, or to the creditors or property of the Corporation or such other obligor, the Trustee, irrespective of whether the principal of the Securities of such series shall then be due and payable as therein expressed or by declaration or otherwise and irrespective of whether the <u>Trustee shall have made any demand pursuant to the provisions of this Section, shall be entitled and empowered, by intervention in such proceedings or otherwise, to file and prove a claim or claims for the whole amount of principal</u> (or, with respect to Original Issue Discount Securities, such portion of the principal amount as may be specified in the terms of that series), and premium, if any, interest, if any, and Additional Amounts, if any, owing and unpaid in respect of the Securities of such series, and to file such other papers or documents as may be necessary or advisable in order to have the claims of the Trustee under Section 7.06 and of the Holders of the Securities and Coupons of such series allowed in any such judicial proceedings relative to the Corporation or other obligor upon the Securities of such series, or to the creditors or property of the Corporation or such other obligor.

1999 Indenture ¶6.02 (emphasis added).

senior and junior subordinated unsecured debt.[8]  Therefore, the Debtors object to the Individual

Holder Claims as duplicative, but are not objecting to the Wilmington Trust Trustee Claim or the

Law Debenture Trustee Claim.[9]

        27.    JPMorgan is the administrative agent for the lenders under the Debtors'

prepetition 2005 credit facility.  Pursuant to the Bar Date Order, JPMorgan was authorized to file

a master proof of claim ("JPMorgan Master Proof of Claim") on behalf of all the lenders.[10]  On

---

[8]    The Bar Date Order provided, in relevant part:

> Proofs of Claim are not required, at this time, to be filed by any Person or Entity asserting a Claim of any of the types set forth below:
>
>        \*   \*   \*
>
> (g)  Any holder of a Claim arising under or in respect of any of the following issuances of Delphi Corporation senior and junior subordinated unsecured debt (each, a "Noteholder"): (i) those certain senior unsecured securities bearing interest at 6.55% and maturing on June 15, 2006; (ii) those certain senior unsecured securities bearing interest at 6.50% and maturing on May 1, 2009; (iii) those certain senior unsecured securities bearing interest at 6.50% and maturing on August 15, 2013; (iv) those certain senior unsecured securities bearing interest at 7.125% and maturing on May 1, 2029; (v) those certain 8.25% junior subordinated notes due 2033; or (vi) those certain adjustable-rate junior subordinated notes due 2033 (collectively, the "Unsecured Securities"), other than the indenture trustees of the Unsecured Securities; provided, however, that any Noteholder who wishes to assert a Claim against the Debtors that is not based solely upon the outstanding prepetition principal and interest due on account of its ownership of such Unsecured Securities must file a proof of claim on or prior to the General Bar Date in respect of such Claim.

  Bar Date Order ¶5 (emphasis added).

[9]    The Debtors expressly reserve all of their rights to further object to either or both of the Wilmington Trust Trustee Claim and the Law Debenture Trustee Claim at a later date on any basis whatsoever.

[10]    The Bar Date Order provides, in relevant part:

> (a)  In order to facilitate the processing of claims, to ease the burden upon the Court and to reduce any unnecessary expense to the Debtors' estates, the Pre-Petition Agent (as defined in the Final DIP Financing Order) is authorized to file a master proof of claim on behalf of itself and the Pre-Petition Secured Lenders (as defined in the Final DIP Financing Order) on account of their claims arising under the Third Amended and Restated Credit Agreement, dated as of June 14, 2005, and all other documentation executed in connection therewith (collectively, the "Loan Documents") and under the Final Order under 11 U.S.C §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e) and Federal Rules of Bankruptcy Procedure 2002, 4001 and 9014 (i) Authorizing the Debtors to Obtain Post-Petition Financing, (ii) to Utilize Cash Collateral and (iii) Granting Adequate Protection to Pre-Petition Secured Parties, dated October 28, 2005 (the "Final DIP Financing Order"), against all of the Debtors (the "Master Proof of Claim"), and the Pre-Petition Agent shall not be required to file a verified statement pursuant to Rule 2019 of the Bankruptcy Rules.

*(cont'd)*

July 26, 2006, JPMorgan filed its Master Proof of Claim in the amount of $2,547,541,816.00

(Claim No. 11047). Despite the provisions of the Bar Date Order providing that upon filing of

the Master Proof of Claim each lender shall be deemed to have filed a proof of claim, certain

lenders filed proofs of claim asserting liabilities under the prepetition credit facility (the

"Individual Lender Claims"). Because the Individual Lender Claims are thus duplicative of the

liabilities asserted under the Master Proof of Claim, the Debtors object to the Individual Lender

Claims. At this time, the Debtors are not objecting to the Master Proof of Claim.[11]

28.     Attached hereto as Exhibit C is a list of Claims that the Debtors have

identified as Individual Holder Claims and Individual Lender Claims. For each Individual

Holder Claim and Individual Lender Claim listed on Exhibit C hereto, the Debtors have

indicated the appropriate Trustee or Agent Claim that will be the "Surviving Claim." The

Debtors (a) object to the Individual Holder Claims, (b) object to the Individual Lender Claims,

and (c) seek entry of an order disallowing and expunging the Individual Holder Claims and

Individual Lender Claims in their entirety.

C.      Duplicate And Amended Claims

29.     During the Debtors' review of the Proofs of Claim received to date, the

Debtors determined that certain of the Proofs of Claim filed against the Debtors in fact assert

_____

*(cont'd from previous page)*

      (b) Upon the filing of the Master Proof of Claim against the Debtors, the Pre-Petition Agent and each Pre-Petition Secured Lender, and each of their respective successors and assigns, shall be deemed to have filed a proof of claim against each Debtor in the amount set forth opposite its name therein in respect of its claims against each Debtor arising under the Loan Documents, and the claim of the Pre-Petition Agent and each Pre-Petition Secured Lender (and each of their respective successors and assigns), named in the Master Proof of Claim shall be allowed or disallowed as if such entity had filed a separate proof of claim in the chapter 11 cases in the amount set forth opposite each name in the Master Proof of Claim. . . .

    Bar Date Order ¶10.

[11]   The Debtors expressly reserve all of their rights to further object to the Master Proof of Claim at a later date on any basis whatsoever.

duplicate Claims (each, a "Duplicate Claim") for a single liability. In some instances, Duplicate

Claims arose when a claimant filed Proofs of Claim against multiple Debtor entities for the same

liability. In an effort to eliminate the Duplicate Claims, the Debtors reviewed the Proofs of

Claim, the supporting documentation provided for those Proofs of Claim, and the Debtors'

Schedules and Statements to make a determination as to which duplicate claim should be the

surviving claim.

30. Additionally, the Debtors have determined that many Claims evidenced by

Proofs of Claim were subsequently amended or superseded by other Proofs of Claim filed by

creditors with respect to the same liabilities. For instance, many amended Proofs of Claim (the

"Amended Proofs of Claim") were filed to amend an amount previously claimed in an earlier

Proof of Claim (the "Original Proof of Claim"). Other Amended Proofs of Claim were filed to

amend the classification of part or all of an earlier Original Proof of Claim.

31. It is axiomatic that creditors are not entitled to multiple recoveries for a

single liability against a debtor. Accordingly, the Debtors wish to eliminate the Duplicate

Claims. In addition, the Debtors wish to eliminate from the Debtors' claims register Original

Proofs of Claim for which Amended Proofs of Claim were subsequently filed (collectively, the

"Duplicate and Amended Claims").

32. Set forth on Exhibit D attached hereto is a list of Claims that the Debtors

have identified as Duplicate and Amended Claims. For each Duplicate and Amended Claim,

Exhibit D classifies Proofs of Claim as either a Claim To Be Expunged (the "Expunged Claim")

or as a Surviving Claim (the "Surviving Claim").[12] Generally, the Surviving Claims reflect the

---

[12]  Certain of the Claims on Exhibit B are listed in the amount of $0.00. This generally reflects the fact that the
claim amount asserted by the Claimant is unliquidated.

classifications of the liabilities as reflected on the Debtors' Schedules.[13]  The Debtors request that

the Claims marked as Expunged Claims on <u>Exhibit D</u> be disallowed and expunged.  With respect

to the Claims on <u>Exhibit D</u> marked as Surviving Claims, the Debtors do not seek any relief at

this time.  The inclusion of the Surviving Claims on <u>Exhibit D</u>, however, does not reflect any

view by the Debtors as to the ultimate validity of any such Claim.  The Debtors therefore

expressly reserve all of their rights to further object to any or all of the Surviving Claims at a

later date on any basis whatsoever.

        33.     Accordingly, the Debtors (a) object to the Duplicate and Amended Claims

and (b) seek entry of an order disallowing and expunging the Duplicate and Amended Claims in

their entirety.

Separate Contested Matters

        34.     To the extent that a response is filed with respect to any Claim listed in

this Second Omnibus Claims Objection and the Debtors are unable to resolve the response prior

to the hearing on this objection, the Debtors request that each such Claim and the objection to

such Claim asserted in this Second Omnibus Claims Objection be deemed to constitute a

separate contested matter as contemplated by Bankruptcy Rule 9014.  The Debtors further

---

[13]    As stated in the Global Notes And Statement Of Limitations, Methodology And Disclaimer Regarding Debtors' Schedules And Statements (the "Global Notes"), filed as part of the Debtors' Schedules and Statements:

> Certain of the Debtors maintain consolidated books and records.  Specifically, the books and records for Exhaust Systems Corporation, Environmental Catalysts LLC, ASEC Manufacturing General Partnership [("ASEC Manufacturing")], and ASEC Sales General Partnership [(collectively, the "Catalyst Entities")] are maintained in this manner.  The financial information for these entities has been consolidated for purposes of the Schedules and Statements and such consolidated financial information has been included in the Schedules and Statements of each of [the Catalyst Entities].

> Global Notes ¶ 19.  Where claimants filed Proofs of Claim against ASEC Manufacturing and one or more of the other Catalyst Entities, the Debtors have, for purposes of administrative convenience, retained the Claim filed against ASEC Manufacturing as the Surviving Claim.  Undoubtedly, despite the consolidation of the books and records of the Catalyst Entities, claimants should not retain more than one claim for a single liability.  Nonetheless, the Debtors expressly reserve all of their rights to re-classify these obligations as obligations of another Debtor entity at a later date.

request that any order entered by the Court with respect to an objection asserted in this Second Omnibus Claims Objection be deemed a separate order with respect to each Claim.

Reservation Of Rights

35.     The Debtors expressly reserve the right to amend, modify, or supplement this Second Omnibus Claims Objection and to file additional objections to the Proofs of Claim or any other Claims (filed or not) which may be asserted against the Debtors.  Should one or more of the grounds for objection stated in this Second Omnibus Claims Objection be dismissed, the Debtors reserve their rights to object on other stated grounds or on any other grounds that the Debtors discover during the pendency of these cases.  In addition, the Debtors reserve the right to seek further reduction of any Claim to the extent that such Claim has been paid.

Responses To Objections

A.     Filing And Service Of Responses

36.     To contest an objection, responses (a "Response"), if any, to the Second Omnibus Claims Objection must (a) be in writing, (b) conform to the Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules for the Southern District of New York, and the Amended Eighth Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered on October 26, 2006 (the "Eighth Supplemental Case Management Order") (Docket No. 5418), (c) be filed with the Bankruptcy Court in accordance with General Order M-242 (as amended) – registered users of the Bankruptcy Court's case filing system must file electronically, and all other parties-in-interest must file on a 3.5 inch disk (preferably in Portable Document Format (PDF), WordPerfect, or any other Windows-based word processing format), (d) be submitted in hard copy form directly to the chambers of the Honorable Robert D. Drain, United States Bankruptcy Judge, United

States Bankruptcy Court for the Southern District of New York, One Bowling Green, Room 610, New York, New York 10004, and (e) be served upon (i) Delphi Corporation, 5725 Delphi Drive, Troy, Michigan 48098 (Att'n: General Counsel), (ii) counsel to the Debtors, Skadden, Arps, Slate, Meagher & Flom LLP, 333 West Wacker Drive, Suite 2100, Chicago, Illinois 60606 (Att'n: John Wm. Butler, Jr.), (iii) counsel to the agent under the Debtors' prepetition credit facility, Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York, New York 10017 (Att'n: Kenneth S. Ziman), (iv) counsel to the agent under the postpetition credit facility, Davis Polk & Wardwell, 450 Lexington Avenue, New York, New York 10017 (Att'n: Donald Bernstein and Brian Resnick), (v) counsel to the Official Committee of Unsecured Creditors, Latham & Watkins LLP, 885 Third Avenue, New York, New York 10022 (Att'n: Robert J. Rosenberg and Mark A. Broude), (vi) counsel to the Official Committee of Equity Security Holders, Fried, Frank, Harris, Shriver & Jacobson LLP, One New York Plaza, New York, New York 10004 (Att'n: Bonnie Steingart), and (vii) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, Suite 2100, New York, New York 10004 (Att'n:  Alicia M. Leonhard) in each case so as to be received no later than 4:00 p.m. (Prevailing Eastern Time) on November 24, 2006.

B.      Contents Of Responses

                37.    Every Response to this Second Omnibus Claims Objection must contain at a minimum the following:

                (a)    a caption setting forth the name of the Court, the names of the Debtors, the case number, and the title of this Second Omnibus Claims Objection to which the Response is directed;

                (b)    the name of the Claimant and description of the basis for the amount of the Claim;

                (c)    a concise statement setting forth the reasons why the Claim should not be disallowed, expunged, or reclassified for the reasons set forth in the Second Omnibus

Claims Objection, including, but not limited to, the specific factual and legal bases upon which the Claimant will rely in opposing this Second Omnibus Claims Objection;

(d)    all documentation or other evidence of the Claim upon which the Claimant will rely in opposing the Second Omnibus Claims Objection to the extent not included with the Proof of Claim previously filed with the Court,;

(e)    the address(es) to which the Debtors must deliver any reply to the Response, if different from the address(es) presented in the Claim; and

(f)    the name, address, and telephone number of the person (which may be the Claimant or his/her/its legal representative) possessing ultimate authority to reconcile, settle, or otherwise resolve the Claim on behalf of the Claimant.

C.    Timely Response Required

38.    If a Response is properly and timely filed and served in accordance with the above procedures, and the Debtors are unable to reach a consensual resolution with the Claimant, the Debtors may request the Court to conduct a hearing with respect to the Second Omnibus Claims Objection and the Response on November 30, 2006 at 10:00 a.m. or as soon thereafter as counsel may be heard.

39.    Only those Responses made in writing and timely filed and received will be considered by the Court at any such hearing.  The Debtors reserve the right to seek to adjourn a hearing with respect to a specific objection set forth herein and any Response thereto.

40.    If a Claimant whose Claim is subject to this Second Omnibus Claims Objection and who is served with this Second Omnibus Claims Objection fails to file and serve a timely Response in compliance with the foregoing procedures, the Debtors may present to the Court an appropriate order disallowing and expunging or otherwise limiting such Claim without further notice to the Claimant.  Thus, a failure to respond may forever bar Claimants listed on this Second Omnibus Claims Objection from sustaining a Claim against the Debtors.

<u>Replies To Responses</u>

41.     The Debtors may, at their option, file and serve a reply to a Claimant's Response so that it is received by the Claimant (or counsel, if represented) no later than 4:00 p.m. (Prevailing Eastern Time) on the day immediately preceding the date of any hearing on this Second Omnibus Claims Objection.

<u>Service Of Second Omnibus Claims Objection Order</u>

42.     Consistent with Bankruptcy Rule 9022, the Debtors respectfully request that this Court direct the Claims Agent to serve the order entered with respect to this Second Omnibus Claims Objection, including exhibits, only on the master service list and the 2002 list. The Debtors further request that this Court direct the Claims Agent to serve all Claimants whose proofs of claim are listed on an exhibit to this Second Omnibus Claims Objection with a copy of the order, without exhibits, and a personalized Notice Of Entry Of Order in the form attached hereto as <u>Exhibit E</u> specifically identifying the Claimant's proof of claim that is subject to the order, the Court's treatment of such proof of claim, and the basis for such treatment, and advising the Claimant of its ability to view the order with exhibits free of charge on the Debtors' Legal Information Website.

<u>Further Information</u>

43.     Questions about this Second Omnibus Claims Objection or requests for additional information about the proposed disposition of Claims hereunder should be directed to the Debtors' counsel by e-mail to [delphi@skadden.com](mailto:delphi@skadden.com), by telephone at 1-800-718-5305, or in writing to Skadden, Arps, Slate, Meagher & Flom LLP, 333 West Wacker Drive, Suite 2100, Chicago, Illinois 60606 (Att'n: John Wm. Butler, Jr., John K. Lyons, and Randall G. Reese). Questions regarding the amount of a Claim or the filing of a Claim should be directed to the

Claims Agent at 1-888-259-2691 or www.delphidocket.com.  Claimants should not contact the Clerk of the Bankruptcy Court to discuss the merits of their Claims.

Notice

44.     Notice of this Objection has been provided in accordance with the Amended Eighth Supplemental Case Management Order.  In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

Memorandum Of Law

45.     Because the legal points and authorities upon which this Objection relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

WHEREFORE the Debtors respectfully request that the Court enter an order (a) granting the relief requested herein and (b) granting the Debtors such other and further relief as is just.

Dated:       New York, New York
              October 31, 2006

SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP

By:  /s/ John Wm. Butler, Jr.
     John Wm. Butler, Jr. (JB 4711)
     John K. Lyons (JL 9331)
     Ron E. Meisler (RM 3026)
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606

    - and -

By:  /s/ Kayalyn A. Marafioti
     Kayalyn A. Marafioti (KM 9632)
     Thomas J. Matz (TM 5986)
Four Times Square
New York, New York 10036

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

**Hearing Date and Time: November 30, 2006 at 10:00 a.m.**
**Response Date and Time: November 24, 2006 at 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

   - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - -  -  x
                               :
      In re                        :    Chapter 11
                                 :
DELPHI CORPORATION, et al.,    :    Case No. 05-44481 (RDD)
                               :
                               :    (Jointly Administered)
         Debtors.        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

DEBTORS' (I) THIRD OMNIBUS OBJECTION (SUBSTANTIVE) PURSUANT TO
11 U.S.C. § 502(b) AND FED. R. BANKR. P. 3007 TO CERTAIN (A) CLAIMS WITH
INSUFFICIENT DOCUMENTATION, (B) CLAIMS UNSUBSTANTIATED BY DEBTORS' BOOKS
AND RECORDS, AND (C) CLAIMS SUBJECT TO MODIFICATION AND (II) MOTION TO
ESTIMATE CONTINGENT AND UNLIQUIDATED CLAIMS PURSUANT TO 11 U.S.C. § 502(c)

("THIRD OMNIBUS CLAIMS OBJECTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates (the "Affiliate Debtors"), debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this (I) Third Omnibus Objection (Substantive) Pursuant To 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 3007 To Certain (a) Claims With Insufficient Documentation, (b) Claims Unsubstantiated By Debtors' Books And Records, And (c) Claims Subject To Modification And (II) Motion To Estimate Contingent And Unliquidated Claims Pursuant To 11 U.S.C. § 502(c) (the "Third Omnibus Claims Objection"), and respectfully represent as follows:

Background

A.      The Chapter 11 Filings

1.      On October 8 and 14, 2005, Delphi and certain of its U.S. subsidiaries and affiliates filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. This Court entered orders directing the joint administration of the Debtor's chapter 11 cases.

2.      No trustee or examiner has been appointed in the Debtors' cases. On October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors. On April 28, 2006, the U.S. Trustee appointed an official committee of equity holders.

3.      This Court has jurisdiction over this objection pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

4.     The statutory predicates for the relief requested herein are sections 502(b) and 502(c) of the Bankruptcy Code and Rule 3007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

B.     Current Business Operations Of The Debtors

5.     As of December 31, 2005, Delphi and its subsidiaries and affiliates (collectively, the "Company") had global 2005 net sales of approximately $26.9 billion and global assets of approximately $17.0 billion.[1]  At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues, and the thirteenth largest public company business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are not chapter 11 debtors and continue their business operations without supervision from the Bankruptcy Court.

6.     The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology.  The Company supplies products to nearly every major global automotive original equipment manufacturer.

7.     Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of General Motors Corporation ("GM").  Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM.  In

---

[1]    The aggregated financial data used in this objection generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates.

connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications.  Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

C.    Events Leading To The Chapter 11 Filing

8.    In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income.  Every year thereafter, however, with the exception of 2002, the Company has suffered losses.  In calendar year 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[2] Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of approximately $2.4 billion on net sales of $26.9 billion.

9.    The Debtors believe that the Company's financial performance has deteriorated because of (a) increasingly unsustainable U.S. legacy liabilities and operational restrictions driven by collectively bargained agreements, including restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which have the effect of creating largely fixed labor costs, (b) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (c) increasing commodity prices.

10.    In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product

---

[2]    Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004.  The Company's net operating loss in calendar year 2004 was $482 million.

portfolio, operational issues, and forward-looking revenue requirements.  Because discussions with its major unions and GM had not progressed sufficiently by the end of the third quarter of 2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete the Debtors' transformation plan and preserve value for its stakeholders.

D.      The Debtors' Transformation Plan

11.      On March 31, 2006, the Company outlined the key tenets of its transformation plan.  The Company believes that this plan will enable it to return to stable, profitable business operations and allow the Debtors to emerge from these chapter 11 cases in the first half of 2007.  To complete their restructuring process, the Debtors must focus on five key areas.  First, Delphi must modify its labor agreements to create a competitive arena in which to conduct business.  Second, the Debtors must conclude their negotiations with GM to finalize GM's financial support for the Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company.  Third, the Debtors must streamline their product portfolio to capitalize on their world-class technology and market strengths and make the necessary manufacturing alignment with their new focus.  Fourth, the Debtors must transform their salaried workforce to ensure that the Company's organizational and cost structure is competitive and aligned with its product portfolio and manufacturing footprint.  Finally, the Debtors must devise a workable solution to their current pension situation.

12.      Upon the conclusion of the reorganization process, the Debtors expect to emerge as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal all of its resources to continue to deliver high-quality products to its customers globally.  Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

E.    Bar Date, Proofs Of Claim, And Omnibus Claims Objections

13.    On April 12, 2006, this Court entered an Order Under 11 U.S.C. §§ 107(b), 501, 502, And 1111(a) And Fed R. Bankr. P. 1009, 2002(a)(7), 3003(c)(3), And 5005(a) Establishing Bar Dates For Filing Proofs Of Claim And Approving Form And Manner Of Notice Thereof (Docket No. 3206) (the "Bar Date Order").  Among other things, the Bar Date Order established July 31, 2006 (the "Bar Date") as the last date for all persons and entities holding or wishing to assert "Claims," as such term is defined in 11 U.S.C. § 101(5), against a Debtor (collectively, the "Claimants") to file a proof of claim form with respect to each such Claim.

14.    On or prior to April 20, 2006, Kurtzman Carson Consultants, LLC, the claims and noticing agent in these cases (the "Claims Agent"), provided notice of the Bar Date by mailing a notice of bar date approved by this Court (the "Bar Date Notice"), together with a proof of claim form, to (a) the persons or entities set forth in the Debtors' Schedules of Assets and Liabilities and Statements of Financial Affairs (the "Schedules and Statements") filed with this Court on January 20, 2006 (and subsequently amended on February 1, 2006 and April 18, 2006) and (b) the persons and entities included in the notice database compiled by the Debtors, but not listed on any of the Schedules and Statements.  In total, the Debtors provided Bar Date Notices to more than 500,000 persons and entities.

15.    In addition, the Debtors published the Bar Date Notice in the New York Times (National Edition), the Wall Street Journal (National, European, and Asian Editions), USA Today (Worldwide Edition), the Automotive News (National Edition), and in local editions of the following: the Adrian Daily Telegram, the Arizona Daily Star, the Buffalo News, the Chicago Sun Times, the Clinton News, the Columbia Dispatch, the Daily Leader, Dayton Daily News, the Detroit Free Press, the El Paso Times, the Fitzgerald Herald Leader, the Flint Journal, the Gadsden Times, the Grand Rapids Press, the Greenville News, the Indianapolis Star, the

Kansas City Star, the Kokomo Tribune, the Lansing State Journal, the Laurel Leader, the Los Angeles Daily News, the Milwaukee Journal Sentinel, the Mobile Beacon, the Mobile Register, the Oakland Press, the Olathe Daily News, the Rochester Democrat and Chronicle, the Saginaw News, the Sandusky, the Tribune Chronicle, the Tulsa World, the Tuscaloosa News, and the Vindicator, and electronically through posting on the Delphi Legal Information Website, www.delphidocket.com, on or before April 24, 2006.

16. Approximately 16,000 proofs of claim (the "Proofs of Claim") have been timely filed against the Debtors in these cases. On September 19, 2006, the Debtors filed the First Omnibus Objection Pursuant To 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 3007 To Certain (i) Duplicate And Amended Claims And (ii) Equity Claims ("First Omnibus Claims Objection"). In the First Omnibus Claims Objection, the Debtors objected to approximately 3,500 claims. On October 24, 2006, the Court entered an order disallowing and expunging (a) certain Claims because they were duplicative of other Claims or had been amended or superseded by later filed Claims and (b) certain Claims because they were filed by holders of Delphi common stock solely on account of their stock holdings.

17. Contemporaneously with the Third Omnibus Claims Objection, the Debtors are filing the Second Omnibus Objection (Procedural) Pursuant To 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 3007 To Certain (i) Equity Claims, (ii) Claims Duplicative Of Consolidated Trustee Or Agent Claims, And (iii) Duplicate And Amended Claims ("Second Omnibus Claims Objection"). In the Second Omnibus Claims Objection, the Debtors object to claims on procedural grounds and are seeking to expunge and disallow (a) certain Claims because they were filed by equity holders solely on account of their stock holdings, (b) certain Claims because they were filed by equity holders solely on account of their stock holdings or, in

the alternative, were untimely pursuant to the Bar Date Order, (c) certain Claims because they were filed by individual noteholders or individual lenders and are duplicative of the consolidated or master proofs of claim filed on behalf of the individual noteholders and lenders by JPMorgan Chase Bank, N.A., Law Debenture Trust Company of New York, or Wilmington Trust Company, and (d) certain Claims because they are duplicative of other Claims or have been amended or superseded by later filed Claims. The Debtors objected to 2,853 proofs of claim in the Second Omnibus Claims Objection.

18. In this Third Omnibus Claims Objection, the Debtors are objecting to 1,017 claims.[3]

## Relief Requested

19. By this Objection, the Debtors seek entry of an order pursuant to 11 U.S.C. § 502(b) and Bankruptcy Rule 3007 (a) disallowing and expunging those Claims set forth on Exhibit B-1 attached hereto because they contain insufficient documentation in support of the Claims asserted, (b) disallowing and expunging those Claims set forth on Exhibit B-2 attached hereto because they contain insufficient documentation in support of the Claims asserted and were untimely pursuant to the Bar Date Order, (c) disallowing and expunging those Claims set forth on Exhibit C-1 attached hereto because they are unsubstantiated liabilities or dollar amounts that are not discernable from the Debtors' books and records, (d) disallowing and expunging those Claims set forth on Exhibit C-2 attached hereto because they are

---

[3] Consistent with the notice provided to claimants with respect to the First Omnibus Claims Objection and approved by this Court in the order entered with respect thereto, the Debtors will provide each Claimant whose Proof of Claim is subject to an objection pursuant to this Third Omnibus Claims Objection with a personalized Notice Of Objection To Claim which specifically identifies the Claimant's Proof of Claim that is subject to an objection and the basis for such objection. A form of Notice Of Objection To Claim is attached hereto as Exhibit A. Claimants will receive a copy of this Third Omnibus Claims Objection without Exhibits B-1, B-2, C-1, C-2, and D hereto. Claimants will nonetheless be able to review such exhibits free of charge by accessing the Debtors' Legal Information Website (www.delphidocket.com).

unsubstantiated liabilities or dollar amounts that are not discernable from the Debtors' books and records and were untimely pursuant to the Bar Date Order, and (e) modifying the asserted amount of the overstated or improperly-denominated Claims set forth on Exhibit D attached hereto.

20. In the alternative, should this Court find that any of the Claims to which the Debtors have objected in this Third Omnibus Claims Objection should not be disallowed and expunged, or modified, as applicable, to the extent that such Claims assert contingent or unliquidated claims, the Debtors seek entry of an order pursuant to 11 U.S.C. § 502(c) estimating such Claims for purposes of setting a maximum allowable amount of the claim for distributions under a plan of reorganization confirmed in these chapter 11 cases.

Objections To Claims

A.   Insufficiently Documented Claims

21. During their review, the Debtors discovered that certain Proofs of Claim that were filed in these cases do not include sufficient documentation to support the claim asserted (the "Insufficiently Documented Claims"). This deficiency in documentation has made it impossible for the Debtors meaningfully to review the asserted Claims. Furthermore, the Debtors contacted each Claimant which filed an Insufficiently Documented Claim (other than those Claimants who filed a blank proof of claim form).[4]

22. The burden of proof to establish a claim against an estate rests on the claimant and, if a proof of claim does not include sufficient factual support, the proof of claim is not entitled to a presumption of prima facie validity pursuant to Bankruptcy Rule 3001(f) . In re

---

[4] Claims who responded to the Debtors' communications and provided additional information are not included as part of this objection.

WorldCom, Inc., No. 02-13533, 2005 WL 3832065, at *4 (Bankr. S.D.N.Y. Dec. 29, 2005) (only a claim that alleges facts sufficient to support legal liability to claimant satisfies claimant's initial obligation to file substantiated proof of claim); see also In re Allegheny Intern., Inc., 954 F.2d 167, 174 (3d Cir. 1992) (in its initial proof of claim filing, claimant must allege facts sufficient to support claim); In re Chiro Plus, Inc. 339 B.R. 111, 113 (Bankr. D.N.J. 2006) (claimant bears initial burden of sufficiently alleging claim and establishing facts to support legal liability); In re Armstrong Finishing, L.L.C., No. 99-11576-C11, 2001 WL 1700029, at *2 (Bankr. M.D.N.C. May 2, 2001) (only when claimant alleges facts sufficient to support its proof of claim is it entitled to have claim considered prima facie valid); In re United Cos. Fin. Corp., 267 B.R. 524, 527 (Bankr. D. Del. 2000) (claimant must allege facts sufficient to support legal basis for its claim to have claim make prima facie case).  As a result of the Claimants' failure to provide sufficient documentation to permit an understanding of the basis for the Claims, such Claims do not make out a prima facie case against the Debtors.

        23.     The Insufficiently Documented Claims either (a) fail to assert a Claim, (b) fail to assert a monetary amount for the Claim, (c) state that there is no outstanding Claim against the Debtors, and/or (d) contain no documentation in support of the Claim or provide no evidence of the Debtors' liability for the Claim.  In addition, certain of the Insufficiently Documented Claims were received by the Debtors after the Bar Date ("Untimely Insufficiently Documented Claims").  In addition, for those Untimely Insufficiently Documented Claims, the Debtors also object to such Claims on the basis that they were not timely filed pursuant to the Bar Date Order.[5]

---

[5]    The Bar Date Order provides:

*(cont'd)*

24.     Attached hereto as <u>Exhibit B-1</u> is a list of the Insufficiently Documented Claims which the Debtors have identified as Claims that do not contain sufficient documentation to permit an understanding of the basis for the claim.  Attached hereto as <u>Exhibit B-2</u> is a list of Untimely Insufficiently Documented Claims which the Debtors have identified as Claims that do not contain sufficient documentation to permit an understanding of the basis for the claim and were not timely filed pursuant to the Bar Date Order.[6]  In the event that this Court does not disallow and expunge these Claims in full, the Debtors expressly reserve all of their rights to further object to any or all of the Insufficiently Documented Claims and Untimely Insufficiently Documented Claims at a later date on any basis whatsoever.

25.     Accordingly, the Debtors (a) object to both the Insufficiently Documented Claims and the Untimely Insufficiently Documented Claims and (b) seek entry of an order disallowing and expunging the Insufficiently Documented Claims and Untimely Insufficiently Documented Claims in their entirety.

B.     <u>Claims Unsubstantiated By Debtors' Books And Records</u>

26.     During the Debtors' review of the Proofs of Claim, the Debtors determined that certain Proofs of Claim assert liabilities or dollar amounts that are not owing pursuant to the

_____
*(cont'd from previous page)*

> Any Person or Entity which is required to file a Proof of Claim in these chapter 11 cases but that fails to do so in a timely manner on or before the applicable Bar Date shall be forever barred, estopped, and enjoined from (a) asserting any Claim against the Debtors that such Person or Entity has that (i) is in an amount that exceeds the amount, if any, that is set forth in the Schedules as undisputed, non-contingent, and unliquidated or (ii) is of a different nature or in a different classification than as set forth in the Schedules (any such Claim referred to as an "Unscheduled Claim") and (b) voting upon, or receiving distributions under, any plan or plans of reorganization in these chapter 11 cases in respect of an Unscheduled Claim, and the Debtors and their property shall be forever discharged from any and all indebtedness or liability with respect to such Unscheduled Claim.

> Bar Date Order ¶ 11.

[6]     None of the Untimely Insufficiently Documented Claims listed on <u>Exhibit B-2</u> hereto was included as part of the Motion For Order Under Fed. R. Bankr. P. 3003(c)(3) And 9006(b)(1) Deeming Certain Proofs Of Claim Timely Filed, dated September 29, 2006 (Docket No. 5238) ("Claims Timeliness Motion").

Debtors' books and records ("Unsubstantiated Claims").   Additionally, the Debtors determined that certain other Proofs of Claim also assert liabilities or dollar amounts that are not owing pursuant to the Debtors' books and records or, in the alternative, were not timely filed pursuant to the Bar Date Order ("Untimely Unsubstantiated Claims").  The Debtors believe that the parties asserting both Unsubstantiated Claims and Untimely Unsubstantiated Claims are not creditors of the Debtors.

27.     The bases for determining that the Debtors are not liable for an asserted Claim include, but are not limited to, the following: (a) the Debtors' books and records reflect that the asserted Claim was properly paid prior to the commencement of the Debtors' cases, (b) the Debtors' books and records do not reflect the existence of the asserted Claim or of the Claimant asserting such Claim, or (c) the Claim has been paid during the course of these proceedings pursuant to an order of the Bankruptcy Court.

28.     A claimant's proof of claim is entitled to the presumption of prima facie validity under Bankruptcy Rule 3001(f) only until such time an objecting party refutes "'at least one of the allegations that is essential to the claim's legal sufficiency.'"  WorldCom, 2005 WL 3832065, at *4 (quoting Allegheny, 954 F.2d at 174).  Once such an allegation is refuted, "'the burden reverts to the claimant to prove the validity of the claim by a preponderance of the evidence.'"  Id.  The Debtors' books and records refute an essential allegation as to each Unsubstantiated Claim; namely, that the claims asserted therein are owing from any of the Debtors.

29.     Attached hereto as Exhibit C-1 is a list of the Unsubstantiated Claims that the Debtors have identified as Claims for which the Debtors are not liable.  Attached hereto as Exhibit C-2 is a list of the Untimely Unsubstantiated Claims which the Debtors have identified

as Claims for which the Debtors are not liable. The Debtors object to these Claims as Claims for which the Debtors have no liability and as Claims that were not timely filed pursuant to the Bar Date Order.[7] In the event that this Court does not disallow and expunge these Claims in full, the Debtors expressly reserve all of their rights to further object to any or all of the Unsubstantiated Claims and Untimely Unsubstantiated Claims at a later date on any basis whatsoever.

30. Accordingly, the Debtors (a) object to both the Unsubstantiated Claims and the Untimely Substantiated Claims and (b) seek entry of an order disallowing and expunging both the Unsubstantiated Claims and Untimely Unsubstantiated Claims in their entirety.

C. Claims Subject To Modification

31. During the Debtors' review of the Proofs of Claim, the Debtors have identified certain Claims asserted against the Debtors that either were denominated in a foreign currency or are overstated, including as a result of the assertion of invalid unliquidated claims ("Claims Subject to Modification"). Based on an initial review of the Claims Subject to Modification, the Debtors have determined that their liability with respect to each such Claim does not exceed the dollar amount set forth on Exhibit D attached hereto. Moreover, the Debtors have determined that such Claims should be classified as set forth on Exhibit D attached hereto.

32. The bases for including the Claims Subject to Modification include, but are not limited to, the following: (a) the asserted Claim was denominated in foreign currency in violation of the Bar Date Order,[8] (b) the asserted Claim states a claim for unmatured interest or postpetition interest on an unsecured claim, which interest is not is allowed under 11 U.S.C. §§ 502(b)(2), 506(b), (c) the asserted Claim does not account for amounts that may have been paid

---

[7] None of the Untimely Unsubstantiated Claims listed on Exhibit C-2 hereto was included as part of the Claims Timeliness Motion.

[8] See Bar Date Order ¶ 3(d) ("Proofs of Claim must . . . (iv) be denominated in United States currency. . .").

or credited against such Claim prior to the commencement of these cases, (d) the asserted Claim does not account for amounts that may have been paid or credited against such Claim following the commencement of these cases, and (e) the asserted Claim is misclassified as a priority or secured claim.  Thus, the Debtors seek to modify the dollar amount of the Claims Subject to Modification to a fully liquidated, U.S.-denominated amount in line with the Debtors' books and records and/or the liquidated amounts requested by the Claimants, as appropriate, and to appropriately classify the Claims.

33.     As stated above, a claimant's proof of claim is entitled to the presumption of prima facie validity under Bankruptcy Rule 3001(f) only until such time an objecting party refutes "'at least one of the allegations that is essential to the claim's legal sufficiency.'" WorldCom, 2005 WL 3832065, at *4 (quoting Allegheny, 954 F.2d at 174).  As with the Unsubstantiated Claims, the Debtors' books and records refute that certain of the claims asserted in each Claim Subject to Modification are actually owed by any of the Debtors.

34.     Set forth on Exhibit D attached hereto is a list of Claims Subject to Modification that the Debtors believe should be modified to solely assert a properly classified, fully liquidated claim amount.  For each Claim Subject to Modification, Exhibit D reflects the amount asserted in the Claimant's Proof of Claim in a column titled "Asserted Claim Amount"[9] and the proposed modified dollar amount of the Claim in a column titled "Modified Claim Amount."  The Debtors object to the Asserted Claim Amount for each Claim Subject to Modification on Exhibit D and request that each such Claim be amended to the amount listed as the Modified Claim Amount of the Claim.  Thus, no Claimant listed on Exhibit D would be

---

[9]     As a result of the manner in which Claims are docketed by the Claims Agent, Claims asserted in foreign currency may be listed on Exhibit D as $0.00.  In addition, the Asserted Claim Amount on Exhibit D reflects only asserted liquidated claims.

entitled to a recovery for any Claim Subject to Modification in an amount exceeding the dollar value listed as the Modified Claim Amount for such Claim on Exhibit D, or to assert a classification which is inconsistent with that which is listed on Exhibit D, subject to the Debtors' right to further object to each such Claim Subject to Modification.

35.     The inclusion of the Claims Subject to Modification on Exhibit D, however, does not reflect any view by the Debtors as to the ultimate validity of any such Claim. The Debtors therefore expressly reserve all of their rights to further object to any or all of the Claims Subject to Modification at a later date on any basis whatsoever.

36.     Accordingly, the Debtors (a) object to the Asserted Claim Amount for the Claims Subject to Modification and (b) seek an order modifying the Claims Subject to Modification to the Modified Claim Amount as set forth on Exhibit D.

<u>Estimation Of Claims</u>

37.     Although the Debtors believe that all Claims subject to this Third Omnibus Objection should be disallowed, expunged, or reduced as described above and set forth on Exhibits B-1, B-2, C-1, C-2, and D hereto, as alternative relief, the Debtors request that, to the extent that such Claims assert contingent or unliquidated Claims, this Court estimate such Claims for the purposes of setting a maximum allowable amount of the Claim for all purposes, including voting and distribution, pursuant to section 502(c) of the Bankruptcy Code.

38.     As described above, more than 16,000 Proofs of Claim have been timely filed in these chapter 11 cases, asserting liabilities in excess of $36 billion.  As the Debtors have reported, they are currently engaged in framework discussions with their principal stakeholders attempting to reach agreement on the terms and structure of a plan of reorganization in these cases.  The Debtors and their key constituents continue to believe that it is important for the

Debtors to emerge from these chapter 11 cases as expeditiously as possible and the Debtors continue to target the first half of 2007 for emergence to occur. In the course of the ongoing framework discussions, it has become clear to all of the participants that the parties' ability to reach agreement on a framework for the Debtors' emergence is predicated upon a clear understanding of the scope of the claims against the Debtors which will ultimately be allowed in these cases. Therefore, it is essential that the Debtors determine the value of asserted Claims as expeditiously as possible.

        39.     With this need for efficiency in mind, should any of the Debtors' objections to Claims identified for objection in this Third Omnibus Claims Objection not be granted or should the Debtors receive a properly-filed response to an objection from a Claimant and should such claims assert contingent or unliquidated amounts (the "Estimable Claims"), the Debtors request that this Court estimate such Estimable Claims. This estimation would be used for all purposes, including to set the maximum allowable amount of the Estimable Claim for distribution under any future plan of reorganization confirmed and consummated in these cases. The Debtors request that any Estimable Claim estimated by this Court never be allowed in an amount in excess of the estimated amount of such claim.

        40.     The Debtors further request that this estimate would neither constitute an admission by the Debtors as to the allowability, amount, classification, priority, or merits of any Claim nor be permitted to be used by any party for any other purpose whatsoever. The Debtors would reserve all of their rights with respect to such Estimable Claims, including, without limitation, the right to object to the Estimable Claims on any basis whatsoever, as well as the right to seek to reduce the estimated amount of the Estimable Claim. Nonetheless, the certainty that estimations of the Estimable Claims provides would permit the Debtors to more accurately

determine the likely amount of claims that will be allowed against the Debtors in these chapter 11 cases.  Making this assessment would immeasurably enhance the Debtors' ability to reach agreement on a consensual plan of reorganization with their key constituents.

41.     There is ample authority for the Court to estimate the Estimable Claims for purposes of a distribution under a plan of reorganization.  Indeed, section 502(c) of the Bankruptcy Code provides that the Court shall estimate for purposes of allowance "any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case."  11 U.S.C. § 502(c); see In re Chateaugay Corp., 944 F.2d 997, 1006 (2d Cir. 1991) (stating that courts should make a "speedy and rough estimation of claims for purposes of determining [claimant's] voice in the Chapter 11 proceeding"); In re Fox, 64 B.R. 148, 151 (Bankr. N.D. Ohio 1986) ("The language of section 502(c) is mandatory and places an affirmative duty on the court to estimate unliquidated claims under proper circumstances").

42.     In estimating the Estimable Claims, this Court has broad latitude and may use whatever method is best suited to the contingencies of the case, so long as the procedure is consistent with the fundamental policy of chapter 11 which encourages quick and efficient reorganizations.  In re Adelphia Bus. Solutions, Inc., 341 B.R. 415, 422 (Bankr. S.D.N.Y. 2003) (stating that "estimation, authorized under section 502(c) of the Code, provides a means for a bankruptcy court to achieve reorganization, and/or distributions on claims, without awaiting the results of legal proceedings that could take a very long time to determine"); see also Bittner v. Borne Chem. Co., 691 F.2d 134, 134 (3d Cir. 1982) (finding that in estimating value, court is bound by legal rules which may govern ultimate value of claims, but court is not limited in its authority to evaluate claims except for general principles which should inform all decisions made

under Bankruptcy Code).  Moreover, because neither the Bankruptcy Code nor the Bankruptcy Rules prescribe any method for estimating claims, bankruptcy courts have employed a variety of claim estimation methods depending on what best suits the particular circumstances of a case. <u>In re Ralph Lauren Womenswear</u>, <u>Inc.</u>, 197 B.R. 771, 775 (Bankr. S.D.N.Y. 1996) (applying probability of success test, which requires court to estimate claims according to present value of probability of success);  <u>In re Kaplan</u>, 186 B.R. 871 874 (Bankr. D.N.J. 1995) (estimating unliquidated guarantee claim at $0 under section 502(c)(1)); <u>In re Windsor Plumbing Supply Co.</u>, <u>Inc.</u>, 170 B.R. 503, 520 (Bankr. E.D.N.Y 1994) (stating that estimated value of claim should be amount of claim diminished by probability that it may be sustainable only in part or not at all).

43.	As discussed above, the Debtors and their key constituents continue to believe that it is important for the Debtors to emerge from these chapter 11 cases as expeditiously as possible.  The Debtors' emergence is predicated on a clear understanding of the scope of the claims against the Debtors that will ultimately be allowed in these cases.  Absent the estimation of the Estimable Claims for the purposes of setting a maximum allowable amount of the Claim for distribution purposes, the Debtors' framework discussions with their principal stakeholders may be significantly impeded and the Debtors' ability to reach agreement on the terms and structure of a plan of reorganization in these cases may be significantly delayed.

<u>Separate Contested Matters</u>

44.	To the extent that a response is filed with respect to any Claim listed in this Third Omnibus Claims Objection and the Debtors are unable to resolve the response prior to the hearing on this objection, the Debtors request that each such Claim and the objection to such Claim asserted in this Third Omnibus Claims Objection be deemed to constitute a separate contested matter as contemplated by Bankruptcy Rule 9014.  The Debtors further request that

any order entered by the Court with respect to an objection asserted in this Third Omnibus Claims Objection be deemed a separate order with respect to each Claim.

Reservation Of Rights

45.     The Debtors expressly reserve the right to amend, modify, or supplement this Third Omnibus Claims Objection and to file additional objections to the Proofs of Claim or any other Claims (filed or not) which may be asserted against the Debtors, including without limitation the right to object to any claim on the basis that it has been asserted against the wrong Debtor entity.  Should one or more of the grounds for objection stated in this Third Omnibus Claims Objection be dismissed, the Debtors reserve their rights to object on other stated grounds or on any other grounds that the Debtors discover during the pendency of these cases.  In addition, the Debtors reserve the right to seek further reduction of any Claim to the extent that such Claim has been paid.

Responses To Objections

A.     Filing And Service Of Responses

46.     To contest an objection, responses (a "Response"), if any, to the Third Omnibus Claims Objection must (a) be in writing, (b) conform to the Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules for the Southern District of New York, and the Amended Eighth Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered on October 26, 2006 (the "Amended Eighth Supplemental Case Management Order") (Docket No. 5418), (c) be filed with the Bankruptcy Court in accordance with General Order M-242 (as amended) – registered users of the Bankruptcy Court's case filing system must file electronically, and all other parties-in-interest must file on a 3.5 inch disk (preferably in Portable Document Format (PDF),

19

WordPerfect, or any other Windows-based word processing format), (d) be submitted in hard copy form directly to the chambers of the Honorable Robert D. Drain, United States Bankruptcy Judge, United States Bankruptcy Court for the Southern District of New York, One Bowling Green, Room 610, New York, New York 10004, and (e) be served upon (i) Delphi Corporation, 5725 Delphi Drive, Troy, Michigan 48098 (Att'n: General Counsel), (ii) counsel to the Debtors, Skadden, Arps, Slate, Meagher & Flom LLP, 333 West Wacker Drive, Suite 2100, Chicago, Illinois 60606 (Att'n: John Wm. Butler, Jr.), (iii) counsel to the agent under the Debtors' prepetition credit facility, Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York, New York 10017 (Att'n: Kenneth S. Ziman), (iv) counsel to the agent under the postpetition credit facility, Davis Polk & Wardwell, 450 Lexington Avenue, New York, New York 10017 (Att'n: Donald Bernstein and Brian Resnick), (v) counsel to the Official Committee of Unsecured Creditors, Latham & Watkins LLP, 885 Third Avenue, New York, New York 10022 (Att'n: Robert J. Rosenberg and Mark A. Broude), (vi) counsel to the Official Committee of Equity Security Holders, Fried, Frank, Harris, Shriver & Jacobson LLP, One New York Plaza, New York, New York 10004 (Att'n: Bonnie Steingart), and (vii) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, Suite 2100, New York, New York 10004 (Att'n: Alicia M. Leonhard) in each case so as to be received no later than 4:00 p.m. (Prevailing Eastern Time) on November 24, 2006.

B.    Contents Of Responses

47.    Every Response to this Third Omnibus Claims Objection must contain at a minimum the following:

(a)    a caption setting forth the name of the Court, the names of the Debtors, the case number, and the title of this Third Omnibus Claims Objection to which the Response is directed;

(b)     the name of the Claimant and a description of the basis for the amount of the Claim;

(c)     a concise statement setting forth the reasons why the Claim should not be disallowed, expunged, or reclassified for the reasons set forth in this Third Omnibus Claims Objection, including, but not limited to, the specific factual and legal bases upon which the Claimant will rely in opposing the Third Omnibus Claims Objection;

(d)     all documentation or other evidence of the Claim upon which the Claimant will rely in opposing the Third Omnibus Claims Objection to the extent not included with the Proof of Claim previously filed with the Court;

(e)     to the extent that the Claim is fully or partially unliquidated, the amount that the Claimant believes would be the allowable amount of such Claim upon liquidation of the Claim or occurrence of the contingency, as appropriate;

(f)     the address(es) to which the Debtors must deliver any reply to the Response, if different from the address(es) presented in the Claim; and

(g)     the name, address, and telephone number of the person (which may be the Claimant or his/her/its legal representative) possessing ultimate authority to reconcile, settle, or otherwise resolve the Claim on behalf of the Claimant.

C.     Timely Response Required

48.     If a Response is properly and timely filed and served in accordance with the above procedures, and the Debtors are unable to reach a consensual resolution with the Claimant, the Debtors request that this Court conduct a status hearing on November 30, 2006 at 10:00 a.m. regarding this Third Omnibus Claims Objection and any Response hereto and set further hearings pursuant to the Motion For Order Pursuant To 11 U.S.C. §§ 502(b) And 502(c) And Fed. R. Bankr. P. 2002(m), 3007, 7016, 7026, 9006, 9007, And 9014 Establishing (i) Dates For Hearings Regarding Disallowance Or Estimation Of Claims And (ii) Certain Notices And Procedures Governing Hearings Regarding Disallowance Or Estimation Of Claims (the "Claims Objection and Procedures Motion") being filed contemporaneously herewith.  With respect to all uncontested objections, the Debtors request this Court to conduct a final hearing on November 30, 2006 at 10:00 a.m. or as soon thereafter as counsel may be heard.  The procedures set forth in

the Claims Objection and Procedures Motion will apply to all Responses and hearings arising from this Third Omnibus Claims Objection.

49.     Only those Responses made in writing and timely filed and received will be considered by the Court at any such hearing.  The Debtors reserve the right to seek to adjourn a hearing with respect to a specific objection set forth herein and any Response thereto.

50.     If a Claimant whose Claim is subject to this Third Omnibus Claims Objection and who is served with this Third Omnibus Claims Objection fails to file and serve a timely Response in compliance with the foregoing procedures, the Debtors may present to the Court an appropriate order disallowing and expunging such Claim without further notice to the Claimant.  Thus, a failure to respond may forever bar Claimants listed on this Third Omnibus Claims Objection from sustaining a Claim against the Debtors.

51.     To the extent that a Claim would be subject to estimation pursuant to section 502(c) of the Bankruptcy Code, if the Claimant has filed a Response in accordance with the procedures outlined above which (a) acknowledges that the Claim is contingent or fully or partially unliquidated and (b) provides the amount that the Claimant believes would be the allowable amount of such Claim upon liquidation of the Claim or occurrence of the contingency, as appropriate (the "Claimant's Asserted Estimated Amount"), the Debtors have requested authorization in the Claims Objection and Procedures Motion, in their sole discretion, to elect to provisionally accept the Claimant's Asserted Estimated Amount as the estimated amount of such Claim pursuant to section 502(c) of the Bankruptcy Code for all purposes, subject to further objection and reduction as appropriate, by providing notice as described more fully in the Claims Objection and Procedures Motion.

<u>Replies To Responses</u>

52.    The Debtors may, at their option, file and serve a reply to a Claimant's Response so that it is received by the Claimant (or counsel, if represented) no later than 4:00 p.m. (Prevailing Eastern Time) on the day immediately preceding the date of any hearing on this Third Omnibus Claims Objection.

<u>Service Of Third Omnibus Claims Objection Order</u>

53.    Consistent with Bankruptcy Rule 9022, the Debtors respectfully request that this Court direct the Claims Agent to serve the order entered with respect to this Third Omnibus Claims Objection, including exhibits, only on the master service list and the 2002 list. The Debtors further request that this Court direct the Claims Agent to serve all Claimants whose proofs of claim are listed on an exhibit to this Third Omnibus Claims Objection with a copy of the order, without exhibits, and a personalized Notice Of Entry Of Order in the form attached hereto as <u>Exhibit E</u> specifically identifying the Claimant's proof of claim that is subject to the order, the Court's treatment of such proof of claim, and the basis for such treatment, and advising the Claimant of its ability to view the order with exhibits free of charge on the Debtors' Legal Information Website.

<u>Further Information</u>

54.    Questions about this Third Omnibus Claims Objection or requests for additional information about the proposed disposition of Claims hereunder should be directed to the Debtors' counsel by e-mail to <u>delphi@skadden.com</u>, by telephone at 1-800-718-5305, or in writing to Skadden, Arps, Slate, Meagher & Flom LLP, 333 West Wacker Drive, Suite 2100, Chicago, Illinois 60606 (Att'n: John Wm. Butler, Jr., John K. Lyons, and Randall G. Reese). Questions regarding the amount of a Claim or the filing of a Claim should be directed to the

Claims Agent at 1-888-259-2691 or www.delphidocket.com.  Claimants should not contact the Clerk of the Bankruptcy Court to discuss the merits of their Claims.

Notice

55.     Notice of this Objection has been provided in accordance with the Amended Eighth Supplemental Case Management Order.  In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

Memorandum Of Law

56.     Because the legal points and authorities upon which this Objection relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

WHEREFORE the Debtors respectfully request that the Court enter an order (a) granting the relief requested herein and (b) granting the Debtors such other and further relief as is just.

Dated:        New York, New York
                 October 31, 2006

SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP

By:  /s/ John Wm. Butler, Jr.
      John Wm. Butler, Jr. (JB 4711)
      John K. Lyons (JL 9331)
      Ron E. Meisler (RM 3026)
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606

     - and -

By:  /s/ Kayalyn A. Marafioti
      Kayalyn A. Marafioti (KM 9632)
      Thomas J. Matz (TM 5986)
Four Times Square
New York, New York 10036

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

# EXHIBIT D

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

     - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York, 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, <u>et al.</u>,
 Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free: (800) 718-5305
International: (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                      :

| | | |
|---|---|---|
| | : | |
| In re | : | Chapter 11 |
| | : | |
| DELPHI CORPORATION, et al., | : | Case No. 05–44481 (RDD) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MOTION FOR ORDER UNDER 11 U.S.C. § 363 AND FED. R. BANKR. P. 9019 AUTHORIZING
AND APPROVING SETTLEMENT AGREEMENT WITH ELECTRONIC DATA SYSTEMS
<u>CORPORATION, EDS INFORMATION SERVICES L.L.C., AND EDS DE MEXICO, S.A. DE C.V.</u>

("EDS SETTLEMENT MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this motion (the "Motion") for an order under 11 U.S.C. § 363 and Fed. R. Bankr. P. 9019 authorizing and approving the entry of Delphi and Delphi Automotive Systems LLC ("DAS LLC") into a settlement agreement with Electronic Data Systems Corporation ("EDS Corp."), EDS Information Services L.L.C. ("EIS"), and EDS de Mexico, S.A. de C.V. ("EDS Mexico," together with EDS Corp. and EIS, "EDS"), to settle multiple claims filed by EDS against Delphi and DAS LLC, and respectfully represent as follows:

Background

A.     The Chapter 11 Filings

1.     On October 8 and 14, 2005, the Debtors filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code").  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession under Bankruptcy Code sections 1107(a) and 1108.  The Court has ordered joint administration of these cases.

2.     No trustee or examiner has been appointed in these cases.  On October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors.  On April 28, 2006, the U.S. Trustee appointed an official committee of equity holders.

3.     This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

4. The statutory predicates for the relief requested herein is section 363 of the Bankruptcy Code and Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

B. Current Business Operations Of The Debtors

5. Delphi and its subsidiaries and affiliates (collectively, the "Company") as of December 31, 2006 had global net sales of $26.4 billion and global assets of approximately $15.4 billion.[1]  At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues and the thirteenth largest public company business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are not chapter 11 debtors and continue their business operations without supervision from the Bankruptcy Court.[2]

6. The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology.  The Company supplies products to nearly every major global automotive original equipment manufacturer.

7. Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of General Motors Corporation ("GM").  Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in

---

[1]     The aggregated financial data used in this Motion generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates as disclosed in the Company's Form 10-K filed on February 27, 2007.

[2]     On March 20 2007, Delphi Automotive Systems Espana S.L., whose sole operation is a non-core automotive component plant in Cadiz, Spain, filed a "Concurso" application for a Spanish insolvency proceeding.  The application was approved by the Spanish court on April 13, 2007.  The Concurso proceeding does not affect other Delphi legal entities in Spain or elsewhere and is an isolated event that is consistent with Delphi's transformation plan to optimize its manufacturing footprint and to lower its overall cost structure.

accordance with the terms of a Master Separation Agreement between Delphi and GM. In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications. Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

C.    Events Leading To The Chapter 11 Filing

8.    In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income. Every year thereafter, however, with the exception of 2002, the Company has suffered losses. In calendar year 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[3] Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of approximately $2.4 billion on net sales of $26.9 billion. Moreover, in 2006, the Debtors incurred a net loss of $5.5 billion, $3.0 billion of which comprised charges related to the U.S. employee special attrition programs.

9.    The Debtors believe that the Company's financial performance has deteriorated because of (i) increasingly unsustainable U.S. legacy liabilities and operational restrictions driven by collectively bargained agreements, including restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which have the effect of creating largely fixed labor costs, (ii) a competitive U.S. vehicle production environment for domestic

---

[3]    Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004. The Company's net operating loss in calendar year 2004 was $482 million.

OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (iii) increasing commodity prices.

10.     In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward-looking revenue requirements. Because discussions with its major unions and GM had not progressed sufficiently by the end of the third quarter of 2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete the Debtors' transformation plan and preserve value for its stakeholders.

D.     The Debtors' Transformation Plan

11.     On March 31, 2006, the Company outlined five key tenets of its transformation plan. First, Delphi must modify its labor agreements to create a competitive arena in which to conduct business. Second, the Debtors must conclude their negotiations with GM to finalize GM's financial support for the Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company. Third, the Debtors must streamline their product portfolio to capitalize on their world-class technology and market strengths and make the necessary manufacturing alignment with their new focus. Fourth, the Debtors must transform their salaried workforce to ensure that the Company's organizational and cost structure is competitive and aligned with its product portfolio and manufacturing footprint.[4] Finally, the Debtors must devise a workable solution to their current pension situation.

---

[4]     As part of this effort, effective July 1, 2006, the Company realigned its business operations to focus its product portfolio on core technologies for which the Company believes it has significant competitive and technological advantages. The Company's revised operating structure consists of its four core business segments: Electronics and Safety, Thermal Systems, Powertrain Systems, and Electrical/Electronic Architecture. The Company also has two additional segments, Steering and Automotive Holdings Group, which will be transitioned as part of the Company's transformation plan.

12.     On December 18, 2006, the Debtors marked another milestone in their chapter 11 cases with the announcement of two significant agreements.  The first of these was an equity purchase and commitment agreement (the "Equity Purchase and Commitment Agreement") with affiliates of Appaloosa Management L.P., Cerberus Capital Management, L.P., and Harbinger Capital Partners Master Fund I, Ltd., as well as Merrill Lynch & Co. and UBS Securities LLC (collectively, the "Plan Investors").  Under the Equity Purchase and Commitment Agreement, the Plan Investors have agreed to invest up to $3.4 billion in preferred and common equity in the reorganized Delphi to support the Debtors' transformation plan.  The Equity Purchase and Commitment Agreement is subject to the completion of due diligence, satisfaction or waiver of numerous other conditions (including Delphi's goal of achieving consensual agreements with its principal U.S. labor unions and GM), and the non-exercise by either Delphi or the Plan Investors of certain termination rights.  The second agreement was a plan framework support agreement (the "Plan Framework Support Agreement") with the Plan Investors and GM. The Plan Framework Support Agreement outlines certain proposed terms of the Debtors' anticipated plan of reorganization, including the distributions to be made to creditors and shareholders, the treatment of GM's claims, the resolution of certain pension funding issues, and the corporate governance of the reorganized Debtors.  The terms of the Plan Framework Support Agreement are expressly conditioned on the Debtors' reaching consensual agreements with their U.S. labor unions and GM.

13.     On January 12, 2007, this Court authorized the Debtors to execute, deliver, and implement the Equity Purchase and Commitment Agreement and the Plan Framework Support Agreement (Docket No. 6589).  On February 28, 2007, Delphi entered into an amendment to the Equity Purchase and Commitment Agreement with the Plan Investors to

extend the date by which the Company, the Cerberus Capital Management, L.P. affiliate, or the Appaloosa Management L.P. affiliate have the right to terminate the agreement on account of not yet having completed tentative labor agreements with Delphi's principal U.S. labor unions and a consensual settlement of legacy issues with GM. The amendment extended the termination right pursuant to a 14-day notice mechanism. The amendment also extended the deadline to make certain regulatory filings under the federal antitrust laws in connection with the Equity Purchase and Commitment Agreement and the Plan Framework Support Agreement.

14.     On April 19, 2007, Delphi announced that the Debtors anticipated negotiating changes to the Equity Purchase and Commitment Agreement and the Plan Framework Support Agreement. The Debtors do not believe that these developments will preclude the Debtors from filing a joint plan of reorganization and related documents with the Court prior to the current expiration of the exclusivity period on July 31, 2007 or emerging from chapter 11 reorganization this year. The Debtors also confirmed that none of the parties entitled to give notice of termination of the framework agreements has done so as of the date of this filing and that these agreements remain effective as previously filed until modified or terminated.

15.     Although much remains to be accomplished in the Debtors' reorganization cases, the Debtors and their stakeholders are together navigating a course that should lead to a consensual resolution with their U.S. labor unions and GM while providing an acceptable financial recovery framework for the Debtors' stakeholders. Upon the conclusion of the reorganization process, the Debtors expect to emerge as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives. In the meantime, Delphi will marshal all of its resources to continue to deliver high-quality products to its customers globally. Additionally, the Company will preserve and

continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

## Relief Requested

16.     By this Motion, the Debtors seek entry of an order under section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 authorizing and approving the Debtors' entry into that certain Settlement Agreement by and among Delphi, DAS LLC, and EDS, dated May 11, 2007, which resolves multiple claims filed by EDS against Delphi and DAS LLC, in the form attached hereto as Exhibit A (the "Settlement Agreement").  Pursuant to that certain Order Under 11 U.S.C. §§ 363, 502, And 503 And Fed. R. Bankr. P. 9019(b) Authorizing Debtors To Compromise Or Settle Certain Classes Of Controversy And Allow Claims Without Further Court Approval (Docket No. 4414) entered by this Court on June 29, 2006 (the "Settlement Procedures Order"), Delphi and DAS LLC are authorized to consummate the Settlement Agreement only upon order of this Court.

## Basis For Relief

E.      Background To The Proposed Settlement Agreement

17.     EDS, a member of the official committee of unsecured creditors, provides information technology outsourcing services to the Debtors.  The contracts that form the bases for EDS' proofs of claim include the Master Agreement by and among Delphi Automotive Systems Corporation ("Delphi Automotive"), predecessor in interest to Delphi, EDS Corp., and EIS, effective July 1, 1999 and amended October 2001 (the "Delphi Master Agreement"), the U.S. Delphi Services Agreement (the "Delphi Services Agreement") by and among DAS LLC, EDS Corp., and EIS, effective July 1, 1999, the Vega 2 Services Agreement (the "Vega Agreement") by and among Delphi Automotive, EDS Corp., and EIS, effective December 21,

2001 as amended in May 2002, and other certain agreements and amendments (the Delphi Master Agreement, the Delphi Services Agreement, the Vega Agreement, and other certain agreements and amendments, collectively, the "Agreements").

18.    On July 28, 2006, EDS filed proofs of claim numbers 12678, 12679, 12680, 12681, 12682, and 12683 (collectively, the "Claims"). The chart below reflects basic information regarding the Claims and the Debtors' objections thereto:

| Proof Of Claim No. | EDS Entity Asserting Claim | Debtor Entity Against Which Claim Is Asserted | Amount And Nature Of Claim Asserted | Applicable Objection To Claim |
|---|---|---|---|---|
| 12678 | EDS Corp. | DAS LLC | unsecured: $16,691,418.68 priority: $2,061,011.00 | Third Omnibus Claims Objection |
| 12679 | EDS Corp. | Delphi Corp. | unsecured: $16,691,418.68 priority: $2,061,011.00 | Third Omnibus Claims Objection |
| 12680 | EDS Mexico | DAS LLC | unsecured: $518,330.54 priority: $2,061,011.00 | Third Omnibus Claims Objection |
| 12681 | EIS | DAS LLC | unsecured: $16,691,418.68 priority: $2,061,011.00 | Third Omnibus Claims Objection |
| 12682 | EDS Mexico | Delphi Corp. | unsecured: $518,330.54 priority: $2,061,011.00 | Third Omnibus Claims Objection |
| 12683 | EIS | Delphi Corp. | unsecured: $16,691,418.68 priority: $2,061,011.00 | Third Omnibus Claims Objection |

19.    In sum, the Claims assert that Delphi and DAS LLC are both liable under the Agreements for (i) $11,173,088.21 in unpaid invoices with respect to EDS's U.S. operations (the "U.S. Liabilities"), (ii) $518,330.54 in unpaid invoices with respect to EDS's Mexico operations (the "Mexico Liabilities"), (iii) $4,999,999.93 due under the Vega Notes Receivables

(as described in more detail below, the "Vega Notes"), and (iv) $2,061,011.00 in minimum revenue commitment shortfall payments that the Debtors assert accumulated as roll-overs from previous years and any subsequent shortfalls for calendar year 2006 and 2007 as outlined in the current Delphi Master Agreement (the "Minimum Commitment Shortfall").

20. The Vega Notes liability is in respect of an approximately $20 million pre-tax payment (the "Loan") from EDS to Delphi that was received by Delphi in the fourth quarter of 2001. This liability has diminished as payments were made by Delphi to EDS pursuant to the Vega Agreement. Currently, Delphi has a remaining liability of $4,999,999.93, which represents the Vega Notes portion of the Claims.

21. Upon a detailed review of their books and records, the Debtors have verified EDS's claim with respect to the U.S. Liabilities and the Vega Notes (only as asserted against Delphi). With respect to the Mexico Liabilities, a further reconciliation of the Debtors' books and records resulted in a downward variance of $12,604.80 from the amount asserted by EDS. Finally, the Debtors do not believe that they have any liability for the Minimum Commitment Shortfall.

22. On November 22, 2006, EDS filed that certain Response Of Electronic Data Systems, EDS Information Services L.L.C. And EDS de Mexico S.A. de C.V. To The Debtors' Second Omnibus Objection (Procedural) To Certain (I) Equity Claims, (II) Claims Duplicative Of Consolidated Trustee Or Agent Claims And (III) Duplicate And Amended Claims And Third Omnibus Objection (Substantive) To Certain (A) Claims With Insufficient Documentation, (B) Claims Unsubstantiated By Debtors' Books And Records, And (C) Claims Subject To Modification (Docket No. 5722), and the hearing with respect to the Debtors' objections to the Claims was adjourned.

F.    The Proposed Settlement Agreement

23.    To resolve their dispute with EDS over the Claims, the Debtors propose to enter into the Settlement Agreement.  The salient terms of the Settlement Agreement are as follows:[5]

(a)    Proof of Claim No. 12678 would be jointly held by EDS Corp. and EIS and would be allowed as a prepetition general unsecured non-priority claim against (i) DAS LLC in the amount of $11,678,813.95 and (ii) Delphi in the amount of $4,999,999.93 (the "Allowed Claim").  EDS Corp. would be the voting claimant on behalf of itself and EIS on account of Proof of Claim No. 12678 in connection with any plan of reorganization of the Debtors (the "Plan of Reorganization") and the Debtors would only have an obligation to solicit EDS Corp.'s vote on account of Proof of Claim No. 12678.  EDS Corp. would accept on behalf of itself and EIS any and all distributions made under the Plan of Reorganization in connection with Proof of Claim No. 12678.

(b)    Proofs of Claim Nos. 12679, 12680, 12681, 12682, and 12683 would be expunged and disallowed in their entirety.

(c)    For administrative convenience only, and without prejudice to EDS' rights against Delphi, Proof of Claim No. 12679 would be expunged subject to the right of EDS to reassert Proof of Claim No. 12679 as set forth below.

(d)    DAS LLC and Delphi acknowledge and agree that Proof of Claim No. 12679, if reasserted, shall be jointly held by EDS Corp. and EIS and (i) shall be allowed (as that term is used in 11 U.S.C. §502) against Delphi in an amount equal to $11,678,813.95 and (ii) shall be assertable against DAS LLC in an amount equal to $4,999,999.93, provided, however, that DAS LLC reserves the right to contest the allowance of Proof of Claim No. 12679 against DAS LLC, provided, further, however, DAS LLC and EDS agree that DAS LLC shall be permitted to contest only whether DAS LLC is an obligor liable for $4,999,999.93.  DAS LLC would reserve the right to contest whether DAS LLC is an obligor liable for $4,999,999.93.  EDS Corp. would be the voting claimant on behalf of itself and EIS on account of Proof of Claim No. 12679 in connection with the Plan of Reorganization and the Debtors would only have an obligation to solicit EDS Corp.'s vote on account of Proof of Claim No. 12679.  EDS Corp. would accept on behalf of itself and EIS any and all distributions made under the Plan of Reorganization in connection with Proof of Claim No. 12679.  However, if the Plan of Reorganization were to provide for either substantive consolidation of the Debtors' assets and liabilities or full recovery to EDS of the Allowed Claim, then EDS could not reassert Proof of Claim No. 12679 against Delphi.  For purposes of the Settlement Agreement, a plan of

---

[5]    To the extent this summary differs in any way with the Settlement Agreement, the provisions of the Settlement Agreement control.

reorganization that provides for substantive consolidation of the assets and liabilities of Delphi and DAS LLC is one under which claims against either Delphi's or DAS LLC's individual estate are deemed to be claims against the consolidated estate, such that EDS' proofs of claim are deemed to be a single claim filed against the consolidated estate.

(e)    DAS LLC and Delphi each acknowledge and agree that nothing in this Settlement Agreement shall (A) prohibit EDS from asserting (i) any claims arising after the Petition Date out of any agreement or transaction existing or entered into among EDS, DAS LLC and Delphi, and/or each of their respective affiliates and subsidiaries and/or (ii) any rejection claims filed in accordance with paragraph 8 of the Order Under 11 U.S.C. §§ 107(b), 501, 502, And 1111(a) And Fed. R. Bankr. P. 1009, 2002(a)(7), 3003(c)(3), And 5005(a) Establishing Bar Dates For Filing Proofs Of Claim And Approving Form And Manner Of Notice Thereof (Docket No. 3206) and (B) similarly nothing shall impair the Debtors' ability to contest the same.

24.    Given the high costs of litigating the Claims, the reduction of Proof of Claim No. 12678 by approximately $2 million, and the expungement of EDS's other claims totaling approximately $60 million, Delphi and DAS LLC believe that the Settlement Agreement is fair and reasonable and in the best interest of the Debtors' and their creditors.

Applicable Authority

25.    By this Motion, the Debtors respectfully request the entry of an order under section 363 of the Bankruptcy Code and Rule 9019(a) of the Bankruptcy Rules approving the Settlement Agreement and the settlement terms contained therein.  Bankruptcy Rule 9019 provides, in relevant part, that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement."  Settlements and compromises are "a normal part of the process of reorganization…." Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424 (1968) (quoting Case v. L.A. Lumber Prods. Co., 308 U.S. 106, 130 (1939)); see also In re Adelphia Comm'ns Corp., 327 B.R. 143, 159 (decision to accept or reject settlement lies within sound discretion of bankruptcy court), adhered to on reconsideration, 327 B.R. 175 (Bankr. S.D.N.Y. 2005).

26.    Approval of a compromise under Bankruptcy Rule 9019(a) is appropriate when the compromise is fair and equitable and is in the best interests of a debtor's estate.  See,

12

e.g., TMT Trailer Ferry, 390 U.S. at 424; Adelphia Comm'ns, 327 B.R. at 159 ("The settlement need not be the best that the debtor could have obtained.  Rather, the settlement must fall 'within the reasonable range of litigation possibilities.'") (citations omitted) (quoting In re Penn Centr. Transp. Co., 596 F.2d 1102, 1114 (3d Cir. 1979); Nellis v. Shugrue, 165 B.R. 115, 121 (S.D.N.Y. 1994) ("The obligation of the bankruptcy court is to determine whether a settlement is in the best interest of an estate before approving it.").  In general, compromises in the bankruptcy context should be approved unless they "'fall below the lowest point in the range of reasonableness.'" Cosoff v. Rodman (In re W.T. Grant Co.), 699 F.2d 599, 608 (2d Cir. 1983) (citation omitted).

27.     The Supreme Court in TMT Trailer Ferry set forth the following factors that courts should consider in determining whether a proposed settlement or compromise is in the best interests of a debtor's estate:  (a) the probability of the debtor's success in the litigation, (b) the difficulties associated with collection, (c) the complexity of the litigation, and the attendant expense, inconvenience, and delay, and (d) the paramount interests of the estate's creditors. TMT Trailer Ferry, 390 U.S. at 424-25; see also Nellis, 165 B.R. at 122; Fry's Metals, Inc. v. Gibbons (In re RFE Indus., Inc.), 283 F.3d 159, 165 (3d Cir. 2002).

28.     Courts in this district have further elaborated on these factors to consider, including: (a)  the balance between the likelihood of plaintiffs' or defendants' success should the case go to trial vis-à-vis the concrete present and future benefits held forth by the settlement without the expense and delay of a trial and subsequent appellate procedures, (b) the prospect of complex and protracted litigation if the settlement is not approved, (c) the competency and experience of counsel who support the settlement, and (d) the extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion.  Adelphia Comm'ns, 327 B.R. at 159-60; accord In re Texaco Inc., 84 B.R. 893, 902 (Bankr. S.D.N.Y. 1988).

29.     The bankruptcy court need not determine that all of the foregoing criteria favor approval of a compromise, and the proposed compromise need not be the best agreement that the debtor could have achieved under the circumstances.  See Adelphia Comm'ns, 327 B.R. at 159-60; see also Penn Centr., 596 F.2d at 1114.  Instead, the court's proper "role is to determine whether the settlement as a whole is fair and equitable," In re Lee Way Holding Co., 120 B.R. 881, 890 (Bankr. S.D. Ohio 1990), and falls "'within the reasonable range of litigation possibilities.'"  In re Telesphere Comm'ns, Inc., 179 B.R. 544, 553 (Bankr. N.D. Ill. 1994) (citation omitted).  To that end, courts should not substitute their own judgment for that of the debtor, but rather should "'canvass the issues'" to affirm that the proposed settlement falls above "'the lowest point in the range of reasonableness.'"  Adelphia Comm'ns, 327 B.R. at 159 (quoting W.T. Grant Co., 699 F.2d at 608); accord Airline Pilots Ass'n, Int'l v. Am. Nat'l Bank & Trust Co. (In re Ionosphere Clubs, Inc.), 156 B.R. 414, 426 (S.D.N.Y. 1993), aff'd sub nom. Sobchack v. Am. Nat'l Bank & Trust Co., 17 F.3d 600 (2d Cir. 1994).

30.     The Settlement Agreement provides for the immediate consensual resolution of the Claims instead of costly litigation of the Claims pursuant to the Order Pursuant To 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 2002(m), 3007, 7016, 7026, 9006, 9007, And 9014 Establishing (i) Dates For Hearings Regarding Objections To Claims And (ii) Certain Notices And Procedures Governing Objections To Claims, entered on December 7, 2006 (the "Claims Objection Procedures Order") (Docket No. 6088).  The proposed settlement falls within the reasonable range of litigation possibilities and in fact results in a reduction of Proof of Claim No. 12678 by more than $2 million and the disallowance and expungement of EDS's other Claims which assert in the aggregate approximately $60 million in duplicative liabilities.  In this case, a trial on the merits under the Claims Objection Procedures Order would involve significant time

and expense.  Thus, the Debtors believe that resolving the Claims against Delphi and DAS LLC pursuant to the terms of the Settlement Agreement rather than through litigation is a fair resolution of this matter, and serves the best interest of the Debtors and their creditors.

31.     Because the Settlement Agreement involves the use of estate assets, the Debtors also seek authority for the Settlement Agreement under section 363 of the Bankruptcy Code.  Specifically, section 363(b)(1) permits a debtor-in-possession to use property of the estate "other than in the ordinary course of business" after notice and a hearing.  11 U.S.C. § 363(b)(1). Uses of estate property outside the ordinary course of business may be authorized if the debtor demonstrates a sound business justification for it.  See In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983) (business judgment rule requires finding that good business reason exists to grant debtor's application under section 363(b)); In re Delaware Hudson Ry. Co., 124 B.R. 169, 179 (Bankr. D. Del. 1991).

32.     As a rule, the debtor's business judgment "should be approved by the court unless it is shown to be 'so manifestly unreasonable that it could not be based upon sound business judgment, but only on bad faith, or whim or caprice.'" In re Aerovox, Inc., 269 B.R. 74, 81 (Bankr. D. Del. 2001) (quoting In re Interco, Inc., 128 B.R. 229, 234 (Bankr. E.D. Mo. 1991)).

33.     For the reasons set for above, Delphi and DAS LLC believe that they will receive important financial benefits from the Settlement Agreement, and assert that the Settlement Agreement is an appropriate and reasonable exercise of their business judgment. Accordingly, the Debtors respectfully request that the Motion be granted.

Notice

34.     Notice of this Motion has been provided in accordance with the Amended Eighth Supplemental Order Under 11 U.S.C. Sections 102(1) and 105 and Fed. R. Bankr. P.

2002(m), 9006, 9007, and 9014 Establishing Omnibus Hearing Dates and Certain Notice, Case Management, and Administrative Procedures (Docket No. 5418) and the Settlement Procedures Order.  In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

<u>Memorandum Of Law</u>

35.     Because the legal points and authorities upon which this Motion relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

WHEREFORE the Debtors respectfully request that this Court enter an order (a) authorizing and approving the Settlement Agreement and (b) granting them such other and further relief as is just.

Dated: New York, New York
May 11, 2007

SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP

By:   /s/ John Wm. Butler, Jr.
  John Wm. Butler, Jr. (JB 4711)
  John K. Lyons (JL 4951)
  Ron E. Meisler (RM 3026)
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700

- and -

By:   /s/ Kayalyn A. Marafioti
  Kayalyn A. Marafioti (KM 9632)
  Thomas J. Matz (TM 5986)
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
 Debtors and Debtors-in-Possession

# EXHIBIT A

# SETTLEMENT AGREEMENT

THIS AGREEMENT, dated as of May __, 2007 (the "Settlement Agreement"), is entered into by and between Electronic Data Systems Corporation ("EDS Corp."), EDS Information Services L.L.C. ("EIS") and EDS de Mexico, S.A. de C.V. ("EDS Mexico") (together with EDS Corp. and EIS, "EDS"), Delphi Corporation ("Delphi"), and Delphi Automotive Systems LLC ("DAS LLC").

## RECITALS:

WHEREAS, on October 8, 2005 (the "Petition Date"), Delphi, together with certain of its U.S. affiliates, including DAS LLC (collectively, the "Debtors"), filed voluntary petitions under chapter 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended, (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

WHEREAS, on July 28, 2006 EDS Corp. filed proof of claim number 12678 ("Proof of Claim No. 12678") against DAS LLC and proof of claim number 12679 ("Proof of Claim No. 12679") against Delphi which each assert an unsecured non-priority claim in the amount of $16,691,418.68 and a priority claim in the amount of $2,061,011.00 for a total claim of $18,752,429.68. Also on July 28, 2006, EIS filed proof of claim 12681 ("Proof of Claim No. 12681") against DAS LLC and proof of claim 12683 ("Proof of Claim No. 12683") against Delphi, which each also assert a claim in the amount of $18,752,429.68. Finally, on July 28, 2006, EDS Mexico filed proof of claim 12680 ("Proof of Claim No. 12680") against DAS LLC and proof of claim 12682 ("Proof of Claim No. 12682," collectively with Proofs of Claim 12678, 12679, 12680, 12681, and 12683, the "Proofs of Claim") against Delphi, which each assert an unsecured non-priority claim in the amount of $518,330.54 and a priority claim in the amount of $2,061,011.00 for a total claim of $2,579,341.54. All of these claims stemmed from goods, services, and a loan provided by EDS.

WHEREAS, EDS, Delphi and DAS LLC agree to resolve the Proofs of Claim as set forth herein.

WHEREAS, the Debtors objected to Proofs of Claim Nos. 12679, 12680, and 12683 pursuant to the Debtors' Second Omnibus Objection (Procedural) Pursuant To 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 3007 To Certain (I) Equity Claims, (II) Claims Duplicative Of Consolidated Trustee Or Agent Claims, And (III) Duplicate and Amended Claims (Docket No. 5451) (the "Second Omnibus Claims Objection"), which was filed on October 31, 2006, and to Proofs of Claim Nos. 12678, 12681, and 12682 pursuant to the Debtors' (i) Third Omnibus Objection (Substantive) Pursuant To 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 3007 To Certain (a) Claims With Insufficient Documentation, (b) Claims Unsubstantiated By Debtors' Books And Records, And (c) Claims Subject To Modification And (ii) Motion To Estimate Contingent And Unliquidated Claims Pursuant To 11 U.S.C. § 502(c) (Docket No. 5452) (the "Third Omnibus Claims Objection"), which was also filed on October 31, 2006.

WHEREAS on November 22, 2006, EDS filed the Response Of Electronic Data Systems, EDS Information Services L.L.C. And EDS de Mexico S.A. de C.V. To The Debtors' Second

Omnibus Objection (Procedural) To Certain (I) Equity Claims, (II) Claims Duplicative Of Consolidated Trustee Or Agent Claims And (III) Duplicate And Amended Claims And Third Omnibus Objection (Substantive) To Certain (A) Claims With Insufficient Documentation, (B) Claims Unsubstantiated By Debtors' Books And Records, And (C) Claims Subject To Modification (Docket No. 5722) (the "Response").

WHEREAS on January 17, 2007, the Court entered the Order Pursuant To 11 U.S.C. § 502(B) And Fed. R. Bankr. P. 3007 Disallowing And Expunging Certain Duplicate And Amended Claims Identified In Second Omnibus Claims Objection (Docket No. 6634) (the "January Order") that withdrew the Second Omnibus Claims Objection solely as it relates to the following claims: (a) Proof of Claim Number 12679, (b) Proof of Claim Number 12680, and (c) Proof of Claim Number 12683. (Docket No. 6634). Under the January Order, each of these proofs of claim were deemed to have been objected to by the Debtors pursuant to the Third Omnibus Claims Objection on the same basis as the proof of claims filed by each such party that were objected to by the Debtors in the Third Omnibus Claims Objection. The Response to the Third Omnibus Claims Objection was also deemed to apply to Proof of Claim Number 12679, Proof of Claim Number 12680, and Proof of Claim Number 12683.

WHEREAS, on the date hereof, to resolve the Third Omnibus Claims Objection with respect to Proofs of Claim Nos. 12678, 12679, 12680, 12681, 12682, and 12683, DAS LLC, Delphi, and EDS enter into this Settlement Agreement.

WHEREAS, pursuant that certain Order Under 11 U.S.C. §§ 363, 502, And 503 And Fed. R. Bankr. P. 9019(b) Authorizing Debtors To Compromise Or Settle Certain Classes Of Controversy And Allow Claims Without Further Court Approval (Docket No. 4414) entered by the Bankruptcy Court on June 29, 2006, DAS LLC and Delphi are authorized to consummate this Settlement Agreement only upon order of the Bankruptcy Court. (the "Approval Order")

WHEREAS, the Debtors shall file a motion with the Bankruptcy Court no later than May 11, 2007 seeking entry of the Approval Order at the Debtors' omnibus hearing scheduled for May 31, 2007.

NOW THEREFORE, in consideration of the premises set forth above and by execution of this Settlement Agreement, DAS LLC, Delphi and EDS agree as follows:

1.  Allowed General Unsecured Non-Priority Claim. DAS LLC and Delphi acknowledge and agree that EDS Corp. and EIS shall jointly hold Proof of Claim No. 12678 and such claim shall be allowed (as that term is used in 11 U.S.C. §502) as a prepetition general unsecured non-priority claim against (i) DAS LLC in the amount of Eleven Million, Six Hundred And Seventy-Eight Thousand, Eight Hundred And Thirteen Dollars And Ninety-Five Cents ($11,678,813.95) and (ii) Delphi in the amount of Four Million Dollars, Nine Hundred And Ninety-Nine Thousand, Nine Hundred And Ninety-Nine Dollars And Ninety-Three Cents ($4,999,999.93). EDS Corp. acknowledges and agrees that it shall be the voting claimant on behalf of itself and EIS on account of Proof of Claim No. 12678 in connection with any plan of reorganization of the Debtors (the "Plan of Reorganization") and the Debtors shall only have an obligation to solicit EDS Corp.'s

vote on account of Proof of Claim No. 12678. EIS acknowledges and consents to EDS Corp. voting on the Plan of Reorganization on behalf of EIS on account of Proof of Claim No. 12678. Furthermore, EDS Corp. shall accept on behalf of itself and EIS any and all distributions made under the Plan of Reorganization in connection with Proof of Claim No. 12678. EIS acknowledges and consents to EDS Corp.'s acceptance of any and all distributions made in connection with the Proofs of Claim. EIS hereby releases the Debtors of any liability on account of any distribution made to EDS Corp. on account of Proof of Claim No. 12678. EDS agrees that the Proofs of Claim Nos. 12679, 12680, 12681, 12682, and 12683 shall be expunged and disallowed in their entirety. For administrative convenience only, and without prejudice to EDS' rights against Delphi, Proof of Claim No. 12679 shall be expunged subject to the right of EDS to reassert Proof of Claim No. 12679 as set forth herein.

2. <u>EDS' Right To Reassert Proof Of Claim No. 12679</u>. This Settlement Agreement is without prejudice to EDS' right to reassert Proof of Claim No. 12679 against Delphi in an amount no greater than $16,678,813.88 and such reasserted claim shall relate back to the original date of filing and shall be subject to the agreements between the Debtors and EDS as set forth on the record of the Court's hearing held on November 30, 2006 and in the January Order. To the extent EDS reasserts Proof of Claim No. 12679, EDS must file such reasserted claim with the Bankruptcy Court and serve such reasserted claim on counsel for the Debtors and the claims agent in these chapter 11 cases. DAS LLC and Delphi acknowledge and agree that Proof of Claim No. 12679, if reasserted, shall be jointly held by EDS Corp. and EIS and (i) shall be allowed (as that term is used in 11 U.S.C. §502) against Delphi in an amount equal to $11,678,813.95 and (ii) shall be assertable against DAS LLC in an amount equal to $4,999,999.93, provided, however, that DAS LLC reserves the right to contest the allowance of Proof of Claim No. 12679 against DAS LLC, <u>provided</u>, <u>further</u>, however, DAS LLC and EDS agree that DAS LLC shall be permitted to contest only whether DAS LLC is an obligor liable for $4,999,999.93. EDS Corp. acknowledges and agrees that it shall be the voting claimant on behalf of itself and EIS on account of Proof of Claim No. 12679 in connection with the Plan of Reorganization and the Debtors shall only have an obligation to solicit EDS Corp.'s vote on account of Proof of Claim No. 12679. EIS acknowledges and consents to EDS Corp. voting on the Plan of Reorganization on behalf of EIS on account of Proof of Claim No. 12679. Furthermore, EDS Corp. shall accept on behalf of itself and EIS any and all distributions made under the Plan of Reorganization in connection with Proof of Claim No. 12679. EIS acknowledges and consents to EDS Corp.'s acceptance of any and all distributions made in connection with the Proofs of Claim. EIS hereby releases the Debtors of any liability on account of any distribution made to EDS Corp. on account of Proof of Claim No. 12679. If (i) (A) the Court confirms the Plan of Reorganization, and (B) the order confirming such Plan of Reorganization is final, has not been stayed or is no longer subject to appeal, certiorari proceeding or other proceeding for review or rehearing, and no appeal, certiorari proceeding, or other proceeding for review or rehearing shall then be pending and such Plan of Reorganization is consummated, <u>and</u> (ii) (A) the Plan of Reorganization provides for Substantive Consolidation of the assets and liabilities of Delphi and DAS LLC, or (B) under such a plan EDS Corp. and EIS receives a full recovery of its claim of $16,678,813.88 allowed in paragraph 1 herein, then EDS acknowledges and agrees that Proof of Claim No. 12679 may not be reasserted against

Delphi and/or DAS LLC and if already reasserted, shall, upon the effective date of the Plan of Reorganization, be expunged with prejudice. In the event that the Plan of Reorganization does not provide for Substantive Consolidation, EDS Corp. and EIS each acknowledge and agree that they shall not receive a recovery, in the aggregate, in an amount greater than $16,678,813.88. Solely for the purposes of this Settlement Agreement, a plan of reorganization that provides for Substantive Consolidation of the assets and liabilities of Delphi and DAS LLC shall be one under which claims against either Delphi's or DAS LLC's individual estate are deemed to be claims against the consolidated estate, such that the Proofs of Claim are deemed to be a single claim filed against the consolidated estate.

3. Acknowledgement Of EDS' Rights. DAS LLC and Delphi each acknowledge and agree that nothing in this Settlement Agreement shall (A) prohibit EDS from asserting (i) any claims arising after the Petition Date out of any agreement or transaction existing or entered into among EDS, DAS LLC and Delphi, and/or each of their respective affiliates and subsidiaries and/or (ii) any rejection claims filed in accordance with paragraph 8 of the Order Under 11 U.S.C. §§ 107(b), 501, 502, And 1111(a) And Fed. R. Bankr. P. 1009, 2002(a)(7), 3003(c)(3), And 5005(a) Establishing Bar Dates For Filing Proofs Of Claim And Approving Form And Manner Of Notice Thereof (Docket No. 3206) and (B) similarly nothing shall impair the Debtors' ability to contest the same.

4. Binding on Successors and Assigns. This Settlement Agreement shall be binding upon and inure to the benefit of the respective successors, predecessors, heirs, assigns of EDS, Delphi, and DAS LLC to the extent provided by law and any reference to EDS, EDS Corp., EDS Mexico, and/or EIS contained herein shall also include any assignee(s), as applicable.

5. Withdrawal Of Response. EDS agrees that its Response to the Third Omnibus Claims Objection shall be withdrawn upon the effective date of this agreement.

6. Governing Law. This Settlement Agreement shall be governed by, and construed and enforced in accordance with, as appropriate, the Bankruptcy Code and the laws of the State of Michigan, without regard to conflicts of law principles.

7. Representations And Warranties. The parties hereto acknowledge that they are executing this Settlement Agreement without reliance on any representations, warranties, or commitments other than those representations, warranties, and commitments expressly set forth in this Settlement Agreement.

8. Entire Understanding. This Settlement Agreement constitutes the entire understanding of the parties in connection with the subject matter hereof. This Settlement Agreement may not be modified, altered, or amended except by an agreement in writing signed by the Debtors and EDS.

9. Condition Precedent. This Settlement Agreement shall be effective on the date when the Approval Order shall become final and not subject to any stay or appeal. The Debtors shall file a motion (the "Motion") for an order of the Bankruptcy Court approving this

Settlement Agreement pursuant to rule 9019 of the Federal Rules of Bankruptcy Procedure no later than May 11, 2007 scheduling the Motion to be heard at the Debtors' omnibus hearing scheduled for May 31, 2007.

10. <u>No Party Deemed Drafter.</u> This Settlement Agreement is being entered into among competent persons who are experienced in business and represented by counsel, and has been reviewed by (i) EDS and its counsel and (ii) the Debtors and their counsel. Therefore, any ambiguous language in this Settlement Agreement will not be construed against any particular party as the drafter of such language.

11. <u>Counterparts.</u> This Settlement Agreement may be executed in any number of counterparts and by the different parties hereto in separate counterparts, each of which shall be deemed to be an original, but all of which taken together shall constitute one and the same agreement. Delivery of an executed counterpart of this Settlement Agreement by facsimile or electronic mail shall be equally as effective as delivery of an original executed counterpart of this Settlement Agreement.

**Accepted and agreed to by:**

| **Delphi Corporation** | **Electronic Data Systems Corporation** |
|---|---|
| By: _____<br>Name:<br>Title:<br>Dated: _____ __, 2007 | By: _____<br>Name:<br>Title:<br>Dated: _____ __, 2007 |
| **Delphi Automotive Systems LLC** | **EDS Information Services L.L.C.** |
| By: _____<br>Name:<br>Title:<br>Dated: _____ __, 2007 | By: _____<br>Name:<br>Title:<br>Dated: _____ __, 2007 |
| | **EDS de Mexico, S.A. de C.V.** |
| | By: _____<br>Name:<br>Title:<br>Dated: _____ __, 2007 |

# EXHIBIT E

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
-------------------------------------------------------x
                                          :      Chapter 11
                                          :
In re:                                    :
                                          :      Case No. 05-44481 (RDD)
Delphi Corporation, et al.                :      (Jointly Administered)
                                          :
        Debtors                           :
-------------------------------------------------------x
```

## NOTICE OF TRANSFER OF CLAIM
## NO. 12678 PURSUANT TO FRBP RULE 3001(e)(2)

TO:  **ELECTRONIC DATA SYSTEMS**
     **CORPORATION and EDS**
     **INFORMATION SYSTEMS, L.L.C.**
     **("Assignors")**
     Attn: Dean Jenkins
     5400 Legacy Drive, MS H1-3A-34
     Plano, TX 75024


As of June 13, 2007, Assignors' claims against

(i) Delphi Corporation in the principal amount of $4,999,999.93, and

(ii) Delphi Automotive Systems LLC in the principal amount of $11,678,813.95,

totalling an aggregate principal amount of **$16,678,813.88** (the "Claim") have been transferred to
the following Assignee:

> **JPMorgan Chase Bank, N.A.** .
> **270 Park Avenue**
> **New York, NY 10017**
> **Attention:      Neelima Veluvolu**
> **Telephone:   (212) 270-2150**
> **Facsimile:    (646) 792-3855**
> **E-mail:          neelima.veluvolu@jpmorgan.com**

The Evidence of Transfer of Claims is attached as Exhibit A and the Assignee's payment
instructions are attached as Exhibit B. No action is required if you do not object to the transfer
of your claim. However, **IF YOU OBJECT TO THE TRANSFER OF YOUR CLAIM,**
**WITHIN TWENTY (20) DAYS OF THE DATE OF THIS NOTICE, YOU MUST FILE A**
**WRITTEN OBJECTION TO THE TRANSFER:**

| Mailing Address: | Physical Address: |
|---|---|
| United States Bankruptcy Court<br>Southern District of New York<br>Delphi Corporation Claim Docketing Center<br>One Bowling Green Station, P.O. Box 5058<br>New York, New York 10274-5058 | United States Bankruptcy Court<br>Southern District of New York<br>One Bowling Green<br>New York, NY 10004 |

**PLEASE SEND A COPY OF YOUR OBJECTION TO THE TRANSFEREE AT THE FOLLOWING ADDRESS:**

> **JPMorgan Chase Bank, N.A.**
> **270 Park Avenue**
> **New York, NY 10017**
> **Attention:**    **Neelima Veluvolu**
> **Telephone:**  **(212) 270-2150**
> **Facsimile:**   **(646) 792-3855**
> **E-mail:**       **neelima.veluvolu@jpmorgan.com**

**WITH A COPY TO :**

> **Kirkpatrick & Lockhart Preston Ellis Gates LLP**
> **599 Lexington Avenue**
> **New York, NY 10022**
> **Attention:**    **Steven H. Epstein**
> **Telephone:**  **(212) 536-4830**
> **Facsimile:**   **(212) 536-4001**
> **E-mail :**      **sepstein@klgates.com**

If you file an objection, a hearing will be scheduled. **IF YOUR OBJECTION IS NOT TIMELY FILED, THE ASSIGNEE WILL BE SUBSTITUTED FOR THE ASSIGNOR ON THE BANKRUPTCY COURT RECORDS AS A CLAIMANT IN THIS PROCEEDING.**

Dated: June 19, 2007

> **JPMORGAN CHASE BANK, N.A.**
>
> By:
> Name:
> Title:     Stephanie Skowronski
>         Authorized Signatory

# EXHIBIT A

**Evidence Of Transfer Of Claim**

## EXHIBIT B

## FORM OF EVIDENCE OF TRANSFER OF CLAIM –
## PROOF OF CLAIM NUMBER 12678

### TO:  THE DEBTORS AND THE BANKRUPTCY COURT

For value received, the adequacy and sufficiency of which are hereby acknowledged, **Electronic Data Systems Corporation and EDS Information Services L.L.C**, with offices located at 5400 Legacy Dr., Plano, TX 75024 (collectively, the "Sellers"), hereby unconditionally and irrevocably sells, transfers and assigns to **JPMorgan Chase Bank, N.A.**, with offices at 270 Park Avenue, 17th Floor, New York, NY 10017 (the "Buyer") all of their right, title, interest, claim and causes of action in and to, or arising under or in connection with, Sellers' pre-petition claims (identified as Claim No. 12678) against **Delphi Corporation** ("Delphi") and **Delphi Automotive Systems LLC** ("DAS LLC"), debtors and debtors-in-possession (together, the "Debtors") in the jointly administered Chapter 11 reorganization case entitled, In re Delphi Corporation, et al., Chapter 11 Case No. 05-44481 (RDD), Jointly Administered (the "Case"), pending in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), in the aggregate amount of $4,999,999.93 against Delphi and in the aggregate amount of $11,678,813.95 against DAS LLC, which claims were agreed to pursuant to that certain Settlement Agreement dated as of May 11, 2007 among the Sellers and the Debtors (collectively the "Assigned Claims") and approved by the Bankruptcy Court by that certain Order Under 11 U.S.C. § 363 And Fed. R. Bankr. P. 9019 Authorizing And Approving Delphi Automotive Systems LLC's And Delphi Corporation's Entry Into Settlement Agreement With Electronic Data Systems Corporation, EDS Information Services L.L.C., And EDS de Mexico, S.A. de C.V. (the "Order") dated May 31, 2007.

Sellers hereby waive any objection to the transfer of the Assigned Claims to Buyer on the books and records of the Debtors and the Bankruptcy Court, and hereby waive to the fullest extent permitted by law any notice or right to a hearing as might be imposed by Rule 3001 of the Federal Rules of Bankruptcy Procedure, the Bankruptcy Code, applicable local bankruptcy rules or applicable law. Sellers acknowledge and understand, and hereby stipulate, that an order of the Bankruptcy Court may be entered without further notice to Sellers transferring to Buyer the Assigned Claims and recognizing Buyer as the sole owner and holder of such claims. Sellers further direct the Debtors, the Bankruptcy Court and all other interested parties that all further notices relating to the claims, and all payments or distributions of money or property in respect of the Assigned Claims, are to be delivered or made to the Buyer.

IN WITNESS WHEREOF, this EVIDENCE OF TRANSFER OF CLAIM IS
EXECUTED THIS *13th* day of June, 2007.

SELLERS:

ELECTRONIC DATA SYSTEMS
CORPORATION

By: _____
Name: Anthony C. Glasby
Title: Vice President & Treasurer

EDS INFORMATION SERVICES L.L.C.

By: _____
Name: Anthony C. Glasby
Title: Vice President & Treasurer

BUYER:

JPMORGAN CHASE BANK, N.A.

By: _____
Name:
Title:
     NEELIMA VELUVOLU
     Authorized Signatory

## EXHIBIT B

**Assignee's Payment And Delivery Instructions**

<u>Assignee's Payment and Delivery Instructions</u>

<u>Wire</u>:
Name of Bank:                          **JPMorgan Chase Bank New York, N.A.**
Routing Transit/ABA number:            **021000021**
Name of Account:                       **SPS High Yield Loan Trading**
Account Number:                        **544-7-94742**
Reference:                             **Delphi/EDS**

# EXHIBIT F

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
George N. Panagakis (GP 0770)
Ron E. Meisler (RM 3026)

   - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:  http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |  |
|---|---|---|
| | : | |
| In re | : | Chapter 11 |
| | : | |
| DELPHI CORPORATION, et al., | : | Case No. 05-44481 (RDD) |
| | : | |
| | : | (Jointly Administered) |
| Debtors. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

EXPEDITED MOTION FOR ORDER UNDER 11 U.S.C. §§ 102(1)(A), 105(a), 107, 108(a)(2),
AND 546(a) AND FED. R. BANKR. P. 7004, 9006(c), AND 9018 (i) AUTHORIZING
DEBTORS TO ENTER INTO STIPULATIONS TOLLING STATUTE OF LIMITATIONS
WITH RESPECT TO CERTAIN CLAIMS, (ii) AUTHORIZING PROCEDURES TO IDENTIFY
CAUSES OF ACTION THAT SHOULD BE PRESERVED, AND (iii) ESTABLISHING
PROCEDURES FOR CERTAIN ADVERSARY PROCEEDINGS INCLUDING
THOSE COMMENCED BY DEBTORS UNDER 11 U.S.C. § 541, 544, 545, 547, 548, OR 553

("PRESERVATION OF ESTATE CLAIMS PROCEDURES MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), submit this expedited motion (the "Motion") for an order (the "Order") under 11 U.S.C. §§ 102(1)(A), 105(a), 107, 108(a)(2), and 546(a) and Federal Rules of Bankruptcy Procedure 7004, 9006(c), and 9018 (i) authorizing the Debtors to enter into stipulations tolling the statute of limitations with respect to certain claims, (ii) authorizing procedures for the Debtors to identify causes of action that should be preserved and granting authority to abandon certain causes of action, and (iii) establishing procedures for certain adversary proceedings, including those commenced by the Debtors under 11 U.S.C. § 541, 544, 545, 547, 548, or 553, and respectfully represent as follows:

<u>Background</u>

A.    <u>The Chapter 11 Filings</u>

1.    On October 8 and 14, 2005, the Debtors filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code").  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession under Bankruptcy Code sections 1107(a) and 1108.  The Court has ordered joint administration of these cases.

2.    No trustee or examiner has been appointed in these cases.  On October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors.  On April 28, 2006, the U.S. Trustee appointed an official committee of equity holders (together with the official committee of unsecured creditors, the "Statutory Committees").

3.      This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

4.      The statutory predicates for the relief requested herein are sections 102(1)(a), 105(a), 107, 108(a)(2), 502(d), 541, 544, 545, 546(a), 547, 548, and 553 of the Bankruptcy Code and Rules 7004, 9006(c), and 9018 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

B.      <u>Current Business Operations Of The Debtors</u>

5.      Delphi and its subsidiaries and affiliates (collectively, the "Company") as of December 31, 2006 had global net sales of $26.4 billion and global assets of approximately $15.4 billion.[1] At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues and the thirteenth largest public company business reorganization in terms of assets. Delphi's non-U.S. subsidiaries are not chapter 11 debtors and continue their business operations without supervision from the Bankruptcy Court.[2]

6.      The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines,

---

[1]    The aggregated financial data used in this Motion generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates as disclosed in the Company's Form 10-K filed on February 27, 2007.

[2]    On March 20 2007, Delphi Automotive Systems Espana S.L. ("DASE"), whose sole operation is a non-core automotive component plant in Cadiz, Spain, filed a "Concurso" application for a Spanish insolvency proceeding. The application was approved by the Spanish court on April 13, 2007. On July 4, 2007, DASE, its Concurso receivers, and the Cadiz workers councils and unions reached a settlement on a social plan, the funding of which was approved by this Court on July 19, 2007. The Spanish court approved the social plan on July 31, 2007. The Concurso proceeding is consistent with Delphi's transformation plan to optimize its manufacturing footprint and to lower its overall cost structure.

and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology. The Company supplies products to nearly every major global automotive original equipment manufacturer ("OEM").

7.    Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of General Motors Corporation ("GM"). Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries. Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM. In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications. Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

C.    Events Leading To The Chapter 11 Filing

8.    In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income. Every year thereafter, however, with the exception of 2002, the Company has suffered losses. In calendar year 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[3] Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net

---

[3]    Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004. The Company's net operating loss in calendar year 2004 was $482 million.

4

losses of approximately $2.4 billion on net sales of $26.9 billion. Moreover, in 2006, the

Debtors incurred a net loss of $5.5 billion, $3.0 billion of which comprised charges related

to the U.S. employee special attrition programs.

        9.      The Debtors believe that the Company's financial performance has

deteriorated because of (i) increasingly unsustainable U.S. legacy liabilities and operational

restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of

which have the effect of creating largely fixed labor costs, (ii) a competitive U.S. vehicle

production environment for domestic OEMs resulting in the reduced number of motor

vehicles that GM produces annually in the United States and related pricing pressures, and

(iii) increasing commodity prices.

        10.     In light of these factors, the Company determined that it would be

imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities,

product portfolio, operational issues, and forward-looking revenue requirements. Because

discussions with its major stakeholders had not progressed sufficiently by the end of the

third quarter of 2005, the Company commenced these chapter 11 cases for its U.S.

businesses to complete its transformation plan and preserve value for its stakeholders.

D.      The Debtors' Transformation Plan

        11.     On March 31, 2006, the Company outlined the key tenets of a

transformation plan that it believed would enable it to return to stable, profitable business

operations. The Debtors stated that they needed to focus on five key areas:[4] first,

---

[4]    In furtherance of the Debtors' transformation plan, on December 18, 2006, the Debtors announced their
execution of an equity purchase and commitment agreement with certain investors, and a plan
framework support agreement with those investors and GM. On July 9, 2007, Delphi confirmed that it
had formally terminated the equity purchase and commitment agreement and related plan framework

modifying the Company's labor agreements to create a competitive arena in which to conduct business;[5] second, concluding their negotiations with GM to finalize GM's financial support for the Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company;[6] third, streamlining their product portfolio to capitalize on their world-class technology and market strengths and make the necessary manufacturing alignment with their new focus;[7] fourth, transforming their salaried workforce to ensure

---

support agreement but that it expected to enter into new framework agreements with plan investors presently. Subsequently, on July 18, 2007, Delphi announced that it had accepted a new proposal for an equity purchase and commitment agreement (the "Delphi-Appaloosa EPCA") submitted by a group comprising a number of the original plan investors (affiliates of Appaloosa Management L.P., Harbinger Capital Partners Master Fund I, Ltd., Merrill Lynch, Pierce, Fenner & Smith Inc., and UBS Securities LLC) as well as, Goldman Sachs & Co. and an affiliate of Pardus Capital Management, L.P. (collectively, the "New Plan Investors"). Under the Delphi-Appaloosa EPCA, the New Plan Investors would invest up to $2.55 billion in preferred and common equity in the reorganized Delphi to support the Company's transformation plan and plan of reorganization. This Court approved the Delphi-Appaloosa EPCA on August 2, 2007.

[5]   Among the progress made to date, on June 22, 2007, Delphi reached an agreement with the International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America (the "UAW") and GM that (a) modifies, extends, or terminates provisions of the existing collective bargaining agreements among Delphi, the UAW, and its various locals, (b) provides that Delphi and GM will undertake certain financial obligations to Delphi's UAW-represented employees and retirees to facilitate these modifications, and (c) modifies retiree welfare benefits for certain UAW-represented retirees of the Debtors. This agreement, which was approved by this Court on July 19, 2007, should facilitate the Debtors' reaching consensual resolutions of their labor issues with the remaining unions and GM and permit the Debtors to continue to implement their transformation plan and to develop, prosecute, confirm, and consummate a plan of reorganization. As of August 6, 2007, similar agreements have been reached with the International Association of Machinists and Aerospace Workers and its District 10 and Tool and Die Makers Lodge 78, the International Brotherhood of Electrical Workers and its Local 663, International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers-Communication Workers of America and its local unions, and Locals 832S, 18S, and 101S of the International Union of Operating Engineers. Delphi is currently engaged in settlement discussions with its remaining U.S. labor union and is working to conclude discussions with that union as soon as practicable.

[6]   On July 9, 2007, Delphi confirmed that its discussions with GM on a comprehensive settlement agreement had entered the documentation phase and that it expected that a settlement with GM would be incorporated into the Debtors' plan of reorganization rather than filed with this Court for separate approval.

[7]   In connection with their March 31, 2006 announced transformation plan, the Debtors classified "core" and "non-core" product lines and plants. The Debtors have been working to divest non-core assets so as to maximize the value of the estate for stakeholders. During the 2006 and 2007 calendar years, for example, the Debtors sold substantially all of the assets related to MobileAria, Inc., its chapter 11 affiliate, obtained court approval for the sale of substantially all of the assets of their brake hose and

that the Company's organizational and cost structure is competitive and aligned with its

product portfolio and manufacturing footprint[8] and devising a workable solution to their

current pension situation.[9]

　　　　12.　　Upon the conclusion of the reorganization process, the Debtors

expect to emerge as a stronger, more financially sound business with viable U.S.

operations that are well-positioned to advance global enterprise objectives.  In the

meantime, Delphi will marshal all of its resources to continue to deliver high-quality

products to its customers globally.  Additionally, the Company will preserve and continue

the strategic growth of its non-U.S. operations and maintain its prominence as the world's

premier auto supplier.

---

　　　　Saltillo, Mexico brake plant businesses, and obtained court approval of bid procedures related to the
　　　　upcoming sale of substantially all assets used in their catalyst business.  In addition, as announced
　　　　publicly, the Debtors anticipate selling additional non-core assets, including, without limitation, their
　　　　steering, interior, and closures businesses.

[8]　　As part of this effort, effective July 1, 2006, the Company realigned its business operations to focus its
　　　　product portfolio on core technologies for which the Company believes it has significant competitive and
　　　　technological advantages.  The Company's revised operating structure consists of its four core business
　　　　segments:  Electronics and Safety, Thermal Systems, Powertrain Systems, and Electrical/Electronic
　　　　Architecture.  The Company also has two additional segments, Steering and Automotive Holdings
　　　　Group, which will be transitioned as part of the Company's transformation plan.  The Debtors also made
　　　　significant progress in ensuring that their organizational and cost structure is competitive in obtaining the
　　　　entry of this Court's Order Under 11 U.S.C. § 363(b) And Fed. R. Bankr. P. 6004 Authorizing Debtors
　　　　To Enter Into Finance Outsourcing Agreement on April 23, 2007 (Docket No. 7773) (the "Finance
　　　　Outsourcing Order").  The Finance Outsourcing Order authorized the Debtors to outsource certain of the
　　　　Debtors' accounts receivable, accounts payable, fixed assets, travel and expense reporting, general
　　　　ledger, and contract administration processes and significantly reduce SG&A expenses as part of their
　　　　transformation plan.

[9]　　To that end, on May 31, 2007, the Bankruptcy Court granted the Debtors' motion for authority to
　　　　perform under the terms of those certain September 30, 2006 plan year funding waivers, which were
　　　　approved by the IRS, for both the Delphi Hourly-Rate Employees Plan and the Delphi Retirement
　　　　Program for Salaried Employees (collectively, the "Plans").  On July 13, 2007, the IRS modified the
　　　　conditional funding waivers granted to Delphi related to the Plans, extending the dates by which Delphi
　　　　is required to file a plan of reorganization and emerge from chapter 11 to December 31, 2007 and
　　　　February 28, 2008, respectively.

E.    Revised Plan Framework Agreements And Preserving Estate Causes Of Action

13.    The Debtors have made significant progress toward confirming a plan of reorganization:  they have obtained the support of their Statutory Committees for and Court approval of the Delphi-Appaloosa EPCA, they have negotiated agreements with five of their six U.S. labor unions, they are engaged in the documentation phase for a comprehensive settlement agreement with GM, and they have scheduled a hearing in October 2007 to seek approval of their proposed disclosure statement and of solicitation procedures for a reorganization plan.  The Delphi-Appaloosa EPCA approved by this Court on August 2, 2007 details the New Plan Investors' commitment to invest in the reorganized Delphi and attaches a proposed framework for a reorganization plan pursuant to which the Debtors expect to emerge from chapter 11 by the end of the year.  The proposed treatment of claims under this reorganization plan would generally provide that all claims be paid or satisfied in full through distributions of cash, common stock, or both.  Accordingly, avoiding preferential transfers would provide no benefit to the Debtors' estates because any party returning such a transfer would be entitled to a claim for the same amount, to be paid in full under such a plan.  For the same reasons, avoiding statutory liens or prepetition setoffs would provide little to no benefit to the estates.  As a result, the Debtors contemplate that their reorganization plan will waive or release most if not all avoidance causes of action.

14.    At present, the Debtors estimate that they may have more than 11,000 potential preference claims arising from transfers totaling approximately $5.8 billion (before taking into account potential defenses such as transfers made in the ordinary course of business).  The constructively fraudulent transfer reach-back period, made

8

applicable by Bankruptcy Code section 544(b) and state law, is generally six years under the law of Michigan and New York.[10] Thus, with a company of Delphi's size, there are literally hundreds of thousands of transactions that occurred during these constructively fraudulent transfer reach-back periods. Under the Bankruptcy Code, each Debtor has until two years after the entry of the order for relief to commence adversary proceedings asserting avoidance causes of action, as well as certain causes of action where the applicable statute of limitations has been tolled by the Bankruptcy Code during the initial two years of these chapter 11 cases.

15.     Although the Debtors do not intend to pursue avoidance actions in light of their anticipated reorganization, as a precautionary measure they must preserve these actions in some manner. The Debtors have explored various alternatives to filing avoidance actions before the two-year deadline, such as executing tolling agreements with potential defendants. The logistical challenges of circulating and executing agreements with such a large number of potential defendants, however, make that solution impractical. The Debtors, therefore, must timely commence these actions or take other action in the coming months or risk losing forever potential causes of action that should be preserved.[11]

---

[10]     By examining transactions during this reach-back period to identify potential fraudulent transfer claims that should be preserved, the Debtors do not concede that they were insolvent, undercapitalized, or unable to pay their debts as they became due at any time during the reach-back period.

[11]     As noted above, Delphi has been in discussions with GM on a comprehensive settlement agreement that they anticipate incorporating into the Debtors' reorganization plan. Because of GM's unique role in these cases, in addition to filing a sealed complaint governed by the procedures sought in this Motion, the Debtors request leave for the Debtors and GM to file, under seal, a stipulation that contains tolling provisions, consistent with this Motion, and other agreements of the parties with respect to the sealed complaint involving GM, which stipulation shall be deemed "so ordered" and shall be sealed in accordance with the terms of the order sought herein.

16.     Once these actions have been commenced, the Debtors will proceed no further and will not use them for any purpose while they focus on confirming a reorganization plan.  The procedures proposed in this Motion are designed to permit the Debtors to preserve these claims while otherwise maintaining the status quo among all parties in interest.  The causes of action would remain dormant and become relevant again only in the unlikely event that the Debtors do not timely emerge from chapter 11.

<u>Relief Requested</u>

17.     As set forth in the proposed order attached hereto as <u>Exhibit A</u>, the Debtors seek to implement procedures applicable to Adversary Proceedings that will permit all parties to preserve the status quo as the Debtors are finalizing preparations for confirming a reorganization plan by year's end.  By this Motion, the Debtors seek the following relief:

<u>Tolling Agreement</u>

- *Approval Of Form.*  The Debtors seek court approval of a form of stipulation (attached as <u>Exhibit B</u>) which would, without further order of this Court, toll the applicable statute of limitations on claims against parties with whom the Debtors seek to enter into such stipulations.

- *Intercompany Tolling.* The Debtors also seek to have this Court "deem" all Debtors to have entered into a stipulation with each of the other Debtors and affiliated non-Debtor entities.

<u>Approval Of Avoidance Evaluation Procedures And Authority To Abandon Claims</u>

- *Preference Claims Below $250,000 In Value.* The Debtors request authority to abandon these preference actions.  To the extent that these actions are against insiders or involve persons or transactions associated with the SEC investigation of the Debtors, the Debtors also will be authorized to abandon those actions after notice to the Statutory Committees.  If a Statutory Committee objects within 10 days after service of the notice, the Debtors may bring the matter before this Court for a ruling on whether the proposed abandonment satisfies section 554(a) of the Bankruptcy Code.

- *Select Categories Of Preference Claims.* The Debtors seek authority to abandon the following categories of preference actions: (i) payments to parties with a secured or priority interest in such payment, (ii) union dues, (iii) pension plan contributions, (iv) payments required under the terms of collective bargaining agreements, (v) payments to reimburse employee business expenses, (vi) ordinary course wages, salaries, and benefits to employees, (vii) payments required by a garnishment to satisfy third-party judgments and obligations, (viii) contributions to charitable organizations, (ix) payments to foreign suppliers, (x) payments to the Debtors' shippers, (xi) payments to the Debtors' insurance providers, and (xii) payments to the Debtors' utilities.

- *Scope Of Fraudulent Transfer Review.* The Debtors seek entry of an order directing that, for purposes of identifying and preserving potential fraudulent transfer claims, the Debtors need only review the following categories of transactions: merger and acquisition deals at or exceeding $20 million, transfers to Delphi's board of directors or strategy board members other than for compensation or ordinary-course expense reimbursement (if any), unusual securities transactions, dividend distributions to 5% shareholders, and Delphi's financially troubled supplier program.

- *Additional Authority For Abandonment After Notice To Statutory Committees.* The Debtors seek authority to abandon, after notice to the Statutory Committees, and without further order of this Court or further notice under Bankruptcy Rule 6007, claims (i) with insignificant value, (ii) where litigation costs would likely exceed expected recovery, (ii) where the potential harm to businesses outweighs expected recovery, or (iv) where valid defenses exist. If a Statutory Committee objects within 10 days after service of the notice, the Debtors may bring the matter before this Court for a ruling on whether the proposed abandonment satisfies section 554(a) of the Bankruptcy Code.

Commencement Of The Adversary Proceedings And Service Of Process

- *Deferral Of Issuance Of Summons.* The Clerk of Court would be directed by this Court to defer issuing a summons after the filing of a complaint, unless and until the Debtors intend to pursue the claims in the complaint.

- *Extension Of Fed. R. Civ. P. 4(m) Time Period.* The Debtors would have until March 31, 2008 to serve each defendant with a summons and a copy of the complaint, without prejudice to the Debtors' right to seek further extensions of the deadline.

- *Service Of Order With Summons And Complaint*.  The Debtors would be required to serve a copy of any order approving this Motion upon each defendant in any adversary proceeding either if and when the Debtors serve process on the defendant or as soon thereafter as practicable.

<u>Stay Of Adversary Proceedings Until Service Of Process And Interim Sealing</u>

- *Activity During The Stay*. During the stay, the Debtors may (i) amend their complaint, and (ii) after notice to the Statutory Committees, dismiss it.

- *Expiration Of The Stay*. The stay would continue until the earlier of (i) service of process and (ii) further order of this Court.

- *Filing Of The Complaints Under Interim Seal*.  The Debtors seek authority to file under seal paper copies (with PDF copies on appropriate electronic media) of the complaints in the adversary proceedings and to have the docket for such proceedings likewise sealed.

<u>Basis For Relief</u>

18.     The Debtors believe that implementing the proposed procedures would help enable the Debtors fulfill their fiduciary responsibility to preserve valuable estate assets in a manner that would not unnecessarily disrupt the plan process or the Debtors' existing business relationships with potential defendants that are necessary to the Debtors' ongoing operations.  These procedures would also reduce the administrative and economic burdens of the Adversary Proceedings on the Debtors, this Court, and potential defendants.  Most if not all of the avoidance actions will likely remain unnecessary in light of the terms of the Debtors' prospective reorganization plan.

F.     <u>Approval Of Form Of Tolling Agreements</u>

19.     The Debtors desire to preserve their respective rights and to continue negotiation and settlement discussions with certain parties without incurring the expense of filing complaints before the expiration of the applicable statute of limitations

period.  The Debtors anticipate entering into stipulations with, among others, (i) GM, (ii) professional firms retained by the Debtors, and (iii) insiders who received transfers from the Debtors.

20.     Assuming that a potential defendant is willing to enter into a stipulation extending the statute of limitations, the Debtors request authorization to enter into such a stipulation, substantially in the form attached as <u>Exhibit B</u>.  The principal terms of the stipulation would be as follows:

- *Statute Of Limitations*: Execution of the stipulation would toll the statute of limitations provided for under sections 108 and 546(a) of the Bankruptcy Code and other applicable law.

- *Term*: The applicable statute of limitations would be extended up to and including the first business day that is nine months following the entry of an order confirming a plan, as the same may have been amended or modified before its entry (the "Tolling Period").

- *Binding Effect*: The stipulation would bind and inure to the benefit of the successors, representatives, assigns, and heirs of the parties.

- *Termination*: The Debtors or their respective successors and assigns would be permitted during the Tolling Period to commence litigation against (a) other Debtors, (b) affiliated non-Debtor entities, and (c) third parties.

- *Effective Date*: The stipulation would become effective immediately upon execution thereof.

- *Prior Court Approval*: The stipulation would be deemed "so ordered" upon execution.

21.     Allowing the Debtors to enter into the stipulations tolling the applicable statute of limitations with respect to the claims would be the most efficient and cost-effective means of preventing unnecessary motion practice and litigation and preserving the Debtors' and potential defendants' respective legal rights without allowing

the applicable statute of limitations period to expire and without acknowledging in any way that valid claims, causes of action, or defenses thereto do or do not exist.

22. In view of the number of potential claims and causes of action that the Debtors must preserve, obtaining Court approval for each tolling stipulation would result in burdensome administrative expenses such as the time and cost of drafting, serving, and filing separate approval pleadings and the time incurred by attorneys in preparing for, and appearing at, related hearings before this Court. Accordingly, the Debtors request authority to enter into stipulations tolling the statute of limitations with respect to the claims without seeking further Court approval.

23. Likewise, requiring each of the 42 Debtors in these chapter 11 cases to enter into individual stipulations with each of the other Debtors would require the Debtors to execute more than 1,500 stipulations. Execution of stipulations between the Debtors and affiliated non-Debtor entities would add hundreds more. Obviously, such actions and the costs and expenses associated therewith are unnecessarily burdensome and time-consuming in light of the related nature of the claims. Accordingly, the Debtors also seek an order that "deems" them to have entered into a stipulation with each of the other Debtors and affiliated non-Debtor entities.

G. Approval Of Avoidance Evaluation Procedures And Authority To Abandon Certain Causes Of Action

24. The Debtors request approval of their proposed criteria for reviewing, evaluating, and selecting those potential causes of action that should be preserved in accordance with the procedures discussed herein. These criteria strike a sensible balance between the Debtors' duty to preserve valuable estate assets and the

extraordinary costs to preserve then when, as here, there is little chance that the Debtors will prosecute any of the thousands of actions it will be commencing.

### Preference Claims Below $250,000 In Value

25.     In particular, the Debtors seek authority not to pursue any preference action against an entity if the aggregate value of transfers to or for the benefit of that entity is less than $250,000 in value.  Although this threshold would eliminate 9,894 of 11,544 potential preference recoveries, the aggregate amount eliminated would be merely 4.5% of the billions in total potential preferential transfers (before taking into account potential preference defenses).   By focusing on the 1,650 entities which benefited from transfers of $250,000 or more, the Debtors would preserve billions in potential claims (before defenses are considered) while saving the estates from incurring significant legal and other costs and avoiding any disruption to commercial relationships and the Debtors' efforts to emerge from chapter 11.  If the preference action is against an insider or involves a person or transaction associated with the SEC investigation of the Debtors, then the Debtors would be authorized to abandon such actions after notice to the Statutory Committees.  If a Statutory Committee objects within 10 days after service of the notice, the Debtors propose that they would bring the matter before this Court for a ruling on whether the proposed abandonment satisfies section 554(a) of the Bankruptcy Code.

### Select Categories Of Preference Claims

26.     In addition, the Debtors seek authority to abandon the following categories of potential preference actions which the Debtors, in their business judgment, have decided should not be pursued:  (i) payments to parties with a secured or priority

interest in such payment, (ii) union dues, (iii) pension plan contributions, (iv) payments required under the terms of collective bargaining agreements, (v) payments to reimburse employee business expenses, (vi) ordinary course wages, salaries, and benefits to employees, (vii) payments required by a garnishment to satisfy third-party judgments and obligations, (viii) contributions to charitable organizations, (ix) payments to foreign suppliers, (x) payments to the Debtors' shippers, (xi) payments to the Debtors' insurance providers, and (xii) payments to the Debtors' utilities.

<u>Scope Of Fraudulent Transfer Review</u>

27.     As noted above, potential fraudulent transfer claims are likely subject to a six-year reach-back period during which the Debtors engaged in hundreds of thousands of transactions, the vast majority of which indisputably involved the Debtors' receipt of reasonably equivalent value or involved amounts that do not warrant the mammoth undertaking of examining each and every transaction.  To balance the need for a review of transactions effected during the reach-back period and avoiding unnecessary costs, the Debtors propose to identify and review all business or asset acquisition or divestiture transactions that equal or exceed $20 million in value.  This would include a review of whether the Debtors followed their own internal procedures for the transaction and, as necessary, interviews with managers to follow up on any issues identified during the review process.

28.     The Debtors also would review (i) certain transfers to insiders, including payments or indemnifications to current and former members of the Delphi Board of Directors and of the Delphi Strategy Board other than for compensation or

16

ordinary-course expense reimbursement (if any), (ii) large or unusual securities transactions (if any) such as large capitalizations or recapitalizations, derivatives, foreign currency, hedging transactions, or commercial paper transactions, (iii) all dividend distributions to 5% shareholders, and (iv) the financially troubled supplier program. As discussed below, the Debtors would enter into tolling agreements for all intercompany transactions that involve a Debtor or insiders of a Debtor.

29.     The Debtors request authority to abandon the causes of action described above in accordance with the proposed procedures, without the need for any further order or any further notice under Bankruptcy Rule 6007(a).

<u>Additional Authority To Abandon</u>

30.     With respect to other categories of causes of action, the Debtors anticipate that during their review they may identify additional causes of action which, in the exercise of their reasonable business judgment, should not be pursued. The Debtors seek approval for the abandonment of those causes of action which the Debtors determine, upon completion of their review and after notice to counsel to the Statutory Committees, (i) are of insignificant value to the estates, (ii) would impose costs in excess of the value of any reasonably expected recovery, (iii) could pose other potential harm to the Debtors' businesses that would outweigh the expected recovery value, or (iv) with respect to which the Debtors believe the defendants would have valid defenses.

31.     If a Statutory Committee objects within 10 days after service of the notice, the Debtors may bring the matter before this Court for a ruling on whether the proposed abandonment satisfies section 554(a) of the Bankruptcy Code.

<u>Preservation Of The Debtors' Rights Under 11 U.S.C. § 502(d)</u>

32.     Although the Debtors are proposing to abandon certain avoidance causes of action, the Debtors have decided to abandon them based, in part, on their determination that they will have a right to use the avoidance claim liability to seek the disallowance of claims asserted against the estates, as permitted by section 502(d) of the Bankruptcy Code. Under that section, the Debtors may seek to preclude a creditor subject to an avoidance cause of action from asserting a claim against the estate as long as the creditor remains in possession of, or otherwise obtains the benefit of, the avoidable claim or transfer.[12]

H.      <u>Extending Time For Service Of Process</u>

33.     Fed. R. Civ. P. 4(m), made applicable here by Bankruptcy Rule 7004(a)(1), requires this Court either to dismiss without prejudice any adversary proceeding for which the summons and complaint are not served on the defendant within 120 days of the filing of the complaint or direct that service be effected within a specified time, unless the plaintiff in the adversary proceeding can show good cause for extending the 120-day period.  The Debtors request an extension of the time within which the Debtors must serve the summonses and complaints to March 31, 2008[13]—less than 60 days beyond the initial 120-day deadline.  The Debtors seek the extension to preserve the status

---

[12]     In light of an appellate ruling from this district, <u>United States Lines, Inc. v. U.S.</u> (In re McLean Indus.), 196 B.R. 670, 675-77 (S.D.N.Y. 1996) (Cote, J.), <u>aff'g</u> 184 B.R. 10 (Bankr. S.D.N.Y. 1995) (Blackshear, J.), and this Court's prior ruling, <u>In re Metiom, Inc.</u>, 301 B.R. 634, 641 (Bankr. S.D.N.Y. 2003), that section 502(d) may continue to be used defensively after an action on the underlying avoidance action has become time-barred, the Debtors have concluded that no affirmative relief with respect to this Motion is required to preserve the Debtors' ability to use section 502(d) defensively.  The Debtors expressly reserve all rights with respect to section 502(d).

[13]     March 31, 2008 is the current deadline for closing under the Delphi-Appaloosa EPCA.  <u>See</u> Section 12(d)(iii).

quo and to avoid having to force all potential defendants to retain counsel to defend against adversary proceedings when, in fact, most of them likely will be resolved by a reorganization plan and never pursued. The Debtors propose the following procedures concerning the commencement of the Adversary Proceedings and service of process:

- *Deferral Of Issuance Of Summons*. The Clerk of Court would be directed by this Court to defer issuing a summons after the filing of a complaint filed in accordance with these procedures, unless and until the Debtors notify the Clerk of Court that they intend to litigate the claims alleged in the complaint.

- *Extension Of Fed. R. Civ. P. 4(m) Time Period*. The Debtors would have until March 31, 2008 to serve each defendant with a summons and a copy of the complaint, without prejudice to the Debtors' right to seek further extensions of the deadline.

- *Service Of Order With Summons And Complaint*. The Debtors would be required to serve a copy of any order approving this Motion upon each defendant in any Adversary Proceeding either when the Debtors serve the summons and complaint on the defendant or as soon thereafter as practicable.

34. These procedures would permit the Debtors to preserve potentially valuable assets without disrupting the plan process or existing business relationships prematurely or prejudicing the rights of any defendants.

I. Stay Of Adversary Proceedings Until Service Of Process

35. For the same reasons that the Debtors seek an extension of their time to serve potential defendants with process, the Debtors also request that the Adversary Proceedings filed pursuant to the proposed procedures be temporarily stayed, without prejudice to the Debtors' right to amend their complaints during the stay. Under the proposed procedures, the Debtors also would be authorized to file, without further order of this Court, a notice of dismissal of the Adversary Action in accordance with Bankruptcy

Rule 7041 and Fed. R. Civ. P. 41(a) if it is decided that the Adversary Action should not be pursued after notice to the Statutory Committees or as otherwise provided in a plan of reorganization or confirmation order. If a Statutory Committee objects within 10 days after service of the notice, the Debtors request that they be permitted to bring the matter before this Court for a ruling on whether the proposed dismissal satisfies section 554(a) of the Bankruptcy Code. The stay would be lifted upon the Debtors' service of the summons and complaint, without further order of this Court.

J.      Filing Of The Complaints Under Seal

36.     Maintaining the status quo would also be promoted by permitting the filing of the complaints under seal. Once filed, the actions would remain dormant. The Debtors do not intend to prosecute the actions while pursuing plan confirmation. Sealing the complaints will keep the actions inactive and would be consistent with the Debtors' intention to de-link the sealed adversary proceedings from all other activity in these chapter 11 cases and to prevent their use for any purpose by any party. Thus, sealing should promote the plan process and avoid needless costs relating to actions that remain unnecessary under the Debtors' prospective plan.

37.     Moreover, sealing the actions would avoid unnecessarily alarming potential defendants. The Debtors have worked to preserve and repair their business relationship with many of the potential defendants during these cases and have negotiated or regained favorable credit terms with many suppliers and are continuing to do so. The Debtors are also engaged in negotiations with some of the potential defendants on issues unrelated to avoidance actions.

38.     To enable the Debtors to preserve these potential causes of action, yet allow the Debtors to continue to implement their transformation plan and to promptly develop, negotiate, prosecute, confirm, and consummate a plan of reorganization, the Debtors seek authorization to file under seal paper copies (along with discs containing complaints in PDF format) of the complaints filed in each Adversary Proceeding against the potential defendants under seal.  The Debtors also request that the case docket for any adversary proceedings initiated by the complaints likewise be sealed and not available for public access.  The Debtors will coordinate with the Clerk to ensure an efficient, cost-effective approach to filing under seal the numerous actions contemplated by this Motion.

## Applicable Authority

39.     This Court has broad statutory authority to approve the relief requested in this Motion.  The Court may "issue any order, process or judgment that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code.  11 U.S.C. § 105(a).  Under section 105(a) of the Bankruptcy Code, this Court has expansive equitable powers to fashion any order or decree that is in the interest of preserving or protecting the value of the debtor's assets.  See Schwartz v. Aquatic Dev. Group, Inc. (In re Aquatic Dev. Group, Inc.), 352 F.3d 671, 673 (2d Cir. 2003) (Straub, J., concurring) (quoting In re Momentum Mfg. Corp., 25 F.3d 1132, 1136 (2d Cir. 1994) ("[I]t is axiomatic that bankruptcy courts are 'courts of equity, empowered to invoke equitable principles to achieve fairness and justice in the reorganization process.'"); Bird v. Crown Convenience (In re NWFX, Inc.), 864 F.2d 588, 590 (8th Cir. 1988) ("The overriding consideration in bankruptcy . . . is that equitable principles govern.") (citations omitted); In

re Cooper Properties Liquidating Trust, Inc., 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) ("[T]he Bankruptcy Court is one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of its creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws.").  Likewise, this Court has "exclusive jurisdiction of all the property, wherever located, of the debtor as of the commencement of [its] case, and of property of the estate,"  28 U.S.C. § 1334(e), and causes of action generally constitute property of a debtor's estate.  See, e.g., Citicorp Acceptance Co. v. Robison (In re Sweetwater), 884 F.2d 1323, 1326 (10th Cir. 1989).

K.      Approval Of Form Of Tolling Agreements

        40.     The two-year deadline imposed by section 546(a) can be waived or extended by agreement of the non-debtor party to the action.  See In re Rodriguez, 283 B.R. 112, 114 (Bankr. E.D.N.Y. 2001); Pugh v. Brook (In re Pugh), 158 F.3d 530, 532-38 (11th Cir. 1998); McFarland v. Leyh (In re Tex. Gen. Petroleum Corp.), 52 F.3d 1330, 1337-38 (5th Cir. 1995); Brandt v. Gelardi (In re Shape, Inc.), 138 B.R. 334, 337 (Bankr. D. Me. 1992) (plain reading of statute and legislative history support determination that section 546(a) is statute of limitations, waivable either by stipulation or failure to assert it as defense in answer, rather than jurisdictional provision, which is not subject to expansion by court order or otherwise); In re Iron-Oak Supply Corp., 162 B.R. 301, 307 (Bankr. E.D. Cal. 1993) (rejecting argument that section 546(a)(1) is statute of repose); In re M & L Bus. Machs. Inc., 153 B.R. 308, 311 (D. Colo. 1993) aff'd, 160 B.R. 850 (D. Colo. 1993) (section 546 limitations period is not jurisdictional but is waivable and subject to equitable tolling); see also Cepa Consulting Ltd. v. New York Nat'l Bank (In re Wedtech), 187 B.R. 105, 110-11 (S.D.N.Y. 1995) (treating section 546(a) as a non-jurisdictional statute of

limitation that must be raised by opposing party in a timely fashion). But see Martin v. First Nat'l Bank of Louisville (In re Butcher), 829 F.2d 596, 599-600 (6th Cir. 1987) (characterizing section 546(a) as "jurisdictional" or "substantive" statute of limitations, not subject to expansion by Bankruptcy Rule 9006(a) requiring that Saturday and Sunday be excluded in computing two-year limitations period). The Debtors should therefore be authorized to enter into stipulations tolling all applicable statutes of limitations.

L.  Approval Of Avoidance Evaluation Procedures And Authority To Abandon Certain Causes Of Action

41.  The Bankruptcy Code expressly authorizes a debtor to abandon property of the estate that it determines is burdensome or of inconsequential value. 11 U.S.C. § 554. Specifically, section 554 of the Bankruptcy Code provides: "After notice and a hearing, the trustee may abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate." 11 U.S.C. § 554(a). In determining the value and benefits of particular property for purposes of the decision to abandon the property, the debtor is afforded significant discretion. See, e.g., In re Interpictures, Inc., 168 B.R. 526, 535 (Bankr. E.D.N.Y. 1994) ("courts have placed the burden of proving an abuse of discretion of the trustee's action or inaction on abandonment on the party seeking to make the trustee act"); In re Slack, 290 B.R. 282, 284 (Bankr. D.N.J. 2003) ("Courts defer to the trustee's judgment and place the burden on the party opposing the abandonment to prove a benefit to the estate and an abuse of the trustee's discretion."); In re Cult Awareness Network, Inc., 205 B.R. 575, 579 (Bankr. N.D. Ill. 1997) (decision to abandon property "must rest on a reasonable basis"). This Court need

only ensure that the decision to abandon "reflects a business judgment made in good faith." Cult Awareness Network, 205 B.R. at 579.[14]

42.     Notwithstanding abandonment, the failure to file a complaint by the two-year deadline set forth in section 546(a) of the Bankruptcy Code does not prevent the Debtors from later using section 502(d) defensively.  Section 502(d) provides, in pertinent part, as follows:

> the court shall disallow any claim of any entity from which property is recoverable under section 542, 543, 550, or 553 of this title or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, or 724(a) of this title, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of this title.

11 U.S.C. § 502(d).

43.     Courts applying section 502(d) of the Bankruptcy Code have barred any and all claims asserted by creditors who are in receipt of avoidable transfers, unless the creditor first repays the amount of the avoidable transfer to the debtor's estate.  See, e.g., Glinka v. Murad (In re Housecraft Indus. USA, Inc.), 310 F.3d 64, 72 n.8 (2d Cir. 2002); Germain v. Conn. Nat'l Bank, 988 F.2d 1323, 1327 (2d Cir. 1993); In re Centennial Textiles, Inc., 209 B.R. 31, 33 (Bankr. S.D.N.Y. 1997).  Further, this Court, as well as other courts in the Southern District of New York and elsewhere, has specifically held that the section 502(d) defense may be asserted after the expiration of the two-year statute of limitations set forth in section 546(a)(1) of the Bankruptcy Code.  See In re Metiom, Inc.,

---

[14]   Similar relief was granted in In re Safety-Kleen Corp., No. 00-2303 (PJW) (Bankr. D. Del. May 17, 2002.  See Order (I) Establishing Omnibus Filing And Pretrial Procedures For Certain Adversary Proceedings, Including Adversary Proceedings Under 11 U.S.C. § 544, 545, 547, 548 Or 550, And (II) Granting Authority To Abandon Certain Causes Of Action,) (Docket No. 4108).

301 B.R. 634, 641 (Bankr. S.D.N.Y. 2003) (Drain, J.); see also United States Lines, Inc. v.

U.S. (In re McLean Indus.), 196 B.R. 670, 675-77 (S.D.N.Y. 1996) (Cote, J.); In re Asia

Global Crossing, Ltd., 344 B.R. 247, 251 (Bankr. S.D.N.Y. 2006) (Bernstein, J.); In re Mid

Atl. Fund, Inc., 60 B.R. 604, 609-11 (Bankr. S.D.N.Y. 1986) (Abram, J.); El Paso City v.

Am. W. Airlines, Inc. (In re Am. West Airlines, Inc.), 217 F.3d 1161, 1167 (9th Cir. 2000);

cf. Comm. of Unsecured Creditors v. Commodity Credit Corp. (In re KF Dairies, Inc.), 143

B.R. 734, 736-38 (B.A.P. 9th Cir. 1992) (permitting section 502(d) defense after expiration

of section 549 statute of limitations).  But see In re Marketing Assocs. of Am., 122 B.R.

367, 369 (Bankr. E.D. Mo. 1991) (holding that "the Trustee may not use section 502(d)

defensively").

       44.     Here, the Debtors have proposed reasonable criteria and procedures

for determining which avoidance claims should be preserved and which causes of action

the Debtors should be authorized to abandon.  Accordingly, the Debtors seek approval of

these procedures.[15]

M.     Extending Time For Service Of Process

       45.     The Bankruptcy Rules and Federal Rules of Civil Procedure grant

this Court discretion to adopt and implement guidelines, such as those proposed herein,

that will aid in the administration of adversary proceedings.  Bankruptcy Rule 9006(b)(1)

---

[15]    Similar relief was granted in In re Service Merchandise, et al., Case No. 399-02649 (Bankr. M.D. Tenn. Mar. 21, 2001) (Paine, J.), where the bankruptcy court authorized the debtors to abandon claims against critical vendors.  See Order Authorizing Abandonment And/Or Stay Of Certain Estate Causes Of Action And For Related Relief.  The bankruptcy court also authorized the debtors to abandon four categories of claims: (i) claims less than $5,000, (ii) payments of rent to landlords, (iii) customer refunds, and (iv) ordinary course reimbursements to employees.  See Order (i) Establishing Omnibus Initial Filing And Pretrial Procedures For Adversary Proceedings Under 11 U.S.C § 544, 545, 547, 548, Or 553 And Certain Adversary Proceedings, (ii) Granting Authority, Pursuant to Fed. Bankr. R. P. 9019, To Compromise And Settle Such Actions, And (iii) Granting Authority To Abandon Certain De Minimis Claims And Causes Of Action dated February 27, 2001.

provides for the enlargement of time to perform acts required under the Bankruptcy Rules.[16] As previously discussed, Fed. R. Civ. P. 4(m) requires the court to extend the period for service of process after the filing of a complaint upon a showing of good cause. Even absent good cause, this Court has discretion to extend the 120-day service period. Mejia v. Castle Hotel, Inc., 164 F.R.D. 343, 345 (S.D.N.Y. 1996).

46.    Here, the Debtors request an extension to March 31, 2008, an extension of less than 60 days.  By permitting the Debtors to timely file the Adversary Proceedings but to defer serving process on defendants, the procedures would enable the Debtors to preserve valuable business relationships and to continue developing a plan of reorganization.  The Debtors submit that permitting the Debtors to preserve potentially valuable assets without prejudicing the rights of any defendant constitutes good cause for the requested extension.[17]

N.    Stay Of Adversary Proceedings Until Service Of Process

47.    "[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants."  Landis v. North American Co., 299 U.S. 248, 254 (1936); see also Air Line Pilots Ass'n v. Miller, 523 U.S. 866, 879 n.6 (1998).  This inherent power is vested in bankruptcy courts as well.  See Uni-Rty Corp. v.

---

[16]    Bankruptcy Rule 9006(b)(1) provides in relevant part as follows: "[W]hen an act is required or allowed to be done at or within a specified period by these rules or by a notice given thereunder or by order of court, the court for cause shown may at any time in its discretion . . . order the period enlarged if the request therefor is made before the expiration of the period originally prescribed or as extended by a previous order . . . ."  Fed. R. Bankr. P. 9006(b)(1).

[17]    Similar relief was granted in In re Ames Dep't Stores, Inc., No. 01-42217 (REG) (Bankr. S.D.N.Y. Feb. 3, 2004).  See Order Extending Time For Service Of Process With Respect To Certain Preference Actions (Docket No. 2524).

Guangdong Building, Inc. (In re Uni-Rty Corp.), No. 96 Civ. 4573 (DAB), 1998 WL

299941, at *7 (S.D.N.Y. 1998) (recognizing that bankruptcy courts possess inherent

authority to stay proceedings); In re Hagerstown Fiber Ltd. P'ship, 277 B.R. 181, 199

(Bankr. S.D.N.Y. 2002) (court has inherent power to stay proceedings before it,

particularly where stay will promote judicial economy); In re Cleveland, 353 B.R. 254, 260

(Bankr. E.D. Cal. 2006) (staying adversary proceeding pursuant to court's inherent power

to stay proceedings before it); Swift v. Bellucci (In re Bellucci), 119 B.R. 763, 770 (Bankr.

E.D. Cal. 1990) ("a bankruptcy court has the inherent power to control its docket,

including controlling the timing of proceedings on that docket"). The determination

whether a stay of proceedings is appropriate "calls for the exercise of judgment, which

must weigh competing interests and maintain an even balance." Landis, 299 U.S. at 248,

254-55. The party seeking the stay "bears the burden of demonstrating the wisdom and

justice of a stay." John's Insulation, Inc. v. Siska Const. Co., Inc., 671 F. Supp. 289, 297

(S.D.N.Y. 1987). "[T]he basic goal [is] to avoid prejudice." Volmar Distributors v. New

York Post Co., 152 F.R.D. 36, 39 (S.D.N.Y. 1993).[18]

      48.     Here, for essentially the same reasons that the Debtors have

articulated for deferring issuance of summonses and service of legal process, this Court

should likewise stay the proceedings while the Debtors pursue plan confirmation. The stay

will not prejudice the potential defendants. In fact, the potential defendants will benefit

from the stay inasmuch as they will not need to expend time or resources investigating the

---

[18]    The Volmar court articulated the following factors that may guide a court's exercise of its inherent power: "(1) the private interests of the plaintiffs in proceeding expeditiously with the civil litigation as balanced against the prejudice to the plaintiffs if delayed; (2) the private interests of and burden on the defendants; (3) the interests of the courts; (4) the interests of persons not parties to the civil litigation; and (5) the public interest." Id. at 39.

facts relating to, or defending, a lawsuit that the Debtors likely will never need to pursue. Under these circumstances, this Court should stay each proceeding unless and until the Debtors request the Clerk of Court to issue summons in that particular proceeding.[19]

O.    Filing Of The Complaints Under Seal

49.    Section 107 of the Bankruptcy Code provides bankruptcy courts with the power to issue orders that will protect entities from potential harm that may result from the disclosure of certain confidential information. Section 107(b)(1) of the Bankruptcy Code specifically provides in part as follows: "On request of a party in interest, the bankruptcy court shall . . . protect an entity with respect to a trade secret or confidential research, development, or commercial information . . . ." 11 U.S.C. § 107(b)(1).

50.    The Second Circuit has held that section 107(b) of the Bankruptcy Code and Rule 9018 of the Bankruptcy Rules do "not require that commercial information be the equivalent of a trade secret before protecting such information." Video Software Dealers Ass'n v. Orion Pictures Corp. (In re Orion Pictures Corp.), 21 F.3d 24, 28 (2d Cir. 1994). Indeed, other courts in this district have stated that it "is required to grant that relief upon the motion of a party in interest, assuming the information is of the type listed in section 107(b)." In re Global Crossing Ltd., 295 B.R. 720, 723 n.7 (Bankr. S.D.N.Y. 2003) (citing Video Software, 21 F.3d at 27). In addition, the Second Circuit has held that a party seeking the sealing of information is required only to show that the information is confidential and commercial, and no showing of "good cause" is necessary. See Video

---

[19]    Similar relief was granted in In re Service Merchandise, Case No. 399-02649 (Bankr. M.D. Tenn. Mar. 21, 2001), where the bankruptcy court granted the debtors authority to stay certain adversary proceedings while the debtors were continuing to investigate whether they would ultimately pursue them. See Order Authorizing Abandonment And/Or Stay Of Certain Estate Causes Of Action And For Related Relief.

Software, 21 F.3d at 28.  Thus, a bankruptcy court may enter a sealing order under the broad confidentiality protections in bankruptcy proceedings where necessary to protect confidential information.  Id.; see also Global Crossing, 295 B.R. at 725 (The "whole point of [Bankruptcy Rule 9018] is to protect business entities from disclosure of information that could reasonably be expected to cause the entity commercial injury.").

51.     Upon the request of a party in interest, a court has no discretion and must deny public access to information that falls within one of the categories under Bankruptcy Code section 107(b).  Orion Pictures Corp., 21 F.3d at 27.  If, however, the information to be protected does not fit into any of the specified categories, then the court has discretion to decide if the requesting party has shown cause to permit filing under seal. See In re Bennett Funding Group, Inc., 226 B.R. 331, 336 (Bankr. N.D.N.Y. 1998) (citing Nixon v. Warner Communications, Inc., 435 U.S. 589, 599 (1978)); Orion Pictures Corp., 21 F.3d at 27 ("In limited circumstances, courts must deny access to judicial documents").

52.     The power to seal also arises from the inherent power of the court to control dissemination of its records.  See In re Robert Landau Assocs., Inc. 50 B.R. 670, 676, 677 (Bankr. S.D.N.Y. 1985) (court's inherent power to seal, despite section 107(b)'s inapplicability, is implicit in section 704(7)'s exception to disclosure—"unless the court orders otherwise"); In re I.G. Servs. Ltd., 244 B.R. 377, 388 n.14 (Bankr. W.D. Tex. 2000) (concluding that if section 107 applied to records not filed with court, court still had power to control dissemination of information beyond scope of section 107), rev'd on other grounds sub nom. San Antonio Express-News v. Blackwell (In re Blackwell), 263 B.R. 505 (W.D. Tex. 2000); In re Apex Oil Co., 101 B.R. 92, 101-02 (Bankr. E.D. Mo. 1989)

(citing Robert Landau Assocs.); In re EPIC Assocs. V, 54 B.R. 445, 450 (Bankr. E.D. Va.

1985) (exercising inherent supervisory power over its own records and files).   When

deciding to allow a debtor to file documents under seal, courts should look at all relevant

facts and circumstances and weigh the competing interests of the debtor seeking protection

with the general right of the public to access documents filed in a bankruptcy case.

Bennett Funding, 226 B.R. at 336.  Relevant factors include (1) whether the debtor will

suffer irreparable harm if the information is disclosed, (2) whether the debtor can

demonstrate that disclosure will have a negative impact on its estate such that the debtor

would be at a disadvantage in comparison with competitors, and (3) whether the debtor is

seeking to protect the information on a temporary basis or on a permanent basis.  See

generally In re Hemple, 295 B.R. 200, 202 (Bankr. D. Vt. 2003).

        53.     The circumstances of this case demonstrate the need for

confidentiality to preserve the status quo and to avoid unnecessary harm to the Debtors and

others that would be caused by filing these complaints publicly.[20]

                        *        *        *

        54.     In light of the benefits that the relief requested would provide to the

Debtors, defendants in Adversary Proceedings, and other stakeholders, and given the

---

[20]   Similar relief was granted in In re Service Merchandise, et al., Case No. 399-02649 (Bankr. M.D. Tenn.
       Feb. 27, 2001), the bankruptcy court granted the debtors authority to file under seal certain adversary
       proceedings so that the debtors could continue negotiations with defendants, who were also the debtors'
       business partners, and to ensure that such defendants continued doing business with the debtors.  See
       Order (i) Establishing Omnibus Initial Filing And Pretrial Procedures For Adversary Proceedings Under
       11 U.S.C § 544, 545, 547, 548, Or 553 And Certain Adversary Proceedings, (ii) Granting Authority,
       Pursuant to Fed. Bankr. R. P. 9019, To Compromise And Settle Such Actions, And (iii) Granting
       Authority To Abandon Certain De Minimis Claims And Causes Of Action (permitting debtor to file
       documents under seal in any adversary proceeding in which debtors also sought to stay the proceeding).

authority in support of such relief, the Debtors believe that entry of the proposed order is justified and appropriate.

Notice Of Motion

55.    Notice of this Motion has been provided in accordance with the Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered March 20, 2006 (Docket No. 2883) (the "Supplemental Case Management Order"), and the Amended Eighth Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, and 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered October 26, 2006 (Docket No. 5418) (together with the Supplemental Case Management Order, the "Case Management Orders").[21]  In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

Memorandum Of Law

56.    Because the legal points and authorities upon which this Motion relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

---

[21]    In addition to giving notice in accordance with the Case Management Orders, the Debtors will describe the relief obtained through this Motion in their disclosure statement for the Debtors' plan of reorganization.

WHEREFORE the Debtors respectfully request that this Court enter an order (i) granting the Motion and (ii) granting them such other and further relief as is just.

Dated:     New York, New York
           August 6, 2007

                                        SKADDEN, ARPS, SLATE, MEAGHER
                                          & FLOM LLP

                                        By:    /s/ John Wm. Butler, Jr.
                                               John Wm. Butler, Jr. (JB 4711)
                                               George N. Panagakis (GP 0770)
                                               Ron E. Meisler (RM 3026)
                                        333 West Wacker Drive, Suite 2100
                                        Chicago, Illinois 60606
                                        (312) 407-0700

                                                     - and -

                                        By:    /s/ Kayalyn A. Marafioti
                                               Kayalyn A. Marafioti (KM 9632)
                                               Thomas J. Matz (TM 5986)
                                        Four Times Square
                                        New York, New York 10036
                                        (212) 735-3000

                                        Attorneys for Delphi Corporation, et al.,
                                          Debtors and Debtors-in-Possession

# EXHIBIT G

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                          :
      In re                     :      Chapter 11
                                          :
DELPHI CORPORATION, <u>et al.</u>,        :      Case No. 05-44481 (RDD)
                                          :
                 Debtors.    :      (Jointly Administered)
                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

ORDER UNDER 11 U.S.C. §§ 102(1)(A), 105(a), 107, 108(a)(2),
AND 546(a) AND FED. R. BANKR. P. 7004, 9006(c), AND 9018
(i) AUTHORIZING DEBTORS TO ENTER INTO STIPULATIONS
TOLLING STATUTE OF LIMITATIONS WITH RESPECT TO CERTAIN
CLAIMS, (ii) AUTHORIZING PROCEDURES TO IDENTIFY CAUSES OF
ACTION THAT SHOULD BE PRESERVED, AND (iii) ESTABLISHING
PROCEDURES FOR CERTAIN ADVERSARY PROCEEDINGS INCLUDING THOSE
<u>COMMENCED BY DEBTORS UNDER 11 U.S.C. § 541, 544, 545, 547, 548, OR 553</u>

("PRESERVATION OF ESTATE CLAIMS PROCEDURES ORDER")

Upon the motion, dated August 6, 2007 (the "Motion"), of Delphi

Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-

possession in the above-captioned cases (collectively, the "Debtors"), for an order (the

"Order")  under 11 U.S.C. §§ 102(1)(A), 105(a), 107, 108(a)(2), and 546(a) and Federal

Rule of Bankruptcy Procedure 7004, 7016(b), 9006, and 9018 (i) authorizing the Debtors

to enter into stipulations tolling the statute of limitations with respect to certain claims,

(ii) authorizing procedures to identify causes of action that should be preserved, and

(iii) establishing procedures for certain Adversary Proceedings[1] commenced by the

Debtors under 11 U.S.C. § 541, 544, 545, 547, 548, or 553; and upon the record of the

hearing held on the Motion; and this Court having determined that the relief requested in

the Motion is in the best interests of the Debtors, their estates, their creditors, and other

parties-in-interest; and it appearing that proper and adequate notice of the Motion has been

given and that no other or further notice is necessary; and after due deliberation thereon;

and good and sufficient cause appearing therefor, it is hereby

ORDERED, ADJUDGED, AND DECREED THAT:

1.      The Motion is GRANTED.

2.      The filing and service procedures set forth under the Bankruptcy

Rules, the Local Rules, and any orders of this Court in these chapter 11 cases are modified

or waived, as the case may be, as provided herein with respect to the Adversary

Proceedings.

3.      <u>Scope Of The Procedures</u>.  The procedures established by this Order

apply to each Adversary Proceeding that the Debtors identify to the Clerk of the Court as

being subject to these procedures.

4.      <u>Approval Of Tolling Agreements</u>.  The Debtors are hereby

authorized to enter into stipulations, substantially in the form attached hereto as <u>Exhibit 1</u>,

tolling the statute of limitations with respect to claims described in the Motion for the

tolling period described in the Motion.  Each Debtor is deemed to have entered into such a

---

[1]     Capitalized terms used and not defined herein shall have the meanings ascribed to them in the Motion.

stipulation with other Debtors and affiliated non-Debtor entities either controlled by the Debtors or that had actual notice of this Motion.

5.     <u>Procedures To Identify Causes Of Action And Abandonment Authority</u>.  The procedures set forth in the Motion to identify causes of action that should be preserved are approved.  The Debtors are authorized, without the need for any further order or any further notice under Bankruptcy Rule 6007(a), to abandon those causes of action or categories of causes of action that the Debtors propose in the Motion to abandon.  Subject to the procedures set forth in the Motion, the Debtors are further authorized to abandon without further notice causes of action falling within the additional categories of causes of action identified in the Motion and which they determine should not be pursued, without the need for any further order or any further notice under Bankruptcy Rule 6007(a) with the exception of the notice and opportunity for a hearing provided in the next sentence.  The Debtors may abandon such additional causes of action after giving 10 days' notice thereof to the Statutory Committees; if a Statutory Committee objects within 10 days after service of the notice, the Debtors may bring the matter before this Court for a ruling on whether the proposed abandonment satisfies section 554(a) of the Bankruptcy Code.  Notwithstanding any such abandonment, the Debtors fully reserve and preserve all of their rights under section 502(d) of the Bankruptcy Code.

6.     <u>Scope Of Fraudulent Transfer Review</u>.  For purposes of identifying and preserving potential fraudulent transfer claims, the Debtors need only review the following categories of transactions: merger and acquisition deals at or exceeding $20 million, transfers to Delphi's board of directors or strategy board members other than

for compensation or ordinary-course expense reimbursement (if any), unusual securities transactions (if any), dividend distributions to 5% shareholders, and Delphi's "financially troubled supplier" program.

7.  <u>Filing Of Complaints Under Seal</u>.  The Clerk of Court is directed to accept for filing, under seal, paper copies of the complaint in each Adversary Proceeding that the Debtors inform the Clerk is subject to these procedures.  The Debtors may also file under seal any amended complaint in the Adversary Proceeding for so long as the Adversary Proceeding remains stayed in accordance with paragraph 9 below.  Absent further order of the Court or termination of the stay in accordance with paragraph 9 below, the case docket for any such Adversary Proceeding shall not disclose the identity of any defendant in the Adversary Proceeding and shall not disclose the complaint or any amended complaint in the Adversary Proceeding.  The Debtors shall coordinate with the Clerk of Court to accomplish an efficient and cost-effective filing of the complaints and amended complaints contemplated by this order.  The Debtors shall submit to the Clerk, under seal, appropriate electronic media containing PDF copies of the complaints and amended complaints.  This order shall not preclude the Debtors, in their sole discretion, from making a copy of a complaint or amended complaint available to parties; <u>provided</u> that the Debtors maintain an internal record that they, and not the Clerk, made the complaint or amended complaint available.  The Debtors and GM shall have leave to file, under seal, a stipulation acceptable to the Statutory Committees that contains tolling provisions, consistent with this order, and other agreements of the parties with respect to the sealed complaint involving GM, which stipulation shall be deemed "so ordered" and

shall be sealed in accordance with the terms of this order. The complaint and any amended complaint filed in an Adversary Proceeding shall remain under seal until the stay terminates in accordance with paragraph 9 below.

8.      <u>Extension of the Time for Service Under Federal Rule of Civil Procedure 4(m)</u>.  The Debtors shall have until March 31, 2008 to serve each defendant in the Adversary Proceedings with summons and complaint, without prejudice to seek further extensions.

9.      <u>Stay Of Adversary Proceedings</u>.  All activity in the Adversary Proceedings denominated by the Debtors as subject to these procedures shall be stayed until the earlier of (i) the Debtors' service of a summons and complaint on the defendant in any Adversary Proceeding and (ii) further order of this Court after application therefor. Notwithstanding the stay, the Debtors may amend their complaint during the stay.  Also, during the stay, the Debtors may dismiss any Adversary Proceeding after 10 days' notice to counsel to the Statutory Committees.  If a Statutory Committee objects within 10 days after service of the notice of dismissal, the Debtors may bring the matter before this Court for a ruling on whether the proposed dismissal satisfies section 554(a) of the Bankruptcy Code.

10.      <u>Deferral Of Issuance Of Summons</u>.  The Clerk of Court is directed not to issue summons in any Adversary Proceeding denominated by the Debtors as subject to these procedures until either the stay is lifted with respect to such Adversary Proceeding or the Debtors request the Clerk of Court to issue a summons.

11.     <u>Service Of Order With Summons And Complaint</u>.  The Debtors

must serve a copy of this order upon each defendant in any Adversary Proceeding either

when the Debtors serve a summons and complaint on the defendant or as soon thereafter as

practicable.

12.     <u>Additional Procedures</u>.  This Order is without prejudice to the

Debtors' seeking additional procedures to govern the Adversary Proceedings.

13.     This Court shall retain jurisdiction to hear and determine all matters

arising from the implementation of this order.

14.     The requirement under Rule 9013-1(b) of the Local Bankruptcy

Rules for the United States Bankruptcy Court for the Southern District of New York for

the service and filing of a separate memorandum of law is deemed satisfied by the Motion.

Dated: August 16, 2007
        New York, New York


                _____/s/ Robert D. Drain_____
                 UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT H

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                          :
          In re                           :        Chapter 11
                                          :
DELPHI CORPORATION, <u>et al.</u>,        :        Case No. 05-44481 (RDD)
                                          :
                       Debtors.           :        (Jointly Administered)
                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER
UNDER 11 U.S.C. §§ 1129(a) AND (b) AND FED. R. BANKR. P. 3020
CONFIRMING FIRST AMENDED JOINT PLAN OF REORGANIZATION
OF DELPHI CORPORATION AND CERTAIN AFFILIATES,
<u>DEBTORS AND DEBTORS-IN-POSSESSION, AS MODIFIED</u>

Upon the motion, dated September 6, 2007 (the "Motion"), of Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (each, a "Debtor"), for entry of an order approving (i) the Disclosure Statement (as defined below) filed on September 6, 2007 (Docket No. 9264), as amended and filed on December 10, 2007 (Docket No. 11388), (ii) a voting record date, voting deadline, and procedures for temporary allowance of certain claims for voting purposes, (iii) procedures for filing objections to the Plan of Reorganization filed on September 6, 2007 (Docket No. 9263), as amended and filed on December 10, 2007 (Docket No. 11386) (the "Amended Plan"), (iv) procedures for soliciting and tabulating votes on the Amended Plan, (v) a hearing date to consider confirmation of the Amended Plan, (vi) cure claim procedures, (vii) procedures for resolving disputes relating to postpetition interest, and (viii) reclamation claim procedures; and the Amended Plan, as modified by the modifications set forth in <u>Exhibit A</u> hereto (the "Plan"),[1] a copy of which is attached hereto as <u>Exhibit B</u>; and based upon the Court's review of (a) the Gershbein Affidavit Of Mailing With Respect To Solicitation Materials (the "Gershbein Affidavit") (Docket No. 11974), filed on January 12, 2008, the Sullivan Affidavit Of Mailing With Respect To Solicitation Materials (the "Sullivan Affidavit") (Docket No. 11981), filed on January 12, 2008, the Declaration of Eric Kurtzman Regarding Tabulation Of Ballots With Respect To Vote On First Amended Joint Plan Of Reorganization of Delphi Corporation And Certain Of Its Subsidiaries And Affiliates (the "Kurtzman Voting Declaration") (Docket No. 12160), filed on January 16, 2008, and the Declaration of Jane Sullivan Certifying Tabulation Of

---

[1]    Capitalized terms not defined herein shall have the meanings ascribed to them in the Plan.

Ballots Regarding Vote On First Amended Plan Of Reorganization Of Delphi Corporation And Certain Of Its Subsidiaries And Affiliates (the "Sullivan Voting Certification") (Docket No. 12163), filed on January 16, 2008, (b) the Memorandum Of Law (A) In Support Of Confirmation Of The First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession And (B) In Response To Objections Thereto, filed by the Debtors on January 16, 2008, (c) the Plan, (d) the Declarations of Robert S. Miller, executed on January 13, 2008 (the "Miller Declaration"), John D. Sheehan, executed on January 13, 2008 (the "Sheehan Declaration"), David L. Resnick, executed on January 9, 2008 (the "Resnick Declaration"), Randall S. Eisenberg, executed on January 9, 2008 (the "Eisenberg Declaration"), Nick Bubnovich, executed on January 9, 2008 (the "Bubnovich Declaration"), Craig Naylor, executed on January 12, 2008 (the "Naylor Declaration"), Dean R. Unrue, executed on January 11, 2008 (the "Unrue Declaration"), Keith D. Stipp, executed on January 11, 2008 (the "Stipp Declaration"), and Colin E. Wittmer, executed on January 9, 2008 (the "Wittmer Declaration") in support of Confirmation of the Plan, (e) all of the evidence proffered or adduced at, objections filed in connection with and the responses filed thereto, and arguments of counsel made at, the Confirmation Hearing (as defined below), and (f) the entire record of these Chapter 11 Cases; and after due deliberation thereon and good and sufficient cause appearing therefor,

THE COURT HEREBY FINDS AND CONCLUDES THAT:[2]

A.    <u>Exclusive Jurisdiction; Venue; Core Proceeding (28 U.S.C. §§ 157(b)(2) and 1334(a))</u>.  The Court has jurisdiction over the Chapter 11 Cases pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. Confirmation of the Plan is a core proceeding under 28 U.S.C. § 157(b)(2), and the Court has exclusive jurisdiction to determine whether the Plan complies with the applicable provisions of the Bankruptcy Code and should be confirmed.

B.    <u>Filing Of Amended Plan</u>.  On December 10, 2007, the Debtors filed the Amended Plan and the First Amended Disclosure Statement With Respect To First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession (as transmitted to parties-in-interest, the "Disclosure Statement").

C.    <u>Solicitation Procedures Order</u>.  On December 10, 2007, the Court entered an order (the "Solicitation Procedures Order") that, among other things, (i) approved the Disclosure Statement as containing adequate information within the meaning of section 1125 of the Bankruptcy Code and Fed. R. Bankr. P. 3017 and 2002(c)(3), (ii) fixed January 17, 2008 as the date for the commencement of the hearing to consider confirmation of the Amended Plan (the "Confirmation Hearing"), (iii) approved the form and method of notice of the Confirmation Hearing (the "Confirmation Hearing Notice"), and (iv) established certain procedures for soliciting and tabulating votes with respect to the Amended Plan.  In accordance with the Solicitation Procedures Order, on December

---

[2]    Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate.  Fed. R. Bankr. P. 7052.

28, 2007, the Debtors filed modifications to certain plan exhibits filed on or before December 10, 2007 and filed certain other exhibits to the Amended Plan.

      D.    <u>Transmittal Of Solicitation Package</u>.  On or before December 15, 2007, in accordance with Fed. R. Bankr. P. 3017(d), (e) and (f) and the Solicitation Procedures Order, the Debtors caused Kurtzman Carson Consultants LLC ("KCC") and Financial Balloting Group LLC ("FBG") or their agents to transmit (i) the Confirmation Hearing Notice, (ii) a CD-Rom containing (1) the Solicitation Procedures Order (without exhibits), (2) the Disclosure Statement and publicly-filed materials appended thereto, (3) the Amended Plan and publicly-filed materials appended thereto, (4) the solicitation letter of the official committee of unsecured creditors (the "Creditors' Committee Letter"), and (5) the solicitation letter of the official committee of equity security holders (the "Equity Committee Letter"), (iii) paper copies of the Creditors' Committee Letter and Equity Committee Letter, (iv) paper copies of the UAW informational letter to its members who received ballots ("UAW Informational Letter"), (v) paper copies of the Postpetition Interest Rate Determination Notice for all holders of General Unsecured Claims, other than Senior Note Claims and TOPrS Claims, (vi) as to Classes 1C-12C, 1D-12D, 1E, 1G-1, 1G-2, 1H and 8H  (collectively, the "Voting Classes"), a paper ballot and return envelope (such ballot and envelope being referred to as a "Ballot"), and (vii) to the extent appropriate as determined by the Debtors, an Internal Revenue Service form W-9 (Request for Taxpayer Identification Number and Certification) or form W-8BEN to be returned with a party's ballot, all as set forth in the Gershbein Affidavit and Sullivan Affidavit.  In addition, and in accordance with Fed. R. Bankr. P. 3017(d), (e) and (f) and the Solicitation Procedures Order, as to Classes 1A-12A, 1B-12B, and 1J-12J, a paper

Notice To Unimpaired Creditors Of (I) Filing Of Joint Plan Of Reorganization, (II) Treatment Of Claims Under Plan, (III) Hearing On Confirmation Of Plan, And (IV) Deadline And Procedures For Filing Objections Thereto ("Unimpaired Creditors Notice") was transmitted as set forth in the Gershbein Affidavit. Further, and in accordance with Fed. R. Bankr. P. 3017(d), (e) and (f) and the Solicitation Procedures Order, as to Class 1I, a paper Notice Of Non-Voting Status With Respect To Certain Claims And Interests ("Notice of Non-Voting Status") was transmitted as also set forth in the Gershbein Affidavit.

E. <u>Publication Of Confirmation Hearing Notice</u>. The Debtors published the Confirmation Hearing Notice in the <u>New York Times</u> (national edition), the <u>Wall Street Journal</u> (national, European, and Asian editions), <u>USA Today</u> (worldwide), the <u>Automotive News</u> (national edition), and in local editions of the following: the <u>Adrian Daily Telegram</u>, the <u>Arizona Daily Star</u>, the <u>Buffalo News</u>, the <u>Chicago Sun Times</u>, the <u>Cleveland Plain Dealer</u>, the <u>Clinton News</u>, the <u>Columbus Dispatch</u>, the <u>Daily Leader</u>, the <u>Dayton Daily News</u>, the <u>Detroit Free Press</u>, the <u>Detroit News</u> , the <u>El Paso Times</u>, the <u>Fitzgerald Herald Leader</u>, <u>The Flint Journal</u>, the <u>Gadsden Times</u>, the <u>Grand Rapids Press</u>, the <u>Greensville News</u>, the <u>Indianapolis Star</u>, the <u>Kansas City Star</u>, the <u>Kokomo Tribune</u>, the <u>Lansing State Journal</u>, the <u>Laurel Leader</u>, the <u>Los Angeles Daily News</u>, the <u>Milwaukee Journal Sentinel</u>, the <u>Mobile Beacon</u>, <u>The Mobile Register</u>, the <u>Oakland Press</u>, the <u>Olathe Daily News</u>, the <u>Rochester Democrat and Chronicle</u>, the <u>Saginaw News</u>, the <u>Sandusky Register</u>, the <u>Toledo Blade</u>, the <u>Tribune Chronicle</u>, the <u>Tulsa World</u>, the <u>Tuscaloosa News</u>, and <u>The Vindicator</u>, on or before December 24, 2007 as evidenced by

the affidavits of publication of confirmation hearing notice, filed by individuals on behalf of each of the listed publications.[3]

   F. <u>Transmittal And Mailing Of Materials; Notice</u>. Due, adequate, and sufficient notice of the Disclosure Statement and Plan and of the Confirmation Hearing, as well as all deadlines for voting on or filing objections to the Amended Plan, has been given to all known holders of Claims and Interests in accordance with Fed. R. Bankr. P. 2002(b), 3017(d), (e), and (f), and the procedures set forth in the Solicitation Procedures Order. The Disclosure Statement, Amended Plan, Ballots, Solicitation Procedures Order, Confirmation Hearing Notice, Unimpaired Creditors Notice, Notice of Non-Voting Status, Creditors' Committee Letter, Equity Committee Letter, UAW Informational Letter, and Postpetition Interest Rate Determination Notice were transmitted and served in substantial compliance with the Solicitation Procedures Order and the Bankruptcy Rules, and such transmittal and service were adequate and sufficient. Adequate and sufficient notice of the Confirmation Hearing, cure claim procedures, postpetition interest rate dispute procedures, reclamation claim procedures, injunctions and third party releases, bar dates, and other hearings described in the Solicitation Procedures Order was given in compliance with the Bankruptcy Rules and the Solicitation Procedures Order, and no other or further notice is or shall be required.

   G. <u>Bankruptcy Rule 3018(a) Stipulations</u>. Prior to the Confirmation Hearing, four motions were filed for temporary allowance of claims for voting purposes pursuant to Bankruptcy Rule 3018(a) (the "3018(a) Motions"). The 3018(a) Motions include: (1)

---

[3] The affidavits are found at docket numbers 11675, 11786, 11845, 11659, 11657, 11658, 11660, 11661, 11775, 11844, 11662, 11774, 11663, 11776, 11776, 11664, 11665, 11777, 11778, 11666, 11779, 11667, 11668, 11780, 11670, 11671, 11672, 11673, 11782, 11674, 11677, 11678, 11680, 11783, 11784, 11784, 11684, 11682, 11683, and 11785.

Bank of America, N.A, (Docket No. 9683), (2) Technology Properties, Inc. (Docket No. 10425), (3) Fiduciary Counselors, Inc. (Docket No. 11618), and (4) SPCP Group, L.L.C. (Docket No. 11625).

H.     Solicitation.  Votes for acceptance or rejection of the Amended Plan were solicited in good faith and complied with sections 1125 and 1126 of the Bankruptcy Code, Bankruptcy Rules 3017 and 3018, the Disclosure Statement, the Solicitation Procedures Order, all other applicable provisions of the Bankruptcy Code, and all other applicable rules, laws, and regulations.

I.     Ballots.  All procedures used to distribute solicitation materials to the applicable holders of Claims and Interests and to tabulate the Ballots were fair and conducted in accordance with the Solicitation Procedures Order, the Bankruptcy Code, the Bankruptcy Rules, the local rules of the Bankruptcy Court for the Southern District of New York, and all other applicable rules, laws, and regulations.

J.     Voting Reports.  On January 16, 2008, in accordance with the Solicitations Procedures Order, the Debtors filed the Kurtzman Voting Declaration (Docket No. 12160) and Sullivan Voting Certification (Docket No. 12163) (together, the "Voting Reports"), certifying the method and results of the Ballot tabulation for each of the Voting Classes voting to accept or reject the Plan.

K.     Impaired Classes That Have Voted To Accept The Plan.  As evidenced by the Voting Reports, which certified both the method and results of the voting, pursuant to the requirements of sections 1124 and 1126 of the Bankruptcy Code, at least one Impaired Class of Claims, determined without including any acceptance by an insider of any of the Debtors, has voted to accept the Plan.

L.    <u>Classes Deemed To Have Rejected The Plan</u>. Holders of Interests in Class 1I are not entitled to receive any distribution under the Plan on account of their Interests. Pursuant to section 1126(g) of the Bankruptcy Code, Class 1I is conclusively presumed to have rejected the Plan, and votes from those interest holders therefore were not solicited.

M.    <u>Burden Of Proof</u>.  The Debtors, as proponents of the Plan, have met their burden of proving the elements of sections 1129(a) and (b) of the Bankruptcy Code, by a preponderance of the evidence, which is the applicable evidentiary standard in the Court. The Court also finds that the Debtors have satisfied the elements of sections 1129(a) and (b) of the Bankruptcy Code under the clear and convincing standard of proof.

N.    <u>Plan Compliance With Bankruptcy Code (11 U.S.C. § 1129(a)(1))</u>.  The Plan complies with the applicable provisions of the Bankruptcy Code, thereby satisfying section 1129(a)(1) of the Bankruptcy Code.

1.    <u>Proper Classification (11 U.S.C. §§ 1122, 1123(a)(1))</u>.  In addition to Administrative Claims and Priority Tax Claims (which are not required to be classified), Article III of the Plan designates 37 Classes of Claims and five Classes of Interests.  The Claims and Interests placed in each Class are substantially similar to other Claims or Interests in each such Class.  Valid business, factual, and legal reasons exist for classifying the various Classes of Claims and Interests in the manner set forth in the Plan, and such Classes do not unfairly discriminate between holders of Claims or Interests. Thus, the Plan satisfies sections 1122 and 1123(a)(1) of the Bankruptcy Code.

2.    <u>Specification Of Unimpaired Classes (11 U.S.C. § 1123(a)(2))</u>. Article 4.1 of the Plan specifies the Classes of Claims that are Unimpaired.  Thus, the Plan satisfies section 1123(a)(2) of the Bankruptcy Code.

3. <u>Specification Of Treatment Of Impaired Classes (11 U.S.C. § 1123(a)(3))</u>. Article 4.2 of the Plan specifies the Classes of Claims and Interests that are Impaired under the Plan. Article V of the Plan specifies the treatment of Claims and Interests in all such Classes. Thus, the Plan satisfies section 1123(a)(3) of the Bankruptcy Code.

4. <u>No Discrimination (11 U.S.C. § 1123(a)(4))</u>. The Plan provides for the same treatment for each Claim in each respective Class unless the holder of a particular Claim has agreed to less favorable treatment with respect to such Claim. Thus, the Plan satisfies section 1123(a)(4) of the Bankruptcy Code.

5. <u>Implementation Of Plan (11 U.S.C. § 1123(a)(5))</u>. The Plan provides adequate and proper means for implementation of the Plan, including, without limitation, (i) the continued corporate existence of the Debtors, (ii) the corporate constituent documents that will govern the Reorganized Debtors after the Effective Date, including, without limitation, the Certificate of Incorporation and Bylaws, (iii) entry into the Exit Financing Arrangements and Registration Rights Agreement, (iv) issuance of the New Common Stock, New Preferred Stock, New Warrants, GM Note, and 414(l) Note (v) assumption of the collective bargaining agreements, as amended, (vi) consummation of the Restructuring Transactions, and the transactions contemplated by the Investment Agreement and the Delphi-GM Definitive Documents, and (vii) the execution, delivery, filing, or recording of all contracts, instruments, releases, indentures, and other agreements or documents related to the foregoing. Thus, the Plan satisfies section 1123(a)(5) of the Bankruptcy Code.

6.    Prohibition Against Issuance Of Non-Voting Equity Securities And Provisions For Voting Power Of Classes Of Securities (11 U.S.C. § 1123(a)(6)). Article 7.4 of the Plan provides that the articles of incorporation of the Reorganized Debtors will comply with section 1123(a)(6) of the Bankruptcy Code.  Such statutory provisions have been incorporated into the articles of incorporation of Reorganized Delphi, as set forth in Plan Exhibit 7.4(a).

7.    Selection Of Officers, Directors, And The Trustee (11 U.S.C. § 1123(a)(7)).  In Article 7.5, Article 7.6, and Article 7.7 of the Plan, as identified publicly prior to the Confirmation Hearing, or as otherwise announced at the Confirmation Hearing, the Debtors properly and adequately disclosed or otherwise identified the procedures for determining the identity and affiliations of all individuals or entities proposed to serve on or after the Effective Date as officers or directors of the Reorganized Debtors.  The appointment or employment of such individuals or entities and the proposed compensation and indemnification arrangements for officers and directors are consistent with the interests of Claim and Interest holders and with public policy.  Thus, section 1123(a)(7) of the Bankruptcy Code is satisfied.

8.    Additional Plan Provisions (11 U.S.C. § 1123(b)).  The Plan's provisions are appropriate and consistent with the applicable provisions of the Bankruptcy Code, including, without limitation, provisions for (i) distributions to holders of Claims and Interests, (ii) the disposition of executory contracts and unexpired leases, (iii) approval of and authorization for entrance into the Delphi-GM Definitive Documents, (iv) amendment and assumption of the Union Settlement Agreements, (v) performance of the Debtors' obligations under the Investment Agreement, (vi) the retention of, and right

to enforce, sue on, settle, or compromise (or refuse to do any of the foregoing with respect to) certain claims or causes of action against third parties, to the extent not waived and released under the Plan, (vii) resolution of Disputed Claims, (viii) allowance of certain Claims, (ix) indemnification obligations, (x) releases by the Debtors of certain parties, (xi) releases by holders of Claims and Interests, (xii) releases by Unions, (xiii) releases of GM-Related Parties (as defined in the Delphi-GM Global Settlement Agreement) by the Debtors and third parties, (xiv) releases and exculpation of each Plan Investor (in its capacity as such or otherwise), its Affiliates, shareholders, partners, directors, officers, employees and advisors, and (xv) the exculpation of certain parties.

9.    <u>Fed. R. Bankr. P. 3016(a)</u>.  The Plan is dated and identifies the entities submitting it, thereby satisfying Fed. R. Bankr. P. 3016(a).

O.    <u>Debtors' Compliance With Bankruptcy Code (11 U.S.C. § 1129(a)(2))</u>. The Debtors have complied with the applicable provisions of the Bankruptcy Code, thereby satisfying section 1129(a)(2) of the Bankruptcy Code.  Specifically, the Debtors are proper debtors under section 109 of the Bankruptcy Code and proper proponents of the Plan under section 1121(a) of the Bankruptcy Code.  The Debtors have complied with the applicable provisions of the Bankruptcy Code during the Chapter 11 Cases, including as provided or permitted by orders of the Court.  The Debtors have complied with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Solicitation Procedures Order in transmitting the Plan, the Disclosure Statement, the Ballots, and related documents and notices, and in soliciting and tabulating votes on the Plan.

P.    <u>Plan Proposed In Good Faith (11 U.S.C. § 1129(a)(3))</u>.  The Debtors have proposed the Plan in good faith and not by any means forbidden by law, thereby

satisfying section 1129(a)(3) of the Bankruptcy Code.  In determining that the Plan has been proposed in good faith, the Court has examined the totality of the circumstances surrounding the filing of the Chapter 11 Cases and the formulation of the Plan.  <u>See</u> Bankruptcy Rule 3020(b).  The Debtors, the Statutory Committees, GM and each Plan Investor (in its capacity as such or otherwise), and their respective Affiliates, shareholders, partners, directors, officers, employees, and advisors, among others, and each of their respective professionals negotiated the Plan in good faith and participated in the Plan formulation process in good faith.  The Chapter 11 Cases were filed, and the Plan was proposed, with the legitimate and honest purpose of reorganizing and maximizing the value of each of the Debtors and the recovery to holders of Claims and Interests under the circumstances of these cases.

Q.    <u>Payments For Services Or Costs And Expenses (11 U.S.C. § 1129(a)(4))</u>. Based on modifications to the Plan, attached hereto as <u>Exhibit A</u>, any payment made or to be made by the Debtors for services or for costs and expenses in connection with the Chapter 11 Cases, including all administrative expense and substantial contribution claims under sections 503 and 507 of the Bankruptcy Code, or in connection with the Plan and incident to the Chapter 11 Cases, has been approved by, or is subject to the approval of, the Court as reasonable, thereby satisfying section 1129(a)(4) of the Bankruptcy Code.  Any amounts allocated by the Debtors for the payment of such services, costs, and expenses, or any recoveries or disgorgements subsequently ordered by the Court on account of payments to professionals prior to final allowance of such amounts shall constitute assets owned exclusively by the Reorganized Debtors except as

otherwise provided in Section 10.3(c) of the Plan. Accordingly, the requirements of section 1129(a)(4) of the Bankruptcy Code have been met.

R. <u>Directors, Officers, And Insiders (11 U.S.C. § 1129(a)(5))</u>.  The Debtors have complied with section 1129(a)(5) of the Bankruptcy Code.  Specifically, the Debtors have disclosed the identity and the affiliation of all of the initial officers of the Reorganized Debtors and the directors (as applicable) for all Reorganized Debtors, with the exception of Reorganized Delphi.  The process for the selection of the directors of Reorganized Delphi is described in Article 7.5 of the Plan and is approved.  On December 10, 2007, the Debtors filed Plan Exhibit 7.8 which described the Reorganized Debtors' Management Compensation Plan, including the objectives and philosophy of the compensation plan, the elements of various employees' compensation, and management performance.  Thereafter, the Debtors filed (i) a supplement to the Management Compensation Plan on December 28, 2007 and (ii) modifications to Plan Exhibit 7.8 on January 16, 2008 and January 23, 2008 (the "Article 7.8 Modifications"), which are included with the Plan modifications attached hereto as <u>Exhibit A</u>.  The Creditors' Committee has agreed that the requirements of Article 7.8 of the Plan have been satisfied. The Management Compensation Plan described in Plan Exhibit 7.8 (and as described in Section 9(a)(xxi) of the Investment Agreement), are reasonably acceptable to ADAH. The Debtors have fully disclosed compensation to be paid to management in Plan Exhibit 7.8.  The appointment to, or continuance in, such office of each such individual, is consistent with the interests of holders of Claims and Interests, and with public policy. Accordingly, the requirements of section 1129(a)(5) of the Bankruptcy Code have been met.

S.      No Rate Changes (11 U.S.C. § 1129(a)(6)).  Section 1129(a)(6) of the Bankruptcy Code is satisfied because the Plan does not provide for any change in rates over which a governmental regulatory commission has jurisdiction.

T.      Best Interests Test (11 U.S.C. § 1129(a)(7)).  The Plan satisfies section 1129(a)(7) of the Bankruptcy Code.  The liquidation analysis in Appendix E to the Disclosure Statement, the Eisenberg Declaration, and other evidence proffered or adduced at the Confirmation Hearing (1) are persuasive, credible, and accurate as of the dates such evidence was prepared, presented, or proffered, (2) either have not been controverted by other persuasive evidence or have not been challenged, (3) are based upon reasonable and sound assumptions, (4) provide a reasonable estimate of the liquidation values of the Debtors upon conversion to a case under chapter 7 of the Bankruptcy Code, and (5) establish that each holder of a Claim or Interest in an Impaired Class that has not accepted the Plan will receive or retain under the Plan, on account of such Claim or Interest, property of a value, as of the Effective Date of the Plan, that is not less than the amount that it would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date.

U.      Acceptance By Impaired Classes (11 U.S.C. § 1129(a)(8)).  With the exception of Class 6C, all voting Impaired Classes have voted to accept the Plan.  Further, Class 1I is deemed to have rejected the Plan and, accordingly, confirmation is sought pursuant to 11 U.S.C. § 1129(b).

V.      Treatment Of Administrative And Priority Tax Claims (11 U.S.C. § 1129(a)(9)).  The treatment of Administrative Claims under the Plan satisfies the requirements of section 1129(a)(9)(A) and (B) of the Bankruptcy Code, and the treatment

of Priority Tax Claims under the Plan satisfies the requirements of section 1129(a)(9)(C) of the Bankruptcy Code.

W.      Acceptance By Impaired Class (11 U.S.C. § 1129(a)(10)).  Each Impaired Class of Claims other than those listed in paragraph U above has voted to accept the Plan and, to the best of the Debtors' knowledge, do not contain "insiders," as such term is defined in 11 U.S.C. § 101(31).  Thus, the Plan satisfies section 1129(a)(10) of the Bankruptcy Code.

X.      Feasibility (11 U.S.C. § 1129(a)(11)).  The Plan satisfies section 1129(a)(11) of the Bankruptcy Code.  The financial projections in Appendix C to the Disclosure Statement, the Sheehan Declaration, and other evidence proffered or adduced at the Confirmation Hearing (1) are persuasive and credible, (2) have not been controverted by other evidence or sufficiently challenged in any of the objections to the Plan, (3) establish the ability of the Debtors to pay their debts as they mature, and (4) establish that subject to, and upon consummation of, the transactions set forth as conditions to the Effective Date in Article 12.2 of the Plan, the Plan is feasible and that confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or the Reorganized Debtors.  Specifically, based on the Court's entry of the Order Under 11 U.S.C. § 363 and Fed. R. Bankr. P. 2002, 6004, 9006, and 9007 Authorizing Debtors' Entry into Exit Facility Engagement and Fee Letters and Performance Thereunder ("Exit Financing Order") (Docket No. 10960), the uncontroverted evidence proffered or adduced at the Confirmation Hearing, and the requirement of consummation of the Exit Financing Arrangements as a condition

to the Effective Date, the Court finds that the Plan is feasible, notwithstanding that a firm commitment for exit financing was not entered into as of the Confirmation Hearing.

Y.     Payment Of Fees (11 U.S.C. § 1129(a)(12)).  The Debtors have paid, or pursuant to Sections 1.2, 2.1, and 14.2 of the Plan will pay by the Effective Date, fees payable under 28 U.S.C. § 1930 plus accrued interest under 31 U.S.C. § 3717.  Thus, the Plan satisfies section 1129(a)(12) of the Bankruptcy Code.

Z.     Continuation Of Retiree Benefits (11 U.S.C. § 1129(a)(13)). As required by section 1129(a)(13) of the Bankruptcy Code, and in connection with the authorization of the Delphi-GM Definitive Documents as set forth in section 7.20 of the Plan and the assumption of the collective bargaining agreements as set forth in section 7.21 of the Plan, following the Effective Date of the Plan, the payment of all retiree benefits (as defined in section 1114 of the Bankruptcy Code) will continue at the levels established pursuant to subsections (e)(1)(B) or (g) of section 1114 of the Bankruptcy Code, at any time prior to the entry of this Confirmation Order, for the duration of the periods the Debtors have obligated themselves to provide such benefits, thereby satisfying section 1129(a)(13) of the Bankruptcy Code; provided, however, that during the Chapter 11 Cases, modifications to certain retiree benefits were made solely in accordance with the terms of the existing retiree benefit plans, and not as a result of subsections (e)(1)(B) or (g) of section 1114 of the Bankruptcy Code.

AA.     Non-Applicability Of Sections 1129(a)(16).  Section 1129(a)(16) does not apply because each of the Debtors is a moneyed, business or commercial corporation or limited liability company.

BB.     Section 1129(b)-Confirmation Of The Plan Over Nonacceptance Of

Impaired Classes.  All voting Impaired Classes voted to accept the Plan, other than those

Classes identified in paragraph U above.  Pursuant to section 1129(b) of the Bankruptcy

Code, the Plan may be confirmed notwithstanding that not all Impaired Classes have

voted to accept the Plan.  All of the requirements of section 1129(a) of the Bankruptcy

Code other than section 1129(a)(8), with respect to such Classes, have been met.

Specifically, Class 6C voted to reject the Plan and Class 1I is deemed to have rejected the

Plan pursuant to 11 U.S.C. § 1126(g).  With respect to Class 6C, the Plan is fair and

equitable and does not discriminate unfairly against the holders of Class 6C claims.

Holders of Class 6C claims will receive property at least equal to the full amount of its

claim with postpetition interest.  With respect to Class 1I, no holders of Claims or

Interests junior to the holders of such Class will receive or retain any property under the

Plan on account of such Claims or Interests, and, as evidenced by the valuations and

estimates contained in the Disclosure Statement and admitted into evidence at the

Confirmation Hearing, no Class of Claims or Interests senior to such Class is receiving

more than full payment on account of such Claims or Interests.  No Class of Interests is

of the same or equal priority as Class 1I.  Accordingly, the Plan is fair and equitable and

does not discriminate unfairly, as required by section 1129(b) of the Bankruptcy Code,

and section 1129(b) of the Bankruptcy Code therefore is satisfied.

CC.     Principal Purpose Of Plan (11 U.S.C. § 1129(d)).  The principal purpose

of the Plan is not the avoidance of taxes or the avoidance of the application of section 5

of the Securities Act of 1933 (15 U.S.C. § 77e).  Accordingly, the Plan satisfies the

requirements of section 1129(d) of the Bankruptcy Code.

DD.     Modifications To The Plan.  The modifications to the Amended Plan described and/or set forth beginning on Exhibit A hereto constitute non-material or technical changes and/or changes with respect to particular Claims or Interests by agreement with holders of such Claims or Interests, and do not materially adversely affect or change the treatment of any Claims or Interests.  Accordingly, pursuant to Bankruptcy Rule 3019, these modifications do not require additional disclosure under section 1125 of the Bankruptcy Code or re-solicitation of votes under section 1126 of the Bankruptcy Code, nor do they require that holders of Claims or Interests be afforded an opportunity to change previously cast acceptances or rejections of the Amended Plan.

EE.     Good Faith Solicitation (11 U.S.C. § 1125(e)).  The Debtors and their agents, representatives, attorneys, and advisors, and other Persons involved in the solicitation process have solicited votes on the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code and the Solicitation Procedures Order and are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code and the exculpation provisions set forth in Section 11.11 of the Plan.

FF.     The Reorganized Debtors Will Not Be Insolvent Nor Left With Unreasonably Small Capital.  As of the occurrence of the Effective Date and after taking into account the transactions contemplated by the Plan, on a consolidated basis (a) the present fair saleable value of the property of the Reorganized Debtors will be not less than the amount that will be required to pay the probable liabilities on the Reorganized Debtors' then-existing debts as they become absolute and matured considering all financing alternatives and potential asset sales reasonably available to the Reorganized

Debtors and (b) the Reorganized Debtors' capital is not unreasonably small in relation to their business or any contemplated or undertaken transaction.

GG. <u>Valuation</u>.  The valuation analysis appended to the Disclosure Statement as Appendix D (the "Valuation Analysis") and the implied total enterprise value, as described in the Resnick Declaration and Exhibits D and E thereto, are reasonable.

HH. <u>Executory Contracts</u>.  The Debtors have exercised reasonable business judgment in determining whether to assume or reject each of their executory contracts and unexpired leases as set forth in Article VIII of the Plan.  Each assumption or rejection of an executory contract or unexpired lease as provided in Article 8.1 of the Plan shall be legal, valid, and binding upon the applicable Reorganized Debtor and all non-Debtor parties to such executory contract or unexpired lease, all to the same extent as if such assumption or rejection had been effectuated pursuant to an appropriate authorizing order of the Court entered before the Confirmation Date under section 365 of the Bankruptcy Code.

II. <u>Adequate Assurance</u>.  The Debtors have cured, or provided adequate assurance that the Reorganized Debtors will cure, defaults (if any) under or relating to each of the Assumed Contracts and Leases which are being assumed by the Debtors pursuant to the Plan.

JJ. <u>Conditions To Confirmation</u>.  The conditions to Confirmation set forth in Article 12.1 of the Plan have been satisfied, waived, or will be satisfied by entry of this Confirmation Order.

KK. <u>Conditions To Consummation</u>.  The conditions to the Effective Date are set forth in Article 12.2 of the Plan.  Certain conditions to the Effective Date set forth in

Article 12.2 of the Plan may be waived as set forth in section 12.3 of the Plan, without any further notice to parties-in-interest or the Court and without a hearing except as otherwise provided in section 12.3 of the Plan.

LL. <u>Retention Of Jurisdiction</u>. The Court properly may retain jurisdiction over the matters set forth in Article XIII of the Plan.

MM. <u>Agreements And Other Documents</u>. The Debtors have made adequate and sufficient disclosure of: (1) the adoption of new or amended and restated certificates of incorporation and bylaws or similar constituent documents for the Reorganized Debtors, (2) the distributions to be made pursuant to the Plan, (3) the issuance for distribution, in accordance with the terms of the Plan, of the New Common Stock, New Preferred Stock, New Warrants, GM Note, and 414(l) Note, (4) the Investment Agreement, (5) the Delphi-GM Definitive Documents, (6) the MDL Settlements, (7) the memoranda of understanding with the Unions, (8) the adoption, execution, delivery, and implementation of all contracts, leases, instruments, releases, and other agreements or documents related to any of the foregoing, (9) the adoption, execution, and implementation of employment and indemnification agreements, the Management Compensation Plan, and other employee plans and related agreements, and (10) the other matters provided for under the Plan involving the corporate structure of the Reorganized Debtors.

NN. <u>TOPrS Subordination Provision</u>. Under the Plan, Senior Debt is to be paid in full based on the negotiated Plan value and the subordination provisions of the TOPrS Indenture are accordingly deemed to have been effectuated as between the holders of the TOPrS and the holders of Senior Debt, and thus, are deemed satisfied. The distributions afforded to the holders of TOPrS under the Plan comply with the subordination

provisions because the TOPrS receive the distributions remaining after other holders of claims in Class C (General Unsecured Claims) are paid in full with postpetition interest (as required by the TOPrS Indenture). Moreover, because of the settlement nature of the Plan, the deemed satisfaction of the TOPrS subordination provision is proper. In addition, because the Senior Notes and the TOPrS, if treated as being in separate classes as permitted under Article 14.3 of the Plan, voted to accept the Plan under section 1126 of the Bankruptcy Code, the Senior Notes, as a class, and the TOPrS, as a class, have each agreed to the treatment under the Plan and are not entitled to any different or additional recovery under the Plan, and are not entitled to the treatment specified in section 1129(b) of the Bankruptcy Code.

OO.  Exit Financing Arrangements.  The Plan provides for the Exit Financing Arrangements on the terms and conditions set forth in Exhibit 7.14 to the Plan, or in a form substantially similar thereto.  The Debtors have provided sufficient and adequate notice of the Exit Financing Arrangements.  All documents necessary to implement the Plan including, without limitation, those associated with the Exit Financing Arrangements, shall, upon execution, be valid, binding, and enforceable agreements and not be in conflict with any federal or state law.

PP.  Investment Agreement.  The Investment Agreement is an essential element of the Plan and entry into and consummation of the Investment Agreement is in the best interests of the Debtors, their estates, and their creditors and is approved in all respects, as reflected in the Court's previous orders dated August 2, 2007 and December 10, 2007 authorizing and approving the Debtors' entrance into the Delphi-Appaloosa Equity Purchase and Commitment Agreement and subsequent amendment thereto

(Docket Nos. 8856 and 11382), which orders are incorporated herein by reference. The investment being made by the Plan Investors pursuant to, and subject to the terms and conditions of, the Investment Agreement represents reasonably equivalent value for the consideration the Plan Investors are receiving under the Plan. Each Plan Investor (in its capacity as such or otherwise), its Affiliates, shareholders, partners, directors, officers, employees, and advisors, has acted in good faith in connection with the Chapter 11 Cases and the formulation and confirmation of the Plan.

QQ.    Delphi-GM Definitive Documents. The Debtors' settlement with GM, as memorialized in the Plan and the Delphi-GM Definitive Documents (the "GM Settlement"), is essential to the Plan and provides material and substantial consideration to Delphi, which allows Delphi to provide material and substantial distributions to stakeholders that would be impossible to deliver without the GM Settlement. As adequately described in Section V.F. of the Disclosure Statement, the Debtors underwent an extensive investigation and analysis of their claims and potential claims against GM and certain defenses to claims that might be asserted by GM against the Debtors' estates (the "GM Claims and Defenses") and determined that the consensual resolution of the GM Claims and Defenses as set forth in the Delphi-GM Definitive Documents is essential to the reorganization, in the best interest of the Debtors' estates, and superior to any alternative under which the Debtors would seek to pursue the GM Claims and Defenses through proceedings adversarial to GM. As adequately described in Section IX.B.1 of the Disclosure Statement, absent the GM Settlement, the Debtors would not be able to provide meaningful distributions to junior stakeholders or a par plus accrued recovery at Plan Equity Value for holders of unsecured claims. Pursuant to Bankruptcy

Rule 9019, which is made applicable to the determination of the reasonableness of a settlement included within a plan as permitted under section 1123(b)(3)(A) of the Bankruptcy Code, and based on the admitted evidence and considerations by the Court of the probability of success, the difficulties in collection, the complexity of the litigation, the expense, inconvenience and delay, and other factors, the Court finds:

1.      the proposed recoveries achieved by the Debtors' estates, creditors, and equity holders as a result of the GM Settlement are higher than reasonably foreseeable litigation outcomes in the absence of the GM Settlement and therefore fall within the range of reasonableness;

2.      any litigation against GM in the absence of the GM Settlement would be very complex and very time consuming, with the attendant expense, inconvenience, and delay to the Debtors' estates;

3.      the GM Settlement is supported by both statutory committees appointed in these Chapter 11 Cases;

4.      as discussed in more detail in section SS of this Confirmation Order, the releases of the GM-Related Parties (as defined in the Delphi-GM Global Settlement Agreement) pursuant to the Plan and the GM Settlement are fair and equitable; and

5.      the GM Settlement is the product of good faith negotiations and arm's-length bargaining between the parties, all of whom were represented by competent and experienced counsel and other advisors, and is necessary to the Plan.

RR.     Union Settlement Agreements.  The Union Settlement Agreements are essential to the Plan and the assumption of the Union Settlement Agreements is in the

best interests of the Debtors, their estates, and their creditors and is approved in all respects, as reflected in the Court's previous orders on July 19, 2007, August 16, 2007, and August 29, 2007, authorizing and approving the Debtors' entry into the Union Settlement Agreements (Docket Nos. 8693, 9106, 9107, and 9169). The Debtors have exercised reasonable business judgment in determining to enter into the Union Settlement Agreements as set forth in Exhibits 7.21(a)-(d) to the Plan. The Debtors have provided sufficient and adequate notice of the Union Settlement Agreements to all parties-in-interest, including, without limitation, the Creditors' Committee, the Equity Committee, the Plan Investors, and GM. Each Union has acted in good faith in connection with the Chapter 11 Cases and the formulation and confirmation of the Plan.

SS. <u>Releases And Discharges</u>.

1. In General. The discharge, release, indemnification, and exculpation provisions set forth in Article XI of the Plan constitute good faith compromises and settlements of the matters covered thereby. Such compromises and settlements are made in exchange for consideration and are in the best interests of the Debtors, their Estates, and holders of Claims and Interests, are fair, equitable, reasonable, and are integral elements of the restructuring and resolution of the Chapter 11 Cases in accordance with the Plan. Each of the discharge, release, indemnification, and exculpation provisions set forth in the Plan:

(a) is within the jurisdiction of the Court under 28 U.S.C. §§ 1334(a), (b), and (d),

(b) is an essential means of implementing the Plan pursuant to section 1123(a)(5) of the Bankruptcy Code,

(c)     is an integral element of the settlements and transactions incorporated into the Plan,

(d)     confers material benefit on, and is in the best interests of, the Debtors, their estates, and the holders of Claims and Interests,

(e)     is important to the overall objectives of the Plan to finally resolve all Claims among or against the parties-in-interest in the Chapter 11 Cases with respect to the Debtors, their organization, capitalization, operation, and reorganization, and

(f)     is consistent with 11 U.S.C. §§ 105, 1123, and 1129, and other applicable provisions of the Bankruptcy Code.

The failure to effect the discharge, release, indemnification, and exculpation provisions described in Article XI of the Plan would seriously impair the Debtors' ability to confirm the Plan.

2.     Release and Exculpation of Plan Investors.  The releases and exculpation of each Plan Investor (in its capacity as such or otherwise, as set forth in Article 11.8 of the Plan), its Affiliates, shareholders, partners, directors, officers, employees, and advisors, set forth in Article 11.8 of the Plan by the Debtors and third parties (the "Plan Investor Releases") are a condition to the consummation of the transaction contemplated in the Investment Agreement and, thus, are necessary to the Debtors' reorganization and play an important part in the Plan.  The Plan Investor Releases are fair and equitable, reasonable, and in the best interests of the Debtors, their estates, shareholders, creditors, and all parties-in-interest, and are an integral component of the Plan and the restructuring and resolution of the Chapter 11 Cases.  More

specifically, factors which support approval of the Plan Investor Releases include, without limitation:

(a)    The investment made by the Plan Investors pursuant to, and subject to the terms and conditions of, the Investment Agreement constitutes a material, substantial contribution to the Debtors' estates;

(b)    The Plan Investors' contribution is necessary and integral to the success of the Plan because the Plan Investors' investment provides a substantial source of funds to the Debtors' estates and allows substantial distributions to be made to holders of Claims and Interests, which could not be made without the Plan Investors' investment pursuant to, and subject to the terms and conditions of, the Investment Agreement;

(c)    The Plan Investor Releases are an important part of the Plan because without the Plan Investor Releases, the Plan Investors would not have agreed to make the substantial contributions to the Debtors' estates without obtaining the Plan Investor Releases; and

(d)    The breadth of the Plan Investor Releases is necessary to the Plan and bears a reasonable relationship to the protection of the Debtors' estates. As set forth in the Voting Reports, the Plan, which includes the Plan Investor Releases, was overwhelmingly accepted by holders of Claims and Interests.

Accordingly, the Plan Investor Releases, including the third-party releases, are consistent with sections 105, 1123, and 1129 of the Bankruptcy Code and applicable law in the Second Circuit, and should be, and hereby are, approved.

3. Releases of GM-Related Parties. The releases of GM-Related Parties (as defined in the Delphi-GM Global Settlement Agreement) by the Debtors and third parties (collectively, the "GM Releases") pursuant to Section 11.7 of the Plan, which are described in Article IV of the Delphi-GM Global Settlement Agreement, (i) are fair and equitable, reasonable, and in the best interests of the Debtors' estates and holders of Claims and Interests, (ii) are supported by truly unusual circumstances that render the release terms important to the process of the Plan, and (iii) are integral elements of the restructuring and resolution of the Chapter 11 Cases. More specifically, factors which support the approval of the GM Releases include, without limitation:

(a) As acknowledged by the Debtors in section 4.01(k) of the Delphi-GM Global Settlement Agreement, the consideration GM provided and will provide pursuant to the Delphi-GM Definitive Documents, the Union Settlement Agreements, and other agreements entered into as part of the Debtors' reorganization constitutes a material, substantial contribution to the Debtors' estates;

(b) GM's contribution is necessary to the success of the Plan because GM's consideration provides a substantial source of funds to the Debtors' estates and allows substantial distributions to be made to the holders of Claims and Interests, which could not be made without the GM Settlement;

(c) The GM Releases are an important part of the Plan because, as set forth in section 4.01(k) of the Delphi-GM Global Settlement Agreement, and as acknowledged by the Debtors, GM would not have agreed to make these substantial contributions to the Debtors' estates without obtaining the GM Releases;

(d)     The breadth of the GM Releases is necessary to the Plan and bears a reasonable relationship to the protection of the Debtors estates; and

(e)     Absent the GM Settlement and the GM Releases, as a result of existing indemnification agreements and GM's filed claims for indemnification and contribution, the third-party claims that are being released hereby may have indirectly impacted the Debtors and /or Reorganized Delphi.

Accordingly, the GM Releases, including the third-party releases, are consistent with sections 105, 1123, and 1129 of the Bankruptcy Code and the law in the Second Circuit, and should be, and hereby are, approved.

TT.     <u>Registration Rights Agreement</u>.  The Registration Rights Agreement is an essential element of the Plan and entry into the Registration Rights Agreement is in the best interests of the Debtors, their Estates, and holders of Claims and Interests.  The Debtors have exercised reasonable business judgment in determining to enter into the Registration Rights Agreement on the terms and in the form set forth in Exhibit 7.16(b) to the Plan.  The Debtors have provided sufficient and adequate notice of the Registration Rights Agreement, including any material modifications to the Registration Rights Agreement, to all parties-in-interest, including, without limitation, the Creditors' Committee, the Equity Committee, the Plan Investors, and GM.  The Registration Rights Agreement shall, upon execution, be valid, binding, and enforceable and shall not be in conflict with any federal or state law.

UU.     <u>Distributions of New Common Stock, Notes, and Warrants</u>.  Certain distributions of New Common Stock and New Preferred Stock as contemplated by the

Plan are exempt from the requirements of section 5 of the Securities Act of 1933, as amended, and state registration requirements as follows:

1.       by virtue of section 1145 of the Bankruptcy Code, as to distributions to holders of General Unsecured Claims, Section 510(b) Note Claims, Section 510(b) Equity Claims, Section 510(b) ERISA Claims, and holders of Existing Common Stock;

2.       by virtue of section 1145 of the Bankruptcy Code, as to the distribution of the Seven-Year Warrants and Ten-Year Warrants to holders of Existing Common Stock;

3.       by virtue of section 4(2) of the Securities Exchange Act, as to distributions to the Plan Investors that are made in exchange for the Plan Investors' other cash investments, including the "Series A" and "Series B" New Preferred Stock;

4.       by virtue of section 1145 of the Bankruptcy Code, as to distributions to GM of the "Series C" New Preferred Stock and the GM Note pursuant to the terms of the Delphi-GM Global Settlement Agreement; and

5.       by virtue of section 4(2) of the Securities Exchange Act, as to distributions of Direct Subscription Shares and Unsubscribed Shares.

As described in the amendment to Delphi's registration statement on Form S-1, filed on December 20, 2007, as further amended, the offering and sale of the Discount Rights, Par Value Rights, Six-Month Warrants, and New Common Stock in Reorganized Delphi to be issued pursuant to the exercise of the Discount Rights, Par Value Rights, and Six-Month Warrants will be registered pursuant to the Securities Act and will be offered solely by means of prospectuses relating to such securities which will be provided when

the Rights Offerings commence or such Six-Month Warrants are issued, as the case may be.

VV.    <u>Rights Offerings Estimation Motion</u>.  Notice of the Motion For Order Pursuant To 11 U.S.C. §§ 105(a) And 502(c) Estimating Or Provisionally Allowing Certain Unreconciled Claims Solely For Purposes Of Administration Of Discount Rights Offering ("Rights Offering Estimation Motion") (Docket No. 11606) was appropriate.

WW.    <u>The Plan Investors' Investment Intent</u>.  As disclosed on the record at the Confirmation Hearing at Joint Exhibit No. 119 and not otherwise controverted at the Confirmation Hearing, the "Series A" New Preferred Stock, and the New Common Stock into which such securities are convertible, have a two-year restriction on transfer and the "Series B" New Preferred Stock, and the New Common Stock into which such securities are convertible, have a 90-day restriction on transfer contained in the Certificate of Designation governing such securities.  In addition, in Section 4(e) of the Investment Agreement, each Plan Investor represents that it "is acquiring the Investor Shares for investment for its own account, not as a nominee or agent, and not with the view to, or for resale in connection with, any distribution thereof not in compliance with applicable securities laws, and such Investor has no present intention of selling, granting any participation in, or otherwise distributing the same, except in compliance with applicable securities laws."  By virtue of these restrictions and representations, the securities described above will come to rest with the Plan Investors, and the Plan Investors are purchasing these securities with investment intent and not with a view to a distribution of these securities.

XX.     The Plan Investors Do Not Have "Control".  As disclosed on the record at

the Confirmation Hearing at Joint Exhibit No. 119 and not otherwise controverted at the

Confirmation Hearing in Section 4(j) of the Investment Agreement, each Plan Investor

represents that it "acknowledges and agrees that the [Debtor] is acting solely in the

capacity of an arm's-length contractual counterparty to the Plan Investor with respect to

the transactions contemplated hereby (including in connection with determining the terms

of the Rights Offering)."  At all times during the pendency of the Debtors' Chapter 11

Cases, including during the negotiations regarding the Investment Agreement, the Plan

and related agreements and documents, the Plan Investors have negotiated on an arm's-

length basis and have not "controlled" the Debtors, either through securities ownership,

contractual arrangements, or otherwise.  The holder of Delphi's new Series A-1 Preferred

Stock will have certain governance and voting rights as set forth in the Certificate of

Designation governing such securities and Reorganized Delphi's Certificate of

Incorporation, but such holders will only be entitled to elect three of nine directors of

Delphi's board of directors and only for a limited period not to extend beyond Delphi's

2011 annual meeting of stockholders.  Delphi's new certificate of incorporation provides

that at all times during such period, at least six of the nine directors must be independent

of the Plan Investors and further provides that Delphi's board of directors must satisfy the

independence criteria of any relevant stock exchange upon which the New Common

Stock is listed.  The corporate actions over which the holders of Series A-1 Preferred

Stock have objection rights are very limited:  liquidation; adverse changes to Delphi's

certificate of incorporation or bylaws; and, only during the two-year transfer restriction

period applicable to the Series A-1 Preferred Stock, certain transactions constituting a

sale of Delphi or acquisitions or investments of more than $250,000,000.  These facts indicate that none of the Plan Investors controls the Debtors as contemplated by the Securities Act, the Exchange Act, or the Bankruptcy Code.

YY.  Re-Sale Under 1145.  The securities issued under the Plan pursuant to section 1145 of the Bankruptcy Code may be resold by the holders thereof without registration unless the holder is an "underwriter" with respect to such securities, as defined in section 1145(b)(1) of the Bankruptcy Code.

ZZ.  IRC Section 414(l) Transfer.  No earlier than the Effective Date, but no later than five days after the Effective Date (the "Transfer Date"), Reorganized Delphi shall make a transfer of pension assets and liabilities as set forth in section 2.03(c) of the Delphi-GM Global Settlement Agreement (the "IRC Section 414(l) Transfer").  On the Transfer Date, Reorganized Delphi shall also issue a note (the "414(l) Note") to GM as set forth in section 2.03(c)(iii)(3) of the GM-Delphi Global Settlement Agreement, which is payable by the Reorganized Delphi within ten days of the Transfer Date.  The financial projections in Appendix C to the Disclosure Statement, the Sheehan Declaration, and other evidence proffered or adduced at the Confirmation Hearing establish that Reorganized Delphi has or will have on the Effective Date the financial wherewithal to consummate all transactions contemplated by section 2.03(c) of the Delphi-GM Global Settlement Agreement in accordance with the terms of such section.

AAA.  Pension Plans.  The Debtors sponsor various pension plans covered by Title IV  of the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1301-1461 ("ERISA").  Notwithstanding anything to the contrary in Article 7.22 of the Plan, the Pension Plans (as defined below) shall be frozen on or before March

1, 2008, or as soon as practicable thereafter, except as otherwise set forth in the Union Settlement Agreements. Pursuant to Article 7.22 of the Plan, and subject to the preceding sentence hereof, the following Debtors shall assume and continue the following plans on a frozen basis: (1) Delphi Corporation: Delphi Hourly-Rate Employees Pension Plan and Delphi Retirement Program for Salaried Employees; (2) Delphi Mechatronic Systems, Inc.: Delphi Mechatronic Systems Retirement Program; (3) ASEC Manufacturing: ASEC Manufacturing Retirement Program; and (4) Packard-Hughes Interconnect Company: Packard-Hughes Interconnect Bargaining Retirement Plan and Packard-Hughes Interconnect Non-Bargaining Retirement Plan (collectively, the "Pension Plans").

BBB. <u>Pension Plans – Minimum Funding Contribution</u>. No earlier than the Transfer Date, and no later than five days after the Effective Date, Reorganized Delphi shall contribute cash to the Pension Plans sufficient to meet ERISA minimum funding contributions not covered by the IRC Section 414(l) Transfer. Nothing in the Plan or the Confirmation Order shall have any effect on the Debtors' obligations under the minimum funding standard waiver letters (the "Waivers"), as amended, as approved by the Bankruptcy Court pursuant to the Order Under 11 U.S.C. § 363(b) And Fed. R. Bankr. P. 9019 Authorizing Delphi Corporation To (A) Perform Under Pension Funding Waivers Issued By United States Internal Revenue Service And (B) Provide Letters Of Credit To Pension Benefit Guaranty Corporation Thereunder, entered May 31, 2007 (Docket No. 8117), and the Order Under 11 U.S.C. § 363 And Fed. R. Bankr. P. 9019 Authorizing Delphi Corporation To Perform Under Second Pension Funding Waiver Issued By United States Internal Revenue Service, entered October 25, 2007 (Docket No. 10726), or the Waivers as they may be further amended or extended. Nothing in the Plan shall be

construed as discharging, releasing, or relieving the Debtors or the Debtors' successors, including the Reorganized Debtors, or any party, in any capacity, from any liability for minimum funding under 26 U.S.C. § 412 and 29 U.S.C. § 1082 or liability under 29 U.S.C. § 1362 with respect to the Pension Plans or the PBGC.  The PBGC and the Pension Plans shall not be enjoined or precluded from seeking to enforce such liability as a result of any provision of the Plan or the Confirmation Order.

CCC.   <u>Preservation Of Causes Of Action</u>.  It is in the best interests of the holders of Claims and Interests that the Retained Actions that are not expressly released under the Plan be retained by the Reorganized Debtors pursuant to Article 7.24 of the Plan to maximize the value of the Debtors' Estates.  It is also in the best interests of holders of Claims and Interests that Avoidance Actions shall not be retained by the Reorganized Debtors unless specifically listed on Exhibit 7.24 of the Plan.

DDD.   <u>Judicial Notice</u>.  The Court takes judicial notice of the docket of the Chapter 11 Cases maintained by the Clerk of the Court and/or its duly-appointed agent, including, without limitation, all pleadings and other documents filed, all orders entered, and all evidence and arguments made, proffered, or adduced at the hearings held before the Court during the pendency of the Chapter 11 Cases.

IT IS ORDERED, ADJUDGED, AND DECREED THAT:

1.      <u>Confirmation</u>.  The Plan, which consists of the Amended Plan (and all exhibits and supplements thereto) and the modifications set forth in Exhibit A hereto, which are hereby incorporated into and constitute a part of the Plan, is hereby approved and confirmed under section 1129 of the Bankruptcy Code.  The exhibits to the Plan (as may be modified pursuant to the terms of the Plan and/or such exhibit, as applicable) are

incorporated by reference into and comprise an integral part of the Plan and this Confirmation Order.

2.    Objections.  All Objections to confirmation of the Plan that have not been withdrawn, waived, settled or addressed in the Plan, including Exhibit A hereto, and all reservations of rights included therein, are overruled on the merits.

3.    Provisions Of Plan And Order Nonseverable And Mutually Dependent.  The provisions of the Plan and this Confirmation Order, including the findings of fact and conclusions of law set forth herein, are nonseverable and mutually dependent.

4.    Plan Classification Controlling.  The classification of Claims and Interests for purposes of the distributions to be made under the Plan shall be governed solely by the terms of the Plan.  The classifications set forth on the Ballots tendered to or returned by the Debtors' creditors or interest holders in connection with voting on the Plan (a) were set forth on the Ballots solely for purposes of voting to accept or reject the Plan, (b) do not necessarily represent, and in no event shall be deemed to modify or otherwise affect, the actual classification of such Claims or Interests under the Plan for distribution purposes, (c) may not be relied upon by any creditor or interest holder as representing the actual classification of such Claims or Interests under the Plan for distribution purposes, and (d) shall not be binding on the Reorganized Debtors, the Estates, or the Debtors.

5.    Effects Of Confirmation; Immediate Effectiveness; Successors And Assigns.  The stay provided by Bankruptcy Rule 3020(e) shall not apply to this Confirmation Order.  Immediately upon the entry of this Confirmation Order, this

Confirmation Order and the terms of the Plan (subject to the provisions of Articles 12.2

and 12.3 of the Plan) shall be deemed binding upon (a) the Debtors, (b) the Reorganized

Debtors, (c) all holders of Claims against and Interests in the Debtors, whether or not

Impaired under the Plan and whether or not, if Impaired, such holders accepted the Plan,

(d) each Person acquiring property under the Plan, (e) any other party-in-interest, (f) any

Person making an appearance in these Chapter 11 Cases, and (g) each of the foregoing's

respective heirs, successors, assigns, trustees, executors, administrators, affiliates,

officers, directors, agents, representatives, attorneys, beneficiaries, or guardians.

      6.     Continued Corporate Existence; Vesting Of Assets.  Except as

otherwise provided in the Plan, each Reorganized Debtor shall continue to exist after the

Effective Date as a separate corporate or other legal entity, with all the powers of a

corporation or legal entity under applicable law in the jurisdiction in which each

applicable Debtor is incorporated or otherwise formed and pursuant to its certificate of

incorporation and bylaws or other organizational documents in effect prior to the

Effective Date, except to the extent such certificate of incorporation and bylaws or other

organizational documents are amended by the Plan.  Except as otherwise explicitly

provided in the Plan or in this Confirmation Order, including, without limitation, Articles

9.6 and 11.1 of the Plan and the Plan Modifications set forth herein, on the Effective Date,

all property comprising the Estates (including Retained Actions, but excluding property

that has been abandoned pursuant to the Plan or an order of the Court) shall revest in each

of the Reorganized Debtors that owned such property or interest in property as of the

Effective Date, free and clear of all Claims, liens, charges, encumbrances, rights, and

interests of creditors and interest holders.  As of and following the Effective Date, the

Reorganized Debtors may operate their businesses and use, acquire, and dispose of property and settle and compromise Claims or Interests without supervision of the Court, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan and this Confirmation Order.

7. <u>Intercompany Claims And Interests In The Affiliate Debtors</u>. The treatment of Intercompany Claims and Interests in the Affiliate Debtors provided in Articles 5.6 and 7.2 of the Plan is approved in its entirety.

8. <u>Release Of Liens</u>. Except as otherwise provided in the Plan or this Confirmation Order, or in any contract, instrument, release, or other agreement or document entered into or delivered in connection with the Plan, including the Exit Financing Arrangements, on the Effective Date and/or concurrently with the applicable distributions made pursuant to the Plan, all mortgages, deeds of trust, liens, or other security interests against the property of any Estate are fully released and discharged (except to the extent Reinstated under the Plan), and all right, title, and interest of any holder of such mortgages, deeds of trust, liens, or other security interests, including any rights to any collateral thereunder, shall revert to the applicable Reorganized Debtor and its successors and assigns.

9. <u>Retained Assets</u>. To the extent that the succession to assets of the Debtors by the Reorganized Debtors pursuant to the Plan are deemed to constitute "transfers" of property, such transfers of property to Reorganized Debtors (a) are or shall be legal, valid, and effective transfers of property, (b) vest or shall vest the Reorganized Debtors with good title to such property, free and clear of all liens, charges, Claims, encumbrances, or Interests, except as expressly provided in the Plan or this Confirmation

Order, (c) do not and shall not constitute avoidable transfers under the Bankruptcy Code or under applicable nonbankruptcy law, and (d) do not and shall not subject the Reorganized Debtors to any liability by reason of such transfer under the Bankruptcy Code or under applicable nonbankruptcy law, including, without limitation, any laws affecting successor or transferee liability.

10. <u>Return Of Deposits</u>. All utilities, including any person who received a deposit or other form of adequate assurance of performance pursuant to section 366 of the Bankruptcy Code during these Chapter 11 Cases (collectively, the "Deposits"), including, without limitation, gas, electric, telephone, and sewer services, shall return such Deposits to the Debtors and/or the Reorganized Debtors, as the case may be, either by setoff against postpetition indebtedness or by cash refund, within 45 days following the Effective Date.

11. <u>Discharge, Releases, Limitations Of Liability, And Indemnification</u>. Pursuant to applicable law, including sections 105(a) and 1123(b)(3) and (6) of the Bankruptcy Code, the discharge of the Debtors and any of their assets or properties provided in Article 11.2 of the Plan, the releases set forth in Articles 11.4, 11.5, 11.6, 11.7, and 11.8 of the Plan, and the exculpation and limitation of liability provisions set forth in Articles 11.8 and 11.11 of the Plan, are deemed incorporated in this Confirmation Order as if set forth in full herein and are hereby approved as an integral part of the Plan and are fair, equitable, reasonable and in the best interests of the Debtors, their estates, and holders of Claims and Interests.

12. <u>Injunction</u>. Except as otherwise specifically provided in the Plan and except as may be necessary to enforce or remedy a breach of the Plan, the Debtors

and all Persons shall be precluded and permanently enjoined on and after the Effective Date from (a) commencing or continuing in any manner any Claim, action, employment of process, or other proceeding of any kind with respect to any Claim, Interest, Cause of Action, or any other right or Claim against the Reorganized Debtors, which they possessed or may possess prior to the Effective Date, (b) the enforcement, attachment, collection, offset, recoupment, or recovery by any manner or means of any judgment, award, decree, order or otherwise with respect to any Claim, Interest, Cause of Action or any other right or Claim against the Reorganized Debtors, which they possessed or may possess prior to the Effective Date, (c) creating, perfecting, or enforcing any encumbrance of any kind with respect to any Claim, Interest, Cause of Action or any other right or Claim against the Reorganized Debtors, which they possessed or may possess prior to the Effective Date, and (d) asserting any Claims, Interests, or Causes of Action that are satisfied, discharged, released, or subject to exculpation  hereby or by the Plan.

13. <u>Automatic Stay</u>.  The stay in effect in the Chapter 11 Cases pursuant to section 362(a) of the Bankruptcy Code shall continue to be in effect until the Effective Date, and at that time shall be dissolved and of no further force or effect, subject to the injunction set forth in the preceding paragraph and/or sections 524 and 1141 of the Bankruptcy Code and Article 11.14 of the Plan; <u>provided</u>, <u>however</u>, that nothing herein shall bar the filing of financing documents (including uniform commercial code financing statements, security agreements, leases, mortgages, trust agreements, bills of sale, and applications for aircraft registration) or the taking of such other actions as are

necessary to effectuate the transactions specifically contemplated by the Plan or by this Confirmation Order prior to the Effective Date.

14.    Matters Relating To Implementation Of The Plan; General Authorizations.  The approvals and authorizations specifically set forth in this Confirmation Order are nonexclusive and are not intended to limit the authority of any Debtor or Reorganized Debtor or any officer thereof to take any and all actions necessary or appropriate to implement, effectuate, and consummate any and all documents or transactions contemplated by the Plan or this Confirmation Order pursuant to section 1142(b) of the Bankruptcy Code or otherwise.  In addition to the authority to execute and deliver, adopt, assign, or amend, as the case may be, the contracts, leases, instruments, releases, and other agreements specifically granted in this Confirmation Order, the Debtors and the Reorganized Debtors are authorized, and empowered, without necessity of action of their respective stockholders or boards of directors, to take any and all such actions as any of their executive officers may determine are necessary or appropriate to implement, effectuate, and consummate any and all documents or transactions contemplated by the Plan or this Confirmation Order.  Pursuant to section 1142 of the Bankruptcy Code, no action of the stockholders or boards of directors of the Debtors or the Reorganized Debtors shall be required for the Debtors or the Reorganized Debtors to (a) enter into, execute and deliver, adopt, or amend, as the case may be, any of the contracts, leases, instruments, releases, and other agreements or documents and plans to be entered into, executed and delivered, adopted, or amended in connection with the Plan, and, following the Effective Date, each of such contracts, leases, instruments, releases, and other agreements shall comprise a legal, valid, and binding obligation of the

applicable Reorganized Debtor and enforceable against such Reorganized Debtor in accordance with its terms, (b) issue for distribution or reserve, for issuance in accordance with the terms of the Plan, the New Common Stock, New Preferred Stock, New Warrants, or Rights (upon such issuance, all such shares shall be duly and validly authorized, issued, and outstanding, fully paid, nonassessable, free and clear of any mortgage, lien, pledge, security interest, or other encumbrance of any kind, and not subject to pre-emptive or similar rights of third parties), or (c) issue the GM Note and 414(l) Note in accordance with the Plan, the Delphi-GM Settlement Agreement, and the Investment Agreement (upon such issuance, if any, such notes shall be duly authorized, validly issued and outstanding, and free and clear of any mortgage, lien, pledge, security interest, or other encumbrance of any kind), or (d) authorize the Reorganized Debtors to engage in any of the activities set forth in this paragraph or otherwise contemplated by the Plan. Each of the Chief Executive Officer and President, Chief Financial Officer, Chief Restructuring Officer, and General Counsel of the Debtors, or their respective designees, as appropriate, shall be authorized, and empowered to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan, this Confirmation Order, and any and all documents or transactions contemplated by the Plan or this Confirmation Order, all without further application to or order of the Court and whether or not such actions or documents are specifically referred to in the Plan, the Disclosure Statement, the Solicitation Procedures Order, this Confirmation Order, or the exhibits or appendices to any of the foregoing, and the signature of such officer on a document shall be conclusive evidence of the officer's

determination that such document and any related actions are necessary and appropriate to effectuate or further evidence, and are not in contravention of, the terms and conditions of the Plan, this Confirmation Order, or other documents or transactions contemplated by the Plan or this Confirmation Order. The secretary or any assistant secretary of each Debtor or Reorganized Debtor, as appropriate, is authorized and empowered when required, to certify or attest to any of the foregoing actions. Pursuant to section 1142 of the Bankruptcy Code, to the extent that, under applicable nonbankruptcy law or the rules of any stock exchange (including, without limitation, the New York Stock Exchange and the NASDAQ Global Select Market), any of the foregoing actions otherwise would require the consent or approval of the stockholders or the boards of directors of any of the Debtors or Reorganized Debtors, this Confirmation Order shall constitute such consent or approval, and such actions are deemed to have been taken by unanimous action of the stockholders and directors of the appropriate Debtor or Reorganized Debtor.

15.     <u>Post-Effective Date Action</u>. Any and all actions necessary or appropriate to implement, effectuate, and consummate any and all documents or transactions contemplated by the Plan or this Confirmation Order to be taken after the Effective Date shall be authorized only in accordance with applicable organizational documents and corporate law.

16.     <u>Directors And Officers Of Reorganized Debtors</u>. In accordance with the applicable governance documents, the existing senior officers of the Debtors shall serve in their current capacities after the Effective Date (except for the Executive Chairman); <u>provided</u>, <u>however</u>, that, subject to the employment contracts of such existing officers, the board of directors of Reorganized Delphi reserves the right to remove any

officer and/or to identify and appoint new officers of Reorganized Delphi or the Affiliate Debtors at any time thereafter in accordance with the applicable governance documents. The Court approves the appointment of the initial directors of Reorganized Delphi, without the necessity for consent or approval of the stockholders, as disclosed at or prior to the Confirmation Hearing, as of and immediately following the Effective Date. The initial directors of Reorganized Delphi shall be considered to have taken office at a point in time immediately following the Effective Date. Notwithstanding any otherwise applicable non-bankruptcy law, directors of Reorganized Delphi appointed in accordance with Article 7.5(b) of the Plan and as set forth in Paragraph R above shall serve in three classes of directors as set forth in Article 7.5(b) of the Plan for the terms described in Article 7.5(c) of the Plan. The existing directors of the Affiliate Debtors shall continue to serve in their current capacities after the Effective Date, provided, however, that Reorganized Delphi shall have the right, in accordance with the applicable provisions of its corporate governance documents and other applicable agreements, to identify new members of the board of directors of such Affiliate Debtors at any time thereafter.

17. Approval Of Employment, Retirement, Indemnification, And Other Related Agreements And Incentive Compensation Programs. Pursuant to section 1142(b) of the Bankruptcy Code, without further action by the Court or the stockholders or board of directors of the Reorganized Debtors, and without limiting the power or authority of the Reorganized Debtors following the Effective Date to take any and all such actions as may be permitted or required by applicable nonbankruptcy law, the Reorganized Debtors shall be authorized, as of the Effective Date, to (a) maintain, amend, or revise existing employment, retirement, indemnification, and other agreements with

their respective active directors, officers, and employees who will continue in such capacities (or similar capacities) after the Effective Date, or retirement income plans, welfare benefit plans, and other plans for such Persons, subject to the terms and conditions of any such agreement, and subject to the Plan, and (b) enter into new employment, retirement, indemnification, and other agreements for active directors, officers, and employees, and retirement income plans, welfare benefits plans, and other plans for active and retired directors, officers, and employees, subject to the Plan; provided, however, that to enter into or obtain the benefits of any employment, retirement, indemnification, or other agreement with the Debtors or Reorganized Debtors, an employee must contractually waive and release any claims arising from pre-existing employment, retirement, indemnification, or other agreements with any of the Debtors.

18. <u>Freezing Of Pension Plans</u>. Notwithstanding anything in the Plan, the Pension Plans shall be frozen by March 1, 2008 or as soon as practicable thereafter.

19. <u>SERP Claims</u>. Notwithstanding Article 7.9 of the Plan and for the avoidance of doubt, to the extent a proof of claim asserting a claim for SERP benefits has already been properly filed, no further proof of claim shall be required to be filed in connection with the rejection and termination of the SERP.

20. <u>Exit Financing Arrangements</u>. The provisions of Article 7.14 of the Plan are approved in their entirety. Specifically, on the Effective Date, the Reorganized Debtors shall receive the proceeds of the Exit Financing Arrangements on the terms as set forth in the exit financing engagement letter and term sheet attached to the Plan as Exhibit 7.14, as such term sheet may be amended, modified, or supplemented in accordance with the Plan (subject to consents of third parties, if any, as may be

required by the Plan).  The Reorganized Debtors are hereby authorized to execute any

documents required to effectuate the Exit Financing Arrangements without further

approval of the board of directors of the Debtors.  The Exit Financing Arrangements shall

constitute legal, binding and authorized obligations of the Reorganized Debtors,

enforceable in accordance with their terms.  On the Effective Date, all of the liens and

security interests to be granted in accordance with the Exit Financing Arrangements shall

be deemed to be approved and shall be legal, binding and enforceable liens on the

collateral granted thereunder.  In furtherance of the foregoing, the Reorganized Debtors

and any other person granting such liens and security interests are authorized to make all

filings and recordings, and to obtain all governmental approvals and consents necessary

to establish and perfect such liens and security interests under the provisions of any state,

federal or other law (whether domestic or foreign) that would be applicable in the

absence of this Confirmation Order, and will thereafter cooperate to make all other filings

and recordings that would be necessary under applicable law to give notice of such liens

and security interests to third parties.

        21.    <u>Exemption From Certain Taxes And Recording Fees</u>.  Pursuant to

section 1146(c) of the Bankruptcy Code, the issuance, transfer, or exchange of any

security, or the making, delivery, filing, or recording of any instrument of transfer under,

or in connection with, the Plan shall not be taxed under any law imposing a recording tax,

stamp tax, transfer tax, or similar tax.  Furthermore, and without limiting the foregoing,

any transfers from a Debtor to a Reorganized Debtor or to any other Person pursuant to

the Plan, as contemplated by the Plan or pursuant to any agreement regarding the transfer

of title to or ownership of any of the Debtors' property in the United States, shall not be

subject to any document recording tax, stamp tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording tax, or other similar tax or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(c) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment. The Court shall retain specific jurisdiction with respect to these matters.

22. <u>Assumptions</u>. The executory contract and unexpired lease provisions of Article VIII of the Plan are approved. All executory contracts and unexpired leases as to which any of the Debtors is a party shall be deemed automatically assumed in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code as of the Effective Date, unless such executory contracts or unexpired leases (i) shall have been previously rejected by the Debtors by Final Order of the Bankruptcy Court, (ii) shall be the subject of a motion to reject pending on or before the Effective Date, (iii) shall have expired or terminated on or prior to December 31, 2007 (and not otherwise extended) pursuant to their own terms, (iv) are listed on the schedule of rejected executory contracts or unexpired leases attached as Exhibit 8.1(a) to the Plan, or (v) are otherwise rejected pursuant to the terms of the Plan (the "Assumed Contracts and Leases"). Each of the Assumed Contracts and Leases shall be assumed only to the extent that any such contract or lease constitutes an executory contract or unexpired lease. Listing a contract or lease on Plan Exhibit 8.1(a) shall not constitute an

admission by a Debtor or Reorganized Debtor that such contract or lease is an executory

contract or unexpired lease or that a Debtor or Reorganized Debtor has any liability

thereunder. Notwithstanding the foregoing or anything else in Article VIII of the Plan, (i)

all executory contracts or unexpired leases between GM and the Debtors shall receive the

treatment described in the Delphi-GM Definitive Documents, (ii) all agreements, and

exhibits or attachments thereto between the Unions and Delphi shall receive the treatment

described in Article 7.21 of the Plan and the Union Settlement Agreements, and (iii) all

executory contracts memorializing Ordinary Course Customer Obligations shall receive

the treatment described in Article 5.2 of the Plan.

        23.     <u>Payments Related To Assumption Of Material Supply Agreements.</u>

This Confirmation Order shall constitute an order approving the assumptions described in

Article 8.1 and 8.2(a) of the Plan, pursuant to section 365 of the Bankruptcy Code, which

assumption shall be effective as of the Effective Date. To the extent that a counterparty

complied with the procedures set forth in Article VIII and disputes the Debtors' proposed

Cure Amount, then the Debtors and the counterparty shall comply with the Cure

procedures established under the Solicitation Procedures Order and set forth in Article

8.2 of the Plan; provided, however, that (a) to the extent of any inconsistency, paragraph

23 shall supersede the procedures set forth in the Solicitation Procedures Order and

Article 8.2(a) of the Plan with respect to Material Supply Agreements for which notice of

assumption and cure was served after December 21, 2007, and (b) to the extent that no

resolution is reached by a disputing counterparty and the applicable Debtor prior to the

Effective Date, then the Cure Amount Claim, to the extent Allowed, shall be paid in Cash.

24.     Payments Related To Assumption Of Omitted Material Supply
Agreements.  With respect to Material Supply Agreements to be assumed pursuant to
Article VIII of the Plan that were not included on a Cure Amount Notice served on or
prior to December 21, 2007 pursuant to Article 8.2(a) and the Solicitation Procedures
Order (the "Omitted Contracts"), within five business days following entry of this Order,
the Debtors shall file with the Bankruptcy Court and serve via overnight delivery upon
the counterparties to such Omitted Contract a cure notice substantially in the form of
Exhibit C attached hereto.  Any monetary amounts by which an Omitted Contract is in
default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code by Cure, and
shall be paid in cash to the non-Debtor counterparty to the Omitted Contract.  As shall be
indicated on the cure notice, counterparties shall have ten days from the date of mailing
to file and serve any objection to the Debtors' proposed assumption and Cure amount.  If
the non-Debtor party does not timely respond to the cure notice, the counterparty shall be
deemed to have accepted the Debtors' proposed Cure and the assumption of such contract
and the monetary amount of the Cure shall be paid as soon as reasonably practicable after
the Effective Date.  If the non-Debtor party responds to the cure notice prior to the ten-
day objection period and in accordance with the procedures set forth in the notice, and the
non-Debtor party asserts a dispute regarding (x) the nature or amount of any proposed
Cure, (y) the ability of the Reorganized Debtor or any assignee to provide "adequate
assurance of future performance" (within the meaning of section 365 of the Bankruptcy
Code) under the contract or lease to be assumed, or (z) any other matter pertaining to the
assumption, the Cure shall occur following the entry of a Final Order resolving the
dispute and approving the assumption or assumption and assignment, as the case may be;

provided that if there is a dispute as to the amount of Cure that cannot be resolved consensually among the parties, the Debtors shall have the right to reject the contract or lease for a period of five days after entry of a Final Order establishing a Cure amount in excess of that provided by the Debtors. The Creditors' Committee shall be provided access to information regarding the Debtors' proposed Cure Claim payments above a threshold amount to be reasonably agreed upon by the Creditors' Committee and the Debtors, after which the Creditors' Committee may object to a proposed Cure Claim payment; provided, however, that any unresolved objection shall be determined by the Bankruptcy Court after notice and hearing.

25. <u>Payments Related To Assumption Of Other Executory Contracts And Unexpired Leases</u>. This Confirmation Order shall constitute an order approving the assumptions described in Article 8.1 of the Plan, pursuant to section 365 of the Bankruptcy Code, as of the Effective Date. The provisions (if any) of each Other Executory Contract or Other Unexpired Lease to be assumed under the Plan which are or may be in default shall be satisfied solely by Cure. Any party to an Other Executory Contract or Other Unexpired Lease who wishes to assert that Cure shall be required as a condition to assumption shall file and serve a proposed Cure Claim so as to be received by the Debtors or Reorganized Debtors, as applicable, and their counsel at the address set forth in Article 14.8 of the Plan within 45 days after entry of this Confirmation Order (the "Cure Claim Submission Deadline"), after which the Debtors or Reorganized Debtors, as the case may be, shall have 45 days to file any objections thereto. Should a party to an Other Executory Contract or Other Unexpired Lease not file a proposed Cure Claim by the Cure Claim Submission Deadline in accordance with the procedures set forth in this

paragraph, then any default then existing shall be deemed cured as of the day following the Cure Claim Submission Deadline and such party shall forever be barred from asserting against the Debtors or the Reorganized Debtors, as applicable, any claim that arose on or prior to the Confirmation Date.  If there is a dispute regarding (i) the nature or amount of any Cure, (ii) the ability of any Reorganized Debtor or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed, or (iii) any other matter pertaining to assumption, the matter shall be set for hearing in the Court on the next available hearing date, or such other date as may be agreed upon, and Cure, if any, shall occur following the entry of a Final Order of the Court resolving the dispute and approving the assumption or assumption and assignment, as the case may be; provided, however, that if there is a dispute as to the amount of Cure that cannot be resolved consensually among the parties, the Debtors shall have the right for a period of five days after entry of a Final Order establishing a Cure amount in excess of that asserted by the Debtors, to reject the contract or lease.  If the Cure amount was filed and served in accordance with the procedures set forth herein and is not disputed, the Debtors or Reorganized Debtors, as the case may be, shall pay the Cure Claim, if any, to the claimant within 20 days after service of the Cure Claim.  Disputed Cure amounts that are resolved by agreement or Final Order shall be paid by the Debtors within 20 days of such agreement or Final Order.  Notwithstanding any of the foregoing, payments related to assumption of executory contracts or unexpired leases between GM and/or any of its Affiliates and any of the Debtors shall be in accordance with the Delphi-GM Definitive Documents.

26.     <u>Payments Related To Assumption Of Intercompany Executory</u> <u>Contracts And Intercompany Unexpired Leases</u>.  Any Claim relating to and outstanding at the time of assumption of an Intercompany Executory Contract or an Intercompany Unexpired Lease shall be Reinstated and shall be satisfied in a manner to be agreed upon by the relevant Debtors and/or non-Debtor Affiliates.

27.     <u>Assignment Pursuant To Restructuring Transactions</u>.  To the extent that a Debtor that is party to an executory contract or unexpired lease is to be merged or liquidated as part of a Restructuring Transaction, the non-Debtor parties to such executory contract or unexpired lease shall, upon assumption as contemplated in the Plan, be deemed to have consented to the assignment of such executory contract or unexpired lease to the Reorganized Debtor that is the surviving entity after such Restructuring Transaction.

28.     <u>Assumption And Assignment Of Divestiture-Related Executory</u> <u>Contracts And Unexpired Leases</u>.  In the event that the Court enters an order on or prior to the Effective Date authorizing a Debtor(s) to assume and assign certain executory contracts or unexpired leases in connection with a divestiture transaction, but the Debtor(s) does not assume and assign such contracts and leases prior to the Effective Date (a) notwithstanding anything to the contrary in the applicable sale order, such assumption shall be consummated pursuant to Article VIII of the Plan and service of notice and any Cure payments owed to the non-Debtor counterparty under such contracts and leases shall be made pursuant to Article 8.2 of the Plan and (b) the Debtor(s) shall be permitted to assign such assumed executory contracts and unexpired leases subsequent to

the Effective Date pursuant to sections 365 and 1123 of the Bankruptcy Code and the applicable sale order.

29.     Rejections.  As provided in Article 8.1 of the Plan, all executory contracts or unexpired leases shall be assumed by the Reorganized Debtors; provided, however, that any contract or lease set forth on Plan Exhibit 8.1(a) (the "Rejected Contracts and Leases") shall be rejected pursuant to section 365 of the Bankruptcy Code. All of the Rejected Contracts and Leases shall be rejected only to the extent that any such contract or lease constitutes an executory contract or unexpired lease.  This Confirmation Order shall constitute an order approving such rejections, pursuant to section 365 of the Bankruptcy Code, as of the Effective Date.  Notwithstanding the foregoing or anything else in Article VIII of the Plan, (i) all executory contracts or unexpired leases between GM and the Debtors shall receive the treatment described in the Delphi-GM Definitive Documents, (ii) all agreements, and exhibits or attachments thereto between the Unions and Delphi shall receive the treatment described in Article 7.21 of the Plan and the Union Settlement Agreements, and (iii) all executory contracts memorializing Ordinary Course Customer Obligations shall receive the treatment described in Article 5.2 of the Plan. Nothing in this Order modifies the section 365(d)(4) deadline under the Bankruptcy Code to assume or reject leases, as extended by prior orders of the Court, except that if the Debtors anticipate that the Plan will not become effective by February 29, 2008, the Debtors may file a motion (a "Real Property Lease Motion") to further extend the deadline under section 365(d)(4) of the Bankruptcy Code to assume or reject any and all unexpired leases of nonresidential real property ("Real Property Leases"), provided that the Real Property Lease Motion is filed on or before February 29, 2008 and noticed to be

heard at the next available omnibus hearing, and the date by which the Debtors must assume or reject any and all Real Property Leases is extended to February 29, 2008 for such purpose. Upon the filing of such a Real Property Lease Motion, the deadline to assume or reject any or all Real Property Leases shall be automatically extended until the later of (a) the date set forth in any subsequent order, (b) three business days after the Court rules on the Real Property Lease Motion, and (c) March 31, 2008.

30. <u>Bar Date For Rejection Damage Claims And Related Procedures</u>. If the rejection by the Debtors, pursuant to the Plan or otherwise, of an executory contract or unexpired lease results in a Claim, then such Claim shall be forever barred and shall not be enforceable against either the Debtors, the Reorganized Debtors, or such entities' properties unless a proof of claim is filed with the Claims Agent and served upon counsel to the Debtors and the Creditors' Committee within 30 days after the later of (a) entry of the Confirmation Order or (b) notice that the executory contract or unexpired lease has been rejected, unless otherwise ordered by the Court.

31. <u>DIP Facility Claims</u>. On the Effective Date, the DIP Facility Revolver Claim, the principal amount of the DIP Facility First Priority Term Claim, and the principal amount of the DIP Facility Second Priority Term Claim shall each be allowed in an amount to be agreed upon by the Debtors and, as applicable, the DIP Lenders, or as ordered by the Bankruptcy Court, at least five Business Days prior to the Effective Date, and all obligations of the Debtors thereunder shall be paid in full in Cash in accordance with the DIP Credit Agreement on the Effective Date; <u>provided</u>, <u>however</u>, that with respect to letters of credit issued under the DIP Facility, such claims may be satisfied in full by the cash collateralization of such letters of credit, or by procuring

back-up letters of credit, in each case in accordance with the DIP Credit Agreement or as otherwise agreed to by the DIP Agent. Upon compliance with the foregoing sentence, all liens and security interests granted to secure the DIP Facility Revolver Claim, the DIP Facility First Priority Term Claim, and the DIP Facility Second Priority Term Claim shall be deemed cancelled and shall be of no further force and effect. To the extent that the DIP Lenders or the DIP Agent have filed or recorded publicly any liens and/or security interests to secure the Debtors' obligations under the DIP Facility, the DIP Lenders or the DIP Agent, as the case may be, shall take any and all commercially reasonable steps requested by the Debtors that are necessary to cancel and/or extinguish such publicly-filed liens and/or security interests.

32.     <u>Investment Agreement</u>.  Notwithstanding any provision in this Confirmation Order, the Investment Agreement is valid, binding, in full force and effect in accordance with its terms, and constitutes an obligation of the parties thereto fully enforceable on its terms, and is not amended or modified in any way hereby.

33.     <u>Professional Claims And Final Fee Applications</u>.  All final requests for payment of Professional Claims and requests for reimbursement of expenses of members of the Statutory Committees must be filed no later than the last day of the second full month after the Effective Date or May 31, 2008, whichever is later.  After notice and a hearing in accordance with the procedures established by the Court and prior orders of the Court, the allowed amounts of such Professional Claims and expenses shall be determined by the Court.  Subject to the Holdback Amount, on the Effective Date, the Debtors or Reorganized Debtors shall pay all amounts owing to Professionals and members of the Statutory Committees for all outstanding amounts payable relating to

prior periods through the Confirmation Date.  In accordance with Article 10.3(b) of the

Plan, to receive payment on the Effective Date for unbilled fees and expenses incurred

through the Confirmation Date, the Professionals shall estimate fees and expenses due for

periods that have not been billed as of the Confirmation Date and shall deliver such

estimate to the Debtors, counsel for the Statutory Committees, and the United States

Trustee for the Southern District of New York.  Within 45 days after the Effective Date, a

Professional receiving payment for the estimated period shall submit a detailed invoice

covering such period in the manner and providing the detail as set forth in the

Professional Fee Order or the Ordinary Course Professionals Order, as applicable.

Should the estimated payment received by any Professional exceed the actual fees and

expenses for such period, this excess amount shall be credited against the Holdback

Amount for such Professional or, if the award of the Holdback Amount for such matter is

insufficient, disgorged by such Professional.  On the Effective Date, the Debtors or the

Reorganized Debtors shall fund the Holdback Escrow Account with Cash equal to the

aggregate Holdback Amount for all Professionals.  The Disbursing Agent shall maintain

the Holdback Escrow Account in trust for the Professionals with respect to whom fees

have been held back pursuant to the Professional Fee Order.  Such funds shall not be

considered property of the Debtors, the Reorganized Debtors, or the Estates.  The

remaining amount of Professional Claims owing to the Professionals shall be paid to such

Professionals by the Disbursing Agent from the Holdback Escrow Account when such

claims are finally allowed by the Court.  When all Professional Claims have been paid in

full, amounts remaining in the Holdback Escrow Account, if any, shall be paid to the

Reorganized Debtors.  Upon the Confirmation Date, any requirement that Professionals

comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for such services rendered after such date will terminate, and the Reorganized Debtors may employ and pay Professionals in the ordinary course of business.

      34.    <u>Post-Confirmation Statutory Committee Fees</u>.  Professionals retained by the Statutory Committees after the Confirmation Date shall deliver written copies of invoices in respect of their fees and expenses, with a narrative description of services rendered, for the period between the Confirmation Date and the Effective Date to the Reorganized Debtors no later than the last day of the second full month after the Effective Date or May 31, 2008, whichever is later.  If the Reorganized Debtors do not object to the fees and expenses, the Reorganized Debtors shall pay such fees and expenses within 15 business days after receipt of such invoices (without the need for such Professionals to file fee applications with the Court).  The Reorganized Debtors shall not be required to make any payments with respect to the disputed portion of any fees or expenses until such portion of the disputed fees or expenses is resolved or approved by the Bankruptcy Court.

      35.    <u>Termination Of Reimbursement Obligations</u>.  Upon the Effective Date, the Reorganized Debtors shall have no continuing obligation to the Unions and the PBGC to reimburse financial advisor fees.

      36.    <u>Record Date For Claims Distributions</u>.  The Reorganized Debtors, the Disbursing Agent, the Indenture Trustees (as agent or Servicer as described in Section 9.5 of the Plan), and Servicers shall have no obligation to recognize the transfer of, or the sale of any participation in, any Allowed Claim that occurs after January 17, 2008 (the

"Claims Record Date"), and shall be entitled for all purposes herein to recognize and distribute only to those holders of Allowed Claims who are holders of such Claims, or participants therein, as of the Claims Record Date. The Reorganized Debtors, the Disbursing Agent, the Indenture Trustees (as agent or Servicer as described in Section 9.5 of the Plan), and Servicers shall instead be entitled to recognize and deal for all purposes under the Plan with only those record holders stated on the official claims register or the transfer ledger, as the case may be, as of the Claims Record Date. On the Claims Record Date, the transfer ledgers of the Indenture Trustees, or other agents and Servicers shall be closed, and there shall be no further changes in the record holders of securities. The Reorganized Debtors, the Disbursing Agent, the Indenture Trustees (as agent or Servicer as described in Section 9.5 of the Plan), and Servicers shall have no obligation to recognize any transfer of the Senior Notes, the TOPrS, or the Subordinated Notes occurring after the Claims Record Date. The Reorganized Debtors, the Disbursing Agent, the Indenture Trustees (as agent or Servicer as described in Section 9.5 of the Plan), and Servicers shall be entitled instead to recognize and deal for all purposes hereunder with only those record holders stated on the transfer ledgers as of the Claims Record Date, provided, however, that with respect to deceased record holders, the Indenture Trustee (as agent or Servicer as described in Section 9.5 of the Plan) shall be authorized, but not directed, to recognize transfers to the appropriate heir, executor, or otherwise, following provision of notice together with such evidence of the transfer to the appropriate Indenture Trustee as is reasonably satisfactory to the applicable Indenture Trustee. Such notice shall be effective only as to distributions due at least 60 days after such notice is accepted as satisfactory by the applicable Indenture Trustee.

37.     <u>Record Date For Equity Distributions</u>.  The Reorganized Debtors, the Disbursing Agent, and Servicers shall have no obligation to recognize the transfer of, or the sale of any participation in, any Allowed Interest that occurs after February 11, 2008 (the "Equity Record Date"), and shall be entitled for all purposes herein to recognize and distribute only to those holders of Allowed Interests who are holders of such Interests as of the Equity Record Date.  The Reorganized Debtors, the Disbursing Agent, and Servicers shall instead be entitled to recognize and deal for all purposes under the Plan with only those record holders stated on the transfer ledger as of the Equity Record Date.  On the Equity Record Date, the transfer registers of the Existing Common Stock shall be closed, and there shall be no further changes in the record holders of Existing Common Stock.  The Reorganized Debtors, the Disbursing Agent, and Servicers shall have no obligation to recognize any transfer of the Existing Common Stock occurring after the Equity Record Date.  The Reorganized Debtors, the Disbursing Agent, and Servicers shall be entitled instead to recognize and deal for all purposes hereunder with only those record holders stated on the transfer ledgers as of the Equity Record Date, <u>provided</u>, <u>however</u>, that with respect to deceased record holders, the Disbursing Agent and Servicers shall be authorized, but not directed, to recognize transfers to the appropriate heir, executor, or otherwise, following provision of notice together with such evidence of the transfer to the appropriate Disbursing Agent or Servicers as is reasonably satisfactory to the applicable Disbursing Agent or Servicer.  Such notice shall be effective only as to distributions due at least 60 days after such notice is accepted as satisfactory by the applicable Disbursing Agent or Servicer.

38.     <u>Substantial Contribution Compensation And Expenses Bar Date</u>.
Any Person (including the Indenture Trustees) who requests compensation or expense
reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to
sections 503(b)(3), (4), and (5) of the Bankruptcy Code shall file an application with the
Court on or before the 45th day after the Effective Date (the "503 Deadline"), and serve
such application on counsel for the Debtors, the Statutory Committees, the Plan Investors,
the United States Trustee for the Southern District of New York, and such other parties as
may be directed by the Court and the Bankruptcy Code on or before the 503 Deadline, or
be forever barred from seeking such compensation or expense reimbursement.

39.     <u>Indenture Trustee Fees</u>.

(a)     <u>Prepetition Fees</u>.  On or within 10 business days after the
Confirmation Date, the Indenture Trustees shall deliver to the Debtors, the Creditors'
Committees, and the joint fee review committee established by the Professional Fee
Order (the "Fee Review Committee") written copies of invoices in respect of prepetition
fees and expenses (the "Prepetition Fee Claims"), with narrative descriptions of the
services rendered (including appropriate redactions to preserve privileged matters) and
itemization of expenses incurred in such detail and with such supporting documentation
as is customarily submitted by Professionals in the Chapter 11 Cases.  If none of the
Debtors, the Creditors' Committee, or the Joint Fee Review Committee object to the
Prepetition Fee Claims, the Debtors shall pay such claims in full in Cash by the later of
the Effective Date or 10 business days after receipt of such invoices.  The Debtors shall
not be required to make any payments with respect to the disputed portion of a
Prepetition Fee Claim until such portion of the disputed Prepetition Fee Claim is resolved

or approved by the Bankruptcy Court pursuant to section 1129(a)(4) on motion of the Indenture Trustee.

        (b)    <u>Postpetition Fees</u>.  On or within 10 business days after the Confirmation Date, the Indenture Trustees shall deliver to the Debtors, the Creditors' Committee, and the Fee Review Committee written copies of invoices in respect of fees and expenses, including the fees and disbursements of counsel to the Indenture Trustees, incurred between the Petition Date and the Confirmation Date and a reasonable estimate of the fees and expenses, including the fees and disbursements of counsel to the Indenture Trustees, that will be incurred between the Confirmation Date and the Effective Date (collectively, the "Postpetition Fee Claims"), with narrative descriptions of the services rendered or to be rendered (including appropriate redactions to preserve privileged matters) and itemization of expenses incurred in such detail and with such supporting documentation as is customarily submitted by Professionals in the Chapter 11 Cases.  If none of the Debtors, the Creditors' Committee, or the Joint Fee Review Committee object to the Postpetition Fee Claims within 10 business days of the receipt of the invoices therefor, the Debtors shall pay such Postpetition Fee Claims in full in Cash on or before the Effective Date.  In the event any of the Debtors, the Creditors' Committee, or the Fee Review Committee shall object to payment of all or a portion of such fees within such 10- business day period, the Debtors shall not be required to make any payments with respect to the disputed portion of a Postpetition Fee Claim until the disputed portion of the Postpetition Fee Claim has been approved by the Bankruptcy Court pursuant to section 1129(a)(4) on motion of the Indenture Trustee.

40.    <u>Other Administrative Claims</u>.  All other requests for payment of an Administrative Claim (other than as set forth in the Plan) must be filed, in substantially the form of the Administrative Claim Request Form attached as Exhibit 10.5 to the Plan, with the Claims Agent and served on counsel for the Debtors and the Statutory Committees no later than 45 days after the Effective Date.  Any request for payment of an Administrative Claim pursuant to this paragraph that is not timely filed and served shall be disallowed automatically without the need for any objection from the Debtors or the Reorganized Debtors.  The Debtors or the Reorganized Debtors may settle an Administrative Claim without further Bankruptcy Court approval.  Unless the Debtors or the Reorganized Debtors object to an Administrative Claim within 60 days after the Administrative Claims Bar Date (unless such objection period is extended by the Bankruptcy Court), such Administrative Claim shall be deemed allowed in the amount requested.  In the event that the Debtors or the Reorganized Debtors object to an Administrative Claim, the Court shall determine the allowed amount of such Administrative Claim.  Notwithstanding the foregoing, no request for payment of an Administrative Claim need be filed with respect to an Administrative Claim which is paid or payable in the ordinary course of business.

41.    <u>Substantive Consolidation</u>.  For the reasons described in IX.C. of the Disclosure Statement and the evidence and arguments made, proffered, or adduced at the Confirmation Hearing, certain of the Debtors' estates shall be substantively consolidated as set forth in Article III of the Plan, solely for the purposes of voting on the Plan and making distributions to holders of Claims and Interests under the Plan.

42. <u>Restructuring Transactions</u>.  The Restructuring Transactions contemplated by Article 7.3 of the Plan and described in Exhibit 7.3 to the Plan are approved and the Debtors and Reorganized Debtors and their officers are authorized to take such actions as may be necessary and appropriate to effectuate the relevant Restructuring Transactions, including, without limitation, executing such documents as may be reasonably required in order to effectuate the Restructuring Transactions.  Each and every federal, state, and local governmental agency or department is hereby directed to accept for filing and recording any and all documents and instruments necessary or appropriate to consummate the transactions contemplated by the Restructuring Transactions.

43. <u>Registration Rights Agreement</u>.  Without limiting the effect of section 1145 of the Bankruptcy Code or the foregoing paragraphs, Reorganized Delphi is authorized and empowered to enter into the Registration Rights Agreement with GM, the Investors, and any Related Purchaser, Ultimate Purchaser (each as defined in the Investment Agreement), affiliate of a Plan Investor who owns registrable securities, assignee, or transferee, and any Creditor Party (as defined in the Registration Rights Agreement), who executes a joinder agreement as contemplated by Registration Rights Agreement on substantially the terms set forth in the form attached to the Plan as Exhibit 7.16(b), which form is hereby approved.  Upon signature by the parties thereto, the Registration Rights Agreement shall become effective and binding in accordance with its terms and conditions upon the parties thereto without further notice to or order of the Court, act or action under applicable law, regulation, order, or rule.

44.     <u>Exemption From Securities Laws</u>.  The provisions of section 1145 of the Bankruptcy Code are applicable to the issuance and distribution of the New Common Stock to holders of General Unsecured Claims, Section 510(b) Note Claims, Section 510(b) Equity Claims, Section 510(b) ERISA Claims, and Existing Common Stock in exchange for the recipient's Claim or Interest.  In addition, the provisions of section 1145 of the Bankruptcy Code are applicable to the distribution of the Seven-Year Warrants and Ten-Year Warrants to holders of Existing Common Stock.  Further, the provisions of section 1145 of the Bankruptcy Code are applicable to distributions to GM of the "Series C" New Preferred Stock and the GM Note.  Section 4(2) of the Securities Exchange Act is applicable to distributions to the Plan Investors that are made in exchange for the Plan Investors' other cash investments, including the "Series A" and "Series B" New Preferred Stock as well as distributions of Direct Subscription Shares and Unsubscribed Shares. Therefore, to the extent that an "offer or sale" is deemed to have occurred with respect to the above, any such securities are exempt from the requirements of section 5 of the Securities Act and state registration requirements.  Pursuant to and to the fullest extent permitted by section 1145 of the Bankruptcy Code, the resale of any securities issued under the Plan shall be exempt from section 5 of the Securities Act and any state registration requirements.  Notwithstanding the foregoing, as described in the amendment to Delphi's registration statement on Form S-1, filed on December 20, 2007, as further amended, the offering and sale of the Discount Rights, the Par Value Rights, the Six-Month Warrants, and the New Common Stock in Reorganized Delphi to be issued pursuant to the exercise of  the Discount Rights, Par Value Rights, and/or the Six-Month Warrants will be registered pursuant to the Registration Statement under the

Securities Act and will be offered solely be means of prospectuses relating to such securities which shall be provided at such time as the Rights Offerings commence or such Six-Month Warrants are issued, as the case may be.

45. <u>Resolution Of Claims And Interests</u>.  Except as otherwise ordered by the Court, any Claim or Interest that is not an Allowed Claim or Allowed Interest shall be determined, resolved, or adjudicated in accordance with the terms of the Plan.  The Debtors or Reorganized Debtors, as the case may be, may (a) until 120 days after the Effective Date (unless extended by order of the Court) file objections in the Court to the allowance of any Claim or Interest (whether or not a proof of Claim or Interest has been filed) and/or (b) amend their Schedules at any time before their Chapter 11 Cases are closed.

46. <u>Existing Common Stock</u>.  Pursuant to the cancellation of the Existing Common Stock set forth in Article 7.10 of the Plan, the par value for all issued and outstanding Existing Common Stock and any related paid-in capital in excess of par value shall be reduced to zero.  Any par value and related paid-in capital in excess of par value related to the New Common Stock shall be established pursuant to generally accepted accounting principles.

47. <u>Distribution Reserve</u>.  The Debtors shall establish one or more Distribution Reserves of New Common Stock, New Warrants, Oversubscription Cash, and Cash raised by the Par Value Rights Offering for the purpose of effectuating distributions to holders of Disputed Claims or Disputed Interests pending the allowance or disallowance of such claims or interests in accordance with the Plan.  The amounts to be withheld as part of the Distribution Reserves shall be determined as set forth in Article

9.8(b) of the Plan.  The Debtors or the Reorganized Debtors may request estimation for any Disputed Claim that is contingent or unliquidated, but such parties are not required to do so, and nothing herein shall impair any claimant's defenses or objections to such requested estimation.  Such Distribution Reserve may not be relied upon to show that any Disputed Claim is either probable or estimable for any other purpose.  Any Disputed Claim or Disputed Interest that ultimately becomes an Allowed Claim or Allowed Interest as the case may be, shall be entitled to receive its applicable distribution under the Plan solely from the Distribution Reserves established on account of such Disputed Claim or Disputed Interest.  In no event shall any holder of a Disputed Claim or Disputed Interest have any recourse with respect to distributions made, or to be made, under the Plan to holders of such Claims or Interests to any Debtor or Reorganized Debtor on account of such Disputed Claim or Disputed Interest, regardless of whether such Disputed Claim or Disputed Interest shall ultimately become an Allowed Claim or Allowed Interest, as the case may be, or regardless of whether sufficient Cash, New Common Stock, New Warrants, or other property remains available for distribution in the Distribution Reserve established on account of such Disputed Claim or Disputed Interest at the time such Claim or Interest becomes entitled to receive a distribution under the Plan.

48.     <u>Payment Of Fees</u>.  All fees payable by the Debtors under 28 U.S.C. § 1930 shall be paid on or before the Effective Date, and each Reorganized Debtor shall pay quarterly fees plus accrued interest under 28 U.S.C. § 1930 and 31 U.S.C. § 3717 to the United States Trustee for its Chapter 11 Case, notwithstanding any substantive

consolidation for plan purposes, until its Chapter 11 Case is dismissed, converted to chapter 7 or closed by the entry of a final decree.

49. <u>Authorization To Consummate Plan</u>. Notwithstanding Bankruptcy Rule 3020(e), but subject to Articles 12.2 and 12.3 of the Plan, the Court authorizes the Debtors to consummate the Plan upon entry of this Confirmation Order. The Debtors are authorized to execute, acknowledge, and deliver such deeds, assignments, conveyances, and other assurances, documents, instruments of transfer, uniform commercial code financing statements, trust agreements, mortgages, indentures, security agreements, and bills of sale and to take such other actions as may be reasonably necessary to perform the terms and provisions of the Plan, all transactions contemplated by the Plan, and all other agreements related thereto.

50. <u>Failure To Consummate Plan</u>. If consummation of the Plan does not occur, then the Plan, any settlement or compromise embodied in the Plan (including, but not limited to, the fixing or limiting to an amount certain any Claim or Interest or Class of Claims or Interests, the effect of substantive consolidation for purposes of the Plan, the MDL Settlements, the Court's order approving the MDL Settlements, the GM Settlement, or the allocation of the distributions to be made thereunder), the assumption or rejection of executory contracts or leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be null and void. In such event, nothing contained in the Plan, the Disclosure Statement, or this Confirmation Order, and no acts taken in preparation for consummation of the Plan, shall be deemed to constitute a waiver or release of any Claims by or against the Debtors or any other Person, to prejudice in any manner the rights of the Debtors, the holder of a Claim or Interest, the Creditors'

Committee, the Equity Committee, GM, the Plan Investors, or any Person in any further proceedings involving such Debtor or Debtors or to constitute an admission of any sort by the Debtors or any other Person, or be construed as a finding of fact or conclusion of law with respect thereto. Upon the occurrence of the Effective Date with respect to each Debtor, the Plan shall be deemed substantially consummated as to such Debtor.

51. <u>Retention Of Jurisdiction</u>. Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, and notwithstanding the entry of this Confirmation Order or the occurrence of the Effective Date, and subject to the provisions of Sections 7.05 and 7.10 of the Delphi-GM Global Settlement Agreement and Delphi-GM Master Restructuring Agreement, respectively, the Court shall retain exclusive jurisdiction as provided in the Plan over all matters arising out of, and related to, the Chapter 11 Cases and the Plan to the fullest extent permitted by law, including, among other items and matters, jurisdiction over those items and matters set forth in Article XIII of the Plan.

52. <u>Dissolution Of Statutory Committees</u>. Effective on the Effective Date, the Statutory Committees appointed in the Chapter 11 Cases shall dissolve automatically, whereupon their members, professionals, and agents shall be released from any further duties and responsibilities in the Chapter 11 Cases and under the Bankruptcy Code, except with respect to obligations arising under confidentiality agreements, non-disclosure agreements, joint interest agreements, and protective orders entered during the Chapter 11 Cases, all of which shall remain in full force and effect according to their terms. The Professionals retained by the Statutory Committees and the respective members thereof shall not be entitled to compensation and reimbursement of expenses for services rendered after the Effective Date, except for services rendered in connection

with challenges to any order confirming the Plan or any applications for allowance of compensation and reimbursement of expenses pending on the Effective Date or filed after the Effective Date and for the other duties and responsibilities of the Statutory Committees set forth in this paragraph 52 and the Plan and other services as may be requested by the Debtors, and the Reorganized Debtors shall pay the fees and expenses in respect of such services in the ordinary course of business without further order of the Bankruptcy Court.

53.     <u>References To Plan Provisions</u>.  The failure to include or specifically reference any particular provision of the Plan in this Confirmation Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Plan be confirmed in its entirety.  The provisions of the Plan and of this Confirmation Order shall be construed in a manner consistent with each other so as to effect the purposes of each; <u>provided</u>, <u>however</u>, that if there is determined to be any inconsistency between any Plan provision and any provision of this Confirmation Order that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of this Confirmation Order shall govern and any such provision of this Confirmation Order shall be deemed a modification of the Plan and shall control and take precedence.  Notwithstanding the foregoing, in the event there are any conflicts between the terms and provisions of the Plan or this Confirmation Order (as either document may be amended) and the terms and provisions of the Delphi-GM Global Settlement Agreement and Delphi-GM Master Restructuring Agreement, the terms of the Delphi-GM Global Settlement Agreement and Delphi-GM Master Restructuring Agreement (as appended to the Plan as Exhibits 7.20(a) and 7.20(b) and incorporated by reference in the

Plan) shall govern; provided, however, that notwithstanding the foregoing or anything to the contrary in this order, the Plan or the Delphi-GM Definitive Documents, and upon the consent of GM, which consent was acknowledged by GM's counsel on the record at the Confirmation Hearing, nothing in this order, the Plan, or the Delphi-GM Definitive Documents providing for the release of GM-Related Parties or an injunction of actions against GM-Related Parties shall apply to (i) any claims, debts, obligations, rights, suits, damages, actions, causes of action, remedies, and liabilities of the United States or any agency thereof, (ii) any claims, debts, obligations, rights, suits, damages, actions, causes of action, remedies, and liabilities of any State or any agency of any State, under state or federal environmental laws; or (iii) any criminal liability under the laws of the United States or any State.  In addition, nothing contained in the Plan or this Confirmation Order shall alter, amend, or modify the rights of the Plan Investors under the Investment Agreement, which remains binding and enforceable, unless such alteration, amendment, or modification has been agreed to in writing by each Plan Investor.  To the extent that any exhibit to the Plan is inconsistent with the terms of the Plan and unless otherwise provided in this Confirmation Order, the terms of the exhibit to the Plan shall control as to all transactions contemplated thereby and the terms of the Plan shall control as to any Plan provision that may be required under an exhibit to the Plan other than the provisions of Section 9 of the Investment Agreement, which provisions shall control in all respects.

54.     Separate Confirmation Orders.  This Confirmation Order is and shall be deemed a separate Confirmation Order with respect to each of the Debtors in each Debtors' separate Chapter 11 Case for all purposes.  The Clerk of the Court is

directed to file and docket this Confirmation Order in the Chapter 11 Case of each of the Debtors.

55. <u>Filing And Recording</u>. This Confirmation Order (a) is and shall be effective as a determination that, on the Effective Date, all Claims and Interests existing prior to such date have been unconditionally released, discharged, and terminated and (b) is and shall be binding upon and shall govern the acts of all entities including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required, by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any document or instrument. Each and every federal, state, and local government agency is hereby directed to accept any and all documents and instruments necessary, useful, or appropriate (including Uniform Commercial Code financing statements) to effectuate, implement, and consummate the transactions contemplated by the Plan and this Confirmation Order without payment of any recording tax, stamp tax, transfer tax, or similar tax imposed by state or local law.

56. <u>Notice Of Confirmation Order And Occurrence Of Effective Date</u>. On or before the fifth Business Day following the occurrence of the Effective Date, the Debtors shall serve notice of this Confirmation Order and occurrence of the Effective Date pursuant to Bankruptcy Rules 2002(f)(7), 2002(k), and 3020(c) on all holders of Claims and Interests, the United States Trustee for the Southern District of New York, and other parties-in-interest, by causing a notice of this Confirmation Order and the

occurrence of the Effective Date in substantially the form of the notice annexed hereto as Exhibit D, which form is hereby approved (the "Notice of Effective Date"), to be delivered to such parties by first class mail, postage prepaid; provided, however, that notice need not be given or served under the Bankruptcy Code, the Bankruptcy Rules, or this Confirmation Order to any Person to whom the Debtors mailed a notice of the Bar Date or Confirmation Hearing, but received such notice returned marked "undeliverable as addressed," "moved - left no forwarding address," "forwarding order expired," or similar marking, unless the Debtors have been informed in writing by such Person of that Person's new address. The notice described herein is adequate under the particular circumstances of the Chapter 11 Cases, and no other or further notice is necessary. Notwithstanding the foregoing, pursuant to Bankruptcy Rule 2002(l), the Debtors shall be deemed to have satisfied the requirements of Bankruptcy Rule 2002(f)(7) with respect to any Claimholder that does not reside in the United States by publishing the Notice of Effective Date in the Wall Street Journal (national, European, and Asian editions), the New York Times (National Edition), and USA Today (worldwide), within 15 Business Days of the Effective Date.

57.    28 U.S.C. § 157(d). Nothing in this Confirmation Order or the Plan is intended to modify or violate 28 U.S.C. § 157(d).

58.    GM Settlement. The GM Settlement is hereby authorized and approved pursuant to section 1123(b)(3) of the Bankruptcy Code, including (a) the Delphi-GM Global Settlement Agreement, attached to the Plan as Exhibit 7.20(a), which resolves, inter alia, the GM Claim, and (b) the Delphi-GM Master Restructuring Agreement, attached to the Plan as Exhibit 7.20(b), which sets forth the continuing

obligations of GM and Delphi.  The terms of the Delphi-GM Global Settlement

Agreement and the Delphi-GM Master Restructuring Agreement, and the exhibits thereto,

are incorporated by reference into and comprise an integral part of the Plan and this

Confirmation Order.  In addition, to the extent that the Delphi-GM Global Settlement

Agreement and Delphi-GM Master Restructuring Agreement required certain provisions

to be contained in the Plan, including without limitation, the releases required by sections

4.01, 4.02, and 4.03 of the Delphi-GM Global Settlement Agreement (incorporated by

reference in Article 11.7 of the Plan), the retention of jurisdiction by the Bankruptcy

Court required by section 7.05 of the Delphi-GM Global Settlement Agreement and

section 7.10 of the Delphi-GM Master Restructuring Agreement, and the terms and

provisions relating to the assumption and rejection of contracts by and among the parties

to the Delphi-GM Master Restructuring Agreement as required by Article 5 of the

Delphi-GM Master Restructuring Agreement, such provisions are hereby approved.  In

addition, as provided in section 7.23 of the Delphi-GM Global Settlement Agreement, the

Affiliates of both GM and Delphi are hereby deemed to have acknowledged and shall be

bound by the terms of the Delphi-GM Global Settlement Agreement.  Reorganized

Delphi shall be authorized, empowered, and directed to make, no earlier than the

Effective Date, but no later than five days after the Effective Date, the IRC Section 414(l)

Transfer as set forth in section 2.03 of the Delphi-GM Global Settlement Agreement and

to issue and pay the 414(l) Note as set forth in section 2.03(c)(iii)(3) thereof.

      59.    <u>MDL Settlements</u>.  Upon the entry of orders approving the MDL

Settlement by the Court and the MDL Court, distributions pursuant to the Plan on

account of Section 510(b) Note Claims, Section 510(b) Equity Claims, and Section 510(b)

ERISA Claims shall be made in accordance with the terms of Articles 5.5, 5.8, 5.9, 7.15(a), 7.16 and 7.19 of the Plan.

60. <u>Union Settlement Agreements</u>. Pursuant to the Plan, upon the Effective Date, the Union Settlement Agreements and the certain documents referenced in Section 7.21 of the Plan shall be assumed and shall be valid, binding, and enforceable and shall not be in conflict with any federal or state law.

61. <u>Effect On Other Orders And Agreements</u>. Neither the confirmation of the Plan nor anything set forth in this Confirmation Order shall modify the following previous orders of the Court, except to the extent contemplated in such orders: (a) Order Under 11 U.S.C. §§ 363, 1113, and 1114 and Fed. R. Bankr. P. 6004 and 9019 Approving Memorandum of Understanding Among UAW, Delphi, and General Motors Corporation Including Modification of UAW Collective Bargaining Agreements and Retiree Welfare Benefits for Certain UAW-Represented Retirees, entered July 19, 2007 (Docket No. 8693), (b) Order Under 11 U.S.C. §§ 363, 1113, and 1114 and Fed. R. Bankr. P. 6004 and 9019 Approving Memorandum of Understanding Among IUE-CWA, Delphi, and General Motors Corporation Including Modification of IUE-CWA Collective Bargaining Agreements and Retiree Welfare Benefits for Certain IUE-CWA-Represented Retirees, entered August 16, 2007 (Docket No. 9106), (c) Order Under 11 U.S.C. §§ 363, 1113, and 1114 and Fed. R. Bankr. P. 6004 and 9019 Approving (I) Memoranda of Understanding Among IUOE, IBEW, IAM, Delphi, and General Motors Corporation Including Modification of IUOE, IBEW, and IAM Collective Bargaining Agreements and Retiree Welfare Benefits for Certain IUOE, IBEW, and IAM-Represented Retirees and (II) Modification of, and Term Sheet Regarding, Retiree Welfare Benefits for Certain

Non-Represented Hourly Active Employees and Retirees, entered August 16, 2007 (Docket No. 9107), (d) Order Under 11 U.S.C. §§ 363, 1113, and 1114 and Fed. R. Bankr. P. 6004 and 9019 Approving Memoranda of Understanding Among USW, Delphi, and General Motors Corporation Including Modification of USW Collective Bargaining Agreements and Retiree Welfare Benefits for Certain USW-Represented Retirees, entered August 29, 2007 (Docket No. 9169), (e) Order Authorizing and Approving Delphi-Appaloosa Equity Purchase and Commitment Agreement Pursuant to 11 U.S.C. §§ 105(a), 363(b), 503(b), and 507(a), entered August 2, 2007 (Docket No. 8856), (f) Order Under 11 U.S.C. §§ 105(a), 363(b), 503(b), and 507(a) Authorizing and Approving Delphi-Appaloosa Equity Purchase and Commitment Agreement Amendment, entered December 10, 2007 (Docket No. 11382), and (g) both the Amended Opinion And Order Regarding Lead Plaintiffs' Motions For (1) Final Approval Of Settlements, (2) Settlement Class Certification, (3) Final Approval Of Plans Of Allocation, And (4) Award Of Attorneys' Fees; And Delphi Trust I Interim Counsel's Motion For Attorneys' Fees, Case No. 05-MD-01725 (E.D. Mich., January 11, 2008) and the Final Order Approving the Multidistrict Litigation and Insurance Settlement entered on January 25, 2008 (Docket No. 12358).

        62.    <u>Resolution Of Plan Objections Of Certain Senior Noteholders</u>.

        (a)    The request for approval of the settlement (the "Senior Noteholders Settlement") under Bankruptcy Rule 9019 with certain holders of Senior Notes (the "Senior Noteholders") represented by Goodwin Procter LLP made by oral motion of the Debtors on January 17, 2008, is hereby approved.

(b) Notice of the Senior Noteholders Settlement was adequate and the terms of the Senior Noteholders Settlement as described on the record, are appropriate and in the best interests of the Debtors and their estates.

(c) Under the terms of the Senior Noteholders Settlement:

(i) The Senior Noteholders' objections to confirmation of the Plan (Docket Nos. 11471, 11951), the MDL Settlement (Docket Nos. 10687, 10689), and certain motions for allowance of claims pursuant to Bankruptcy Rule 3018 (Docket Nos. 11830, 11960) are withdrawn based on the Senior Noteholders Settlement;

(ii) The Debtors agree to pay, up to an aggregate maximum of $5 million, all actual, reasonable, documented fees and expenses incurred by Goodwin Procter LLP, Klestadt & Winters (as special conflicts counsel), and Maryann Keller & Associates (collectively, the "Noteholders' Professionals") from September 1, 2007 through January 17, 2008, in connection with the representation of Senior Noteholders who were current clients of the Noteholders' Professionals as of January 17, 2008, and former clients of the Noteholders' Professionals to the extent current clients of the Noteholders' Professionals benefited from the work product performed on behalf of the former clients.

(iii) The Noteholders' Professionals fees and expenses are subject to Court review for reasonableness, based on the totality of the circumstances, and approval pursuant to section 1129(a)(4) of the Bankruptcy Code. The Noteholders' Professionals shall be required to file fee applications and shall be subject to the procedures described in the Professional Fee Order; provided, however, that the Debtors shall not be required to pay any of the Noteholders' Professionals' fees and expenses until such fees and expenses have been approved by the Court as being reasonable based on the totality of the circumstances. The Debtors shall use their reasonable best efforts to obtain Court approval of the payment of such fees and expenses, including, without limitation, preparing and filing supporting pleadings and, if necessary, propounding testimony in support of the fee applications and Senior Noteholders Settlement.

63. Miscellaneous.

(a) Notwithstanding anything in Article 5.1 of the Plan to the contrary, any holder of a Secured Claim, which Claim arose as a result of a tax secured by a lien, shall retain its lien in accordance with applicable non-bankruptcy law until the

Claim is paid in full with Postpetition Interest as provided in the Plan, and the payment of the Secured Claim shall not include the treatment set forth in Article 2.2(i) of the Plan.

(b) Notwithstanding any provision of the Plan or this Confirmation Order to the contrary, the confirmation and effectuation of the Plan as modified shall not release, reduce, or discharge the Reorganized Debtors from any obligations under the Underwriters Indemnification Agreement dated August 31, 2007.

(c) As stated on the record at the Confirmation Hearing, in resolution of the objection to confirmation of the Plan filed by Audio MPEG, Inc. and S.I.SV. EL., S.p.A. (Docket No. 11883), Claims against non-Debtors that are independent of the commercial relationship between the Debtors and Audio MPEG, Inc. or its parent Societa' Italiana per lo Sviluppo dell'Elettronica, S.I.SV.EL., S.p.A. are not covered under the third party release set forth under Article 11.5 of the Plan.

64. <u>Modifications To The Amended Plan</u>. At the request of the Debtors, the Amended Plan is hereby modified pursuant to section 1127(a) of the Bankruptcy Code as set forth on <u>Exhibit A</u> hereto.

Dated: New York, New York
       January 25, 2008


        /s/ Robert D. Drain
        UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT I

Exhibit 7.24

Retained Actions

All Plan Exhibits are subject to all of the provisions of the First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession (Docket No. 11386) (as subsequently modified or amended, the "Plan"), including, without limitation, Article 14.3, under which the Debtors have reserved the right to alter, amend, or modify the Plan or any Exhibits thereto under section 1127(a) of the Bankruptcy Code at any time prior to the Confirmation Date.

Retained Actions

<u>General Note to Plan Schedule 7.24</u>[1]

     In accordance with section 1123(b)(3) of the Bankruptcy Code and except as otherwise provided in section 7.24 of the Plan, the Reorganized Debtors shall retain and may (but are not required to) enforce all Retained Actions and all other similar claims arising under applicable state laws, including, without limitation, fraudulent transfer claims, if any, and all other Causes of Action of a trustee and debtor-in-possession under the Bankruptcy Code, including, without limitation, all of those claims, Retained Actions, and Causes of Action that are listed in the Debtors' Schedules, as they may have been amended, and any such claims, Retained Actions, and Causes of Action that may have subsequently arisen, that may have subsequently been discovered, or which may be pending. The Debtors or the Reorganized Debtors, in their sole and absolute discretion, shall determine whether to bring, settle, release, compromise, or enforce such Retained Actions (or decline to do any of the foregoing), and shall not be required to seek further approval of the Bankruptcy Court for such action unless such approval is required under section 9.6(b) of the Plan. The Reorganized Debtors or any successors may pursue such litigation claims in accordance with the best interests of the Reorganized Debtors or any successors holding such rights of action.

     For the avoidance of any confusion, the Debtors and Reorganized Debtors or any successors holding such rights of action expressly retain, among all other rights of action:

    1.   Any and all claims, Causes of Action, rights of action, suits, and proceedings in favor of the Debtors or their Estates against General Motors Corporation and its affiliates and subsidiaries (collectively, the "GM Entities"), including but not limited to claims and causes of action subject to (a) the Stipulation and Consent Order Addressing Estate Litigation Against General Motors Corporation, dated October 5, 2007, and (b) the Debtors' complaint against the GM Entities, each of which was filed under seal in accordance with the Bankruptcy Court's August 16, 2007 order (Docket No. 9105), except that all of such claims, Causes of Action, rights of action, suits, and proceedings in favor of the Debtors and their Estates against GM Entities shall survive only until the date on which all of the conditions set forth in Article 6 of the Delphi-GM Global Settlement Agreement have been satisfied or waived in accordance with the terms therein, at which time they shall be released, subject to the next sentence of this paragraph. Notwithstanding the foregoing, any and all claims, Causes of Action, rights of action, suits, and proceedings in favor of the Debtors or their Estates against the GM Entities that are Delphi Surviving Claims (as defined in the Delphi-GM Global Settlement

---

[1] Capitalized terms used in this Exhibit and not otherwise defined have the meanings ascribed to such terms in the First Amended Joint Plan of Reorganization of Delphi Corporation and Certain Affiliates, Debtors and Debtors-In-Possession.

Agreement), shall survive and not be released.[2]

2. Any and all claims, Causes of Action, rights of action, suits, and proceedings in favor of the Debtors or their Estates against Furukawa Electric North America APD and Furukawa Electric Co., Ltd. and their affiliates and subsidiaries.

3. Any and all claims, Causes of Action, rights of action, suits, and proceedings in favor of the Debtors or their Estates against any party or third party arising out of or relating to the claims raised against the Debtors in certain consolidated class action proceedings styled In Re Delphi Corporation Securities, Derivative & ERISA Litigation, Master Case No. 05-md-1725, pending in the United States District Court for the Eastern District of Michigan (the "MDL Litigation"), including claims for indemnification, claims related to the rights to the proceeds of any applicable insurance policies, claims for breach of duty or breach of care in connection with the allegations in the MDL Litigation, derivative claims against former officers, directors, or employees of the Debtors, and claims for negligent or willful conduct which may have caused or contributed to the alleged liability of the Debtors in connection with the MDL Litigation. Provided further, that only those claims and Causes of Action that are expressly specified as being subject to release by the Debtors in certain stipulations of settlement in connection with the MDL Litigation, will be released but only when and if those stipulations become effective by their terms.

4. Any and all claims, Causes of Action, rights of action, suits, and proceedings in favor of the Debtors or their Estates against the United States of America with respect to the Debtors' right to a refund of taxes paid by Delphi, a predecessor of Delphi Automotive Systems LLC, and Delphi Automotive Systems LLC under the Federal Insurance Contributions Act with respect to "ratification bonuses" paid shortly after the effective date of duly ratified collective bargaining agreements to certain union members in 1999 and 2003.

5. Any and all claims, Causes of Action, rights of action, suits, and proceedings in favor of the Debtors or their Estates against Laneko Engineering Co., Wachovia Bank, National Association and Laneko Engineering Co. Inc. and their affiliates and subsidiaries.

The Debtors reserve their right to modify this list to amend, add or remove parties or otherwise update this list, but disclaim any obligation to do so.

---

[2] In the event that there are any conflicts between the terms and provisions of this Exhibit (and as it may be amended) and the provisions of the Delphi-GM Global Settlement Agreement, the terms of the Delphi-GM Global Settlement Agreement shall govern.

# EXHIBIT J

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

   - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                            :
      In re                    :    Chapter 11
                            :
DELPHI CORPORATION, et al.,    :    Case No. 05-44481 (RDD)
                            :
                            :    (Jointly Administered)
           Debtors.         :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MOTION PURSUANT TO FED. R. BANKR. P. 7004(a) AND
9006(b)(1) AND FED. R. CIV. P. 4(m) TO EXTEND DEADLINE TO
SERVE PROCESS FOR AVOIDANCE ACTIONS FILED IN CONNECTION
WITH PRESERVATION OF ESTATE CLAIMS PROCEDURES ORDER

("EXTENSION OF AVOIDANCE ACTION SERVICE DEADLINE MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this Motion Pursuant To Fed. R. Bankr. P. 7004(a) And 9006(b)(1) And Fed. R. Civ. P. 4(m) To Extend Deadline To Serve Process For Avoidance Actions Filed In Connection With Preservation Of Estate Claims Procedures Order (Docket No. 9105) (the "Motion"), and respectfully represent as follows:

Background

A.     The Chapter 11 Filings

1.     On October 8 and 14, 2005, the Debtors filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code").  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession under Bankruptcy Code sections 1107(a) and 1108.  This Court has ordered joint administration of these cases.

2.     No trustee or examiner has been appointed in these cases.  On October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors.  On April 28, 2006, the U.S. Trustee appointed an official committee of equity holders.

3.     On September 6, 2007, the Debtors filed the Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In Possession (Docket No. 9263) and the Disclosure Statement With Respect To Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In Possession (Docket No. 9264).  Subsequently, on December 10, 2007, the Debtors filed the First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession  (Docket No. 11386) (the "Plan") and the First Amended Disclosure Statement with

respect to the Plan (Docket No. 11388) (the "Disclosure Statement"). The Court entered an order approving the adequacy of the Disclosure Statement and granting the related solicitation procedures motion on December 10, 2007 (Docket No. 11389). On January 25, 2008, the Court entered an order confirming the Plan (as modified) (Docket No. 12359) (the "Confirmation Order"), which became a final order on February 4, 2008.

4. This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

5. The statutory predicates for the relief requested herein are rules 7004 and 9004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and rule 4(m) of the Federal Rules of Civil Procedure.

B.    Current Business Operations Of The Debtors

6. Delphi and its subsidiaries and affiliates (collectively, the "Company") as of December 31, 2007 had global net sales of $22.3 billion and global assets of approximately $13.7 billion.[1] At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues and the thirteenth largest public company business reorganization in terms of assets. Delphi's non-U.S. subsidiaries are not chapter 11 debtors and have continued their business operations without supervision from the Court.[2]

---

[1]    The aggregated financial data used herein generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates as disclosed in the Company's Form 10-K filed on February 19, 2008.

[2]    On March 20, 2007, Delphi Automotive Systems Espana S.L. ("DASE"), whose sole operation is a non-core automotive component plant in Cadiz, Spain, filed a "Concurso" application for a Spanish insolvency proceeding, which was approved by the Spanish court on April 13, 2007. On July 4, 2007, DASE, its Concurso receivers, and the Cadiz workers councils and unions reached a settlement on a social plan, the funding of which was approved by this Court on July 19, 2007. The Spanish court approved the social plan on July 31, 2007. The Concurso proceeding is consistent with Delphi's transformation plan to optimize its manufacturing footprint and to lower its overall cost structure.

7.      The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology.  The Company supplies products to nearly every major global automotive original equipment manufacturer ("OEM").

8.      Delphi was incorporated in Delaware in 1998 as a wholly owned subsidiary of General Motors Corporation ("GM").  Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM.  In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications.  Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

C.      Events Leading To The Chapter 11 Filing

9.      In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income.  Every year thereafter, however, with the exception of 2002, the Company has suffered losses.  In calendar year 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[3] Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of

---

[3]     Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on U.S. deferred tax assets as of December 31, 2004.  The Company's net operating loss in calendar year 2004 was $482 million.

approximately $2.4 billion on net sales of $26.9 billion. Moreover, in 2006 the Debtors incurred a net loss of $5.5 billion, $3.0 billion of which comprised charges related to the U.S. employee special attrition programs, and in 2007, the Debtors incurred a net loss of $3.1 billion.

10. The Debtors believe that the Company's financial performance deteriorated because of (i) increasingly unsustainable U.S. legacy liabilities and operational restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which have the effect of creating largely fixed labor costs, (ii) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (iii) increasing commodity prices.

11. In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward-looking revenue requirements. Because discussions with its major stakeholders had not progressed sufficiently by the end of the third quarter of 2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete its transformation plan and preserve value for its stakeholders.

D. The Debtors' Transformation Plan

12. On March 31, 2006, the Company outlined the key tenets of a transformation plan that it believed would enable it to return to stable, profitable business operations. The Debtors stated that they needed to focus on five key areas: first, modifying the Company's labor agreements to create a competitive arena in which to conduct business; second, concluding their negotiations with GM to finalize GM's financial support for the Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company; third, streamlining their product portfolio to capitalize on their world-class technology and market strengths and

make the necessary manufacturing alignment with their new focus; fourth, transforming their salaried workforce to ensure that the Company's organizational and cost structure is competitive and aligned with its product portfolio and manufacturing footprint; and fifth, devising a workable solution to their current pension situation.

E.  Confirmation Of The Debtors' Plan Of Reorganization

13.     The confirmed Plan is based upon a series of global settlements and compromises that involve nearly every major constituency in the Debtors' reorganization cases. The Global Settlement Agreement and the Master Restructuring Agreement provide for a comprehensive settlement with GM, and both agreements were approved by this Court in the Confirmation Order.  With the Plan confirmed, the Debtors are focusing their efforts on satisfying the conditions for the Plan to become effective and allow them to emerge from chapter 11.  The Debtors anticipate having the Plan become effective as soon as reasonably practicable.

14.     Upon the conclusion of the reorganization process, the Debtors expect to emerge as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal all of its resources to continue to deliver high-quality products to its customers globally.  Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

F.  The Establishment Of Procedures to Preserve Estate Claims

15.     Before the confirmation of the Debtors' Plan, this Court entered on August 16, 2007 that certain Order Under 11 U.S.C. §§ 102(1)(A), 105(a), 107, 108(a)(2), And 546(a) And Fed. R. Bankr. P. 7004, 9006(c), And 9018 (i) Authorizing Debtors To Enter Into Stipulations Tolling Statute Of Limitations With Respect To Certain Claims, (ii) Authorizing Procedures To Identify Causes Of Action That Should Be Preserved, And (iii) Establishing

Procedures For Certain Adversary Proceedings Including Those Commenced By Debtors Under 11 U.S.C. § 541, 544, 545, 547, 548, Or 553 ("Preservation Of Estate Claims Procedures Order") (Docket No. 9105).

16.    The purpose of the Preservation Of Estate Claims Procedures Order was two-fold: on the one hand, it permitted the Debtors to preserve their right to pursue (or abandon) certain avoidance actions before the then-impending expiration of the two-year statute of limitations to file such actions; on the other hand, it established procedures to avoid having to force all potential defendants to retain counsel and defend against the adversary proceedings when, in fact, the Debtors anticipated that most of them would be resolved upon the Debtors' emergence from chapter 11 and thus never pursued.  To that end, the Preservation Of Estate Claims Procedures Order (i) allowed the Debtors to file adversary proceeding complaints under seal, (ii) directed the Clerk of Court to delay issuing summonses for complaints unless and until the Debtors notified the Clerk of Court of their intent to prosecute such actions, (iii) stayed each adversary action unless and until the Debtors make service of process on the respective defendants, and (iv) extended the deadline under Fed. R. Civ. P. 4(m) by which the Debtors would have to serve process to March 31, 2008, which was less than 60 days beyond the 120-day deadline, so that the complaints would not be subject to dismissal under Fed. R. Civ. P. 4(m). Such relief was intended to allow the Debtors to preserve potentially valuable assets without disrupting the Plan process or business relationships or prejudicing the rights of any defendants.

17.    In accordance with the Preservation Of Estate Claims Procedures Order, the Debtors commenced 742 adversary proceedings (the "Adversary Proceedings") by filing complaints under seal.  On January 25, 2008, the Court entered the Confirmation Order.  Under

the Plan, the Debtors will not retain any of the causes of action asserted in the Adversary

Proceedings except those specifically listed on Exhibit 7.24 to the Plan.[4]

## Relief Requested

18.     By this Motion, the Debtors request entry of an order under Bankruptcy

Rule 9006(b)(1) and Federal Rule Of Civil Procedure 4(m), made applicable by Bankruptcy

Rule 7004(a), to extend the deadline by which the Debtors would be required to serve a

summons and complaint upon each defendant under the Preservation Of Estate Claims

Procedures Order.  Specifically, the Debtors request that the existing March 31, 2008 service

deadline set forth in the Preservation Of Estate Claims Procedures Order be extended by two

months to May 31, 2008.  The Debtors accordingly request that the Court enter the proposed

Extension of Avoidance Action Service Deadline Order, a copy of which is annexed hereto as

Exhibit A.

## Basis For Relief

19.     The Debtors intend to emerge from chapter 11 as soon as reasonably

practicable.  Under the Preservation Of Estate Claims Procedures Order, however, the Debtors'

current deadline to serve the summons and complaint on every defendant in the Adversary

Proceedings is March 31, 2008.  To meet the March 31, 2008 deadline for each of the defendants,

the Debtors would first have to request that the Clerk of Court issue in the coming weeks

summonses for each of the 742 Adversary Proceedings to allow enough time for the summonses

to be issued and subsequently served with the complaints by the March 31, 2008 deadline.

---

[4]     Of the five categories of claims listed by the Debtors on Exhibit 7.24 to the Plan, only the claims relating to
Laneko Engineering Co., Wachovia Bank, National Association, Laneko Engineering Co. Inc., and their
affiliates and subsidiaries are subject to the Preservation Of Estate Claims Procedures Order.  (See Exhibit 7.24
to the Plan (Docket No. 11608).)

20.     Contemplating that further extensions may be necessary to achieve the goals of the Preservation Of Estate Claims Procedures Order, that order expressly provided that the Debtors' previous extension of the deadline for services of process was "without prejudice [to the Debtors' ability] to seek further extensions" if appropriate.  (See Preservation Of Estate Claims Procedures Order ¶ 8.)

21.     The Debtors now believe that the short two-month extension of the Fed. R. Civ. P. 4(m) deadline that is requested in this Motion is appropriate, and that there is good cause for such an extension.  Such an extension would enable the Debtors to fulfill their fiduciary responsibility to preserve valuable estate assets in a manner that would not unnecessarily disrupt the emergence process or the Debtors' current business relationships with potential defendants that are necessary to the Debtors' ongoing operations.  Moreover, the requested limited extension would reduce the administrative and economic burdens of the Adversary Proceedings on the Debtors, the Court, the Clerk of Court, and the potential defendants.  Specifically, the Debtors believe that the resources that they, the Court, the Clerk of Court, and the defendants would need to expend on issuing and serving 742 summonses and complaints in the Adversary Proceedings at this time—and the potential need thereafter to prosecute and defend such adversary proceedings—would not be in the best interests of the Debtors' estates, the Debtors' stakeholders, and other parties-in-interest because most of the Adversary Proceedings will not be prosecuted once the Plan becomes effective.  The Debtors submit that these reasons comprise good cause for the requested extension.

Applicable Authority

22.     The Bankruptcy Rules and Federal Rules of Civil Procedure grant this Court discretion to adopt and implement guidelines which will aid in the administration of Adversary Proceedings, including discretion to grant the proposed extension of the service of

process deadline.  See In re Sheehan, 253 F.3d 507, 511 (9th Cir. 2001) ("The time for service in an adversary proceeding may be extended under two different rules: Rule 4(m) of the Federal Rules of Civil Procedure, and Bankruptcy Rule 9006(b).").

23.     Bankruptcy Rule 9006(b)(1) provides for the enlargement of time to perform acts required under the Bankruptcy Rules: "[W]hen an act is required or allowed to be done at or within a specified period by these rules or by a notice given thereunder or by order of court, the court for cause shown may at any time in its discretion . . . order the period enlarged if the request therefor is made before the expiration of the period originally prescribed or as extended by a previous order . . . ."  Fed. R. Bankr. P. 9006(b)(1).

24.     Moreover, Fed. R. Civil P. 4(m), made applicable here by Bankruptcy Rule 7004(a), requires courts, upon a showing of good cause, to extend the period for service of process after the filing of a complaint.  See Bank of Cape Verde v. Bronson, 167 F.R.D. 370, 371-72 (S.D.N.Y. 1996) (good cause existed when future events would have likely "obviated the need to serve the [] complaint" and when plaintiff requested extension before Fed. R. Civ. P. 4(m) deadline expired).  Even absent good cause, this Court has discretion to extend the 120-day service period.  See Mejia v. Castle Hotel Inc., 164 F.R.D. 343, 345 (S.D.N.Y. 1996).

25.     The Debtors accordingly request that the Court enter the proposed order, annexed hereto as Exhibit A, which would extend by two months (i.e., from March 31, 2008 to May 31, 2008) the Debtors' Fed. R. Civ. P. 4(m) deadline to serve each defendant in the Adversary Proceedings commenced in connection with the Preservation Of Estate Claims

Procedures Order with a summons and a copy of the complaint, without prejudice to the Debtors' right to seek further extensions of the deadline.[5]

## Notice Of Motion

26.     Notice of this Motion has been provided in accordance with the Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered March 20, 2006 (Docket No. 2883), and the Tenth Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered February 4, 2008 (Docket No. 12487).  In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

## Memorandum Of Law

27.     Because the legal points and authorities upon which this Motion relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

---

[5]     Similar relief was granted in In re Ames Dep't Stores, Inc., No. 01-42217 (REG) (Bankr. S.D.N.Y. Feb. 3, 2004).  (See Order Extending Time For Service Of Process With Respect To Certain Preference Actions (Docket No. 2524).)

WHEREFORE the Debtors respectfully request that the Court enter an order (a) granting the relief requested herein and (b) granting the Debtors such other and further relief as is just.

Dated:  New York, New York
        February 28, 2008

SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP

By:   /s/ John Wm. Butler, Jr.
      John Wm. Butler, Jr. (JB 4711)
      John K. Lyons (JL 9331)
      Ron E. Meisler (RM 3026)
    333 West Wacker Drive, Suite 2100
    Chicago, Illinois 60606

      - and -

By:   /s/ Kayalyn A. Marafioti
      Kayalyn A. Marafioti (KM 9632)
      Thomas J. Matz (TM 5986)
    Four Times Square
    New York, New York 10036

    Attorneys for Delphi Corporation, et al.,
      Debtors and Debtors-in-Possession

# EXHIBIT K

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                          :
       In re                             :          Chapter 11
                                          :
DELPHI CORPORATION, <u>et al.</u>,      :          Case No. 05-44481 (RDD)
                                          :
                   Debtors.     :          (Jointly Administered)
                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x


ORDER PURSUANT TO FED. R. BANKR. P. 7004(a) AND
9006(b)(1) AND FED. R. CIV. P. 4(m) TO EXTEND DEADLINE TO
SERVE PROCESS FOR AVOIDANCE ACTIONS FILED IN CONNECTION
<u>WITH PRESERVATION OF ESTATE CLAIMS PROCEDURES ORDER</u>

("EXTENSION OF AVOIDANCE ACTION SERVICE DEADLINE ORDER")

            Upon the unopposed motion, dated February 28, 2008 (the "Motion"), of

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and

debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), for an

order under Federal Rules of Bankruptcy Procedure 7004(a) and 9006(b)(1) and Federal

Rule of Civil Procedure 4(m) to extend the deadline to serve process for Adversary

Proceedings[1] commenced in connection with the Preservation Of Estate Claims Procedures

Order[2] (Docket No. 9105); and upon the record of the hearing held on the Motion; and this

Court having determined that the relief requested in the Motion is in the best interests of

the Debtors, their estates, their creditors, and other parties-in-interest; and it appearing that

proper and adequate notice of the Motion has been given, and it appearing that the notice

---

[1]    Capitalized terms used and not defined herein shall have the meanings ascribed to them in the Motion.

of the presentment of this order has been given in accordance with this Court's direction and Local Rule 9074-1 to the parties in the adversary proceeding that is subject to the Preservation of Estate Claims Procedures Order and listed on Exhibit 7.24 of the Debtors' Plan, and it appearing that no other or further notice is necessary; and after due deliberation thereon; and good and sufficient cause appearing therefor, it is hereby

ORDERED, ADJUDGED, AND DECREED THAT:

1.      The Motion is GRANTED.

2.      Paragraph 8 of the Preservation Of Estate Claims Procedures Order is hereby modified so that the time under Federal Rule of Civil Procedure 4(m) by which the Debtors must serve a defendant in the Adversary Proceedings with a summons and complaint is further extended to May 31, 2008, without prejudice to the Debtors' right to seek further extensions.  The Debtors shall serve a copy of this order upon each defendant in any Adversary Proceeding either when the Debtors serve a summons and complaint on such defendant or as soon thereafter as practicable.  All other provisions of the Preservation Of Estate Claims Procedures Order shall remain in effect.

3.      This order shall be deemed entered in each of the Adversary Proceedings.

4.      The Debtors shall file a copy of this order in each of the Adversary Proceedings.

5.      This Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this order.

---

[2]     The Adversary Proceedings are listed by adversary proceeding number on Exhibit A attached hereto.

6.     The requirement under Rule 9013-1(b) of the Local Bankruptcy

Rules for the United States Bankruptcy Court for the Southern District of New York for

the service and filing of a separate memorandum of law is deemed satisfied by the Motion.

Dated: New York, New York
       March 28, 2008

                          ___/s/ Robert D. Drain_____
                              UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT L

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

- and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                      :
            In re                                     :    Chapter 11
                                                      :
DELPHI CORPORATION, et al.,                           :    Case No. 05-44481 (RDD)
                                                      :
                                                      :    (Jointly Administered)
            Debtors.                                  :
- - - - - - - - - - - - - - - - - - - - - - - - - - - x

MOTION PURSUANT TO FED. R. BANKR. P. 7004(a) AND
9006(b)(1) AND FED. R. CIV. P. 4(m) TO EXTEND DEADLINE TO
SERVE PROCESS FOR AVOIDANCE ACTIONS FILED IN CONNECTION
WITH PRESERVATION OF ESTATE CLAIMS PROCEDURES ORDER

("POSTCONFIRMATION EXTENSION OF AVOIDANCE ACTION SERVICE
DEADLINE MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates,

debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"),

hereby submit this Motion Pursuant To Fed. R. Bankr. P. 7004(a) And 9006(b)(1) And Fed. R.

Civ. P. 4(m) To Extend Deadline To Serve Process For Avoidance Actions Filed In Connection

With Preservation Of Estate Claims Procedures Order (Docket No. 9105) (the "Motion"), and

respectfully represent as follows:

Background

A.    The Chapter 11 Filings

1.    On October 8 and 14, 2005, the Debtors filed voluntary petitions in this

Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C.

§§ 101-1330, as then amended (the "Bankruptcy Code"). The Debtors continue to operate their

businesses and manage their properties as debtors-in-possession under Bankruptcy Code sections

1107(a) and 1108. This Court has ordered joint administration of these cases.

2.    No trustee or examiner has been appointed in these cases. On October 17,

2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official

committee of unsecured creditors. On April 28, 2006, the U.S. Trustee appointed an official

committee of equity holders (together with the official committee of unsecured creditors, the

"Statutory Committees").

3.    On September 6, 2007, the Debtors filed the Joint Plan Of Reorganization

Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In Possession (Docket No.

9263) and the Disclosure Statement With Respect To Joint Plan Of Reorganization Of Delphi

Corporation And Certain Affiliates, Debtors And Debtors-In-Possession (Docket No. 9264).

Subsequently, on December 10, 2007, the Debtors filed the First Amended Joint Plan Of

Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession  (Docket No. 11386) (the "Plan") and the First Amended Disclosure Statement with respect to the Plan  (Docket No. 11388) (the "Disclosure Statement").  The Court entered an order approving the adequacy of the Disclosure Statement and granting the related solicitation procedures motion on December 10, 2007 (Docket No. 11389).  On January 25, 2008, the Court entered an order confirming the Plan, as modified  (Docket No. 12359) (the "Confirmation Order"), which became a final order on February 4, 2008.

4. On April 4, 2008, the Debtors announced that although they had met the conditions required to substantially consummate the Plan, including obtaining $6.1 billion of exit financing, Delphi's Plan Investors (as defined in the Plan) refused to participate in a closing that was commenced but not completed and refused to fund their Investment Agreement (as defined in the Plan) with Delphi.  The Debtors are prepared to pursue actions with respect to the Plan Investors that are in the best interests of the Debtors and their stakeholders and are working with their stakeholders to achieve their goal of emerging from chapter 11 as soon as practicable.

5. This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

6. The statutory predicates for the relief requested herein are rules 7004 and 9004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and rule 4(m) of the Federal Rules of Civil Procedure.

B. <u>Current Business Operations Of The Debtors</u>

7. Delphi and its subsidiaries and affiliates (collectively, the "Company") as of December 31, 2007 had global net sales of $22.3 billion and global assets of approximately

$13.7 billion.[1]  At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues and the thirteenth largest public company business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are not chapter 11 debtors and have continued their business operations without supervision from the Court.[2]

8.    The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology.  The Company supplies products to nearly every major global automotive original equipment manufacturer ("OEM").

9.    Delphi was incorporated in Delaware in 1998 as a wholly owned subsidiary of General Motors Corporation ("GM").  Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM.  In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications.  Although GM is still the Company's

---

[1]   The aggregated financial data used herein generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates as disclosed in the Company's Form 10-K filed on February 19, 2008.

[2]   On March 20, 2007, Delphi Automotive Systems Espana S.L. ("DASE"), whose sole operation is a non-core automotive component plant in Cadiz, Spain, filed a "Concurso" application for a Spanish insolvency proceeding, which was approved by the Spanish court on April 13, 2007.  On July 4, 2007, DASE, its Concurso receivers, and the Cadiz workers councils and unions reached a settlement on a social plan, the funding of which was approved by this Court on July 19, 2007.  The Spanish court approved the social plan on July 31, 2007.  The Concurso proceeding is consistent with Delphi's transformation plan to optimize its manufacturing footprint and to lower its overall cost structure.

single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

C.      Events Leading To The Chapter 11 Filing

10.      In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income. Every year thereafter, however, with the exception of 2002, the Company has suffered losses. In calendar year 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[3] Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of approximately $2.4 billion on net sales of $26.9 billion. Moreover, in 2006 the Debtors incurred a net loss of $5.5 billion, $3.0 billion of which comprised charges related to the U.S. employee special attrition programs, and in 2007, the Debtors incurred a net loss of $3.1 billion.

11.      The Debtors believe that the Company's financial performance deteriorated because of (i) increasingly unsustainable U.S. legacy liabilities and operational restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which have the effect of creating largely fixed labor costs, (ii) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (iii) increasing commodity prices.

12.      In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward-looking revenue requirements. Because discussions

---

[3]      Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on U.S. deferred tax assets as of December 31, 2004. The Company's net operating loss in calendar year 2004 was $482 million.

with its major stakeholders had not progressed sufficiently by the end of the third quarter of 2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete its transformation plan and preserve value for its stakeholders.

D.    The Debtors' Transformation Plan

13.    On March 31, 2006, the Company outlined the key tenets of a transformation plan that it believed would enable it to return to stable, profitable business operations.  The Debtors stated that they needed to focus on five key areas: first, modifying the Company's labor agreements to create a competitive arena in which to conduct business; second, concluding their negotiations with GM to finalize GM's financial support for the Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company; third, streamlining their product portfolio to capitalize on their world-class technology and market strengths and make the necessary manufacturing alignment with their new focus; fourth, transforming their salaried workforce to ensure that the Company's organizational and cost structure is competitive and aligned with its product portfolio and manufacturing footprint; and fifth, devising a workable solution to their current pension situation.

E.    Plan Confirmation And Postconfirmation Matters

14.    The confirmed Plan is based upon a series of global settlements and compromises that involve nearly every major constituency in the Debtors' reorganization cases. The Global Settlement Agreement and the Master Restructuring Agreement provide for a comprehensive settlement with GM, and both agreements were approved by this Court in the Confirmation Order.  After the Plan was confirmed, the Debtors focused their efforts on satisfying the conditions for the Plan to become effective.  The Debtors satisfied those conditions and on April 4, 2008 began a formal closing process attended by representatives of GM, the exit lenders, and the Statutory Committees.  The Plan Investors, however, refused to participate in the

closing or fund their obligations under the Investment Agreement. Instead, the Plan Investors delivered written notices purporting to terminate the Investment Agreement based on both alleged breaches by the Debtors and the failure of the Plan's effective date to occur by April 4, 2008. The Debtors are prepared to pursue actions against the Plan Investors that are in the best interests of the Debtors and their stakeholders and are working with their stakeholders to evaluate their options to move forward with emerging from chapter 11 as soon as reasonably practicable.

15. Upon the conclusion of the reorganization process, the Debtors expect to emerge as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives. In the meantime, Delphi will marshal all of its resources to continue to deliver high-quality products to its customers globally. Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

F.      The Establishment Of Procedures to Preserve Estate Claims

16. Before the confirmation of the Debtors' Plan, this Court on August 16, 2007 entered that certain Order Under 11 U.S.C. §§ 102(1)(A), 105(a), 107, 108(a)(2), And 546(a) And Fed. R. Bankr. P. 7004, 9006(c), And 9018 (i) Authorizing Debtors To Enter Into Stipulations Tolling Statute Of Limitations With Respect To Certain Claims, (ii) Authorizing Procedures To Identify Causes Of Action That Should Be Preserved, And (iii) Establishing Procedures For Certain Adversary Proceedings Including Those Commenced By Debtors Under 11 U.S.C. § 541, 544, 545, 547, 548, Or 553 ("Preservation Of Estate Claims Procedures Order") (Docket No. 9105). On March 28, 2008, this Court entered the Order Pursuant To Fed. R. Bankr. P. 7004(a) And 9006(b)(1) And Fed. R. Civ. P. 4(m) To Extend Deadline To Serve Process For

Avoidance Actions Filed In Connection With Preservation Of Estate Claims Procedures Order (Docket No. 13277) (the "Deadline Extension Order").

17.     The purpose of the Preservation Of Estate Claims Procedures Order was two-fold: on the one hand, it permitted the Debtors to preserve their right to pursue (or abandon) certain avoidance actions before the then-impending expiration of the two-year statute of limitations to file such actions; on the other hand, it established procedures to avoid having to force all potential defendants to retain counsel and defend against the adversary proceedings when, in fact, the Debtors anticipated that most of them would be resolved upon the Debtors' emergence from chapter 11 and thus never pursued.  To that end, the Preservation Of Estate Claims Procedures Order and the Deadline Extension Order (i) allowed the Debtors to file adversary proceeding complaints under seal, (ii) directed the Clerk of Court to delay issuing summonses for complaints unless and until the Debtors notified the Clerk of Court of their intent to prosecute such actions, (iii) stayed each adversary action unless and until the Debtors make service of process on the respective defendants, and (iv) extended the deadline under Fed. R. Civ. P. 4(m) by which the Debtors would have to serve process to May 31, 2008, so that the complaints would not be subject to dismissal under Fed. R. Civ. P. 4(m).  Such relief was intended to allow the Debtors to preserve potentially valuable assets without disrupting the Plan process or business relationships or prejudicing the rights of any defendants.

18.     In accordance with the Preservation Of Estate Claims Procedures Order, the Debtors commenced 742 adversary proceedings (the "Adversary Proceedings") by filing complaints under seal.  On January 25, 2008, the Court entered the Confirmation Order.  Under

the Plan, the Debtors will not retain any of the causes of action asserted in the Adversary

Proceedings except those listed on Exhibit 7.24 to the Plan.[4]

Relief Requested

19.    By this Motion, the Debtors request entry of an order under Bankruptcy

Rule 9006(b)(1) and Federal Rule Of Civil Procedure 4(m), made applicable by Bankruptcy

Rule 7004(a), to further extend the deadline by which the Debtors would be required to serve a

summons and complaint upon each defendant under the Preservation Of Estate Claims

Procedures Order, as modified by the Deadline Extension Order.  Specifically, the Debtors

request that the existing May 31, 2008 service deadline set forth in the Deadline Extension Order

be extended to 30 days after substantial consummation of the Plan or any modified plan.  The

Debtors accordingly request that the Court enter the proposed Postcomfirmation Extension Of

Avoidance Action Service Deadline Order, a copy of which is annexed hereto as Exhibit A.

Basis For Relief

20.    As noted above, the Debtors are working with their stakeholders to

develop a path for emerging from chapter 11 as soon as reasonably practicable.  Under the

Deadline Extension Order, however, the Debtors' current deadline to serve the summons and

complaint on every defendant in the Adversary Proceedings is May 31, 2008.  To meet the May

31, 2008 deadline for each of the defendants, the Debtors would first have to request that the

Clerk of Court in the coming weeks issue summonses for each of the 742 Adversary Proceedings

to allow enough time for the summonses to be issued and subsequently served with the

complaints by the May 31, 2008 deadline.

---

[4]    Of the five categories of claims listed by the Debtors on Exhibit 7.24 to the Plan, only the claims relating to
Laneko Engineering Co., Wachovia Bank, National Association, Laneko Engineering Co. Inc., and their
affiliates and subsidiaries are subject to the Preservation Of Estate Claims Procedures Order.  (See Exhibit 7.24
to the Plan (Docket No. 11608).)  Notice of this Motion has been provided to those entities.

21.     Contemplating that further extensions may be necessary to achieve the goals of the Preservation Of Estate Claims Procedures Order, that order and the Deadline Extension Order expressly provided that the Debtors' previous extension of the deadline for services of process was "without prejudice [to the Debtors' ability] to seek further extensions" if appropriate.  (See Preservation Of Estate Claims Procedures Order ¶ 8; Deadline Extension Order ¶ 2.)

22.     The Debtors now believe that the extension of the Fed. R. Civ. P. 4(m) deadline that is requested in this Motion is appropriate, and that there is good cause for such an extension.  Such an extension would enable the Debtors to fulfill their fiduciary responsibility to preserve valuable estate assets in a manner that would not unnecessarily disrupt the emergence process or the Debtors' current business relationships with potential defendants that are necessary to the Debtors' ongoing operations.  Moreover, the requested extension would reduce the administrative and economic burdens of the Adversary Proceedings on the Debtors, the Court, the Clerk of Court, and the potential defendants.  Specifically, the Debtors believe that the resources that they, the Court, the Clerk of Court, and the defendants would need to expend on issuing and serving 742 summonses and complaints in the Adversary Proceedings at this time— and the potential need thereafter to prosecute and defend such adversary proceedings—would not be in the best interests of the Debtors' estates, the Debtors' stakeholders, and other parties-in-interest because most of the Adversary Proceedings will not be prosecuted if the Plan were to become effective and likely will not be prosecuted under any modified plan.  The Debtors submit that these reasons comprise good cause for the requested extension.

<u>Applicable Authority</u>

23.     The Bankruptcy Rules and Federal Rules of Civil Procedure grant this Court discretion to adopt and implement guidelines which will aid in the administration of

Adversary Proceedings, including discretion to grant the proposed extension of the service of process deadline. See Zapata v. City of New York, 502 F.3d 192, 195 (2d Cir. 2007) (Rule 4(m) authorizes court to grant extensions of service period); In re Sheehan, 253 F.3d 507, 511 (9th Cir. 2001) ("The time for service in an adversary proceeding may be extended under two different rules: Rule 4(m) of the Federal Rules of Civil Procedure, and Bankruptcy Rule 9006(b).").

24.     Bankruptcy Rule 9006(b)(1) provides for the enlargement of time to perform acts required under the Bankruptcy Rules: "[W]hen an act is required or allowed to be done at or within a specified period by these rules or by a notice given thereunder or by order of court, the court for cause shown may at any time in its discretion . . . order the period enlarged if the request therefor is made before the expiration of the period originally prescribed or as extended by a previous order . . . ." Fed. R. Bankr. P. 9006(b)(1).

25.     Moreover, Fed. R. Civil P. 4(m), made applicable here by Bankruptcy Rule 7004(a), requires courts, upon a showing of good cause, to extend the period for service of process after the filing of a complaint. See Bank of Cape Verde v. Bronson, 167 F.R.D. 370, 371-72 (S.D.N.Y. 1996) (good cause existed when future events would likely have "obviated the need to serve the [] complaint" and when plaintiff requested extension before Fed. R. Civ. P. 4(m) deadline expired). Even absent good cause, this Court has discretion to extend the 120-day service period. See Zapata, 502 F.3d at 196; Mejia v. Castle Hotel Inc., 164 F.R.D. 343, 345 (S.D.N.Y. 1996).

26.     The Debtors accordingly request that the Court enter the proposed order, annexed hereto as Exhibit A, which would extend until 30 days after substantial consummation of the Plan or any modified plan the Debtors' Fed. R. Civ. P. 4(m) deadline to serve each defendant in the Adversary Proceedings commenced in connection with the Preservation Of Estate Claims Procedures Order with a summons and a copy of the complaint, without prejudice

to the Debtors' right to seek further extensions of the deadline and without prejudice to the right of each of Laneko Engineering Co., Wachovia Bank, National Association, and Laneko Engineering Co. Inc. to seek a shortening of the deadline.

<u>Notice Of Motion</u>

27.     Although notice is not required by Fed. R. Bankr. P. 9006(b)(1), <u>see</u> <u>Law Debenture Trust Co. v. Calpine Corp.</u> (In re Calpine Corp.), 356 B.R. 585, 595 (S.D.N.Y. 2007); <u>Kernisant v. City of New York</u>, 225 F.R.D. 422, 431 n.13 (E.D.N.Y. 2005); <u>Brady v. Marks</u>, 7 F. Supp. 2d 247, 255 (W.D.N.Y. 1998), notice of this Motion has been provided in accordance with the Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered March 20, 2006 (Docket No. 2883), and the Tenth Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered February 4, 2008 (Docket No. 12487). Notice has also been provided to Laneko Engineering Co., Wachovia Bank, National Association, and Laneko Engineering Co. Inc., against whom causes of action have been retained under the confirmed Plan.  In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

<u>Memorandum Of Law</u>

28.     Because the legal points and authorities upon which this Motion relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

WHEREFORE the Debtors respectfully request that the Court enter an order (a) granting the relief requested herein and (b) granting the Debtors such other and further relief as is just.

Dated:   New York, New York
         April 10, 2008

SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP

By:  _/s/ John Wm. Butler, Jr._____
     John Wm. Butler, Jr. (JB 4711)
     John K. Lyons (JL 9331)
     Ron E. Meisler (RM 3026)
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606

     - and -

By:  _/s/ Kayalyn A. Marafioti_____
     Kayalyn A. Marafioti (KM 9632)
     Thomas J. Matz (TM 5986)
Four Times Square
New York, New York 10036

Attorneys for Delphi Corporation, et al.,
  Debtors and Debtors-in-Possession

# EXHIBIT M

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                        :

In re                      :       Chapter 11
                        :

DELPHI CORPORATION, <u>et al.</u>,  :       Case No. 05-44481 (RDD)
                        :

             Debtors.    :       (Jointly Administered)
                        :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

ORDER PURSUANT TO FED. R. BANKR. P. 7004(a) AND
9006(b)(1) AND FED. R. CIV. P. 4(m) TO EXTEND DEADLINE TO
SERVE PROCESS FOR AVOIDANCE ACTIONS FILED IN CONNECTION
<u>WITH PRESERVATION OF ESTATE CLAIMS PROCEDURES ORDER</u>

("POSTCONFIRMATION EXTENSION OF AVOIDANCE ACTION SERVICE
DEADLINE ORDER")

                Upon the motion, dated April 10, 2008 (the "Motion"), of Delphi

Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-

possession in the above-captioned cases (collectively, the "Debtors"), for an order under

Federal Rules of Bankruptcy Procedure 7004(a) and 9006(b)(1) and Federal Rule of Civil

Procedure 4(m) to extend the deadline to serve process for Adversary Proceedings[1]

commenced in connection with the Preservation Of Estate Claims Procedures Order[2]

(Docket No. 9105), which deadline was previously extended to May 31, 2008 pursuant to

the Order Pursuant To Fed. R. Bankr. P. 7004(a) And 9006(b)(1) And Fed. R. Civ. P. 4(m)

To Extend Deadline To Serve Process For Avoidance Actions Filed In Connection With

---

[1]    Capitalized terms used and not defined herein shall have the meanings ascribed to them in the Motion.

[2]    The Adversary Proceedings are listed by adversary proceeding number on <u>Exhibit A</u> attached hereto.

Preservation Of Estate Claims Procedures Order (Docket No. 13277) (the "First Deadline Extension Order"); and upon the record of the hearing held on the Motion; and this Court having determined that the relief requested in the Motion as granted herein is in the best interests of the Debtors, their estates, their creditors, and other parties-in-interest; and it appearing that proper and adequate notice of the Motion has been given, and it appearing that no other or further notice is necessary; and after due deliberation thereon; and good and sufficient cause appearing therefor, it is hereby

ORDERED, ADJUDGED, AND DECREED THAT:

1.      The Motion is GRANTED as provided herein.

2.      Paragraph 8 of the Preservation Of Estate Claims Procedures Order, as previously modified by First Deadline Extension Order, is hereby further modified so that the time under Federal Rule of Civil Procedure 4(m) by which the Debtors must serve a defendant in the Adversary Proceedings with a summons and complaint is further extended until 30 days after the later of substantial consummation of the Plan or any modified chapter 11 plan for the Debtors and December 31, 2008; without prejudice, however, to the Debtors' right to seek further extensions and without prejudice to the right of each of Laneko Engineering Co., Wachovia Bank, National Association, and Laneko Engineering Co. Inc. to seek a shortening of the deadline. The Debtors shall serve a copy of this order upon each defendant in any Adversary Proceeding either when the Debtors serve a summons and complaint on such defendant or as soon thereafter as practicable. All other provisions of the Preservation Of Estate Claims Procedures Order shall remain in effect.

3.      This order shall be deemed entered in each of the Adversary

Proceedings.

4.      The Debtors shall file a copy of this order in each of the Adversary

Proceedings.

5.      This Court shall retain jurisdiction to hear and determine all matters

arising from the implementation of this order.

6.      The requirement under Rule 9013-1(b) of the Local Bankruptcy

Rules for the United States Bankruptcy Court for the Southern District of New York for

the service and filing of a separate memorandum of law is deemed satisfied by the Motion.

Dated: New York, New York
       April 30, 2008


                    _____
                         /s/ Robert D. Drain
                       UNITED STATES BANKRUPTCY JUDGE

# <u>EXHIBIT A</u>

# DELPHI ADVERSARY PROCEEDING NUMBERS

| | | |
|---|---|---|
| 07-02072 | 07-02191 | 07-02200 |
| 07-02084 | 07-02195 | 07-02088 |
| 07-02090 | 07-02201 | 07-02094 |
| 07-02096 | 07-02205 | 07-02099 |
| 07-02101 | 07-02207 | 07-02103 |
| 07-02106 | 07-02209 | 07-02109 |
| 07-02115 | 07-02213 | 07-02110 |
| 07-02120 | 07-02214 | 07-02239 |
| 07-02124 | 07-02219 | 07-02244 |
| 07-02138 | 07-02224 | 07-02248 |
| 07-02142 | 07-02227 | 07-02251 |
| 07-02147 | 07-02231 | 07-02255 |
| 07-02150 | 07-02077 | 07-02259 |
| 07-02154 | 07-02080 | 07-02261 |
| 07-02157 | 07-02083 | 07-02265 |
| 07-02163 | 07-02091 | 07-02267 |
| 07-02170 | 07-02095 | 07-02270 |
| 07-02184 | 07-02102 | 07-02273 |
| 07-02190 | 07-02105 | 07-02276 |
| 07-02198 | 07-02112 | 07-02277 |
| 07-02202 | 07-02117 | 07-02280 |
| 07-02204 | 07-02123 | 07-02281 |
| 07-02208 | 07-02125 | 07-02282 |
| 07-02076 | 07-02128 | 07-02283 |
| 07-02081 | 07-02130 | 07-02284 |
| 07-02087 | 07-02135 | 07-02288 |
| 07-02097 | 07-02137 | 07-02291 |
| 07-02104 | 07-02143 | 07-02293 |
| 07-02112 | 07-02148 | 07-02074 |
| 07-02132 | 07-02152 | 07-02078 |
| 07-02140 | 07-02159 | 07-02082 |
| 07-02145 | 07-02165 | 07-02085 |
| 07-02153 | 07-02169 | 07-02089 |
| 07-02160 | 07-02174 | 07-02093 |
| 07-02166 | 07-02175 | 07-02108 |
| 07-02171 | 07-02182 | 07-02114 |
| 07-02180 | 07-02189 | 07-02119 |
| 07-02186 | 07-02196 | 07-02122 |

| | | |
|---|---|---|
| 07-02126 | 07-02199 | 07-02226 |
| 07-02129 | 07-02206 | 07-02230 |
| 07-02131 | 07-02210 | 07-02252 |
| 07-02136 | 07-02212 | 07-02256 |
| 07-02141 | 07-02217 | 07-02262 |
| 07-02146 | 07-02221 | 07-02266 |
| 07-02151 | 07-02225 | 07-02269 |
| 07-02156 | 07-02228 | 07-02272 |
| 07-02158 | 07-02235 | 07-02275 |
| 07-02164 | 07-02241 | 07-02278 |
| 07-02167 | 07-02245 | 07-02299 |
| 07-02172 | 07-02250 | 07-02303 |
| 07-02176 | 07-02254 | 07-02306 |
| 07-02179 | 07-02260 | 07-02309 |
| 07-02183 | 07-02079 | 07-02314 |
| 07-02187 | 07-02092 | 07-02318 |
| 07-02193 | 07-02098 | 07-02321 |
| 07-02233 | 07-02107 | 07-02326 |
| 07-02238 | 07-02111 | 07-02329 |
| 07-02243 | 07-02118 | 07-02334 |
| 07-02247 | 07-02107 | 07-02337 |
| 07-02249 | 07-02149 | 07-02340 |
| 07-02253 | 07-02162 | 07-02346 |
| 07-02257 | 07-02173 | 07-02350 |
| 07-02263 | 07-02178 | 07-02354 |
| 07-02075 | 07-02185 | 07-02359 |
| 07-02086 | 07-02192 | 07-02237 |
| 07-02100 | 07-02197 | 07-02240 |
| 07-02116 | 07-02203 | 07-02246 |
| 07-02121 | 07-02211 | 07-02258 |
| 07-02127 | 07-02214 | 07-02264 |
| 07-02133 | 07-02218 | 07-02271 |
| 07-02139 | 07-02223 | 07-02274 |
| 07-02144 | 07-02229 | 07-02279 |
| 07-02155 | 07-02232 | 07-02285 |
| 07-02161 | 07-02234 | 07-02289 |
| 07-02168 | 07-02236 | 07-02294 |
| 07-02177 | 07-02242 | 07-02298 |
| 07-02181 | 07-02215 | 07-02302 |
| 07-02188 | 07-02220 | 07-02312 |
| 07-02194 | 07-02222 | 07-02316 |

| | | |
|---|---|---|
| 07-02324 | 07-02392 | 07-02547 |
| 07-02330 | 07-02393 | 07-02549 |
| 07-02336 | 07-02396 | 07-02286 |
| 07-02342 | 07-02402 | 07-02290 |
| 07-02347 | 07-02407 | 07-02295 |
| 07-02783 | 07-02417 | 07-02297 |
| 07-02355 | 07-02421 | 07-02301 |
| 07-02361 | 07-02430 | 07-02305 |
| 07-02367 | 07-02442 | 07-02310 |
| 07-02373 | 07-02445 | 07-02317 |
| 07-02379 | 07-02449 | 07-02322 |
| 07-02397 | 07-02452 | 07-02327 |
| 07-02405 | 07-02454 | 07-02332 |
| 07-02268 | 07-02458 | 07-02335 |
| 07-02296 | 07-02461 | 07-02343 |
| 07-02304 | 07-02464 | 07-02348 |
| 07-02308 | 07-02467 | 07-02352 |
| 07-02311 | 07-02470 | 07-02357 |
| 07-02315 | 07-02473 | 07-02362 |
| 07-02320 | 07-02475 | 07-02366 |
| 07-02323 | 07-02478 | 07-02372 |
| 07-02328 | 07-02481 | 07-02696 |
| 07-02333 | 07-02483 | 07-02701 |
| 07-02784 | 07-02485 | 07-02703 |
| 07-02338 | 07-02488 | 07-02704 |
| 07-02341 | 07-02490 | 07-02706 |
| 07-02345 | 07-02493 | 07-02708 |
| 07-02349 | 07-02497 | 07-02710 |
| 07-02351 | 07-02499 | 07-02712 |
| 07-02356 | 07-02503 | 07-02714 |
| 07-02360 | 07-02506 | 07-02715 |
| 07-02363 | 07-02510 | 07-02717 |
| 07-02364 | 07-02513 | 07-02718 |
| 07-02369 | 07-02517 | 07-02719 |
| 07-02374 | 07-02521 | 07-02720 |
| 07-02377 | 07-02525 | 07-02721 |
| 07-02382 | 07-02528 | 07-02723 |
| 07-02384 | 07-02532 | 07-02726 |
| 07-02386 | 07-02535 | 07-02728 |
| 07-02388 | 07-02538 | 07-02730 |
| 07-02390 | 07-02544 | 07-02732 |

| | | |
|---|---|---|
| 07-02734 | 07-02425 | 07-02541 |
| 07-02736 | 07-02428 | 07-02414 |
| 07-02738 | 07-02429 | 07-02418 |
| 07-02739 | 07-02432 | 07-02424 |
| 07-02741 | 07-02434 | 07-02427 |
| 07-02743 | 07-02436 | 07-02433 |
| 07-02745 | 07-02438 | 07-02435 |
| 07-02747 | 07-02441 | 07-02439 |
| 07-02749 | 07-02443 | 07-02447 |
| 07-02751 | 07-02446 | 07-02451 |
| 07-02753 | 07-02448 | 07-02455 |
| 07-02754 | 07-02450 | 07-02459 |
| 07-02756 | 07-02453 | 07-02462 |
| 07-02758 | 07-02456 | 07-02465 |
| 07-02760 | 07-02457 | 07-02469 |
| 07-02761 | 07-02460 | 07-02471 |
| 07-02762 | 07-02463 | 07-02476 |
| 07-02764 | 07-02786 | 07-02479 |
| 07-02766 | 07-02466 | 07-02482 |
| 07-02368 | 07-02468 | 07-02487 |
| 07-02371 | 07-02472 | 07-02491 |
| 07-02375 | 07-02474 | 07-02496 |
| 07-02378 | 07-02477 | 07-02501 |
| 07-02381 | 07-02480 | 07-02508 |
| 07-02383 | 07-02484 | 07-02512 |
| 07-02785 | 07-02486 | 07-02516 |
| 07-02387 | 07-02489 | 07-02518 |
| 07-02389 | 07-02492 | 07-02522 |
| 07-02391 | 07-02495 | 07-02526 |
| 07-02394 | 07-02498 | 07-02529 |
| 07-02398 | 07-02500 | 07-02531 |
| 07-02400 | 07-02504 | 07-02537 |
| 07-02401 | 07-02511 | 07-02540 |
| 07-02403 | 07-02515 | 07-02543 |
| 07-02406 | 07-02507 | 07-02545 |
| 07-02408 | 07-02520 | 07-02548 |
| 07-02410 | 07-02524 | 07-02559 |
| 07-02413 | 07-02527 | 07-02560 |
| 07-02416 | 07-02530 | 07-02561 |
| 07-02420 | 07-02533 | 07-02562 |
| 07-02423 | 07-02536 | 07-02563 |

| | | |
|---|---|---|
| 07-02564 | 07-02419 | 07-02768 |
| 07-02565 | 07-02689 | 07-02769 |
| 07-02566 | 07-02690 | 07-02770 |
| 07-02567 | 07-02691 | 07-02771 |
| 07-02568 | 07-02692 | 07-02772 |
| 07-02569 | 07-02693 | 07-02773 |
| 07-02570 | 07-02694 | 07-02774 |
| 07-02571 | 07-02695 | 07-02775 |
| 07-02572 | 07-02697 | 07-02776 |
| 07-02573 | 07-02698 | 07-02777 |
| 07-02574 | 07-02699 | 07-02778 |
| 07-02575 | 07-02700 | 07-02779 |
| 07-02576 | 07-02702 | 07-02617 |
| 07-02577 | 07-02705 | 07-02618 |
| 07-02578 | 07-02707 | 07-02619 |
| 07-02580 | 07-02709 | 07-02620 |
| 07-02582 | 07-02711 | 07-02621 |
| 07-02583 | 07-02713 | 07-02622 |
| 07-02584 | 07-02716 | 07-02623 |
| 07-02585 | 07-02722 | 07-02624 |
| 07-02587 | 07-02724 | 07-02625 |
| 07-02589 | 07-02725 | 07-02626 |
| 07-02591 | 07-02727 | 07-02627 |
| 07-02287 | 07-02729 | 07-02628 |
| 07-02292 | 07-02731 | 07-02629 |
| 07-02300 | 07-02733 | 07-02787 |
| 07-02307 | 07-02735 | 07-02630 |
| 07-02313 | 07-02737 | 07-02631 |
| 07-02319 | 07-02740 | 07-02788 |
| 07-02325 | 07-02742 | 07-02632 |
| 07-02331 | 07-02744 | 07-02633 |
| 07-02339 | 07-02746 | 07-02634 |
| 07-02344 | 07-02748 | 07-02635 |
| 07-02353 | 07-02750 | 07-02336 |
| 07-02358 | 07-02752 | 07-02637 |
| 07-02365 | 07-02755 | 07-02638 |
| 07-02370 | 07-02757 | 07-02639 |
| 07-02376 | 07-02759 | 07-02640 |
| 07-02380 | 07-02763 | 07-02641 |
| 07-02385 | 07-02765 | 07-02642 |
| 07-02395 | 07-02767 | 07-02643 |

| | | |
|---|---|---|
| 07-02644 | 07-02685 | 07-02588 |
| 07-02645 | 07-02686 | 07-02590 |
| 07-02646 | 07-02687 | 07-02592 |
| 07-02647 | 07-02688 | 07-02593 |
| 07-02648 | 07-02399 | 07-02594 |
| 07-02649 | 07-02404 | 07-02595 |
| 07-02650 | 07-02409 | 07-02596 |
| 07-02651 | 07-02411 | 07-02597 |
| 07-02652 | 07-02412 | 07-02598 |
| 07-02653 | 07-02415 | 07-02599 |
| 07-02654 | 07-02422 | 07-02600 |
| 07-02655 | 07-02426 | 07-02601 |
| 07-02656 | 07-02431 | 07-02602 |
| 07-02657 | 07-02437 | 07-02603 |
| 07-02658 | 07-02789 | 07-02604 |
| 07-02659 | 07-02440 | 07-02605 |
| 07-02660 | 07-02790 | 07-02606 |
| 07-02661 | 07-02444 | 07-02607 |
| 07-02662 | 07-02494 | 07-02608 |
| 07-02663 | 07-02502 | 07-02609 |
| 07-02664 | 07-02505 | 07-02610 |
| 07-02665 | 07-02509 | 07-02611 |
| 07-02666 | 07-02514 | 07-02612 |
| 07-02667 | 07-02519 | 07-02613 |
| 07-02668 | 07-02523 | 07-02614 |
| 07-02669 | 07-02534 | 07-02615 |
| 07-02670 | 07-02539 | 07-02616 |
| 07-02671 | 07-02542 | 07-02794 |
| 07-02672 | 07-02546 | 07-02803 |
| 07-02673 | 07-02550 | 07-02805 |
| 07-02674 | 07-02551 | 07-02797 |
| 07-02675 | 07-02552 | 07-02795 |
| 07-02676 | 07-02553 | 07-02796 |
| 07-02677 | 07-02554 | 07-02798 |
| 07-02678 | 07-02555 | 07-02799 |
| 07-02679 | 07-02556 | 07-02800 |
| 07-02680 | 07-02557 | 07-02801 |
| 07-02681 | 07-02558 | 07-02802 |
| 07-02682 | 07-02579 | 07-02804 |
| 07-02683 | 07-02581 | 07-02806 |
| 07-02684 | 07-02586 | 07-02807 |

07-02808
07-02809
07-02810
07-02811
07-02812
07-02813
07-02814
07-02815
07-02816
07-02817
07-02818
07-02819
07-02862

# EXHIBIT N

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
155 North Wacker Drive
Chicago, Illinois 60606
John Wm. Butler, Jr.
John K. Lyons
Ron E. Meisler


- and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Kayalyn A. Marafioti

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - -  x
                       :

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| DELPHI CORPORATION, et al., | : | Case No. 05-44481 (RDD) |
| | : | |
| | : | (Jointly Administered) |
| Debtors. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

SUPPLEMENTAL MOTION PURSUANT TO FED. R. BANKR. P. 7004(a) AND
9006(b)(1) AND FED. R. CIV. P. 4(m) TO EXTEND DEADLINE TO
SERVE PROCESS FOR AVOIDANCE ACTIONS FILED IN CONNECTION
WITH PRESERVATION OF ESTATE CLAIMS PROCEDURES ORDER

("SUPPLEMENTAL POSTCONFIRMATION EXTENSION OF AVOIDANCE
ACTION SERVICE DEADLINE MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this Supplemental Motion Pursuant To Fed. R. Bankr. P. 7004(a) And 9006(b)(1) And Fed. R. Civ. P. 4(m) To Extend Deadline To Serve Process For Avoidance Actions Filed In Connection With Preservation Of Estate Claims Procedures Order (the "Motion"), and respectfully represent as follows:

<u>Background</u>

A.      <u>The Chapter 11 Filings</u>

1.      On October 8 and 14, 2005, the Debtors filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession under Bankruptcy Code sections 1107(a) and 1108. This Court has ordered joint administration of these cases.

2.      No trustee or examiner has been appointed in these cases. On October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Creditors' Committee"). On April 28, 2006, the U.S. Trustee appointed an official committee of equity holders, which was disbanded on April 24, 2009. On February 26, 2009, the U.S. Trustee appointed an official committee of retired employees to represent certain of the Debtors' current active salaried employees, retirees, and their spouses for certain limited purposes.

3.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

4.      The statutory predicates for the relief requested herein are rules 7004 and

9004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and rule 4(m) of

the Federal Rules of Civil Procedure.

B.      Plan Confirmation And Postconfirmation Matters

5.      On December 10, 2007, the Debtors filed their first amended joint plan of

reorganization (Docket No. 11386) (the "Plan") and related disclosure statement (Docket No.

11388).  On January 25, 2008, the Court entered an order (Docket No. 12359) (the

"Confirmation Order") confirming the Plan, as modified (the "Confirmed Plan").  The

Confirmation Order became final on February 4, 2008.

6.      During the fall of 2008 the Debtors formulated certain modifications to the

Confirmed Plan.  On October 3, 2008, Delphi filed a motion under 11 U.S.C. § 1127 for an order

approving these modifications and also sought approval of a related disclosure statement and

procedures for re-soliciting votes on the Confirmed Plan, as modified (Docket No. 14310) (the

"Plan Modification Motion").  Subsequently, however, substantial uncertainty and significant

decline in capacity in global debt and equity markets, the global economic downturn generally,

and an unprecedented decline in global automotive production volumes adversely impacted

Delphi's ability to develop a revised recapitalization plan and successfully consummate the

modified plan of reorganization.  Moreover, as a result of market turbulence, the Debtors were

unable to extend the maturity date of their DIP credit facility (the "DIP Facility") on terms

reasonably acceptable to the Debtors and their other stakeholders.  Accordingly, with the support

of the administrative agent (the "DIP Agent") and the requisite lenders under the DIP Facility,

the Debtors entered into an accommodation agreement (as subsequently amended) to allow the

Debtors, among other things, to continue using certain of the proceeds of the DIP Facility.

7.      On June 1, 2009, the Debtors filed a supplement to the Plan Modification Motion (the "Motion Supplement") which sought approval of certain additional modifications to the Confirmed Plan (the "Modified Plan") as well as supplemental disclosure and procedures for re-soliciting votes on the Modified Plan.  The Motion Supplement was approved, with modifications, by order entered June 16, 2009 (the "Modification Procedures Order") and was later supplemented and amended by orders entered June 29, 2009 (Docket No. 17376), July 17, 2009 (Docket No. 18352), and July 21, 2009 (Docket No. 18551).

8.      Also on June 1, 2009, while facing the most difficult economic period in decades with the most precipitous drop in U.S. vehicle sale volumes in half a century, Delphi reached an agreement to effect its emergence from chapter 11 through a transaction with Parnassus Holdings II, LLC ("Parnassus"), an affiliate of Platinum Equity, and with the support of GM Components Holdings LLC ("GM Components"), an affiliate of GM.  In the exercise of the Debtors' fiduciary responsibilities to maximize the value of their estates for the benefit of all of their stakeholders, the Debtors executed an agreement (the "Platinum-GM MDA") to reflect the foregoing transactions through a plan of reorganization.  The agreement and the changes to the Confirmed Plan were filed as part of the Motion Supplement on June 1, 2009.

9.      The Modification Procedures Order, among other things, authorized the Debtors to commence solicitation of votes on the Modified Plan and set forth a comprehensive set of supplemental procedures for evaluating non-solicited alternative transactions to the Platinum-GM MDA (as supplemented and amended, the "Supplemental Procedures").  The Supplemental Procedures provided for, among other things, an auction open to DIP Lenders making a Pure Credit Bid (as defined therein) and other Qualified Bidders (as defined therein).

10.     Pursuant to the Supplemental Procedures, the Debtors held an auction on July 26 and 27, 2009 (the "Auction") at which the DIP Agent submitted a Pure Credit Bid on

behalf of the DIP Lenders that was supported by the requisite majority of the two most senior tranches of the DIP Facility (the "Required Lenders"). The Pure Credit Bid involved a credit bid of 100% of the principal and interest due and owing in respect of the DIP Facility under the DIP Credit Agreement (after giving effect to the application of any cash collateral to the DIP Facility) and was based upon an alternative Master Disposition Agreement (the "Master Disposition Agreement") pursuant to which DIP Holdco 3, LLC ("DIP Holdco 3") would replace Parnassus as a purchaser, subject to the terms of the Master Disposition Agreement. DIP Holdco 3 is an entity controlled by certain of the DIP lenders that together constitute the Required Lenders under the DIP Facility. At the conclusion of the Auction, after careful consideration, Delphi's board of directors determined that the Pure Credit Bid was superior to the Platinum-GM MDA, and approved it, subject to the parties' reaching a final agreement as to the terms and conditions of the Modification Approval Order and other items. Subsequently, the Debtors made certain further modifications to the Modified Plan to address the results of the Auction.

11.    After holding a final plan modification hearing on July 29 and 30, 2009, the Court entered an order approving the Modified Plan (Docket No. 18707) on July 30, 2009. Upon the effectiveness of the Modified Plan, Delphi will contemporaneously effectuate transactions, including the Master Disposition Agreement, through which DIP Holdco 3 will operate Delphi's U.S. and non-U.S. businesses going forward with $3.6 billion in emergence capital and capital commitments but without the labor-related legacy costs associated with the North American sites which, together with Delphi's global steering business, are being acquired by GM Components. DPH Holdings Corporation ("DPH Holdings") will emerge as a reorganized entity that retains certain residual non-core and non-strategic assets and liabilities that are expected to be divested over time.

12.      Consummation of these transactions through the Modified Plan, which embodies concessions made by parties-in-interest to resolve these chapter 11 cases, will provide for the satisfaction of all of the Debtors' administrative claims, secured claims, and priority claims and a potential distribution to holders of general unsecured claims.  Moreover, Delphi's emerging businesses, through GM Components and DIP Holdco 3, will continue to develop and deliver high-quality products to their customers globally.

C.      The Establishment Of Procedures to Preserve Estate Claims

13.      Before the entry of the Confirmation Order, this Court on August 16, 2007 entered that certain Order Under 11 U.S.C. §§ 102(1)(A), 105(a), 107, 108(a)(2), And 546(a) And Fed. R. Bankr. P. 7004, 9006(c), And 9018 (i) Authorizing Debtors To Enter Into Stipulations Tolling Statute Of Limitations With Respect To Certain Claims, (ii) Authorizing Procedures To Identify Causes Of Action That Should Be Preserved, And (iii) Establishing Procedures For Certain Adversary Proceedings Including Those Commenced By Debtors Under 11 U.S.C. § 541, 544, 545, 547, 548, Or 553 ("Preservation Of Estate Claims Procedures Order") (Docket No. 9105).  On March 28, 2008, this Court entered the Order Pursuant To Fed. R. Bankr. P. 7004(a) And 9006(b)(1) And Fed. R. Civ. P. 4(m) To Extend Deadline To Serve Process For Avoidance Actions Filed In Connection With Preservation Of Estate Claims Procedures Order (Docket No. 13277) (the "Deadline Extension Order").

14.      The purpose of the Preservation Of Estate Claims Procedures Order was two-fold: on the one hand, it permitted the Debtors to preserve their right to pursue (or abandon) certain avoidance actions before the then-impending expiration of the two-year statute of limitations to file such actions; on the other hand, it established procedures to avoid having to force all potential defendants to retain counsel and defend against the adversary proceedings when, in fact, the Debtors anticipated that most of them would be resolved upon the Debtors'

emergence from chapter 11 and thus never pursued.  To that end, the Preservation Of Estate Claims Procedures Order and the Deadline Extension Order (i) allowed the Debtors to file adversary proceeding complaints under seal, (ii) directed the Clerk of Court to delay issuing summonses for complaints unless and until the Debtors notified the Clerk of Court of their intent to prosecute such actions, (iii) stayed each adversary action unless and until the Debtors make service of process on the respective defendants, and (iv) extended the deadline under Fed. R. Civ. P. 4(m) by which the Debtors would have to serve process to May 31, 2008, so that the complaints would not be subject to dismissal under Fed. R. Civ. P. 4(m).  Such relief was intended to allow the Debtors to preserve potentially valuable assets without disrupting the Confirmed Plan process or business relationships or prejudicing the rights of any defendants.  In accordance with the Preservation Of Estate Claims Procedures Order, the Debtors commenced 742 adversary proceedings (the "Adversary Proceedings") by filing complaints under seal.

15.     On April 10, 2008, after the Debtors' plan investors failed to participate in a closing and fulfill their obligations to fund the Confirmed Plan, the Debtors filed a Motion Pursuant to Fed. R. Bankr. P. 7004(a) And 9006(b)(1) And Fed R. Civ. P. 4(m) To Extend Deadline To Serve Process For Avoidance Actions Filed In Connection With Preservation Of Estate Claims Procedures Order (the "Postconfirmation Extension Motion") (Docket No. 13361), seeking to extend the service deadline set forth in the Deadline Extension Order until 30 days after substantial consummation of the Confirmed Plan or any modified plan.  The Court granted this extension by order entered April 30, 2008 (the "Postconfirmation Extension Order") (Docket No. 13484).

### Relief Requested

16.     By this Motion, the Debtors request entry of an order under Bankruptcy Rule 9006(b)(1) and Federal Rule Of Civil Procedure 4(m), made applicable by Bankruptcy

Rule 7004(a), to further extend the deadline by which the Debtors would be required to serve a summons and complaint upon each defendant under the Preservation Of Estate Claims Procedures Order, as modified by the Deadline Extension Order and the Postconfirmation Extension Order.  Specifically, the Debtors request that the existing service deadline set forth in the Deadline Extension Order be extended to 180 days after substantial consummation of the Modified Plan.

<u>Basis For Relief</u>

17.     A further extension of the time for service in the Adversary Proceedings is necessary due to the complex nature of the transactions set forth in the Modified Plan and the Master Disposition Agreement.  At the time of the Debtors' request to extend their Fed. R. Civ. P. 4(m) deadline to serve defendants in the Adversary Proceedings until 30 days after substantial consummation of a plan of reorganization, the Confirmed Plan contemplated that the Debtors would maintain essentially the same identity and corporate organization following substantial consummation and that the reorganized company would retain few causes action.  As noted above, however, the transaction set forth in the Modified Plan and the Master Disposition Agreement divides the Debtors' business among three separate parties: DPH Holdings LLC, GM Components, and DIP Holdco 3.  The Debtors anticipate that, in the months following effectiveness of the Modified Plan, a significant amount of time and resources will be devoted to supporting the transition of operations among these three entities and implementing the Modified Plan.  Moreover, Exhibit 7.19 of the Modified Plan lists significantly more causes of action that will be retained by DPH Holdings than originally retained under the Confirmed Plan, including

177 of the Adversary Proceedings filed under seal (the "Retained Adversary Proceedings").[1]

Consequently, the Debtors do not believe that DPH Holdings will be able to evaluate each of the retained Adversary Proceedings – for example, to assess the ongoing relationship with certain defendants and whether events since initiating the Adversary Proceedings have impacted the Debtors' estimated recoveries – and make a determination whether to pursue such Adversary Proceedings within 30 days after substantial consummation of the Modified Plan.

18.     In addition, the extension now sought in this Motion will relieve the Debtors and defendants in the Adversary Proceedings from incurring unnecessary costs. Although the Debtors ultimately may determine not to prosecute certain of the Adversary Proceedings listed on Exhibit 7.19 of the Modified Plan, the Debtors would have to effect service to each of the 177 Retained Adversary Proceedings soon after substantial consummation to allow the Debtors enough to timely serve each defendant and meet the deadline set forth in the Postconfirmation Extension Order. In turn, defendants who are parties to Retained Adversary Proceedings that the Debtors otherwise might not ultimately pursue could be forced to unnecessarily incur litigation expenses associated with the defense of such Adversary Proceedings.

19.     The Debtors believe that there is good cause for the extension of the Fed. R. Civ. P. 4(m) deadline because such an extension would reduce the administrative and economic burdens of the Retained Adversary Proceedings on the Debtors and the potential

---

[1]     Under the Modified Plan, the Debtors will not retain any of the causes of action asserted in the Adversary Proceedings except those listed on Exhibit 7.19 to the Modified Plan. Although the Debtors' request for an extension of the Fed. R. Civ. P. 4(m) deadline is applicable to all of the Adversary Proceedings, upon substantial consummation of the Modified Plan – which may occur prior to the scheduled hearing on this Motion – the extension will affect only those actions specifically retained pursuant to section 7.19 of the Modified Plan.

defendants. Specifically, the Debtors believe that the resources that they and the defendants would need to expend prematurely to issue and serve 177 summonses and complaints in the Retained Adversary Proceedings – and the potential need thereafter to prosecute and defend such adversary proceedings – would not be in the best interests of the Debtors' estates, the Debtors' stakeholders, and other parties-in-interest. The Debtors submit that these reasons comprise good cause for the requested extension.

<u>Applicable Authority</u>

20.     The Bankruptcy Rules and Federal Rules of Civil Procedure grant this Court discretion to adopt and implement guidelines which will aid in the administration of Adversary Proceedings, including discretion to grant the proposed extension of the service of process deadline. <u>See</u> <u>Zapata v. City of New York</u>, 502 F.3d 192, 195 (2d Cir. 2007) (Rule 4(m) authorizes court to grant extensions of service period); <u>In re Sheehan</u>, 253 F.3d 507, 511 (9th Cir. 2001) ("The time for service in an adversary proceeding may be extended under two different rules: Rule 4(m) of the Federal Rules of Civil Procedure, and Bankruptcy Rule 9006(b).").

21.     Bankruptcy Rule 9006(b)(1) provides for the enlargement of time to perform acts required under the Bankruptcy Rules: "[W]hen an act is required or allowed to be done at or within a specified period by these rules or by a notice given thereunder or by order of court, the court for cause shown may at any time in its discretion . . . order the period enlarged if the request therefor is made before the expiration of the period originally prescribed or as extended by a previous order . . . ." Fed. R. Bankr. P. 9006(b)(1).

22.     Moreover, Fed. R. Civil P. 4(m), made applicable here by Bankruptcy Rule 7004(a), requires courts, upon a showing of good cause, to extend the period for service of process after the filing of a complaint. <u>See</u> <u>Bank of Cape Verde v. Bronson</u>, 167 F.R.D. 370, 371-72 (S.D.N.Y. 1996) (good cause existed when future events would likely have "obviated the

need to serve the [] complaint" and when plaintiff requested extension before Fed. R. Civ. P. 4(m) deadline expired). Even absent good cause, this Court has discretion to extend the 120-day service period. See Zapata, 502 F.3d at 196; Mejia v. Castle Hotel Inc., 164 F.R.D. 343, 345 (S.D.N.Y. 1996).

23. The Debtors accordingly request that the Court extend the Debtors' Fed. R. Civ. P. 4(m) deadline to serve each defendant in the Adversary Proceedings commenced in connection with the Preservation Of Estate Claims Procedures Order with a summons and a copy of the complaint until 180 days after substantial consummation of the Modified Plan, without prejudice to the Debtors' right to seek further extensions of the deadline and without prejudice to the right of each of Laneko Engineering Co., Wachovia Bank, National Association, and Laneko Engineering Co., Inc.[2] to seek a shortening of the deadline.

Notice Of Motion

24. Although notice is not required by Fed. R. Bankr. P. 9006(b)(1), see Law Debenture Trust Co. v. Calpine Corp. (In re Calpine Corp.), 356 B.R. 585, 595 (S.D.N.Y. 2007); Kernisant v. City of New York, 225 F.R.D. 422, 431 n.13 (E.D.N.Y. 2005); Brady v. Marks, 7 F. Supp. 2d 247, 255 (W.D.N.Y. 1998), notice of this Motion has been provided in accordance with the Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered March 20, 2006 (Docket No. 2883), and the Fifteenth Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P.

---

[2] Causes of action against Laneko Engineering Co., Wachovia Bank, National Association, and Laneko Engineering Co. Inc. were previously disclosed on Exhibit 7.24 of the Confirmed Plan as actions that would be retained, and these causes of action have again been retained pursuant to section 7.19 of the Modified Plan.

2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case

Management, And Administrative Procedures, entered August 27, 2009 (Docket No. 18839).

Notice has also been provided to Laneko Engineering Co., Wachovia Bank, National Association,

and Laneko Engineering Co., Inc.  In light of the nature of the relief requested, the Debtors

submit that no other or further notice is necessary.

WHEREFORE the Debtors respectfully request that the Court enter an order

(a) granting the relief requested herein and (b) granting the Debtors such other and further relief

as is just.


Dated:      New York, New York
            October 2, 2009
                                        SKADDEN, ARPS, SLATE, MEAGHER
                                           & FLOM LLP

                                        By:  /s/ John Wm. Butler, Jr.
                                            John Wm. Butler, Jr.
                                            John K. Lyons
                                            Ron E. Meisler
                                        155 North Wacker Drive
                                        Chicago, Illinois 60606

                                            - and -

                                        By:  /s/ Kayalyn A. Marafioti
                                            Kayalyn A. Marafioti
                                        Four Times Square
                                        New York, New York 10036

                                        Attorneys for Delphi Corporation, et al.,
                                           Debtors and Debtors-in-Possession

# EXHIBIT O

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                    :
     In re                 :        Chapter 11
                    :
DELPHI CORPORATION, <u>et al.</u>,   :        Case No. 05-44481 (RDD)
                    :
          Debtors.    :        (Jointly Administered)
                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ORDER PURSUANT TO FED. R. BANKR. P. 7004(a) AND
9006(b)(1) AND FED. R. CIV. P. 4(m) TO EXTEND DEADLINE TO
SERVE PROCESS FOR AVOIDANCE ACTIONS FILED IN CONNECTION
<u>WITH PRESERVATION OF ESTATE CLAIMS PROCEDURES ORDER</u>

("POSTCONFIRMATION EXTENSION OF AVOIDANCE ACTION SERVICE
DEADLINE ORDER")

           Upon the supplemental motion, dated October 2, 2009 (the "Motion"), of

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and

debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), for an

order under Federal Rules of Bankruptcy Procedure 7004(a) and 9006(b)(1) and Federal

Rule of Civil Procedure 4(m) to extend the deadline to serve process for Adversary

Proceedings[1] commenced in connection with the Preservation Of Estate Claims Procedures

Order[2] (Docket No. 9105), which deadline was previously extended to May 31, 2008

pursuant to the Order Pursuant To Fed. R. Bankr. P. 7004(a) And 9006(b)(1) And Fed. R.

Civ. P. 4(m) To Extend Deadline To Serve Process For Avoidance Actions Filed In

---

[1]    Capitalized terms used and not defined herein shall have the meanings ascribed to them in the Motion.

[2]    The Adversary Proceedings are listed by adversary proceeding number on <u>Exhibit A</u> attached hereto.

Connection With Preservation Of Estate Claims Procedures Order (Docket No. 13277) (the "First Deadline Extension Order") and further extended to 30 days after substantial consummation of the Confirmed Plan or any modified plan pursuant to the Motion Pursuant to Fed. R. Bankr. P. 7004(a) And 9006(b)(1) And Fed R. Civ. P. 4(m) To Extend Deadline To Serve Process For Avoidance Actions Filed In Connection With Preservation Of Estate Claims Procedures Order (Docket No. 13361) (the "Postconfirmation Extension Motion"); and upon the record of the hearing held on the Motion; and this Court having determined that the relief requested in the Motion as granted herein is in the best interests of the Debtors, their estates, their creditors, and other parties-in-interest; and it appearing that proper and adequate notice of the Motion has been given, and it appearing that no other or further notice is necessary; and after due deliberation thereon; and good and sufficient cause appearing therefor, it is hereby

ORDERED, ADJUDGED, AND DECREED THAT:

1.      The Motion is GRANTED.

2.      Paragraph 8 of the Preservation Of Estate Claims Procedures Order, as previously modified by the First Deadline Extension Order and the Postconfirmation Extension Motion, is hereby further modified so that the time under Federal Rule of Civil Procedure 4(m) by which the Debtors must serve a defendant in the Adversary Proceedings with a summons and complaint is further extended until 180 days after substantial consummation of the Modified Plan, without prejudice, however, to the Debtors' right to seek further extensions and without prejudice to the right of each of Laneko Engineering Co., Wachovia Bank, National Association, and Laneko Engineering Co. Inc. to seek a

shortening of the deadline. The Debtors shall serve a copy of this order upon each

defendant in any Adversary Proceeding either when the Debtors serve a summons and

complaint on such defendant or as soon thereafter as practicable. All other provisions of

the Preservation Of Estate Claims Procedures Order shall remain in effect.

       3.     This order shall be deemed entered in each of the Adversary

Proceedings.

       4.     The Debtors shall file a copy of this order in each of the Adversary

Proceedings.

       5.     This Court shall retain jurisdiction to hear and determine all matters

arising from the implementation of this order.

Dated: New York, New York
      October 22, 2009

                      /s/Robert D. Drain
                       UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT A

| Adversary Proceeding Number | Adversary Proceeding Number | Adversary Proceeding Number |
|---|---|---|
| 07-02074 | 07-02302 | 07-02592 |
| 07-02076 | 07-02305 | 07-02597 |
| 07-02077 | 07-02309 | 07-02600 |
| 07-02084 | 07-02310 | 07-02602 |
| 07-02090 | 07-02312 | 07-02605 |
| 07-02096 | 07-02313 | 07-02606 |
| 07-02098 | 07-02322 | 07-02607 |
| 07-02124 | 07-02328 | 07-02617 |
| 07-02125 | 07-02333 | 07-02618 |
| 07-02130 | 07-02337 | 07-02619 |
| 07-02131 | 07-02339 | 07-02623 |
| 07-02133 | 07-02344 | 07-02625 |
| 07-02135 | 07-02348 | 07-02633 |
| 07-02138 | 07-02350 | 07-02639 |
| 07-02140 | 07-02351 | 07-02644 |
| 07-02142 | 07-02357 | 07-02649 |
| 07-02147 | 07-02358 | 07-02650 |
| 07-02151 | 07-02372 | 07-02652 |
| 07-02161 | 07-02374 | 07-02654 |
| 07-02177 | 07-02378 | 07-02657 |
| 07-02182 | 07-02414 | 07-02659 |
| 07-02185 | 07-02416 | 07-02661 |
| 07-02186 | 07-02432 | 07-02668 |
| 07-02188 | 07-02433 | 07-02672 |
| 07-02198 | 07-02435 | 07-02679 |
| 07-02201 | 07-02436 | 07-02688 |
| 07-02203 | 07-02442 | 07-02689 |
| 07-02210 | 07-02445 | 07-02690 |
| 07-02211 | 07-02449 | 07-02694 |
| 07-02212 | 07-02457 | 07-02697 |
| 07-02214 | 07-02459 | 07-02702 |
| 07-02217 | 07-02462 | 07-02711 |
| 07-02220 | 07-02466 | 07-02712 |
| 07-02227 | 07-02475 | 07-02714 |
| 07-02234 | 07-02477 | 07-02720 |

| Adversary Proceeding Number | Adversary Proceeding Number | Adversary Proceeding Number |
|---|---|---|
| 07-02236 | 07-02479 | 07-02723 |
| 07-02238 | 07-02484 | 07-02730 |
| 07-02242 | 07-02489 | 07-02737 |
| 07-02245 | 07-02500 | 07-02739 |
| 07-02248 | 07-02505 | 07-02742 |
| 07-02250 | 07-02523 | 07-02743 |
| 07-02256 | 07-02525 | 07-02744 |
| 07-02257 | 07-02527 | 07-02745 |
| 07-02258 | 07-02534 | 07-02750 |
| 07-02259 | 07-02539 | 07-02753 |
| 07-02260 | 07-02540 | 07-02756 |
| 07-02262 | 07-02541 | 07-02758 |
| 07-02270 | 07-02543 | 07-02767 |
| 07-02272 | 07-02551 | 07-02768 |
| 07-02274 | 07-02553 | 07-02769 |
| 07-02280 | 07-02554 | 07-02775 |
| 07-02282 | 07-02555 | 07-02783 |
| 07-02284 | 07-02556 | 07-02785 |
| 07-02287 | 07-02562 | 07-02787 |
| 07-02288 | 07-02563 | 07-02789 |
| 07-02291 | 07-02571 | 07-02790 |
| 07-02295 | 07-02572 | 07-02799 |
| 07-02298 | 07-02580 | 07-02800 |
| 07-02301 | 07-02581 | 07-02804 |

# EXHIBIT P

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr.
George N. Panagakis
Ron E. Meisler
Nathan L. Stuart

- and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti
Thomas J. Matz

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |  |
|---|---|---|
|  | : |  |
| In re | : | Chapter 11 |
|  | : |  |
| DELPHI CORPORATION, et al., | : | Case No. 05-44481 (RDD) |
|  | : |  |
| Debtors. | : | (Jointly Administered) |
|  | : |  |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MOTION FOR ORDER (I) APPROVING MODIFICATIONS TO DEBTORS'
FIRST AMENDED PLAN OF REORGANIZATION (AS MODIFIED) AND
RELATED DISCLOSURES AND VOTING PROCEDURES AND (II) SETTING
FINAL HEARING DATE TO CONSIDER MODIFICATIONS TO CONFIRMED
FIRST AMENDED PLAN OF REORGANIZATION

("PLAN MODIFICATION APPROVAL MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this motion (the "Motion") under 11 U.S.C. § 1127[1] for an order (i) approving certain modifications to the confirmed First Amended Joint Plan of Reorganization of Delphi Corporation and Certain Affiliates, Debtors and Debtors-In-Possession, as amended on January 25, 2008 (the "Confirmed Plan"), related modifications to the First Amended Disclosure Statement with respect to the Confirmed Plan (Docket No. 11388) (the "December 10 Disclosure Statement"), and related voting procedures as set forth in the December 10 Solicitation Procedures Order (as defined below) (Docket No. 11389) and (ii) setting a final hearing date on approval of the Debtors' proposed plan modifications.

As further described herein, the Debtors are proposing modifications to the Confirmed Plan (the "Modified Plan") that the Debtors believe require resolicitation. Accordingly, pursuant to the Supplemental Case Management Order (as defined below), October 23, 2008 is set as the date for the hearing on this Motion (the "Preliminary Modification Hearing"). Additionally, the Debtors propose the following schedule related to resolicitation and approval of the modifications to the Confirmed Plan:

---

[1] 11 U.S.C. § 1127 provides, in relevant part:

(b)     The proponent of a plan or the reorganized debtor may modify such plan at any time after confirmation of such plan and before substantial consummation of such plan, but may not modify such plan so that such plan as modified fails to meet the requirements of sections 1122 and 1123 of this title. Such plan as modified under this subsection becomes the plan only if circumstances warrant such modification and the court, after notice and a hearing, confirms such plan as modified, under section 1129 of this title.

(c)     The proponent of a modification shall comply with section 1125 of this title with respect to the plan as modified.

(d)     Any holder of a claim or interest that has accepted or rejected a plan is deemed to have accepted or rejected, as the case may be, such plan as modified, unless, within the time fixed by the court, such holder changes such holder's previous acceptance or rejection.

| DATE | EVENT |
|---|---|
| November 13, 2008 | Deadline to publish notice of hearing to approve modifications to Confirmed Plan |
| | Deadline to commence mailing of solicitation packages |
| November 26, 2008 | Deadline to distribute reclamation opt-out election notices |
| December 2, 2008 | Rule 3018(a) motion deadline |
| | Modified Plan exhibit filing deadline |
| December 12, 2008 | Voting deadline |
| | Deadline to object to modifications to Confirmed Plan |
| | Deadline to return reclamation opt-out election notices |
| December 16, 2008 | Ballot report certification and filing deadline at 4:00 p.m. (prevailing Eastern time) |
| December 17, 2008 | Hearing to approve modifications to the Confirmed Plan and to approve such plan as Modified (the "Final Modification Hearing") |

In further support of this Motion, the Debtors respectfully represent as follows:

Background

A.    The Chapter 11 Filings

1.    On October 8 and 14, 2005, the Debtors filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code").  The Debtors

continue to operate their businesses and manage their properties as debtors-in-possession under Bankruptcy Code sections 1107(a) and 1108. This Court has ordered joint administration of these cases.

2. No trustee or examiner has been appointed in these cases. On October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Creditors' Committee"). On April 28, 2006, the U.S. Trustee appointed an official committee of equity holders (together with the Creditors' Committee, the "Statutory Committees").

3. On September 6, 2007, the Debtors filed the Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In Possession (Docket No. 9263) and the Disclosure Statement With Respect To Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In Possession (Docket No. 9264). Subsequently, on December 10, 2007, the Debtors filed the First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession (Docket No. 11386) (the "December 10 Plan") and the December 10 Disclosure Statement. The Court entered an order approving the adequacy of the December 10 Disclosure Statement and granting the related solicitation procedures motion on December 10, 2007 (Docket No. 11389) (the "December 10 Solicitation Procedures Order"). On January 25, 2008, the Court entered an order confirming the Confirmed Plan (Docket No. 12359) (the "Confirmation Order"), which order became final on February 4, 2008.

4. On April 4, 2008, the Debtors announced that although they had met the conditions required to substantially consummate the Confirmed Plan, including

obtaining $6.1 billion of exit financing, Delphi's Plan Investors (as defined in the Confirmed Plan) refused to participate in a closing that was commenced but not completed and refused to fund their Investment Agreement (as defined in the Confirmed Plan) with Delphi.  On May 16, 2008, Delphi filed complaints for damages and specific performance against the Plan Investors and related parties who refused to honor their equity financing commitments and refused to participate in the closing that would have led to Delphi's successful emergence from chapter 11.

5.     This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

6.     The statutory predicates for the relief requested herein are sections 502 and 1127 of the Bankruptcy Code and rule 2002 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

B.     <u>Current Business Operations Of The Debtors</u>

7.     Delphi and its subsidiaries and affiliates (collectively, the "Company") as of December 31, 2007 had global net sales of $22.3 billion and global assets of approximately $13.7 billion.[2]  At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues and the thirteenth largest public company business reorganization in terms of assets.  Delphi's

---

[2]     The aggregated financial data used herein generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates as disclosed in the Company's Form 10-K filed on February 19, 2008.

non-U.S. subsidiaries are not chapter 11 debtors and have continued their business operations without supervision from the Court.[3]

8.      The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology. The Company supplies products to nearly every major global automotive original equipment manufacturer ("OEM").

9.      Delphi was incorporated in Delaware in 1998 as a wholly owned subsidiary of General Motors Corporation ("GM"). Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries. Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM. In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications. Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

---

[3]     On March 20, 2007, Delphi Automotive Systems Espana S.L. ("DASE"), whose sole operation is a non-core automotive component plant in Cadiz, Spain, filed a "Concurso" application for a Spanish insolvency proceeding, which was approved by the Spanish court on April 13, 2007. On July 4, 2007, DASE, its Concurso receivers, and the Cadiz workers councils and unions reached a settlement on a social plan, the funding of which was approved by this Court on July 19, 2007. The Spanish court approved the social plan on July 31, 2007. The Concurso proceeding is consistent with Delphi's transformation plan to optimize its manufacturing footprint and to lower its overall cost structure.

C.    Events Leading To The Chapter 11 Filing

10.    In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income.  Every year thereafter, however, with the exception of 2002, the Company has suffered losses.  In calendar year 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[4]  Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of approximately $2.4 billion on net sales of $26.9 billion.  Moreover, in 2006 the Debtors incurred a net loss of $5.5 billion, $3.0 billion of which comprised charges related to the U.S. employee special attrition programs, and in 2007, the Debtors incurred a net loss of $3.1 billion.

11.    The Debtors believe that the Company's financial performance deteriorated because of (i) increasingly unsustainable U.S. legacy liabilities and operational restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which had the effect of creating largely fixed labor costs, (ii) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (iii) increasing commodity prices.

12.    In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward-looking revenue requirements.  Because discussions with its major stakeholders had not progressed sufficiently by the

---

[4]    Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on U.S. deferred tax assets as of December 31, 2004.  The Company's net operating loss in calendar year 2004 was $482 million.

end of the third quarter of 2005, the Company commenced these chapter 11 cases for its

U.S. businesses to complete its transformation plan and preserve value for its

stakeholders.

D.      Transformation Plan

13.     On March 31, 2006, Delphi announced its five-point

Transformation Plan:

- Labor:  Modify the Company's labor agreements to create a competitive arena in which to conduct business

- GM:  Conclude negotiations with GM to finalize GM's financial support for certain of the Debtors' legacy and labor costs and ascertain GM's business commitment to the Company

- Product Portfolio and Manufacturing Footprint:  Streamline the Company's product portfolio to capitalize on world-class technology and market strengths and make the necessary manufacturing alignment with its new focus

- Cost Structure:  Transform the Company's salaried workforce and reduce general and administrative expenses to ensure that the Company's organizational and cost structure is competitive and aligned with its product portfolio and manufacturing footprint

- Pension:  Devise a workable solution to the Company's pension funding situation

14.     Delphi has made significant progress in achieving the objectives of

its Transformation Plan and is now poised to emerge from chapter 11.  First, with respect

to the modification of its labor agreements, Delphi has been able to significantly lower its

hourly labor costs by entering into modified collective bargaining agreements with each

of its Unions in 2007.  These agreements have already become effective both prior to and

as a result of the consummation of the Amended GSA and Amended MRA, as defined

below, and Implementation Agreements with the six North American unions have

become effective.

15.     Second, Delphi has entered into comprehensive settlement and restructuring agreements with GM (the "Amended GSA" and the "Amended MRA") and the provisions of these agreements became effective on September 29, 2008.   Under the Amended GSA and Amended MRA, GM agreed to contribute additional value to the Debtors with fewer termination rights and conditionality provisions.  The net contributions provided to the Debtors from GM under the Amended GSA and Amended MRA increased from $6.0 billion under the Settlement Agreement and Restructuring Agreement to approximately $10.6 billion under the Amended GSA and Amended MRA, as demonstrated in the graph below.  This graph assumes that general unsecured creditors receive a recovery of 20% of their claims with contributions from GM.



Original ("Approved") v. Amended GSA/MRA Net GM Contributions To Delphi

16.     Third, with respect to its product portfolio and manufacturing facility realignment, as shown by the illustration below, Delphi has also been successful in streamlining its product portfolio, aligning its manufacturing capabilities to focus on its market strengths, and developing "Safe, Green, & Connected" products.



17.     The Debtors have sold or wound down non-core product lines and manufacturing sites identified in March 2006 and are continuing their efforts to sell certain other non-core product lines. For example, during the first six months of 2008 alone, Delphi obtained Court approval of bidding procedures and sales agreements for the steering and halfshaft product line and closed on the sales of the interiors and closures product line, the North American brake components machining and assembly assets, and the global bearings business. Additionally, under an order providing Delphi with

authority to sell certain assets that do not exceed $10 million without further Court approval, Delphi entered into an agreement to sell its power products business.

18.     Fourth, Delphi has implemented and is continuing to implement restructuring initiatives in furtherance of the transformation of its salaried workforce to reduce selling, general and administrative expenses to support its realigned portfolio. These initiatives include financial services, information technology and certain sales administration outsourcing activities, reduction of its global salaried workforce by taking advantage of attrition and using salaried separation plans, and realignment of certain salaried benefit programs to bring them in line with more competitive industry levels. Although there is an investment required to implement these initiatives, Delphi expects to realize substantial savings in 2009 and beyond.

19.     Fifth, Delphi has substantially achieved its pension funding strategy objectives for hourly employees through the transaction under the Internal Revenue Code of 1986 (the "IRC"), Section 414(l), and Section 208 of the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1001-1461. With respect to its salaried employees, Delphi froze the salaried pension plan and implemented replacement plans that will be more cost-effective for the remainder of their chapter 11 cases and after emergence from chapter 11.

20.     The differences between the business operation of Delphi from the time of its chapter 11 filing in 2005, its present state of transformation in mid-2008, and its expected 2009 state on a post-emergence basis, are striking:

| | Pre-Transformation | Current Progress | Post-Transformation |
|---|---|---|---|
| **Year** | **2005[1]** | **June YTD 2008[1]** | **2009 RPOR 8/08** |
| **Product Line Businesses** | 27 | 21 | 16 |
| **U.S. Plants** | 37[2] | 14 | 8 |
| **U.S. Hourly Cost / Hour** | $73 / hour | > $40 / hour | ~ $27 / hour |
| **Manufacturing % of Revenue** | 30% | 25% | 19% |
| **U.S. Hourly Employment** | 32,869 | 10,665[3] | < 5,000 |
| **U.S. Salaried Employment** | 14,542 | 10,243 | < 7,700 |
| **SG&A Expense[4]** | $1.64 B | $0.70 B | $1.07 B |
| **Number of Suppliers** | > 5,000 | ~ 3,200 | ~ 2,700 |
| **Capital Investment** | $1.1 B | $0.5 B | $0.7 B |
| **GMNA % of Revenue** | 40% | 22% | 18% |
| **Non-GM % of Revenue** | 52% | 67% | 74% |
| **Non-N.A. % of Revenue** | 32% | 56% | 61% |

[1] 2005 and June YTD 2008 metrics include total Delphi operations including those units classified as "Discontinued" for external financial reporting
[2] Excluding idled sites
[3] Excluding active pre-retirement program participants
[4] SG&A metrics exclude one-time transformation related charges

E.      Reaffirmed Business Plan

        21.     When the closing on the Confirmed Plan was suspended on April 4, 2008, as part of Delphi's consideration of potential modifications to its Confirmed Plan to enable it to emerge from chapter 11 as soon as practicable, Delphi undertook a reaffirmation process with respect to the business plan attached as Appendix C to the December 2007 Disclosure Statement (the "POR Business Plan"). That reaffirmation process involved review and reaffirmation of the budget business plan (the "BBP") (which had been prepared as part of Delphi's annual business planning process and which had confirmed Delphi's prior commitment to the aggregate EBITDAR projections in the POR Business Plan). By reaching agreements with GM embodied in the Amended GSA and Amended MRA, the Debtors were able to substantially accomplish two of their transformation goals of finalizing GM's support for Delphi's business and finding a workable solution to pension related issues. The implementation of the Amended MRA,

along with the completion of the first step of the 414(l) Transfer, has allowed Delphi to move forward with a reaffirmed business plan for 2008-2011. The reaffirmed POR business plan for 2008-2011 is attached to the Modified Disclosure Statement as Appendix C and is hereinafter referred to as the "RPOR."

22.     Among other changes, the RPOR includes revised actual and expected volumes for the North American automotive market, significant increases in commodities costs that are used as raw materials in certain of Delphi's products, and changes in the underfunded status of its pension plans as a result of negative plan asset returns. The RPOR also reflects actual financial results for the first half of 2008, updated foreign exchange rates over the RPOR period, and other specific operational adjustments with respect to particular customer program volumes and timing, including the modifications embodied in the Amended GSA and Amended MRA.

23.     As described in greater detail in Appendix C, and described in summary form here, the RPOR projects 2008 EBITDARP at approximately $0.58 billion improving to $1.74 billion in 2009. The main contributors of this improvement are: (a) the reduction of traditional hourly U.S. OPEB expense (substantially all of which has been assumed by GM), (b) GM labor subsidy and keep site facilitation support, (c) structural cost improvements in the areas of manufacturing, engineering and SG&A, and (d) increased profit related to new business wins outside of GM North America. Material cost improvements are also anticipated in the RPOR, partially offset by anticipated year-over-year customer price reductions.

24.     Cash flow from operating activities is projected to increase from an inflow of $0.5 billion in 2008 to an inflow of $1.3 billion in 2011.  Significant sources and uses of cash from operations include:

- EBITDARPO improves from $1.0 billion in 2008 to $2.2 billion in 2011;

- Global restructuring cash outflows of approximately $0.3 billion, $0.5 billion, $0.2 billion and $0.2 billion in 2008, 2009, 2010, and  2011 respectively (the $0.3 billion included in 2008 is net of a $1.0 billion payment from GM);

- Projected net working capital monetization proceeds associated with the exit from certain Non-Continuing Businesses; and,

- Net Payments from GM of $1.7 billion in 2008 resulting from the implementation of the Amended MRA and Amended GSA (including $1.0 billion referred to above in global restructuring cash).

25.     Improved operating cash flows are generally the result of the implementation of the Debtors' Transformation Plan, including product portfolio rationalization and migration, SG&A cost reduction initiatives, reduction in personnel costs as a result of negotiations with labor groups, the freezing of U.S. legacy defined benefit pension plans, and agreement with GM regarding future business commitments and financial support for certain legacy costs, including hourly OPEB.

F.     Valuation Of Reorganized Delphi

26.     The RPOR provides the foundation for the value of the distributions proposed in the Modified Plan, which will be in the form of equity in the Reorganized Company.[5]  Because the proposed distributions under the Modified Plan are in the form of equity in the Reorganized Company, the value of the recovery is based on the enterprise value of Reorganized Delphi.  The RPOR was also necessary to allow the

---

[5]     Capitalized terms used and not otherwise defined herein have the meanings ascribed to them in the Modified Plan.

Debtors' investment banker and financial advisor, Rothschild, Inc. ("Rothschild"), to perform a valuation of the Reorganized Debtors as a going concern and a valuation of the New Common Stock based on information and financial projections provided by the Debtors.

27.     Since the confirmation of the Confirmed Plan and the Debtors' delayed emergence from chapter 11 due to the Plan Investors' breach of the Investment Agreement, Rothschild has undertaken an updated valuation of the Reorganized Debtors as a going concern. Based on many factors, including the RPOR projections and macroeconomic factors affecting the auto industry as a whole such as the current capital market conditions, weakened automotive outlook, and declining public trading multiples, the estimated total enterprise value of Reorganized Delphi ranges from $6.3 billion to $8.0 billion, with a midpoint of approximately $7.2 billion. The Debtors believe that the recoveries provided by the Modified Plan will be at least as much as those realized through any other scenario or other feasible alternative available to the Debtors.

28.     Delphi anticipates raising approximately $3.75 billion of funded emergence capital through a combination of term bank debt and rights to purchase equity in Reorganized Delphi. Delphi anticipates raising at least $2.75 billion in funded first and second lien debt plus an unfunded asset-backed revolving credit facility of up to $1.2 billion. Delphi anticipates raising the remaining funded emergence capital through a combination of a Discount Rights Offering with a backstop and a direct subscription for New Common Stock in Reorganized Delphi. The Debtors expect the principal sources of emergence capital to be their existing creditors and stakeholders.[6] For GM to achieve the

---

[6]     The Debtors anticipate supplementing their Emergence Capital Funding disclosures on or prior to the preliminary hearing on modifications to the Confirmed Plan.

$2.055 billion recovery required under the Amended GSA, as defined below, and for the holders of unsubordinated General Unsecured Claims to receive at least 20% in direct recoveries in the form of New Common Stock, Delphi will be required to achieve its projected $3.75 billion in funded emergence capital, including completing the Discount Rights Offering at a discount not to exceed 40% on a fully diluted basis of Plan Equity Value. In the event that these metrics are not achieved, the Debtors would be required to procure GM's consent pursuant to the Amended GSA with respect to any modified recovery and the minimum recovery to holders of unsubordinated General Unsecured Claims would be proportionally reduced.

29. The Second Amended and Restated Credit Agreement, as defined herein (which consists of a $1.1 billion Tranche A DIP Revolver, a $500 million Tranche B DIP Term Loan and a $2.754 billion Tranche C DIP Term Loan) currently matures on December 31, 2008. The Debtors anticipate seeking an extension of the December 31, 2008 maturity date.

G.    Proposed Modifications To The Confirmed Plan

30. Section 14.3 of the Confirmed Plan, to which no party objected and which was approved by a substantial majority of creditors who voted on the Confirmed Plan, remains in effect and provides that only the Debtors may seek modifications of the Confirmed Plan pursuant to section 1127(b) of the Bankruptcy Code. Moreover, the Debtors previously obtained an extension, subject to certain exceptions described below, of their exclusive right under section 1121 of the Bankruptcy Code to file one or more reorganization plans until 30 days after substantial consummation of the Confirmed Plan or any modified plan and the exclusive right to solicit and obtain acceptances for such plans until 90 days after substantial consummation of the Confirmed

Plan or any modified plan.[7]  The Debtors' exclusive right to file a plan, solely as between the Debtors and the Statutory Committees (the "Plan Proposal Period"), has been extended through and including October 31, 2008 and the right to solicit a plan, solely as between the Debtors and the Statutory Committees (the "Solicitation Period," and, together with the Plan Proposal Period, the "Exclusive Periods"), through and including December 31, 2008.[8]  By separate motion filed concurrently herewith, the Debtors are seeking further extensions of the Exclusive Periods to March 31, 2009 and January 31, 2009, respectively.  Neither of the Statutory Committees objects to this motion.

        31.     Because the Debtors have the exclusive right to propose modifications to the Confirmed Plan or file and solicit a new plan, the Debtors have taken into consideration all of the factors described above, including the additional Transformation Plan-related accomplishments, the RPOR, and the Reorganized Debtors' projected capital structure, and are proposing the following appropriate modifications to the Confirmed Plan for approval by this Court, which are outlined below:

|  | Confirmed Plan | Modified Plan |
|---|---|---|
| Plan Investor | Plan Investors commitment to invest up to $2.55 billion | No plan investor |
| Rights Offering | $1.75 billion discount rights offering | $1.0 billion discount rights offering |
| Net Funded Debt | $4.7 billion | $2.75 billion |

---

[7]    See Order Under 11 U.S.C. § 1121(d) Extending Debtors' Exclusive Periods Within Which To File And Solicit Acceptances Of Reorganization Plan, dated April 30, 2008 (Docket No. 13483) (the "Postconfirmation Exclusivity Order").

[8]    See Order, Solely As To Statutory Committees, Extending Under 11 U.S.C. § 1121(d) Debtors' Exclusive Periods Within Which To File And Solicit Acceptances Of Reorganization Plan, dated July 31, 2008 (Docket No. 14009) (together with the Postconfirmation Exclusivity Order, the "Postconfirmation Exclusivity Orders").

| | Confirmed Plan | Modified Plan |
|---|---|---|
| Revolver | $1.4 billion | Up to $1.2 billion |
| Total Enterprise Value | Agreed plan value of $12.8 billion | $7.2 billion |
| Section 414(l) Transfer | $1.5 billion | - 414(l) Transfer was approved as part of the Amended GSA, which became effective on September 29, 2008 and accordingly such transfer is no longer a term of the Modified Plan.<br>- Transfer of approximately $2.2 billion in net unfunded liabilities was effective on September 29, 2008; the transfer of approximately $1.0 billion of additional net unfunded liabilities is to occur upon consummation of the Modified Plan |
| GM | $4.073 billion consisting of:<br><br>- $1.073 billion (in liquidation amount) in junior preferred securities<br><br>- $1.5 billion, of which at least $750 million will be in Cash and the remainder will be in a second lien note with market terms<br><br>- $1.5 billion in connection with the effectuation of the IRC Section 414(l) assumption | Approximately $2.095 billion consisting of:<br>- An allowed administrative claim of $2.055 billion, which will be satisfied with New Preferred Stock (subject to certain provisions under which value may be allocated to unsubordinated general unsecured creditors)<br><br>- An allowed general unsecured claim in the amount of $2.5 billion, which will be subordinated to the claims of other unsecured creditors until such creditors achieve a 20% recovery |

| | **Confirmed Plan** | **Modified Plan** |
|---|---|---|
| Unsecured Creditors | Par plus accrued recovery at plan value of $12.8 billion consisting of:<br><br>-78.6% in New Common Stock at plan equity value<br><br>-21.4% through pro rata participation in discount rights offering at a 35.6% discount from plan equity value<br><br>-TOPrS Claims included in General Unsecured class with Senior Notes, trade claims, and SERP claims | Approximately 38.8% recovery for allowed general unsecured claimholders (excluding TOPrS Claims) consisting of:<br><br>- Approximate 20% recovery in the form of New Common Stock at plan equity value<br><br>- 18.8% through pro rata participation in Discount Rights Offering at a 40% discount from plan equity value<br><br>- TOPrS Claims included in General Unsecured class with Senior Notes, trade claims, and SERP claims, however, distributions on account of TOPrS Claims will be reallocated and redistributed due to the contractual subordination provision of the indenture governing the TOPrS Claims |
| Postpetition Interest | Postpetition Interest to be paid on certain General Unsecured Claims | No postpetition interest |
| Equity | Direct grant of New Common Stock of $28 million and Warrants valued at $321 million in the aggregate, plus the opportunity to participate in a Par Value Rights Offering | Opportunity to participate in Post-emergence Rights Offering through which New Common Stock will be offered at a discount (valued at approximately $108 million), the proceeds of which will be used to redeem up to 25% of the New Preferred Stock issued to GM |

Relief Requested

32.     By this Motion, the Debtors request entry of an order (the "Proposed Order") approving (i) certain modifications to the Confirmed Plan and related modifications to the December 10 Disclosure Statement and related procedures and notices for resoliciting votes of affected classes on the Modified Plan and (ii) setting a final hearing date on approval of the Debtors ' proposed Modified Plan.

Basis For Relief

33.     As described above, since this Court approved the Confirmed Plan, a number of events have occurred as Delphi has continued to transform its business despite a profound economic downturn in the automotive industry and turbulent capital markets.  As a result of these exceptional efforts, the Debtors are now able to propose a Modified Plan that the Debtors believe should allow them to successfully emerge from chapter 11.  The Modified Plan is the culmination of Delphi's Transformation Plan within the chapter 11 context.  Delphi has determined that it has achieved those aspects of its Transformation Plan for which the chapter 11 reorganization process was necessary and that it is now time to emerge from chapter 11.  A copy of the Modified Plan, marked only to show additions to the Confirmed Plan, is attached hereto as <u>Exhibit 1-A</u>.  Similarly, a copy of the Modified Plan, marked to show all changes from the Confirmed Plan, is attached hereto as <u>Exhibit 1-B</u>.  The modifications are necessary and should facilitate the Debtors' emergence from chapter 11 while allowing for meaningful stakeholder recoveries in a very challenging macroeconomic climate.

34.     Pursuant to 11 U.S.C. § 1127(c) of the Bankruptcy Code, "[t]he proponent of a modification shall comply with section 1125 of this title with respect to the plan as modified."  Under section 1125, as incorporated by section 1127 of the

20

Bankruptcy Code, the Debtors cannot solicit votes from the affected classes, "unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information." 11 U.S.C. § 1125(b). Section 1125(a)(1) defines "adequate information" as "information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical reasonable investor of holders of claims or interests of the relevant class to make an informed judgment about the plan." 11 U.S.C. § 1125(a)(1).

35. In December 2007, the Court found that the December 10 Disclosure Statement contained "adequate information," as that term is defined in section 1125 of the Bankruptcy Code, and approved the December 10 Disclosure Statement. Accordingly, the Debtors commenced their solicitation on the December 10 Plan. The Debtors received overwhelming support for the December 10 Plan on a class by class basis. Due to the material modifications made to the Confirmed Plan on account of the Plan Investors' breach, the Debtors must once again solicit votes on the Confirmed Plan, as modified. To comply with section 1127(c) as it incorporates 1125(b) of the Bankruptcy Code, the Debtors have revised the December 10 Disclosure Statement to provide holders of claims or interests with adequate information regarding the modifications (the "Modified Disclosure Statement"). Attached hereto as <u>Exhibit 2-A</u> is the Modified Disclosure Statement marked only to show additions from the December 10 Disclosure Statement. Similarly, a copy of the Modified Disclosure Statement, marked

to show all changes to the Confirmed Plan, is attached hereto as <u>Exhibit 2-B</u>.[9]  The

Debtors propose to include the Modified Disclosure Statement in the Solicitation Package

(as defined in the December 10 Solicitation Procedures Order and modified herein) that

will be distributed.  Accordingly, pursuant to this Motion, the Debtors are seeking

approval of the Modified Disclosure Statement and a finding that the Modified

Disclosure Statement complies with section 1127(c) as it incorporates section 1125(b) of

the Bankruptcy Code.

H.     <u>Prior Approval Of Disclosure Statement And Procedures For Soliciting Votes On Plan</u>

36.     Although confirmed by this Court, the Confirmed Plan has not yet

been consummated.  Due to the intervening events since confirmation, the Debtors seek

to modify the Confirmed Plan.  Given the nature of the proposed modifications, the

Debtors believe that resolicitation of votes is appropriate.  The Debtors, therefore,

propose to adopt substantially the same procedures as those that were approved by this

Court in the December 10 Solicitation Procedures Order, with the limited modifications,

as set forth below, which the Debtors believe are applicable and appropriate under the

circumstances.  The resolicitation timeline contemplated herein is intended to facilitate

the Debtors' emergence from bankruptcy protection as soon as reasonably practicable.  In

addition, now that the Debtors have formulated what they believe is a viable RPOR in the

current automotive and macroeconomic environment and have implemented the GSA and

MRA, the Debtors are seeking to move as quickly as possible to emerge from chapter 11

in order to limit their exposure to any further unknown event risks.

---

[9]     In addition, the following updated appendices to the Modified Disclosure Statement are attached hereto:
Historical Financial Statements (as <u>Exhibit 2-C</u>), Reaffirmed 2008-2011 Financial Projections (as
<u>Exhibit 2-D</u>), Updated Valuation Analysis (as <u>Exhibit 2-E</u>), Updated Liquidation Analysis (as <u>Exhibit 2-F</u>).

I.    Adoption Of Previously Approved Procedures And Documents For Soliciting
      Votes On Modified Plan With Certain Modifications

          37.    The December 10 Solicitation Procedures Order approved

procedures for the Debtors to transmit through the Voting Agents various solicitation

materials to the classes of claims and interest holders entitled to vote on the December 10

Plan, as well as more limited documents to be sent to those not entitled to vote on the

December 10 Plan.  In addition, the December 10 Solicitation Procedures Order approved

certain forms of ballots to be used to solicit votes, established procedures in connection

with the tabulation of votes, and approved certain other procedures to facilitate and

streamline the solicitation process. The procedures and documents approved in the

December 10 Solicitation Procedures Order allowed the Debtors to efficiently and

effectively solicit the votes of, and provide notice to, more than 500,000 parties-in-

interest.

          38.    Accordingly, the Debtors propose to utilize the same procedures

and the same documents that were previously approved by this Court in the December 10

Solicitation Procedures Order in connection with the solicitation of votes on, and the

provision of notice regarding, various aspects of the Modified Plan, with the following

modifications and exceptions summarized here and explained in more detail below:

- Addition to certain ballots of provisions relating to 11 U.S.C. § 1127(d)
  and application of § 1127(d) to the tabulation of votes on the Modified
  Plan;
- Updates to notices previously provided to certain parties to reflect
  changes to the Modified Plan;
- Changes to dates and deadlines in the resolicitation process and
  associated procedures;
- Inclusion of Delphi's latest Form 10-K and subsequent Form 10-Q and
  removal of IRS forms W-9 and W-8BEN to the Solicitation Package;
- Eliminating the requirement to provide notice to holders of Class F or I
  claims or interests;

- Eliminating the requirement to provide special notice not required to be given Union employees, former employees, and certain non-represented hourly active employees and retires;
- Deemed acceptance by any class in which no class member votes;
- Intermediary Record Owners required to maintain Beneficial Owner voting data for one additional year;
- Adoption of Rights Offering participation amounts;
- Changes to the Cure Claim Procedures pursuant to Modified Plan;
- Changes to the Reclamation Claim Procedures pursuant to Modified Plan

J.     Updated General Procedures From December 10 Solicitation Procedures Order

39.     Final Modification Hearing Date.  By this Motion, the Debtors request that the Court set December 17, 2008 at 10:00 a.m. (prevailing Eastern time), as may be adjourned at the Court's direction, if necessary, as the hearing date to consider approval of the Modified Plan (the "Final Modification Hearing Date").  The Debtors also request that the Court order that the Final Modification Hearing Date may be adjourned from time to time by announcing the adjournment in open court or otherwise, all without further notice to parties-in-interest.

40.     Procedures For Filing Objections To Proposed Modifications To Confirmed Plan.  Because 11 U.S.C. § 1127(b) provides that a plan, as modified, becomes the plan if the "court, after notice and a hearing, confirms such plan as modified, under section 1129 of [the Bankruptcy Code]," Bankruptcy Rule 3020(b)(1) provides guidance in setting an objection deadline with respect to the modifications sought by the Debtors.  Specifically, Bankruptcy Rule 3020(b)(1) provides that objections to confirmation of a plan must be filed and served "within a time fixed by the court."  The Debtors request that the Court set 4:00 p.m. (prevailing Eastern time) on December 12, 2008 (the "Modified Plan Objection Deadline") as the last date and time for filing and serving objections to the approval of the Modified Plan ("Modified Plan Objections").

As discussed, the Debtors propose to send, or cause to be sent in the manner described below, the Solicitation Packages and other notices on or before November 13, 2008. Accordingly, the Modified Plan Objection Deadline would not occur until at least 29 days after the date the Solicitation Packages and other notices are sent. The Debtors request that only timely-filed and served, written Modified Plan Objections be considered and that Modified Plan Objections not timely-filed and served in the manner described in this paragraph and the immediately following paragraph be overruled without consideration by the Court.

41. The Debtors also request that the Court direct that Modified Plan Objections, if any, must (i) be in writing, (ii) comply with the Bankruptcy Rules and the Local Bankruptcy Rules for the Southern District of New York, (iii) set forth the name of the objector and the nature and amount of any claim or interest asserted by the objector against or in the Debtors, their estates, or their property, (iv) state with particularity the legal and factual bases for the objection, and (v) be filed with the Court together with proof of service, and served by personal service, overnight delivery, or first-class mail, with a hard copy delivered to the chambers of the Honorable Robert D. Drain, so as to be RECEIVED no later than the Modified Plan Objection Deadline, by the following (collectively, the "Notice Parties"):

Counsel For The Debtors

Skadden, Arps, Slate, Meagher & Flom LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
Att'n: John Wm. Butler, Jr.
Att'n: George N. Panagakis
Att'n: Ron E. Meisler
Att'n: Nathan L. Stuart

and

Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, New York 10036
Att'n: Kayalyn A. Marafioti
Att'n: Thomas J. Matz

United States Trustee

The Office of the United States Trustee
33 Whitehall Street, Suite 2100
New York, New York 10004
Att'n: Brian Masumoto

Counsel For The Creditors' Committee

Latham & Watkins LLP
885 Third Avenue
New York, New York 10022
Att'n: Robert J. Rosenberg
Att'n: Mitchell A. Seider
Att'n: Mark A. Broude

Counsel For The Equity Committee

Fried, Frank, Harris, Shriver & Jacobson LLP
One New York Plaza
New York, New York 10004
Att'n: Brad E. Scheler
Att'n: Bonnie K. Steingart

Counsel For The Postpetition Lenders

Davis Polk & Wardwell
450 Lexington Avenue
New York, New York  10022
Att'n:  Donald S. Bernstein
Att'n:  Brian M. Resnick

42.     Ballots.  The Debtors request that the Court approve the ballots for

voting on the Modified Plan in substantially the forms attached collectively to the

Proposed Order as Exhibit B, which are substantially the same as those used in the

26

solicitation of votes on the December 10 Plan and which this Court previously approved in the December 10 Solicitation Procedures Order   The Ballots have been updated to reflect the changes to the procedures set forth in this Motion and to conform with the facts and circumstances of a § 1127 resolicitation, including substitutions of dates and provisions relating to the § 1127(d) tabulation protocol as described in detail below.

43.     Notices.   Similarly, the Debtors also request that the Court approve the Notices in substantially the forms attached collectively to the Proposed Order as Exhibit C (Unimpaired Notice), Exhibit D (Non-Voting Status Notice), Exhibit E (Notice To Parties Subject To A Post-Solicitation Date Objection), and Exhibit F (Notice to Employees Regarding Multiple Solicitation Documents), which this Court previously approved in the December 10 Solicitation Procedures Order, to be sent to various parties in connection with the resolicitation of votes on the Modified Plan.  These notices remain in substantially the same form in which they were previously approved by the Court, but have been conformed to the facts and circumstances of a § 1127 resolicitation.

44.     Voting Certification.  Rule 3018-1 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York requires the certification of acceptance and rejections of the plan to be filed at least five days before the hearing on confirmation of a chapter 11 plan.  Consistent with the December 10 Solicitation Procedure Order, the Debtors request that this five-day requirement be modified to permit the Voting Agents to file their certifications no later than 4:00 p.m. (prevailing Eastern time) on December 16, 2008, or one day prior to the hearing to approve modifications to the Confirmed Plan.

45. <u>Notice Of Hearing On Approval Of Plan Modifications</u>. The Debtors propose to provide a notice of the Final Modification Hearing (the "Final Modification Hearing Notice"), substantially in the form attached to the Proposed Order as <u>Exhibit G</u>, in the same manner and on the same categories of parties as were provided the Confirmation Hearing Notice pursuant to the December 10 Solicitation Procedures Order, and with the exceptions detailed in this Motion. For avoidance of doubt, as described in this Motion the Debtors propose that holders of claims or interests in Classes F and I will not be sent a Final Modification Hearing Notice.

K.      <u>Modifications To The December 10 Solicitation Procedures Order</u>

46. <u>Key Dates and Deadlines</u>. In the motion requesting the relief granted in the December 10 Solicitation Procedures Order, the Debtors sought approval of a schedule for the Debtors to solicit votes on the December 10 Plan. The chart below summarizes certain key dates and deadlines that the Debtors propose to use in connection with the resolicitation of votes on the Modified Plan.

| Event | Proposed Date Or Deadline Under Plan Modification Approval Order |
|---|---|
| Deadline By Which Trustees And Transfer Agents Must Provide Record Holder Information To Securities Voting Agent | • November 6, 2008 |
| Solicitation Mailing Deadline | • November 13, 2008<br>• 25 days before voting deadline and objection deadline |
| Deadline For Filing Of Plan Exhibits And Disclosure Statement Appendices (the "Exhibit Filing Date") | • December 2, 2008<br>• 10 days before voting deadline |
| Rule 3018(a) Motion Deadline | • Received no later than 4:00 p.m. (prevailing Eastern time) on December 2, 2008<br>• If the Debtors object to a claim or interest after November 23, 2008, the Rule 3018(a) Motion Deadline |

| Event | Proposed Date Or Deadline Under Plan Modification Approval Order |
|---|---|
| | would be extended for that claim or interest such that the deadline would be ten days following the filing of the Debtors' objection |
| Plan Objection Deadline | • December 12, 2008, 4:00 p.m. (prevailing Eastern time)<br>• 29 days after Solicitation Mailing Deadline |
| Voting Deadline | • Received by the Voting Agents no later than 7:00 p.m. (prevailing Eastern time) on December 12, 2008<br>• 29 days after Solicitation Mailing Meadline |
| Final Modification Hearing Date | • To commence on December 17, 2008<br>• 34 days after anticipated mailing of solicitation documents |

47.     <u>Content And Transmittal Of Solicitation Packages</u>.  The contents

of the Solicitation Package have been modified to include a copy or conformed printed

version of the Final Modification Hearing Notice and a CD-ROM[10] including, along with

similar materials provided with respect to the December 10 Solicitation Procedures Order,

a copy of the Debtors' most recently filed Form 10-Q.  The Solicitation Package will not

include an Internal Revenue Service form W-9 (Request for Taxpayer Identification

Number and Certification) or form W-8BEN to be returned with a party's ballot.

48.     <u>Notice Not Required For Holders of Claims and Interests In</u>

<u>Classes F And I</u>.  The Debtors propose that because the treatment of Class F in the

Modified Plan is identical to the treatment that was provided to that class under the

---

[10]     The Modified Disclosure Statement and Modified Plan, including exhibits, are more than 1,000 pages in length.  Accordingly, to reduce substantially the administrative costs associated with printing and mailing such a voluminous document, the Debtors propose,  to serve the Modified Disclosure Statement and Modified Plan (including exhibits) via CD-ROM instead of in printed format to all parties.  This procedure was approved by this Court in the December 10 Solicitation Procedures Order with respect to the solicitation on the Confirmed Plan and has also been approved in several other large chapter 11 cases in this district.  <u>See, e.g.</u>, <u>In re Delta Airlines, Inc.</u>, Case No. 05-17923 (Bankr. S.D.N.Y.); <u>In re Adelphia Communications Corp.</u>, Case No. 02-41729 (Bankr. S.D.N.Y.); <u>In re Enron Corp.</u>, Ch. 11 Case No. 01-16034 (Bankr. S.D.N.Y.).  The Modified Plan and Modified Disclosure Statement would also be available at no charge via the Internet at www.delphidocket.com.  In addition, the Debtors would provide parties in interest (at no charge) a hard copy of the Solicitation Package upon reasonable written or telephonic request as set forth below.

Confirmed Plan, the Debtors would not be required to solicit votes on the Modified Plan from such class, and no solicitation materials would be sent to these parties. Similarly, the Debtors propose that no notice of the Modified Plan, Modified Disclosure Statement, and any hearings related thereto, shall be required to be provided to holders of claims or interests in non-voting Class I. Under the Modified Plan, the "Other Interests" in Class I will be deemed cancelled and the holders of "Other Interests" in Class I would not receive or retain any property in account of their interests. The treatment of the holders of Class I "Other Interests" under the Modified Plan is identical to the treatment afforded such holders under the Confirmed Plan, and the Debtors have previously incurred significant costs in providing notice to the members of Class I in connection with the solicitation of votes on the Confirmed Plan. With respect to these parties, therefore, additional notice of the Modified Plan would be redundant, and therefore, unnecessary.

49.     Notices To Union-Represented Employees And Former Employees Not Required. In connection with the solicitation on the December 10 Plan, the Debtors sent specialized notices to the current and former employees represented by Unions (as defined in the December 10 Disclosure Statement) and certain non-represented hourly active employees and retirees. The Debtors believe that no special Union or non-represented hourly active employee and retiree notices are required in connection with solicitation of votes on the Modified Plan because the Modified Plan incorporates those same underlying Union settlement agreements, even though certain aspects of those agreements have been adjusted to effectuate the revised terms and timing provisions of the Amended GSA and Amended MRA. The Unions, as representatives of the current

and former employees, are on notice of these adjustments and have already agreed to them in the context and implementation of the Amended GSA and Amended MRA

50.    Maintaining Record Date Established In December 10 Solicitation Procedures Order   Section 1127(d) of the Bankruptcy Code provides that "[a]ny holder of a claim or interest that has accepted or rejected a plan is deemed to have accepted or rejected, as the case may be, such plan as modified, unless, within the time fixed by the Court, such holder changes such holder's previous acceptance or rejection." Implementation of the foregoing would require the Debtors to maintain the record date (for voting purposes only) established by this Court under the December 10 Solicitation Procedures Order.  That record date was established as November 26, 2007.  Deciding the appropriate record date has required the Debtors to make a determination: comply with section 1127(d) and not update the record date or seek this Court's permission to refrain from applying section 1127(d).  The plain language of the statute permits the Debtors to use the November 26, 2007 record date, and the legislative history of section 1127(d) notes that the purpose of section 1127(d) is to "simplif[y] [the] modification procedure by deeming any creditor or equity security holder that has already accepted or rejected the plan to have accepted or rejected the modification."  H.R. Rep. No. 95-595, at 411 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6367.  Because the Debtors already have the information necessary to implement solicitation using the November 26, 2007 record date, keeping that record date would simplify the Debtors' resolicitation effort, which is consistent with Congress' intent and the purpose of section 1127(d).

51.    Moreover, the Debtors are not aware of any reported decision under section 1127(d) requiring a new record date for resoliciting votes on a modified

plan.[11]  In addition, to the extent a party purchased a claim or interest after the voting

record date, such party purchased the claim or interest subject to the record date

established by this Court.  The only way that the Debtors can feasibly satisfy the plain

language requirements of section 1127(d) is by maintaining the same record date used for

soliciting votes on the December 10 Plan.  Thus, using the November 26, 2007 record

date is logical and rational.

52.     Although the Debtors realize that more than ten months have

lapsed since the November 26, 2007 record date, the December 10 Solicitation

Procedures Order sets the record date at November 26, 2007 and any party who

purchased a claim or interest after that record date purchased the claim or interest subject

to the record date established by this Court.  This is similar to a situation in which a party

who purchases a security following the ex-dividend date is not entitled to receive the

dividend; instead, the dividend is payable to the seller of the security.  In a slightly

different context, this Court established record dates for claim and equity distributions

and made clear that purchasers of claims or interests following the distribution record

date would not need to be recognized by the Debtors.  (Confirmation Order ¶¶ 36-37.)

The principle here is the same and the Debtors believe that maintaining the voting record

date as previously established by this Court is similarly appropriate.

53.     Accordingly, application of section 1127(d) of the Bankruptcy

Code requires that if a holder of a claim or interest does not vote to accept or reject the

Modified Plan by the Voting Deadline, that holder's prior vote would count as it was

---

[11]     But see, e.g., In re American Banknote Corp., Case No. 99 B 11577 (Bankr. S.D.N.Y. 2002) (upon
modification of plan post-confirmation under 11 U.S.C. § 1127(b), court established new record date
for previously unsolicited class as well as class whose treatment under plan had been modified); cf. In
re Oakwood Homes Corp., Case No. 02-13396 (Bankr. D. Del. 2004) (upon modification of plan pre-
confirmation, court set new record date).

originally cast.  Continuing to count those votes as acceptances or rejections of the

Modified Plan will minimize the confusion, expense, and time necessary to complete the

solicitation of votes on the Modified Plan by allowing claimants and interest holders who

are satisfied with their prior vote to leave that vote in place, while affording them a

meaningful opportunity to change their vote in the event that they feel the modifications

to the Confirmed Plan so warrant.  This procedures is consistent with section 1127(d) of

the Bankruptcy Code and is the only feasible means of implementing section 11 U.S.C. §

1127(d).  The Debtors request, therefore, that this Court confirm November 26, 2007 as

the record date for purposes of determining members of Classes C, D, E, G-1, G-2, H for

soliciting votes on the Modified Plan.

        54.    <u>Effect Of Failure Of Class To Vote</u>. The Debtors also propose that
if no claim or interest holder of a particular class votes either to accept or reject the

Modified Plan, then that class would be deemed to have accepted the Modified Plan.

        55.    <u>Maintenance Of Records By Intermediary Record Holders</u>.
Pursuant to the procedures approved in the December 10 Solicitation Procedures Order,

Intermediary Record Owners (as that term in defined in that order) who were required to

use the Master Ballot (as that term in defined in that order) voting process were required

to retain for inspection by the Court the Beneficial Owner Ballots (as that term in defined

in that order) cast by Beneficial Owners (as that term in defined in that order) for one

year following the January 11, 2008 voting deadline set by that order, and Intermediary

Record Owners who were required to send Prevalidated Ballots (as that term in defined in

that order) to Beneficial Owners for direct return to the respective Voting Agent were

also required to retain for inspection by the Court a list of those Beneficial Owners to

whom the Prevalidated Ballots were sent for one year following the January 11, 2008

Voting Deadline. To facilitate the Debtors' resolicitation of votes on the Modified Plan,

the Debtors request that this Court direct the Intermediary Record Owners to maintain

these records and any new or other data relating to Beneficial Owners, until January 11,

2010.

        56.   <u>Rights Offering Participation Amounts</u>. The Confirmed Plan

included a discount rights offering in which unsecured creditors were entitled to purchase

shares of Reorganized Delphi (as defined in the Confirmed Plan) at a discount to the

value ascribed to those shares under the Confirmed Plan. To reconcile the correct

participation amounts for unsecured creditors, on December 28, 2007, the Debtors filed

the Rights Offering Estimation Motion (Docket No. 11606). The Rights Offering

Estimation Motion sought to estimate claims for the purpose of participation in the

discount rights offering, and the Court approved the motion and entered the Rights

Offering Estimation Order on January 24, 2008 (Docket No. 12334). As with the

Confirmed Plan, the Modified Plan provides for unsecured creditors to participate in a

discount rights offering and the Debtors are thus again required to determine the correct

participation amounts for unsecured creditors. Accordingly, subject to this Court's

approval, the Debtors intend to use the participation amounts set by the Rights Offering

Estimation Order, unless either (i) the claim has been adjudicated to a different amount in

the intervening period, or (ii) the Debtors and the individual claimholder agree to a

different amount. Parties who wish to confirm their participation amount may contact the

Debtors' Creditor Voting Agent, Kurtzman Carson Consultants LLC, 2335 Alaska

Avenue, El Segundo, California 90245, Att'n: Delphi Corporation, <u>et al.</u>, (888) 249-2691.

L.   Modified Cure Claim Procedures

57.   To assume executory contracts and unexpired leases pursuant to the Modified Plan under 11 U.S.C. § 365, the Debtors will be required to cure certain defaults under those contracts.  In the December 10 Solicitation Procedures Order and the Confirmation Order, this Court approved certain procedures with respect to the assumption of executory contracts and unexpired leases under the Confirmed Plan and the payment of the related cure.  The Confirmed Plan provided for the cure of Material Supply Agreements in cash or plan currency at the counterparty's election.  Based upon the reduced recoveries anticipated in the Modified Plan, the Debtors now propose to make these cure payments in cash and not offer the plan currency election.  For the avoidance of doubt, the Debtors would not be sending out new or additional Cure Amount Notices under the Modified Plan.  The Debtors would continue to apply these previously established procedures to resolve the remaining disputed cure amounts.

58.   In addition, because the Cure Amount Notices were sent out more than nine months ago, certain of the Master Supply Agreements to be assumed and cured under the Confirmed Plan have since expired or terminated and thus are no longer executory.  For the avoidance of doubt, the Debtors propose to send a Notice of Non-Assumption of Executory Contracts, substantially in the form attached to the Proposed Order as Exhibit H, to counterparties to expired or terminated Material Supply Agreements that previously received a Cure Amount Notice so that they are aware that such contracts are no longer being assumed or cured.

M.   Modified Reclamation Claim Procedures

59.   The Debtors seek to implement the following procedures regarding reclamation claims ("Reclamation Claims") asserted by sellers of goods with a statutory

or common law right to reclamation or holders of such claims ("Sellers"). Because the

Modified Plan provides for reduced distributions to unsecured creditors, the Debtors

propose to rescind all elections made by Sellers pursuant to the procedures established by

this Court regarding Reclamation Claims in conjunction with the Confirmed Plan.[12]

Instead, the Debtors will seek a judicial determination at a contested hearing subsequent

to the effective date of the Modified Plan (the "Reclamation Hearing") that Reclamation

Claims are not entitled to priority treatment because the goods and/or the proceeds from

the sale of the goods that are the subject of Reclamation Claims are or were subject to,

among other things, a valid security interest (the "Prior Lien Defense"). Pursuant to a

separate personalized notice substantially in the form of Exhibit I attached to the

Proposed Order, (the "Reclamation Election Notice"), Sellers would be given the choice

to opt out of litigation and receive the treatment afforded to holders of general unsecured

claims under the Modified Plan, which notice the Debtors will transmit by November 26,

2008 and which must be returned no later than December 12, 2008. This election should

expedite distributions to holders of Reclamation Claims who would otherwise not receive

a distribution until their Reclamation Claim is resolved. Notwithstanding this procedure,

the Debtors reserve all rights in law and in equity to contest the amount of any

Reclamation Claim to the extent such amount has yet to be resolved pursuant to the

Second Reclamation Order. The Sellers would not receive any voting rights on the

Modified Plan on account of Reclamation Claims. If a Seller (i) elects to dispute its

Reclamation Claim on the Reclamation Election Notice, (ii) makes no election on the

---

[12] See Second Amended And Restated Final Order Under 11 U.S.C. §§ 362, 503, And 546 And Fed. R. Bankr. P. 9019 Establishing Procedures For Treatment Of Reclamation Claims (Docket No. 10409) (the "Second Reclamation Order").

Reclamation Election Notice, or (iii) fails to return the Reclamation Election Notice by December 12, 2008, then that Seller would have its Reclamation Claim litigated at the Reclamation Hearing.

Applicable Authority

60.     Section 1127 of the Bankruptcy Code applies when a party seeks to modify a plan of reorganization.  Specifically, 11 U.S.C. § 1127(b) provides that a "proponent of a plan or the reorganized debtor may modify such a plan at any time after confirmation of such a plan and before substantial consummation of such a plan." However, the modifications, "may not modify such plan so that such plan as modified fails to meet the requirements of sections 1122 and 1123 of this title."  Id.  The proponent of a modified plan is also required to comply with the disclosure and solicitation requirements outlined in section 1125 of the Bankruptcy Code.  11 U.S.C. § 1127(c). Whether a debtor needs to resolicit votes on modifications to a plan of reorganization depends on whether the modification is material or not and whether the creditors and interest holders are adversely affected.  See In re Am. Solar King Corp., 90 B.R. 808, 824 (Bankr. W.D. Tex. 1988) (finding that plan modification reducing distribution to creditors by less than one percent did not require resolicitation); In re Boroff, 189 B.R. 53, 57 (D. Vt. 1995) (quoting In re Frontier Airlines, Inc., 93 B.R. 1014, 1023 (Bankr. D. Colo. 1988) ("If the modification adversely affects the interests of a creditor in more than a purely ministerial, de minimis manner, that creditor should have the opportunity to reconsider and change his or her vote.")).

61.     When a debtor resolicits acceptances of a modified plan, section 1127 of the Bankruptcy Code provides that a holder's prior vote on the December 10 Plan may be counted as a vote on the Modified Plan.  11 U.S.C. § 1127(d) (holder may be

"deemed to have accepted or rejected, as the case may be, such plan as modified"). See, e.g., In re McCommas LFG Processing Partners, LP, Nos. 07-32222-HDH-11, 07-32219-DHD-11, 2007 WL 4234139, at *3 (Bankr. N.D. Tex. Nov. 29, 2007) ("[p]ursuant to section 1127(d) of the Bankruptcy Code and Bankruptcy Rule 3019, all acceptances of the Plan prior to such Modifications are deemed acceptances of the Plan"); Enron Corp v. New Power Co. (In re New Power Co.), 438 F.3d 1113, 1117-18 (11th Cir. 2006) (court may deem holder's prior vote of acceptance for original plan as acceptance of a modified plan even without resoliciting "unless the modification materially and adversely changes the way that claim or interest holder is treated").

62. As required by section 1127(c) of the Bankruptcy Code, the Debtors believe that resolicitation of votes on the Modified Plan is required, and therefore the Debtors have filed with this Court the Modified Disclosure Statement together with the Modified Plan. Section 1125(b) of the Bankruptcy Code, as incorporated by section 1127 of the Bankruptcy Code, prohibits postpetition solicitation of a reorganization plan unless the plan and "a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information" are transmitted to those persons whose votes are being solicited. As previously stated, the Debtors filed the Modified Plan and Modified Disclosure Statement, and are seeking this Court's approval to commence solicitation of acceptances of the Modified Plan.

63. This Court previously approved the December 10 Disclosure Statement as providing adequate information within the meaning of Section 1125(a)(1) of the Bankruptcy Code. Section 1125(a)(1) of the Bankruptcy Code defines "adequate information" as:

> [I]nformation of a kind, and in sufficient detail, as far as is
> reasonably practicable in light of the nature and history of the
> debtors and the condition of the debtor's books and records, that
> would enable a hypothetical reasonable investor typical of holders
> of claims or interests of the relevant class to make an informed
> judgment about the plan. . . .

11 U.S.C. § 1125(a)(1).  Because certain events have subsequently transpired since the

approval of the December 10 Disclosure Statement and the confirmation of the

Confirmed Plan, the Debtors believed that modifications to the Confirmed Plan are

desirable and have updated the December 10 Disclosure Statement.  The Debtors believe

that the Modified Disclosure Statement contains "adequate information."  Accordingly

the Debtors request the Modified Disclosure Statement be approved for resolicitation of

votes on the Modified Plan in accordance with section 1127(b).

64.     In examining the adequacy of the information contained in a

disclosure statement, a bankruptcy court has broad discretion.  See Texas Extrusion Corp.

v. Lockheed Corp. (In re Texas Extrusion Corp.), 844 F.2d 1142, 1157 (5th Cir. 1988); In

re Dakota Rail, Inc., 104 B.R. 138, 143 (Bankr. D. Minn. 1989) (court has "wide

discretion to determine . . . whether a disclosure statement contains adequate information

without burdensome, unnecessary and cumbersome detail").  Accordingly, the

determination of whether a disclosure statement contains adequate information is to be

made on a case-by-case basis, focusing on the unique facts and circumstances of each

case.  In that regard, courts generally examine whether the disclosure statement contains

information including:

- the circumstances that gave rise to the filing of the bankruptcy petition;

- a complete description of the available assets and their value;

- the anticipated future of the debtor;

- the source of the information provided in the disclosure statement;

- a disclaimer, which typically indicates that no statements or information concerning the debtor or its assets or securities are authorized other than those set forth in the disclosure statement;

- the condition and performance of the debtor while in chapter 11;

- information regarding claims against the estate;

- a liquidation analysis setting forth the estimated return that creditors would receive under chapter 7;

- the accounting and valuation methods used to produce the financial information in the disclosure statement;

- information regarding the future management of the debtor, including the amount of compensation to be paid to any insiders, directors, and/or officers of the debtor;

- a summary of the plan of reorganization;

- an estimate of all administrative expenses, including attorneys' fees and accountants' fees;

- the collectibility of any accounts receivable;

- any financial information, valuations, or pro forma projections that would be relevant to creditors' determinations of whether to accept or reject the plan;

- information relevant to the risks being taken by the creditors and interest holders;

- the actual or projected value that can be obtained from avoidable transfers;

- the existence, likelihood, and possible success of non-bankruptcy litigation;

- the tax consequences of the plan; and

- the relationship of the debtor with its affiliates.

In re Scioto Valley Mortgage Co., 88 B.R. 168, 170-71 (Bankr. S.D. Ohio 1988); see also

Abel v. Shugrue (In re Ionosphere Clubs, Inc.), 179 B.R. 24, 29 (S.D.N.Y. 1995)

(determination of whether disclosure statement contains adequate information must be made on case-by-case basis).

65. The Debtors submit that the Modified Disclosure Statement contains adequate information within the meaning of section 1125 of the Bankruptcy Code and therefore satisfies the requirements of section 1127(b) of the Bankruptcy Code. Similar to the December 10 Disclosure Statement which was approved by this Court, the Modified Disclosure Statement is both extensive and comprehensive and satisfies each of the informational items outlined in In re Scioto Valley Mortgage Co. Indeed, the Modified Disclosure Statement contains descriptions and summaries of, among other things, (i) the Modified Plan, (ii) the Debtors' history and prepetition capital structure, (iii) certain events leading to the commencement of the chapter 11 cases, (iv) the significant events during the chapter 11 cases, (v) the claims asserted against the Debtors' estates, (vi) the new securities to be issued under the Modified Plan, (vii) various risk factors affecting the Modified Plan and the Debtors' restructuring, (viii) a liquidation analysis setting forth the estimated return that creditors would receive in a hypothetical chapter 7 case, (ix) financial information and valuations relevant to creditors' determinations of whether to accept or reject the Modified Plan, (x) certain securities law and tax law consequences of the Modified Plan, and (xi) a disclaimer indicating that no statements or information concerning the Debtors and their assets and securities are authorized other than those set forth in the Modified Disclosure Statement. Accordingly, the Debtors submit that the Modified Disclosure Statement contains adequate information within the meaning of section 1125 of the Bankruptcy Code as incorporated by section 1127 of the Bankruptcy Code and should be approved under section 1127(b) of the Bankruptcy Code.

66.     The Debtors further request that the Court authorize them to (i) make non-material changes to the Modified Disclosure Statement and related documents (including the exhibits thereto and to this Motion) and (ii) revise the Modified Disclosure Statement and related documents (including the exhibits thereto) to add further disclosure concerning events occurring at or after the Preliminary Modification Hearing, before distributing it to each person and entity in accordance with the terms of the proposed order granting this Motion.  If so permitted, the Debtors would file copies with the Court of any changed pages marked to show the changes.

67.     Consistent with the Court's finding in connection with the December 10 Disclosure Statement, the Debtors also request that this Court find that, as far as the Court has been made aware, (i) all material information regarding the Debtors and their subsidiaries, their respective assets, affairs, and financial conditions, and the reorganization and restructuring provided for under the Modified Plan has been set forth in the Modified Disclosure Statement and the Debtors' public filings with the Securities and Exchange Commission before the date of the Preliminary Modification Hearing (or the exhibits or appendices thereto), or that all such material information has been disclosed fully and adequately thereby, and (ii) there is no material nonpublic information regarding the Debtors or their subsidiaries, their respective assets, affairs, or financial conditions, or the reorganization and restructuring provided for under the Modified Plan that has not been disclosed.

## Notice Of Motion

68.     Notice of this Motion has been provided in accordance with the Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case

Management, And Administrative Procedures, entered March 20, 2006 (Docket No. 2883) (the "Supplemental Case Management Order") and the Twelfth Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered July 23, 2008 (Docket No. 13965).  The Debtors also request that any party filing a timely objection to this Motion (i) make a good faith effort to include in such objection proposed language that would resolve the objection and (ii) participate in a meet and confer with the Debtors on the day after the objection deadline to this Motion, or as soon thereafter as the Debtors determine, in an effort to resolve the objection consensually.  In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

WHEREFORE the Debtors respectfully request that the Court (a) enter an order (i) approving certain modifications to the Confirmed Plan and related modifications to the December 10 Disclosure Statement and related procedures and notices for resoliciting votes of affected classes on the Modified Plan and (ii) setting a final hearing date on approval of the Debtors ' proposed Modified Plan and (b) grant them such other and further relief as is just.

Dated:    New York, New York
           October 3, 2008

SKADDEN, ARPS, SLATE, MEAGHER
 & FLOM LLP

By:    /s/ John Wm. Butler, Jr.
       John Wm. Butler, Jr.
       George N. Panagakis
       Ron E. Meisler
       Nathan L. Stuart
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700

- and –

By:    /s/ Kayalyn A. Marafioti
       Kayalyn A. Marafioti
       Thomas J. Matz
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
 Debtors and Debtors-in-Possession

# EXHIBIT Q

Exhibit 7.19

Retained Causes Of Action

All Plan Exhibits are subject to all of the provisions of the First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession (As Modified) (Docket No. 17030) (as subsequently modified or amended, the "Modified Plan"), including, without limitation, Article 14.3, under which the Debtors have reserved the right to alter, amend, or modify the Modified Plan or any Exhibits thereto.

<u>EXHIBIT 7.19</u>

**<u>Non-Exclusive List of Retained Actions</u>**

<u>General Note to Plan Schedule 7.19</u>[1]

In accordance with section 1123(b)(3) of the Bankruptcy Code and except as otherwise provided in section 7.19 of the Plan, the Reorganized Debtors shall retain and may (but are not required to) enforce all Retained Actions and all other similar claims arising under applicable state laws, including, without limitation, fraudulent transfer claims, if any, and all other Causes of Action of a trustee and debtor-in-possession under the Bankruptcy Code, including, without limitation, all of those claims, Retained Actions, and Causes of Action that are listed in the Debtors' Schedules, as they may have been amended, and any such claims, Retained Actions, and Causes of Action that may have subsequently arisen, that may have subsequently been discovered, or which may be pending. The Debtors or the Reorganized Debtors, in their sole and absolute discretion, shall determine whether to bring, settle, release, compromise, or enforce such Retained Actions (or decline to do any of the foregoing), and shall not be required to seek further approval of the Bankruptcy Court for such action. The Reorganized Debtors or any successors may pursue such litigation claims in accordance with the best interests of the Reorganized Debtors or any successors holding such rights of action.

For the avoidance of any confusion, the Debtors and Reorganized Debtors or any successors holding such rights of action expressly retain, among all other rights of action:

1. Any and all claims, Causes of Action, rights of action, suits, and proceedings in favor of the Debtors or their Estates against Furukawa Electric North America APD and Furukawa Electric Co., Ltd. and their affiliates and subsidiaries, including those asserted in Adversary Proceeding No. 07-02379.

---

[1] Capitalized terms used in this Exhibit and not otherwise defined have the meanings ascribed to such terms in the Plan.

2.  Any and all claims, Causes of Action, rights of action, suits, and proceedings in favor of the Debtors or their Estates against any party or third party arising out of or relating to the claims raised against the Debtors in certain consolidated class action proceedings styled <u>In Re Delphi Corporation Securities, Derivative & ERISA Litigation</u>, Master Case No. 05-md-1725, pending in the United States District Court for the Eastern District of Michigan (the "MDL Litigation"), including claims for indemnification, claims related to the rights to the proceeds of any applicable insurance policies, claims for breach of duty or breach of care in connection with the allegations in the MDL Litigation, derivative claims against former officers, directors, or employees of the Debtors, and claims for negligent or willful conduct which may have caused or contributed to the alleged liability of the Debtors in connection with the MDL Litigation. Provided further, that only those claims and Causes of Action that are expressly specified as being subject to release by the Debtors in certain stipulations of settlement in connection with the MDL Litigation will be released, but only when and if those stipulations become effective by their terms.

3.  Any and all claims, Causes of Action, rights of action, suits, and proceedings in favor of the Debtors or their Estates against the United States of America with respect to the Debtors' right to a refund of taxes paid by Delphi, a predecessor of Delphi Automotive Systems LLC, and Delphi Automotive Systems LLC under the Federal Insurance Contributions Act with respect to "ratification bonuses" paid shortly after the effective date of duly ratified collective bargaining agreements to certain union members in 1999 and 2003 including claims asserted in an action styled: <u>Delphi Corporation, <em>et al.</em> v United States of America</u>, No. 08 Civ. 4487 (PKC)(RLE) in the United States District Court for the Southern District of New York.

4.  Any and all claims, Causes of Action, rights of action, suits, and proceedings in favor of the Debtors or their Estates against Appaloosa Management L.P., <em>et al.</em> in Adversary Proceeding No. 08-01232, and against UBS Securities LLC in Adversary Proceeding No. 08-01233.

5. Any and all claims, Causes of Action, rights of action, suits, and proceedings in favor of the Debtors or their Estates against Laneko Engineering Co., Wachovia Bank, National Association and Laneko Engineering Co. Inc. and their affiliates and subsidiaries including those asserted in Adversary Proceeding No. 07-02720.

6. Any and all claims, Causes of Action, rights of action, suits, and proceedings in favor of the Debtors or their Estates against the defendants in the following Adversary Proceedings that were filed under seal in accordance with and pursuant to the Order Under 11 U.S.C. §§ 102(1)(A), 105(a), 107, 108(a)(2), And 546(a) And Fed. R. Bankr. P. 7004, 9006(c), And 9018 (i) Authorizing Debtors To Enter Into Stipulations Tolling Statue Of Limitations With Respect To Certain Claims, (ii) Authorizing Procedures To Identify Causes Of Action That Should Be Preserved, And (iii) Establishing Procedures For Certain Adversary Proceedings Including Those Commenced By Debtors Under 11 U.S.C. § 541, 544, 547, 548, Or 553, dated August 16, 2007:

| Adversary Proceeding Number | Adversary Proceeding Number | Adversary Proceeding Number |
|---|---|---|
| 07-02074 | 07-02302 | 07-02592 |
| 07-02076 | 07-02305 | 07-02597 |
| 07-02077 | 07-02309 | 07-02600 |
| 07-02084 | 07-02310 | 07-02602 |
| 07-02090 | 07-02312 | 07-02605 |
| 07-02096 | 07-02313 | 07-02606 |
| 07-02098 | 07-02322 | 07-02607 |
| 07-02124 | 07-02328 | 07-02617 |
| 07-02125 | 07-02333 | 07-02618 |
| 07-02130 | 07-02337 | 07-02619 |
| 07-02131 | 07-02339 | 07-02623 |
| 07-02133 | 07-02344 | 07-02625 |
| 07-02135 | 07-02348 | 07-02633 |
| 07-02138 | 07-02350 | 07-02639 |
| 07-02140 | 07-02351 | 07-02644 |
| 07-02142 | 07-02357 | 07-02649 |
| 07-02147 | 07-02358 | 07-02650 |
| 07-02151 | 07-02372 | 07-02652 |
| 07-02161 | 07-02374 | 07-02654 |
| 07-02177 | 07-02378 | 07-02657 |

| Adversary Proceeding Number | Adversary Proceeding Number | Adversary Proceeding Number |
| --- | --- | --- |
| 07-02182 | 07-02414 | 07-02659 |
| 07-02185 | 07-02416 | 07-02661 |
| 07-02186 | 07-02432 | 07-02668 |
| 07-02188 | 07-02433 | 07-02672 |
| 07-02198 | 07-02435 | 07-02679 |
| 07-02201 | 07-02436 | 07-02688 |
| 07-02203 | 07-02442 | 07-02689 |
| 07-02210 | 07-02445 | 07-02690 |
| 07-02211 | 07-02449 | 07-02694 |
| 07-02212 | 07-02457 | 07-02697 |
| 07-02214 | 07-02459 | 07-02702 |
| 07-02217 | 07-02462 | 07-02711 |
| 07-02220 | 07-02466 | 07-02712 |
| 07-02227 | 07-02475 | 07-02714 |
| 07-02234 | 07-02477 | 07-02720 |
| 07-02236 | 07-02479 | 07-02723 |
| 07-02238 | 07-02484 | 07-02730 |
| 07-02242 | 07-02489 | 07-02737 |
| 07-02245 | 07-02500 | 07-02739 |
| 07-02248 | 07-02505 | 07-02742 |
| 07-02250 | 07-02523 | 07-02743 |
| 07-02256 | 07-02525 | 07-02744 |
| 07-02257 | 07-02527 | 07-02745 |
| 07-02258 | 07-02534 | 07-02750 |
| 07-02259 | 07-02539 | 07-02753 |
| 07-02260 | 07-02540 | 07-02756 |
| 07-02262 | 07-02541 | 07-02758 |
| 07-02270 | 07-02543 | 07-02767 |
| 07-02272 | 07-02551 | 07-02768 |
| 07-02274 | 07-02553 | 07-02769 |
| 07-02280 | 07-02554 | 07-02775 |
| 07-02282 | 07-02555 | 07-02783 |
| 07-02284 | 07-02556 | 07-02785 |
| 07-02287 | 07-02562 | 07-02787 |
| 07-02288 | 07-02563 | 07-02789 |
| 07-02291 | 07-02571 | 07-02790 |
| 07-02295 | 07-02572 | 07-02799 |
| 07-02298 | 07-02580 | 07-02800 |
| 07-02301 | 07-02581 | 07-02804 |

The Debtors reserve their right to modify this list to amend, add, or remove parties or otherwise update this list, but disclaim any obligation to do so.

# EXHIBIT R

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
155 North Wacker Drive
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr.
John K. Lyons
Ron E. Meisler

    - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti

Attorneys for Delphi Corporation, et al.,
  Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free: (800) 718-5305
International: (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                            :
    In re                      :    Chapter 11
                            :
DELPHI CORPORATION, et al.,    :    Case No. 05-44481 (RDD)
                            :
                Debtors.  :    (Jointly Administered)
                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

NOTICE OF (A) ORDER APPROVING MODIFICATIONS TO FIRST
AMENDED JOINT PLAN OF REORGANIZATION OF DELPHI CORPORATION
AND CERTAIN AFFILIATES, DEBTORS AND DEBTORS-IN-POSSESSION
AND (B) OCCURRENCE OF EFFECTIVE DATE

      1.      **Confirmation Of The Plan.**  On January 25, 2008 (the "Confirmation Date"), the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") entered an order confirming the First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession, dated January 25, 2008 (the "Confirmed Plan"), in the Chapter 11 Cases of Delphi Corporation and certain of its subsidiaries and affiliates, the debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors").

2.     **Approval Of Modifications To The Confirmed Plan.**  On July 30, 2009 (the "Modification Approval Date"), the Bankruptcy Court entered an order (the "Modification Approval Order") approving certain modifications to the Confirmed Plan embodied in the First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession (As Modified) (the "Modified Plan"), attached as Exhibit A to the Modification Approval Order.  Unless otherwise defined in this Notice Of (A) Order Approving Modifications To First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession And (B) Occurrence Of Effective Date, capitalized terms and phrases used herein have the meaning(s) given to them in the Modified Plan and the Modification Approval Order.

3.     **Effective Date.**  On October 6, 2009, the Effective Date of the Modified Plan occurred. The Modified Plan was substantially consummated at a closing that occurred at the offices of Skadden, Arps, Slate, Meagher & Flom LLP in New York City, New York; provided however, that all of the transactions contemplated by the Master Disposition Agreement and related agreements to occur at the closing are effective for tax and accounting purposes as of 11:58 p.m., local time, on the Closing Date as defined in the Master Disposition Agreement.

4.     **Discharge Of Claims And Termination Of Interests.**  Pursuant to section 1141(d) of the Bankruptcy Code, except as otherwise specifically provided in the Modified Plan, Confirmation Order, or Modification Approval Order, the distributions and rights that are provided in the Modified Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims and Causes of Action, whether known or unknown, against, liabilities of, liens on, obligations of, rights against, and Interests in the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Modified Plan on account of such Claims, rights, and Interests, including, but not limited to, Claims and Interests that arose before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not (a) a proof of claim or interest based upon such Claim, debt, right, or Interest is filed or deemed filed under section 501 of the Bankruptcy Code, (b) a Claim or Interest based upon such Claim, debt, right, or Interest is allowed under section 502 of the Bankruptcy Code, or (c) the holder of such a Claim, right, or Interest accepted the Modified Plan.  Due to the occurrence of the Effective Date, the Modification Approval Order shall be a judicial determination of the discharge of all Claims against and Interests in the Debtors.

5.     **Injunctions.**

(a)     Subject to Article 11.13 of the Modified Plan, the satisfaction, release, and discharge pursuant to Article XI of the Modified Plan shall act as an injunction against any Person commencing or continuing any action, employment of process, or act to collect, offset, or recover any Claim, Interest, or Cause of Action satisfied, released, or discharged under the Modified Plan to the fullest extent authorized or provided by the Bankruptcy Code, including, without limitation, to the extent provided for or authorized by sections 524 and 1141 thereof.

(b)     By accepting distributions pursuant to the Modified Plan, each Holder of an Allowed Claim shall be deemed to have specifically consented to the injunctions set forth in Article XI of the Modified Plan.

6.     **Release By Debtors Of Certain Parties.**  Pursuant to section 1123(b)(3) of the Bankruptcy Code, but subject to Article 11.13 of the Modified Plan, effective as of the Effective Date, each Debtor, in its individual capacity and as a debtor-in-possession for and on behalf of its Estate, shall release and discharge and be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged all Released Parties for and from any and all claims or Causes of Action

existing as of the Effective Date in any manner arising from, based on, or relating to, in whole or in part, the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Modified Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, or any act, omission, occurrence, or event in any manner related to any such Claims, Interests, restructuring, or the Chapter 11 Cases. The Reorganized Debtors, including Reorganized DPH Holdings, and any newly-formed entities that will be continuing the Debtors' businesses after the Effective Date, shall be bound, to the same extent the Debtors are bound, by the releases and discharges set forth above. Notwithstanding the foregoing, nothing in the Modified Plan shall be deemed to release (i) any of the Debtors or GM from their obligations under the Delphi-GM Definitive Documents or the transactions contemplated thereby, except to the extent set forth in the Master Disposition Agreement, (ii) any of the Debtors, the Unions, or GM from their obligations under the Union Settlement Agreements or the transactions contemplated thereby, (iii) any of the Buyers from their obligations under the Master Disposition Agreement, or (iii) any of the Debtors or the Plan Investors or their affiliates from their obligations under the Investment Agreement or the transactions contemplated thereby.

7. **Release By Holders Of Claims And Interests.** On the Effective Date, (a) each Person who votes to accept the Modified Plan and (b) to the fullest extent permissible under applicable law, as such law may be extended or interpreted subsequent to the Effective Date, each entity (other than a Debtor) which has held, holds, or may hold a Claim against or Interest in the Debtors, in consideration for the obligations of the Debtors and the Reorganized Debtors under the Modified Plan and Cash, General Unsecured MDA Distribution, and other contracts, instruments, releases, agreements, or documents to be delivered in connection with the Modified Plan (each, a "Release Obligor"), shall have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged all Released Parties for and from any claim or Cause of Action existing as of the Effective Date in any manner arising from, based on, or relating to, in whole or in part, the Debtors, the subject matter of, or the transaction or event giving rise to, the claim of such Release Obligor, the business or contractual arrangements between any Debtor and Release Obligor or any Released Party, the restructuring of the claim prior to the Chapter 11 Cases, or any act, omission, occurrence, or event in any manner related to such subject matter, transaction, obligation, restructuring, or the Chapter 11 Cases, including, but not limited to, any claim relating to, or arising out of the Debtors' Chapter 11 Cases, the negotiation and filing of the Modified Plan, the filing of the Chapter 11 Cases, the formulation, preparation, negotiation, dissemination, filing, implementation, administration, confirmation, or consummation of the Modified Plan, the Disclosure Statement, the Plan Exhibits, the Delphi-PBGC Settlement Agreement, the Credit Bid, the Master Disposition Agreement, the Union Settlement Agreements, any employee benefit plan, instrument, release, or other agreement or document created, modified, amended or entered into in connection with either the Modified Plan or any other agreement with the Unions, including but not limited to the Union Settlement Agreements, or any other act taken or not taken consistent with the Union Settlement Agreements in connection with the Chapter 11 Cases; provided, however, that (A) Article 11.5 of the Modified Plan is subject to and limited by Article 11.13 of the Modified Plan and (B) 11.5 of the Modified Plan shall not release any Released Party from any Cause of Action held by a governmental entity existing as of the Effective Date based on (i) the Internal Revenue Code or other domestic state, city, or municipal tax code, (ii) the environmental laws of the United States or any domestic state, city, or municipality, (iii) any criminal laws of the United States or any domestic state, city, or municipality, (iv) the Exchange Act, the Securities Act, or other securities laws of the United States or any domestic state, city, or municipality, (v) the Employee Retirement Income Security Act of 1974, as amended, or (vi) the laws and regulations of the Bureau of Customs and Border Protection of the United States Department of Homeland Security. Notwithstanding the foregoing, all releases given by GM to (i) the Debtors and the Debtors' Affiliates shall be as set forth in the Delphi-GM Global Settlement Agreement and (ii) the Unions shall be as set forth in the Union Settlement Agreements.

8. **Assumption And Assignment Of Executory Contracts And Unexpired Leases.** Subject to the terms of the Modified Plan, Modification Approval Order, and any related Bankruptcy Court orders, upon the occurrence of the Effective Date, each executory contract or unexpired lease assumed, or assumed and assigned, as applicable, pursuant to Article VIII of the Modified Plan, shall vest in and be fully enforceable by the applicable Reorganized Debtor or its assignee in accordance with its terms. On the Effective Date, all executory contracts and unexpired leases as to which any Debtor is a party are deemed automatically assumed by the applicable Reorganized Debtor in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code as of the Effective Date, unless such executory contracts or unexpired leases (a) have been previously rejected by the Debtors by Final Order of the Bankruptcy Court, (b) are the subject of a motion to reject, or that otherwise authorizes rejection, filed on or before the Modification Approval Date, (c) have been rejected or assumed pursuant to a motion to sell or transfer property or assets filed by the Debtors prior to the Effective Date, (d) have expired or terminated on or prior to the Effective Date (and were not otherwise extended) pursuant to their own terms, (e) are listed on the schedule of rejected contracts on Exhibit 8.1(a) to the Modified Plan, or (f) are otherwise rejected pursuant to the terms of the Modified Plan and/or upon the direction of either Buyer pursuant to the Master Disposition Agreement. Subject to the foregoing sentences, entry of the Modification Approval Order by the Bankruptcy Court approved the rejections, assumptions, and assumptions and assignments contemplated by the Modified Plan, the Modification Approval Order, the Master Disposition Agreement, and related documents pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.

9. **Bar Dates**

(a) **Administrative Bar Date.** Requests for payment of an Administrative Claim (other than as set forth in Article X of the Modified Plan), must be filed with the Claims Agent and served on counsel for the Debtors and the Creditors' Committee no later than November 5, 2009 or shall be disallowed automatically without the need for any objection from the Debtors or Reorganized Debtors. Unless the Debtors or the Reorganized Debtors object to an Administrative Claim on or prior to May 4, 2010 (unless such objection period is extended by the Bankruptcy Court), such Administrative Claim shall be deemed allowed in the amount requested. In the event that the Debtors or the Reorganized Debtors object to an Administrative Claim, the Bankruptcy Court shall determine the allowed amount of such Administrative Claim.

(b) **Professional Claims And Final Fee Applications.** All final requests for payment of Professional Claims and requests for reimbursement of expenses of members of the Statutory Committees must be filed no later than December 31, 2009. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior orders of the Bankruptcy Court, the allowed amounts of such Professional Claims and expenses shall be determined by the Bankruptcy Court. Pursuant to the Bankruptcy Court's prior orders, any requirement that Professionals comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered terminated on the Confirmation Date, and the Reorganized Debtors have employed and paid Professionals in the ordinary course of business thereafter.

(c) **Substantial Contribution Bar Date.** Except as otherwise provided in the Modification Approval Order, any Person who requests compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code shall file an application with the clerk of the Bankruptcy Court on or before November 20, 2009, and serve such application on counsel for the Debtors, the Creditors' Committee, the United States Trustee for the Southern District of New York, and such other parties as may be decided by the Bankruptcy Court and the Bankruptcy Code on or before November 20, 2009, or be forever barred from seeking such compensation or expense reimbursement.

Dated:  New York, New York
       October 6, 2009

SKADDEN, ARPS, SLATE, MEAGHER &
  FLOM LLP

By: /s/ John Wm. Butler,
     John Wm. Butler, Jr.
     John K. Lyons
     Ron E. Meisler
155 North Wacker Drive
Chicago, Illinois  60606
(312) 407-0700

By: /s/ Kayalyn A. Marafioti
     Kayalyn A. Marafioti
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
     Debtors and Debtors-in-Possession

5

# EXHIBIT S

BUTZEL LONG, a professional corporation
Eric B. Fisher
Barry N. Seidel
Cynthia J. Haffey (Detroit office)
380 Madison Avenue, 22nd Floor
New York, New York 10017
Telephone: (212) 374-5359
Facsimile: (212) 818-0494
fishere@butzel.com

*Attorneys for Plaintiffs*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DPH HOLDINGS CORP., et al., <br><br> Reorganized Debtors, | Chapter 11 <br><br> Case No. 05-44481 (RDD) <br> (Jointly Administered) <br><br> Adv. Pro. No. 07-02074, et seq. |

**REORGANIZED DEBTORS' EMERGENCY MOTION FOR ORDER UNDER SECTION 105(a) OF THE BANKRUPTCY CODE, FED. R. BANKR. P. 7004(a) AND 9006(b)(1), AND FED. R. CIV. P. 4(m) EXTENDING DEADLINE TO SERVE PROCESS FOR CERTAIN AVOIDANCE ACTIONS**

Plaintiffs DPH Holdings Corporation and certain of its affiliated reorganized debtors (collectively, the "Reorganized Debtors" or "Plaintiffs"), hereby submit this emergency motion for an order under 11 U.S.C. § 105(a), Fed. R. Bankr. P. 7004(a) And 9006(b)(1), and Fed. R. Civ. P. 4(m) Extending the Deadline to Serve Process For Certain Avoidance Actions (the "Motion"), and respectfully represent as follows:

**Preliminary Statement**

1.     The Reorganized Debtors bring this Motion because unanticipated difficulties have prevented the completion of service of process in certain of the 177 adversary proceedings

retained by the Debtors (the "Retained Adversary Proceedings").[1]  As a result, the Reorganized Debtors have been unable to effectuate service in 62 of the Retained Adversary Proceedings (the "Sixty Two Adversary Proceedings") by April 5, 2010 (the "Service Deadline").

2.     As explained in detail below, the Retained Adversary Proceedings, 62 of which are the subject of this Motion, were preserved for eventual prosecution by the Debtors pursuant to a series of orders entered by this Court during the reorganization proceedings that led to Delphi's emergence from chapter 11 protection on October 6, 2009 (the "Effective Date").  Since the Effective Date, the Reorganized Debtors have asked the Clerk of the Court to unseal these actions and issue summonses, and have served, and continue to serve, the issued summonses upon the defendants.

3.     The Sixty Two Adversary Proceedings that are the subject of this motion generally fall into three categories: (i) actions in which the Clerk of the Court has not yet issued a summons in response to the Reorganized Debtors' written request; (ii) actions involving service upon foreign defendants pursuant to the Hague Service Convention or the Inter-American Convention, as applicable;[2] and (iii) actions in which service was attempted, but not completed, due, in most cases, to a change in location of or possible dissolution of the defendant entity.  In each instance, the Reorganized Debtors' inability to effectuate service to date resulted from circumstances beyond the control of the Reorganized Debtors.  Accordingly, the Reorganized Debtors respectfully request an extension of the Service Deadline with respect to the Sixty Two Adversary Proceedings.

---

[1] Togut, Segal & Segal LLP (the "Togut Firm") is counsel to Plaintiffs with respect to eleven of the Retained Adversary Proceedings.  Of those eleven actions, the Togut Firm joins in this Motion with respect to the five actions listed in Exhibit A attached hereto.

[2] While Fed. R. Civ. P. 4(m) does not govern foreign service, Plaintiffs nonetheless request relief from the Service Deadline in the Third Extension Order (defined herein).

## Background

### A.      The Chapter 11 Filings And Initial Steps Toward Reorganization

4.      On October 8 and 14, 2005, Delphi and its subsidiary and affiliated U.S. entities (together, the "Debtors") filed voluntary petitions in this Court for reorganization relief under chapter 11 of Title XI of the United States Code, 11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code").  The Debtors continued to operate their businesses and manage their properties as Debtors-in-Possession under Bankruptcy Code §§ 1107(a) and 1108 until the Effective Date.  The Court ordered joint administration of these cases.[3]

5.      No Trustee or Examiner was appointed in these cases.  On October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors.  On April 28, 2006, the U.S. Trustee appointed an official committee of equity holders (together with the official committee of unsecured creditors, the "Statutory Committees").

6.      By August of 2007, the Debtors had made significant progress toward confirming a plan of reorganization.  Specifically, they had obtained the support of their Statutory Committees for, and Court approval of, an equity purchase and commitment agreement under which several leading financial firms committed to invest up to $2.55 billion in preferred and common equity in the reorganized Delphi (the "EPCA"), and they scheduled a hearing in October 2007 to seek approval of their proposed disclosure statement and of solicitation procedures for a reorganization plan.  Moreover, the Debtors expected to emerge from chapter 11

---

[3] At the time of its chapter 11 filing, Delphi's bankruptcy was the fifth largest public company business reorganization in terms of revenues and the thirteenth largest public company business reorganization in terms of assets.

by the end of 2007 and to pay or satisfy all creditor claims in full through distributions of cash, common stock, or both. Accordingly, the Debtors originally intended to waive or release most, if not all, avoidance causes of action upon reorganization.[4] It was made clear, though, that those waivers and releases were conditioned upon the consummation of the EPCA and the plan that was predicated on the EPCA.

7.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

8.      The statutory predicates for the relief requested herein are section 105 of the Bankruptcy Code, rules 7004 and 9004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rule 4(m) of the Federal Rules of Civil Procedure.

**B.      The Preservation Of Estate Claims And The Filing Of The Adversary Proceedings**

9.      Although the Debtors initially did not believe that it would be necessary to pursue avoidance actions in light of their then-anticipated reorganization plan, the Debtors nonetheless preserved the actions for the possible future benefit of the Debtors' estate. To this end, the Debtors explored various alternatives to filing avoidance actions before expiration of the two-year statute of limitations, such as executing tolling agreements with potential defendants. The logistical challenges of circulating and executing agreements with such a large number of potential defendants, however, made that solution impractical. The Debtors, therefore, elected to commence the actions timely or take other measures in the ensuing months to avoid forfeiting causes of action that were of potentially significant value to the Debtors' estates. For those

---

[4] The Debtors initially estimated that they had more than 11,000 potential preference claims arising from transfers totaling approximately $5.8 billion (before taking into account potential defenses such as transfers made in the ordinary course of business).

reasons, and because the statutory limitations period for filing adversary proceedings was to expire on October 8, 2007, the Debtors filed the Preservation of Estate Claims Procedures Motion (Docket No. 8905) (the "Preservation Motion") on August 6, 2007.

10.     The purpose of the Preservation Motion was two-fold: on the one hand, it permitted the Debtors to preserve their right to pursue certain avoidance actions before the then-impending expiration of the two-year statute of limitations to file such actions; on the other hand, it established procedures to avoid having to force all potential defendants to retain counsel and defend against the adversary proceedings when, in fact, the Debtors initially anticipated that most of those cases would resolve upon the Debtors' emergence from chapter 11 and thus would never be pursued.

11.     On August 16, 2007, this Court entered the Preservation of Estate Claims Procedures Order (Docket No. 9105) (the "Preservation Order").  The Preservation Order (i) allowed the Debtors to file adversary proceeding complaints under seal, (ii) directed the clerk of court to delay issuing summonses unless and until the Debtors notified the clerk of the court of their intent to prosecute such actions, (iii) stayed each adversary action unless and until the Debtors made service of process on the respective defendants, and (iv) extended the deadline under Fed. R. Civ. P. 4(m) by which the Debtors would have to serve process to March 31, 2008, which was less than 60 days beyond the 120-day deadline, so that the complaints would not be subject to dismissal under Fed. R. Civ. P. 4(m).  Further, the Preservation Order expressly stated that the extension of the service deadline to March 31, 2008 was "without prejudice [to the Debtors' ability] to seek further extension" if appropriate.  *See* Preservation Order, ¶ 8.

12.     In accordance with the Preservation Order, the Debtors commenced 742 adversary proceedings by filing the complaints under seal.  The Debtors, however, did not intend

to prosecute the actions, or to use them for any purpose, while the Debtors focused on confirming a reorganization plan. The procedures set forth in the Preservation Order were designed to permit the Debtors to preserve their preference claims while otherwise maintaining the status quo among all parties-in-interest.

## C.    The Extension of Avoidance Action Service Deadline Order

13.    On January 25, 2008, the Debtors achieved confirmation of the First Amended Joint Plan of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession (Docket No. 11386) (the "Plan"). On January 25, 2008, the Court entered an order confirming the Plan (as modified) (Docket No. 12359), which became a final order on February 4, 2008.

14.    Having secured confirmation, the Debtors focused on consummating the Plan and emerging from chapter 11. To that end, the Debtors filed the Extension of Avoidance Action Service Deadline Motion (the "First Extension Motion"). The First Extension Motion sought a two-month extension of the deadline to serve the sealed adversary proceedings under the Preservation Order to May 31, 2008. Consistent with the Preservation Motion, the Debtors sought an extension to preserve the integrity of their supply base, which was vital to the Debtors' then-ongoing business operations and their ability to emerge from chapter 11. Moreover, the Debtors believed that the resources that they, the Court, the Clerk of Court, and the defendants would need to expend to issue and serve 742 summonses and complaints in the adversary proceedings on or before March 31, 2008 – and to thereafter prosecute such adversary proceedings – would not be in the best interest of the Debtors' estates, the Debtors' stakeholders, and other parties-in-interest at that time.

15.     On March 28, 2008, the Court entered the Extension of Avoidance Action Service Deadline Order (Docket No. 13277) (the "First Extension Order"), and extended the deadline by which the Debtors were to serve the summonses and complaints in the adversary proceedings to May 31, 2008.  The First Extension Order also provided that the relief granted "was without prejudice to the Debtors' right to seek further extensions."  *See* First Extension Order, ¶ 2.

**D.      The Postconfirmation Extension of Avoidance Action Service Deadline Order**

16.     In April of 2008, the Debtors announced that the EPCA investors refused to participate in a closing and to fund their Investment Agreement (as defined in the Plan) with Delphi.  Notwithstanding, the Debtors continued to work with their stakeholders to achieve their goal of emerging from chapter 11.  For that reason, on April 10, 2008, the Debtors filed the Postconfirmation Extension of Avoidance Action Service Deadline Motion (Docket No. 13361) (the "Second Extension Motion"), and sought an extension of the deadline to serve the adversary proceedings for 30 days after substantial consummation of the Plan or any modified Plan.

17.     On April 30, 2008, the Court granted the Debtors' request and entered the Postconfirmation Extension of Avoidance Action Service Deadline Order (Docket No. 13484) (the "Second Extension Order").  The Second Extension Order, like the Preservation Order and the First Extension Order, preserved the Debtors' right to seek future extensions, specifically providing that the extension of the service deadline to 30 days after substantial consummation of the Plan or any modified Plan was "without prejudice . . . to the Debtors' right to seek further extensions" if appropriate.  *See* Second Extension Order, ¶ 2.

**E.      The Supplemental Postconfirmation Extension of Avoidance Action Service Deadline Order**

18.     After the withdrawal of the EPCA plan investors, which collapsed the Debtors' effort to consummate the Plan at that time, the Debtors made several modifications to the Plan

and, from the spring of 2008 through the summer of 2009, developed procedures for re-soliciting votes on a new plan. During that period, however, the steady decline in the global economy and the consequent adverse effect upon global automotive production volumes placed a heavy burden on the Debtors' ability to develop a revised recapitalization plan and to consummate reorganization under the Plan, as modified.

19. On July 30, 2009, the Court entered an order approving the Plan, as then-modified (Docket No. 18707) (the "Modified Plan"), which, along with contemporaneous transactions, divided the Debtors' business among three separate entities: DPH Holdings, LLC, GM Components and DIP Holdco III. The Debtors anticipated that during the following months, a significant amount of time and resources would be necessary to implement the Modified Plan and to support the transition of operations among the three entities to which the Debtors' business was distributed.

20. As a result of the changed circumstances surrounding the Debtors' restructuring efforts and the new basis for that reorganization, it became apparent, as contemplated by the Preservation Order, that prosecution of certain of the Retained Adversary Proceedings would be in the best interests of the Debtors' estates. Of the 742 adversary proceedings filed under seal pursuant to the Preservation Order, the Debtors retained only 177 – the Retained Adversary Proceedings – under the Modified Plan. The Debtors did not believe, however, that they would have been able then to evaluate each of the Retained Adversary Proceedings – for example, by assessing the ongoing relationship with certain defendants and whether events since initiating the adversary proceedings have impacted estimated recoveries – and make a determination whether to pursue the Retained Adversary Proceedings within 30 days after substantial consummation of the Modified Plan, as required under the Second Extension Order.

21.     Consequently, the Debtors filed the Supplemental Postconfirmation of Avoidance Action Service Deadline Motion (Docket No. 18952) (the "Third Extension Motion") on October 2, 2009, and requested an extension of the then-existing deadline for serving the summonses and complaints in the Retained Adversary Proceedings to 180 days after substantial consummation of the Modified Plan.  On October 22, 2009, the Court granted the relief requested by the Debtors in the Third Extension Motion by entering the Supplemental Postconfirmation Extension of Avoidance Action Service Deadline Order (Docket No. 18999) (the "Third Extension Order"), which set April 5, 2010 as the deadline for serving the summonses and complaints in the Retained Adversary Proceedings.

22.     Since November 2009, the Reorganized Debtors have completed service with respect to almost 100 of the Retained Adversary Proceedings. The Reorganized Debtors have been promptly attempting to effect service of process in each of the Retained Adversary Proceedings as summonses have been issued.  The Reorganized Debtors have worked collaboratively with the Clerk of the Court, communicating on a regular basis by telephone and email.  The Clerk of the Court has been responsive to the Reorganized Debtors' needs for the issuance of summonses in their cases.  However, the sheer volume of the demands in the Reorganized Debtors' cases and the other cases pending in this Court has unavoidably delayed the issuance of summonses and, consequently, the service of process in 21 of the Sixty Two Adversary Proceedings (listed in Exhibit B attached hereto).

23.     In addition, 30[5] of the Sixty Two Adversary Proceedings involve defendants that are foreign corporations (the "Foreign Defendants").  The Reorganized Debtors immediately

---

[5] 25 of the Sixty Two Adversary Proceedings involve Foreign Defendants and are being prosecuted by Butzel Long, as listed in Exhibit C attached hereto.  5 of the Sixty Two Adversary

began the process of serving these Foreign Defendants as prescribed by the Hague Service Convention or the Inter-American Convention, as applicable, as required for each Foreign Defendant's specific jurisdiction. In addition, typically the Hague Service Convention and the Inter-American Convention require that the documents to be served upon such Foreign Defendant be translated in the official language of the foreign jurisdiction. Although the Reorganized Debtors have acted and continue to act promptly and diligently in their efforts to effectuate service upon such Foreign Defendants, service under the Hague Service Convention or the Inter-American Convention, as applicable, could take six to eight months and therefore cannot be accomplished by the Service Deadline.

24. The remaining 11 of the Sixty Two Adversary Proceedings (listed in Exhibit D attached hereto) generally involve situations where the Reorganized Debtors attempted service on a particular defendant but such service was returned. The Reorganized Debtors are working diligently to locate the defendant or any successors to defendants and continue to investigate the reasons surrounding the returned service.

**Relief Requested**

25. The Reorganized Debtors seek entry of an order extending the deadline by which the Reorganized Debtors would be required to serve the summons and complaint in the Sixty Two Adversary Proceedings. Specifically, the Reorganized Debtors request that the Service Deadline be extended by (a) 240 days from the date of the order with respect to the Foreign Defendants and (b) 30 days from the date of the order with respect to the remaining 32 adversary proceedings.

---

Proceedings involve Foreign Defendants and are being prosecuted by the Togut Firm, as listed in Exhibit A attached hereto.

## Basis For Relief

26.     A further extension of the time for service in the Sixty Two Adversary Proceedings is necessary for a variety of reasons.  First, due to the complex nature of effectuating service on the Foreign Defendants in accordance with the Hague Service Convention or the Inter-American Convention, as applicable, the Reorganized Debtors are at the mercy of several foreign jurisdictions which estimate that the process may take as long as 8 months.  Similarly, a further extension of the time for service in 21 of the Sixty Two Adversary Proceedings is necessary due to the unforeseen delay in the issuance of certain summons after the request therefor.[6]  In addition, the Reorganized Debtors' investigation concerning returned service is ongoing.  For the foregoing reasons, the Reorganized Debtors are unable to complete service by the Service Deadline.  The Reorganized Debtors seek immediate relief on this ground.

## Applicable Authority

27.     The Bankruptcy Rules and Federal Rules of Civil Procedure grant this Court discretion to adopt and implement guidelines which will aid the administration of adversary proceedings, including discretion to grant the proposed extension of the service of process deadline.  See Zapata v. City of New York, 502 F. 3d 192, 195 (2d Cir. 2007) (Rule 4(m) authorizes court to grant extensions of service period); In re Sheehan, 253 F.3d 507, 511 (9th Cir. 2001) ("[t]he time for service in an adversary proceeding may be extended under two different rules: Rule 4(m) of the Federal Rules of Civil Procedure, and Bankruptcy Rule 9006(b).").

28.     Bankruptcy Rule 9006(b)(1) provides for the enlargement of time to perform acts required under the Bankruptcy Rules: "[W]hen an act is required or allowed to be done at or within a specified period by these rules or by a notice given thereunder or by order of court, the

---

[6] With the exception of Duraswitch Industries, Inc. as noted in Exhibit B attached hereto.

court for cause shown may at any time in its discretion . . . order the period enlarged if the request therefor is made before the expiration of the period originally prescribed or as extended by a previous order . . . ." Fed. R. Bankr. P. 9006(b)(1).

29.     The broad discretion granted to courts under 11 U.S.C. § 105(a) permit the Court to hear this Motion on an expedited, emergency basis in advance of the Service Deadline which expires before the next scheduled omnibus hearing set for April 22, 2010.

30.     Moreover, Fed. R. Civ. P. 4(m), made applicable here by Bankruptcy Rule 7004(a), requires courts, upon a showing of good cause, to extend the period for service of process after the filing of a complaint.  See Bank of Cape Verde v. Bronson, 167 F.R.D. 370, 371-72 (S.D.N.Y. 1996) (good cause finding premised in large part upon plaintiff having requested extension before deadline expired).  Even absent a showing of good cause, the rule permits the Court in the exercise of its discretion to extend the time for service.  Mejia v. Castle Hotel, Inc., 164 F.R.D. 343, 345 (S.D.N.Y. 1996) (interpreting Rule 4(m) of the Federal Rules of Civil Procedure).

31.     Here, the extension request is being made before the expiration of the Service Deadline and will substantially aid in the efficient administration of the Sixty Two Adversary Proceedings.  The benefits of the additional time to the Court, the Reorganized Debtors and the defendants are apparent:  (a) the Clerk of the Court will have extended time that is needed to issue all of the remaining summonses in those 21 adversary proceedings listed in Exhibit B attached hereto; (b) the Court will not have to be burdened by motions to dismiss the Sixty Two Adversary Proceedings due to untimely service; (c) the Reorganized Debtors will not be burdened with having to spend time discussing issues of untimely service with defendants – time that could be much more effectively spent discussing substantive issues; (d) valuable claims in

favor of the Reorganized Debtors' estates will be maintained; and (e) the defendants in the Sixty Two Adversary Proceedings will not be burdened with having to incur legal fees pursuing the issue of untimely service.

32.     The Reorganized Debtors submit the foregoing benefits constitute good cause under Bankruptcy Rule 7004(m). Were the Court to find that good cause has not been shown, the Reorganized Debtors submit that the Court should exercise its discretion to grant the requested extensions of time.

33.     The Reorganized Debtors accordingly request that the Court extend the Service Deadline with respect to the Sixty Two Adversary Proceedings commenced in connection with the Preservation Order without prejudice to the Reorganized Debtors' right to seek further extensions of the deadline.

### Notice of Motion

34.     Notice of this Motion has been provided to each defendant at the most reliable address the Reorganized Debtors have been able to identify via overnight mail, and by filing the Motion on the docket in each of the Sixty Two Adversary Proceedings. Given the particular circumstances of this Motion, the Reorganized Debtors submit that no other or further notice is necessary under section 102(1) of the Bankruptcy Code.

WHEREFORE, the Reorganized Debtors respectfully request that this Court enter an order (i) granting the relief requested herein as set forth in the proposed order submitted herewith, and (ii) granting the Reorganized Debtors such other and further relief as the Court deems just and proper.

Dated: March 25, 2010
New York, New York

Respectfully submitted,

**BUTZEL LONG,**
a professional corporation

By: /s/ Eric B. Fisher
     Barry N. Seidel
     Eric B. Fisher
     Cynthia J. Haffey
380 Madison Avenue
22nd Floor
New York, New York 10017
Telephone: (212) 374-5359
Facsimile: (212) 818-0494
fishere@butzel.com

**TOGUT FIRM ACTIONS**

| Case No. | Defendant(s) | Foreign Jurisdiction(s) |
|---|---|---|
| 07-02348 | Johnson Controls, et al. | Germany |
| 07-02712 | Kostal, et al. | Mexico |
| 07-02541 | NGK, et al. | Japan |
| 07-02659 | Sumitomo, et al. | Japan |
| 07-02534 | Valeo, et al. | France, Germany |

**EXHIBIT B**

**SUMMONS REQUESTED BUT NOT YET ISSUED**

| Case No. | Defendant(s) |
|----------|--------------|
| 07-02135 | AutoCam |
| 07-02242 | Dupont Martl, Inc. |
| 07-02220 | Duraswitch Industries, Inc.[7] |
| 07-02484 | MSX International, Inc., et al. |
| 07-02540 | Owens Corning |
| 07-02697 | Progressive Molded Products |
| 07-02742 | Republic |
| 07-02769 | RSR/Ecobat |
| 07-02618 | Select Tool & Die Corp |
| 07-02619 | Setech Inc., et al. |
| 07-02639 | Spartech Polycom |
| 07-02661 | Summit Polymers Inc. |
| 07-02668 | Tata America International Corp. |
| 07-02672 | Tech Central |
| 07-02688 | Timken Company, et al. |
| 07-02539 | Vanguard Distributors |
| 07-02551 | Victory Packaging, L.P., et al. |
| 07-02556 | Vishay Americas, Inc. |
| 07-02597 | Wells Fargo Business, et al. |
| 07-02602 | Westwood Associates, Inc., et al. |
| 07-02605 | Wiegel Tool Works Inc. |

---

[7] In light of recent developments, the Reorganized Debtors must request a second summons to properly identify the correct defendant entity.

# EXHIBIT C

## FOREIGN DEFENDANTS

| Case No. | Defendant(s) | Foreign Jurisdiction(s) |
|---|---|---|
| 07-02270 | BP Amco Corp, et al. | United Kingdom |
| 07-02131 | Century Services | Canada |
| 07-02291 | Carlisle Mexico S.A. DE C. V. | Mexico |
| 07-02198 | Affinia Canada Corp, et al. | Canada, Mexico, Poland |
| 02-02203 | Dong Jin Motor Co., Ltd | Korea |
| 02-02262 | EDS Canada, Inc. | Canada |
| 02-02274 | Fin Machine Co. Ltd | United Kingdom |
| 07-02298 | Flextronics Int'l Asia Pacific | Singapore |
| 07-02357 | JVS EQTOS P/Autom Ind'l Ltd | Brazil |
| 07-02378 | Marquardt GmbH | Germany |
| 07-02435 | Norsk Hydro Canada, et al. | Canada |
| 07-02442 | Heraeus Metal Processing Ltd. | Ireland |
| 07-02449 | Hewlett Packard Mexico | Mexico |
| 07-02617 | Securitas Companies, et al. | Sweden |
| 07-02657 | Styner & Bienz Formtech | Switzerland |
| 07-02679 | TESA AG | Germany |
| 07-02688 | Timken France SAS | France |
| 07-02689 | Pro Tec Corporation | Canada |
| 07-02790 | Tyco Electronics AG | Sweden |
| 07-02714 | Kyocera | Japan |
| 07-02745 | M2M International | Canada |
| 07-02775 | Sasol Germany GmbH | Germany |
| 07-02783 | Freudenberg, et al. | Germany, United Kingdom, Mexico |
| 07-02799 | Osar SRL | Italy |
| 07-02800 | Robert Bosch GmbH | Germany |

# EXHIBIT D

## SERVICE RETURNED

| Case No. | Defendant(s) |
|----------|--------------|
| 07-02090 | Amsea |
| 07-02238 | Circle Plastics Products |
| 07-02260 | Dayton Tool Co. |
| 07-02312 | Fluent Inc. |
| 07-02374 | Hague WM Co. |
| 07-02720 | Laneko Engineering |
| 07-02756 | Magnesium Aluminum |
| 07-02527 | ND AMC |
| 07-02694 | Production Specialty Group |
| 07-02523 | UVA Machine Company |
| 07-02553 | Viking Polymer Solutions |

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

DPH HOLDINGS CORP., et al.,

                  Reorganized Debtors,

Chapter 11

Case No. 05-44481 (RDD)
(Jointly Administered)

Adv. Pro. No. 07-02074, et seq.

## ORDER UNDER SECTION 105(a) OF THE BANKRUPTCY CODE, FED. R. BANKR. P. 7004(a) AND 9006(b)(1), AND FED. R. CIV. P. 4(m) TO EXTEND DEADLINE TO SERVE PROCESS FOR CERTAIN AVOIDANCE ACTIONS

Upon the emergency motion, dated March 25, 2010 (the "Motion"), of DPH Holdings Corporation and certain of its affiliated reorganized debtors (collectively, the "Reorganized Debtors" or "Plaintiffs"), for an order under 11 U.S.C. § 105(a), Fed. R. Bankr. P. 7004(a) And 9006(b)(1), and Fed. R. Civ. P. 4(m) extending the deadline to serve process for certain avoidance actions commenced in connection with the Preservation Order[1] (Docket No. 9105), which deadline was previously extended to May 31, 2008 pursuant to the First Extension Order (Docket No. 13277), and further extended to 30 days after substantial confirmation of the Plan or any modified plan pursuant to the Second Extension Order (Docket No. 13361) and further extended to 180 days after substantial consummation of the Modified Plan pursuant to the Third Extension Order (Docket No. 18999); and upon the record of the hearing held on the Motion; and this Court having determined that the relief requested in the Motion as granted herein is in the best interests of the Reorganized Debtors, their estates, their creditors, and other parties-in-interest; and it appearing that no other or further notice is necessary; and after due deliberation thereon; and good and sufficient cause appearing therefor, it is hereby

---

[1] Capitalized terms used and not defined herein shall have the meanings ascribed to them in the Motion.

ORDERED, ADJUDGED, AND DECREED THAT:

1.        The Motion is GRANTED as provided herein;

2.        Paragraph 8 of the Preservation Order, as previously modified by the First Extension Order, the Second Extension Order and the Third Extension Order, is hereby further modified so that the time under the Federal Rule of Civil Procedure 4(m) by which the Reorganized Debtors must serve a defendant in the Sixty Two Adversary Proceedings with a summons and complaint is further extended until (a) 240 days from the date of this order with respect to the Foreign Defendants and (b) 30 days from the date of this order with respect to the remaining 32 adversary proceedings that are the subject of the Motion, without prejudice, however, to the Reorganized Debtors' right to seek further extensions and without prejudice to the right of any defendant to seek to shorten the deadline.  The Reorganized Debtors shall serve a copy of this order upon each defendant in any of the Sixty Two Adversary Proceedings either when the Reorganized Debtors serve a summons and complaint on such defendant or as soon thereafter as practicable.  All other provisions of the Preservation Order shall remain in effect.

3.        This order shall be deemed entered in each of the Sixty Two Adversary Proceedings.

4.        The Reorganized Debtors shall file a copy of this order in each of the Sixty Two Adversary Proceedings.

5.        This Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this order.

Dated: March __, 2010
       New York, New York

_____
     UNITED STATES BANKRUPTCY JUDGE